# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) JAMES D. BUCHANAN, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>(1) TURN KEY HEALTH CLINICS, LLC, )<br>(2) ROB FRAZIER, in his official capacity as )<br>Muskogee County Sheriff, )<br>(3) BOARD OF COUNTY COMMISSIONERS )<br>OF MUSKOGEE COUNTY, )<br>(4) DR. COOPER, and )<br>(5) KATIE MCCULLAR, LPN, )<br>)<br>Defendants. ) | Case No.: 18-CV-171-RAW<br><br>Jury Trial Demanded<br><br>Attorney Lien Claimed |

## COMPLAINT

COMES NOW, Plaintiff James D. Buchanan ("Plaintiff" or "Mr. Buchanan"), and for his causes of action against the above-named Defendants, alleges and states the following:

## PARTIES, JURISDICTION AND VENUE

1. Plaintiff is a citizen of Oklahoma.

2. Defendant Turn Key Health Clinics, LLC ("TURN KEY") is an Oklahoma limited liability company doing business in Muskogee County, Oklahoma. TURN KEY is a private correctional health care company that contracts with counties, including Muskogee County, to provide medical professional staffing, supervision and care in county jails. TURN KEY was at all times relevant hereto responsible, in part, for providing medical services, supervision and medication to Mr. Buchanan while he was in the custody of the Muskogee County Sheriff's Office ("MCSO"). TURN KEY was additionally responsible, in part, for creating and implementing policies,

practices and protocols that govern the provision of medical and mental health care to inmates at the Muskogee County Jail, and for training and supervising its employees. TURN KEY was, at all times relevant hereto, endowed by Muskogee County with powers or functions governmental in nature, such that TURN KEY became an agency or instrumentality of the State and subject to its constitutional limitations.

3. Defendant Rob Frazier ("Sheriff Frazier" or "Defendant Frazier") is the Sheriff of Muskogee County, Oklahoma, residing in Muskogee County, Oklahoma and acting under color of state law. Sheriff Frazier is sued purely in his official capacity. It is well-established, as a matter of Tenth Circuit authority, that a § 1983 claim against a county sheriff in his official capacity "is the same as bringing a suit against the county." *Martinez v. Beggs,* 563 F.3d 1082, 1091 (10th Cir. 2009). *See also Porro v. Barnes,* 624 F.3d 1322, 1328 (10th Cir. 2010); *Bame v. Iron Cnty.,* 566 F. App'x 731, 737 (10th Cir. 2014). Thus, in suing Sheriff Frazier in his official capacity, Plaintiff has brought suit against the County/MCSO.

4. Defendant Board of County Commissioners of Muskogee County ("BOCC" or the "County") is a statutorily-created governmental entity. 57 Okla. Stat. § 41 provides that "[e]very county, by authority of the *board of county commissioners* and at the expense of the county, *shall have a jail* or access to a jail in another county *for the safekeeping of prisoners lawfully committed.*" (emphasis added). BOCC must discharge its responsibilities to the Muskogee County Jail in a constitutional manner. BOCC is properly sued under the provision of the Oklahoma Governmental Tort Claims Act.

5. Defendant "Dr. Cooper" was at all times relevant hereto, an employee and/or agent of TURN KEY/the County/MCSO, who was, in part, responsible for overseeing Mr. Buchanan's health and well-being; and assuring that Mr. Buchanan's medical/mental health needs were met, during the time he was in the custody of MCSO. At all times pertinent, Dr. Cooper was acting within the scope of his/her employment and under color of state law. Dr. Cooper is being sued in his/her individual capacity.

6. Defendant Katie McCullar, LPN ("Nurse McCullar"), was, at all times relevant hereto, an employee and/or agent of TURN KEY/MCSO, who was, in part, responsible for overseeing Mr. Buchanan's health and well-being; and assuring that Mr. Buchanan's medical/mental health needs were met, during the time he was in the custody of MCSO. At all times pertinent, Nurse McCullar was acting within the scope of her employment and under color of state law. Nurse McCullar is being sued in her individual capacity.

7. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection of and to redress deprivations of rights secured by the Eighth and Fourteenth Amendments to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

8. The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

9. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367, since the claims form part of the same case or controversy arising under the United States Constitution and federal law.

10. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## STATEMENT OF FACTS

11. Paragraphs 1-10 are incorporated herein by reference.

12. On or about September 16, 2016, Mr. Buchanan, while riding a bicycle, was hit by an automobile and sustained multisystem trauma. He was hospitalized over the course of approximately six (6) weeks due to his injuries which included fractures to the spine requiring multiple surgical interventions. He was discharged from Saint John Medical Center on or about October 30, 2016. Upon discharge from Saint John, Mr. Buchanan was ambulatory.

13. On November 3, 2016, Mr. Buchanan was booked into the Muskogee County Jail ("Jail"). Upon booking, Mr. Buchanan reported to the booking personnel employed by the Muskogee County Sheriff's Office ("MCSO") and Turn Key Health Clinics, LLC ("Turn Key") that he had been in a motor vehicle accident on September 16, 2016. Mr. Buchanan further advised MCSO and Turn Key personnel that he was taking pain medication and that he was suffering from ***broken ribs, a collapsed lung,*** "burnt fingers" and ***neck problems***. The Turn Key booking nurse additionally observed that Mr. Buchanan was having increased discomfort with movement.

14. Based on his intake screening alone, it was clear that Mr. Buchanan required an

immediate referral to a physician and close medical monitoring. Nonetheless, and in spite of his serious medical history and acute injuries, the responsible MCSO and Turn Key personnel failed to place Mr. Buchanan in an area of the Jail for more frequent observation and provided him with no medical care or monitoring. He was not set for an appointment with a physician. Mr. Buchanan was not provided with a medical examination. He was provided with no diagnostic testing. Rather, and with negligence and deliberate indifference, MCSO and Turn Key personnel placed Mr. Buchanan in a general population pod with no medical treatment or assessment plan in place.

15. For a period of over ten (10) days Mr. Buchanan languished at the Jail. Mr. Buchanan's condition began to rapidly deteriorate. During this time, Mr. Buchanan received no medical attention whatsoever.

16. By November 4, 2016, just one day into his stay at the Jail, ***Mr. Buchanan had completely lost the ability to move his left arm.***

17. "Dr. Cooper" was notified of Mr. Buchanan's sudden paralysis on November 4, but did not see Mr. Buchanan, schedule him for an appointment or order that he be sent to a hospital.

18. By November 8, 2016, ***Mr. Buchanan had lost all mobility in his right arm.***

19. By as early as November 4, the pain in Mr. Buchanan's neck and extremities became unbearable. Mr. Buchanan complained to MCSO and/or Turn Key staff for days about the pain, decreased mobility and paralysis. Indeed, it was obvious, by November 4, that Mr. Buchanan was suffering from paralysis. These were signs of a serious, emergent and potentially life-threatening medical problem.

20. It is well-established that ***"paralysis is such an uncommon, serious, and traumatic event that even someone without any medical training would … recognize[] the situation as requiring immediate care by a doctor."*** *Fields v. Corizon Health, Inc.,* 490 F. App'x 174, 184 (11th Cir. 2012) (emphasis added) (citing *Simmons v. Cook,* 154 F.3d 805, 808 (8th Cir.1998) (noting that being wheelchair bound is a serious medical need to which even laymen are aware); *Blackmore v. Kalamazoo Cnty.,* 390 F.3d 890, 897 (6th Cir.2004) (quoting *Taylor v. Franklin Cnty.,* 104 Fed.Appx. 531, 538 (6th Cir.2004)) ("Such obvious signs of reoccurring incontinence and debilitating immobility were clear symptoms of a serious problem, even if Defendants did not choose to believe Plaintiff.")).

21. Thus, by November 4, when Mr. Buchanan first displayed signs of paralysis it was obvious, even to a layperson, without any medical training, that he was in need of immediate care by a physician. And by November 8, 2016, at the latest, when Mr. Buchanan lost all mobility in his right arm, it was obvious, even to a layperson, that he required immediate transport to the nearest emergency room. However, in deliberate indifference to Mr. Buchanan's serious medical needs, he did not see a doctor on November 4, after he lost movement of his left arm, and he was not sent to an emergency room (or seen by a doctor) on November 8, when he developed paralysis in his right arm.

22. Responsible MCSO and Turn Key detention and medical staff disregarded known, obvious and substantial risks to Mr. Buchannan's health and safety. And Mr. Buchannan suffered severe and unnecessary pain, a worsening of his condition, and life-altering and permanent injuries as a proximate result of this deliberate

6

indifference.

23. Mr. Buchanan was developing a cervical epidural abscess infection, and his condition deteriorated to the point that he became immobile.  After losing the use of his arms, Mr. Buchanan needed assistance with basic life activities, such as feeding, hydration and toileting.  As other inmates started to assist Mr. Buchanan with his everyday life needs (such as feeding and hydration), MCSO and Turn Key staff could not be bothered to provide him with any assistance.  He was still not provided with any medical care or evaluation, as he deteriorated before the MCSO and Turn Key staff's eyes.

24. From November 8 through November 13, 2016, Mr. Buchanan laid in his cell with full paralysis of both arms, in extreme and worsening pain, and without the ability to feed or hydrate himself.  Still, with deliberate indifference and reckless neglect, responsible MCSO and Turn Key staff provided no medical evaluation, referral, care or treatment to Mr. Buchanan.  No one at the Jail even took Mr. Buchanan's vital signs.  They did ***nothing*** as Mr. Buchanan edged closer and closer to the point of no return.

25. By November 13, 2016, ***Mr. Buchanan had lost all movement of his bilateral lower extremities.***  Thus, by November 13, Mr. Buchanan had paralysis of both arms ***and*** both legs.  Mr. Buchanan complained to MCSO and Turn Key staff that he was completely paralyzed and in need of medical attention.  Yet, even when Mr. Buchanan suffered paralysis of all four limbs, MCSO and Turn Key staff did not send him to the hospital, assure that he saw a physician, or provide any other medical care, supervision or referral, in deliberate indifference to Mr. Buchanan's serious medical needs.

26. As of November 13, after becoming quadriplegic at the Jail, Mr. Buchanan had yet to even see a physician.

27. At approximately 11:27 a.m. on November 14, 2016, Mr. Buchanan was finally seen by a nurse at the Jail. The nurse, Defendant Katie McCullar, LPN, noted that Mr. Buchanan ***"could not walk"*** and "complained of worsening pain and ***inability to move lower extremities…"*** Despite this dire situation, the nurse did not send Mr. Buchanan to the hospital. Instead, she called "Dr. Cooper" and advised him/her of Mr. Buchanan's condition. Amazingly, however, Dr. Cooper did not order immediate transportation to the hospital, either, in spite of the obvious need. Rather, Dr. Cooper placed Mr. Buchanan on the "provider list for the ***upcoming week…"*** With deliberate indifference and reckless neglect, Nurse McCullar and Dr. Cooper then left Mr. Buchanan paralyzed in his general population cell.

28. Approximately ***nine (9) hours later***, at around 8:10 p.m. on November 14, another nurse (whose name is illegible in the records) saw Mr. Buchanan in his general population pod. Mr. Buchanan was still unable to walk and his pain level had increased to "10" on a scale from one to ten. Mr. Buchanan had lost control of his bodily functions and was lying in his own urine. Only now did Dr. Cooper decide to send Mr. Buchanan to the hospital. But it was too late.

29. The nine (9) hour delay in sending Mr. Buchanan to the hospital is yet another example of deliberate indifference to his serious medical needs (by Dr. Cooper and Nurse McCullar) which resulted in unnecessary pain and a worsening of his condition.

30. After his admission to Hillcrest Medical Center, Mr. Buchanan was diagnosed with

quadriplegia and a cervical epidural abscess. A cervical epidural abscess is essentially a collection of pus (infected material) and germs between the outer covering of the brain and spinal cord and the bones of the spine or neck. He required admission to the ICU and multiple invasive surgeries.

31. As noted by Clinton Baird, M.D., a spinal surgeon,

> [Mr. Buchanan] is a 54-year-old gentleman who had a very complicated history… [H]e was involved in being struck by a car while riding bicycle several weeks ago. … ***He ended up finding himself in jail and it was during this time in jail that he had very significant clinical deterioration in his neurologic status. [I]t is obvious that he likely developed the beginnings of cervical epidural abscess infection*** in result of his critical illness [and] hospitalization, but then ***while in <u>jail</u>, he deteriorated significantly and his <u>clinical</u> <u>deterioration</u> <u>went</u> <u>unrecognized</u> <u>and</u> <u>untreated</u> until he was nearly completely quadriplegic.***

(emphasis added).

32. On November 15, 2016, Dr. Baird performed a spinal surgery on Mr. Buchanan. However, the damage had already been done. Mr. Buchanan remained paralyzed. To this day, Mr. Buchanan is confined to a wheelchair and needs assistance with everyday life activities. He is permanently disabled. He will need significant and costly assistance and services for the remainder of his life. His injuries and damages, resulting from deliberate indifference from Dr. Cooper, Nurse McCullar and other MCSO and Turn Key staff, as described above, are substantial, permanent and continuing.

33. The deliberate indifference to Mr. Buchanan's serious medical needs, as summarized *supra*, was in furtherance of and consistent with policies, customs and/or practices which the County/MCSO and TURN KEY promulgated, created, implemented or possessed responsibility for the continued operation of.

34. In recent years, Defendant Turn Key has grown into the largest private medical

9

care provider to county jails in the state. Turn Key has used its political connections to obtain contracts in a number of counties, including Muskogee County, Tulsa County, Garfield County and Creek County.

35. Turn Key and the contracting counties, including Muskogee County, utilize common industry cost-cutting techniques which create financial disincentives to send inmates to outside medical facilities. Under the contractual arrangements between Turn Key and the counties, there is a financial cap on the amount that can be spent on outside medical care, and any amount over this cap is incurred by Turn Key. Thus, the less inmates are sent to the emergency room, or other outside medical provider, the more money Turn Key pockets.

36. Turn Key also has a policy, practice or custom of understaffing county jails, including the Muskogee County Jail, with undertrained and underqualified medical personnel who are ill-equipped to evaluate, assess, supervise, monitor or treat inmates, like Mr. Buchanan, with complex and serious medical needs.

37. In addition, MCSO has utterly failed to train its detention staff in how to properly care for or supervise inmates, like Mr. Buchanan, with complex or serious medical needs, with deliberate indifference to the health and safety of those inmates.

38. Turn Key has no protocol or clear policy with respect to the medical monitoring and care of inmates with complex or serious medical needs, and provides no guidance to its medical staff regarding the appropriate standards of care with respect to inmates with complex or serious medical needs.

39. Turn Key's inadequate or non-existent policies and customs were a moving force behind the constitutional violations and injuries alleged herein.

40. Turn Key's corporate policies, practices and customs as described *supra*, have

resulted in deaths or negative medical outcomes in numerous cases, in addition to Mr. Buchanan's.

41. For instance, in June 2016, a nurse who worked for Turn Key at the Garfield County Jail allegedly did nothing to intervene while a hallucinating man was kept in a restraint chair for more than 48 hours. That man, Anthony Huff, ultimately died restrained in the chair.

42. An El Reno man died in 2016 after being found naked, unconscious and covered in his own waste in a cell at the Canadian County Detention Center, while ostensibly under the care of Turn Key medical staff. The Office of the Chief Medical Examiner found the man had experienced a seizure in the days before his death.

43. A man in the Creek County Jail, also under the purported "care" of Turn Key, died in September 2016 from a blood clot in his lungs after his repeated complaints -- over several days -- of breathing problems were disregarded by responsible staff, and he lost consciousness.

44. And another man, Michael Edwin Smith, encountered deliberate indifference to his serious medical needs at the Muskogee County Jail in the summer of 2016. Mr. Smith's experience at the Jail was eerily similar to Mr. Buchanan's. Like Mr. Buchanan, Mr. Smith became permanently paralyzed after Jail staff failed to provide him medical treatment after he repeatedly complained of severe pain in his back and chest, as well as numbness and tingling. Smith claims that cancer spread to his spine, causing a dangerous spinal compression, a condition that can cause permanent paralysis if left untreated. Smith asserts that he told the Turn Key-employed physician at the Jail that he was paralyzed, but the physician laughed at

Smith and told him he was faking. For a week before he was able to bond out of Jail, Smith was kept in an isolation cell on his back, paralyzed, unable to walk, bathe himself or use the bathroom on his own. He lay in his own urine and feces because Jail staff told Smith he was faking paralysis and refused to help him.

45. Mr. Smith's unconstitutional mistreatment put Turn Key, MCSO and the County on notice that the medical care and supervision provided by Turn Key and the detention staff was wholly inadequate and placed inmates like Mr. Buchanan at excessive risk of harm.  However, MCSO and the County failed to alleviate the known and obvious risks in deliberate indifference to the rights of inmates like Mr. Buchanan.

46. Turn Key has maintained a custom of inadequate medical care at a corporate level which poses excessive risks to the health and safety of inmates like Mr. Buchanan.

47. Prior to filing this Complaint, Buchanan sent notice to Muskogee County pursuant to the Oklahoma Governmental Tort Claims Act ("GTCA"), 51 O.S. § 156.  Ninety (90) days have passed since that time and Defendant has not approved Buchanan's claim in its entirety. Buchanan has filed a timely claim against Defendants within 180 days of the constructive denial date of the GTCA Claim Notice. Therefore, this action is timely brought pursuant to 51 O.S. § 157.

## CAUSES OF ACTION

### CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE EIGHTH AND/OR FOURTEENTH AMENDMENT(S) TO THE CONSTITUTION OF THE UNITED STATES
### (42 U.S.C. § 1983)

48. Paragraphs 1-47 are incorporated herein by reference.

### A.  Underlying Violations of Constitutional Rights

49. Defendants Dr. Cooper, Nurse McCullar (and other agents of MCSO and/or TURN KEY as described above, but who cannot yet be identified by name) knew there was a strong likelihood that Mr. Buchanan was in danger of serious personal harm due to his recent medical history, complaints of a collapsed lung, broken ribs, his progressing and worsening paralysis, his inability to perform everyday life functions without assistance and his inability to walk. As described *supra*, Buchanan had serious and emergent medical issues that were known and obvious to these Defendants and other unnamed MCSO and Turn Key employees/agents. For a period of many days, it was obvious that Mr. Buchanan needed immediate and emergent evaluation and treatment in an emergency room setting, but such services were denied, delayed and obstructed. Defendants Dr. Cooper, Nurse McCullar (and other agents of MCSO and/or TURN KEY as described above, but who cannot yet be identified by name) disregarded the known, obvious and substantial risks to Mr. Buchanan's health and safety.

50. Mr. Buchanan voiced his complaints and concerns of an emergent and life-threatening condition repeatedly over the course of his custody. And through his progressing and worsening paralysis, it was obvious, even to a layperson with no medical training, that Mr. Buchanan was in need of immediate and emergent medical attention from a qualified professional. Any person of reasonable prudence would determine that Plaintiff was at a serious risk for a greater injury that would require immediate evaluation and treatment outside of a correctional setting.

51. Mr. Buchanan's injuries and medical condition sharply and obviously deteriorated under the care of MCSO and TURN KEY staff.

52. However, Defendants Dr. Cooper, Nurse McCullar (and other agents of MCSO

and/or TURN KEY as described above, but who cannot yet be identified by name) repeatedly disregarded the known and obvious risks to Mr. Buchanan's health and safety. As documented herein, Defendants Dr. Cooper, Nurse McCullar (and other agents of MCSO and/or TURN KEY as described above, but who cannot yet be identified by name) did nothing as the state of Mr. Buchanan's injuries grew more severe and his health declined.

53. As a direct and proximate result of Defendants Dr. Cooper, Nurse McCullar (and other agents of MCSO and/or TURN KEY as described above, but who cannot yet be identified by name) conduct, Mr. Buchanan experienced unnecessary physical pain, a worsening of his condition, severe emotional distress, mental anguish, a loss of quality and enjoyment of life, terror, degradation, oppression, humiliation, embarrassment, as well as hospital, surgical and other medical expenses.

54. As a direct and proximate result of Defendants' conduct Mr. Buchanan has suffered damages and is entitled to pecuniary and compensatory damages. Mr. Buchanan is entitled to damages due to the Defendant's deprivation of his rights secured by the U.S. Constitution.

### B. Municipal/"Monell" Liability (TURN KEY)

55. Paragraphs 1-54 are incorporated herein by reference.

56. TURN KEY is a "person" for purposes of 42 U.S.C. § 1983.

57. At all times pertinent hereto, TURN KEY was acting under color of state law.

58. TURN KEY has been endowed by Muskogee County with powers or functions governmental in nature, such that TURN KEY became an instrumentality of the State and subject to its constitutional limitations.

59. TURN KEY is charged with implementing and assisting in developing the policies of MCSO with respect to the medical and mental health care of inmates at the Muskogee County Jail and has shared responsibility to adequately train and supervise its employees.

60. In addition, TURN KEY implements, maintains and imposes its own corporate policies, practices, protocols and customs at the Jail.

61. There is an affirmative causal link between the aforementioned acts and/or omissions of Defendants Dr. Cooper, Nurse McCullar (and other agents of MCSO and/or TURN KEY as described above, but who cannot yet be identified by name) in being deliberately indifferent to Mr. Buchanan's serious medical needs, health, and safety, and the above-described customs, policies, and/or practices carried out by TURN KEY (*See, e.g.,* ¶¶ 33-46, *supra*).

62. TURN KEY knew (either through actual or constructive knowledge), or it was obvious, that these policies, practices and/or customs posed substantial risks to the health and safety of inmates like Mr. Buchanan. Nevertheless, TURN KEY failed to take reasonable steps to alleviate those risks, in deliberate indifference to inmates', including Buchanan's, serious medical needs.

63. TURN KEY tacitly encouraged, ratified, and/or approved of the acts and/or omissions alleged herein.

64. There is an affirmative causal link between the aforementioned customs, policies, and/or practices and Plaintiff's injuries and damages as alleged herein.

   **C. Official Capacity Liability (Sheriff Frazier)**

65. Paragraphs 1-64 are incorporated herein by reference.

66. The aforementioned acts and/or omissions of Defendants Dr. Cooper, Nurse McCullar (and other agents of MCSO and/or TURN KEY as described above, but who cannot yet be identified by name) in being deliberately indifferent to Mr. Buchanan's health and safety and violating Mr. Buchanan's civil rights are causally connected with customs, practices, and policies which the County/MCSO promulgated, created, implemented and/or possessed responsibility for.

67. Such policies, customs and/or practices are specifically set forth in paragraphs 33-46, *supra.*

68. The County/MCSO, through its continued encouragement, ratification, approval and/or maintenance of the aforementioned policies, customs, and/or practices; in spite of their known and obvious inadequacies and dangers; has been deliberately indifferent to inmates', including Mr. Buchanan's, health and safety.

69. As a direct and proximate result of the aforementioned customs, policies, and/or practices, Mr. Buchanan suffered injuries and damages as alleged herein.

## NEGLIGENCE
## (TURN KEY)

70. Paragraphs 1-69 are incorporated herein by reference.

71. TURN KEY is vicariously liable for the acts of its employees and/or agents under the doctrine of *respondeat superior*.

72. TURN KEY, through its employees and/or agents at the Muskogee County Jail, owe a duty to Buchanan, and all other inmates incarcerated at the Muskogee County Jail, to tender medical treatment with reasonable care, taking caution not to cause additional harm during the course of medical treatment.

16

73. As described herein, TURN KEY, through its employees and/or agents, breached its duty to Buchanan, by failing to provide competent and timely medical treatment as required by applicable standards of care, custom and law.

74. TURN KEY staff failed to provide adequate or timely evaluation and treatment, even as Mr. Buchanan's known medical condition deteriorated and even though he had specifically requested medical attention while in MCSO's custody. Agents and/or employees of TURN KEY, failed to reasonably or timely treat Mr. Buchanan's serious medical condition, and prevented his timely transfer to a medical facility for emergent care.

75. TURN KEY's negligence is the direct and proximate cause of Mr. Buchanan's physical pain, severe emotional distress, mental anguish, loss of his health, and the damages alleged herein.

76. As a result of Defendants' negligence, Mr. Buchanan has suffered damages.

### Violation of Article II § 9 and Article II § 7 of the Constitution of the State of Oklahoma (BOCC, TURN KEY and/or Frazier)

77. Paragraphs 1-76 are incorporated herein by reference.

78. Article II § 9 of the Oklahoma Constitution prohibits the infliction of cruel and unusual punishment. Under the Oklahoma Constitution's Due Process Clause, Article II § 7, the right to be free from cruel and unusual punishment extends to pre-trial detainees who have yet to be convicted of a crime (in addition to convicted prisoners who are clearly protected under Article II § 9).[1]

---

[1] It is clearly established, as a matter of federal law, that pretrial detainees, who have not been convicted of a crime, have a constitutional right to medical and psychiatric care under the Due Process Clause of the Fourteenth Amendment at least as protective as for

17

79. The Constitution of the State of Oklahoma, under Article II § 9 and Article II § 7, provides a private right of action for Mr. Buchanan to be free from cruel and unusual punishment, which includes protection from the denial of needed medical care while in custody.

80. As described herein, Mr. Buchanan, while in the custody of MCSO, and under the care of TURN KEY, was denied necessary medical treatment. Defendants Dr. Cooper, Nurse McCullar (and other agents of MCSO and/or TURN KEY as described above, but who cannot yet be identified by name) violated Mr. Buchanan's rights by failing to provide him with prompt and adequate medical assessment, evaluation, treatment and supervision despite the obvious need.

81. At all times relevant, Defendants Dr. Cooper, Nurse McCullar (and other agents of MCSO and/or TURN KEY as described above, but who cannot yet be identified by name) were acting within the scope of their employment and under the supervision of and ultimate control of BOCC/TURN KEY/MCSO.

82. Defendants Dr. Cooper, Nurse McCullar (and other agents of MCSO and/or TURN KEY as described above, but who cannot yet be identified by name) denial, delay and obstruction of medical care and treatment to Mr. Buchanan violated Article II §§ 7 and 9 of the Constitution of the State of Oklahoma and was a direct and proximate cause of Mr. Buchanan's injuries and the damages alleged herein.

83. BOCC, TURN KEY and/or Sheriff Frazier are vicariously liable for the violations of the Oklahoma Constitution by employees and agents acting within the scope of their employment.

---

convicted prisoners. *See Bell v. Wolfish*, 441 U.S. 520, 545 (1979); *Martin v. Bd. of County Com'rs of County of Pueblo,* 909 F.2d 402, 406 (10th Cir. 1990).

WHERFORE, based on the foregoing, Plaintiff prays this Court grant him the relief sought, including but not limited to actual and punitive damages (for reckless disregard of his rights) in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing suit, the costs of bringing this action, a reasonable attorneys' fee, along with such other relief as is deemed just and equitable.

    Respectfully submitted,

    **SMOLEN, SMOLEN & ROYTMAN, PLLC**

    /s/Daniel E. Smolen
    Daniel E. Smolen, OBA #19943
    Robert M. Blakemore, OBA #18656
    701 S. Cincinnati Avenue
    Muskogee, Oklahoma 74119
    (918) 585-2667 P
    (918) 585-2669 F

    ***Attorneys for Plaintiff***