# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) JAMES D. BUCHANAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 18-CV-171-RAW |
| | ) | |
| (1) TURN KEY HEALTH CLINICS, LLC, | ) | JURY TRIAL DEMANDED |
| (2) ROB FRAZIER, in his official capacity as | ) | |
| Muskogee County Sheriff, | ) | |
| (3) BOARD OF COUNTY COMISSIONERS | ) | |
| OF MUSKOGEE COUNTY, OKLAHOMA, | ) | |
| (4) DR. COOPER, and | ) | |
| (5) KATIE MCCULLAR, LPN | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT, BOARD OF COUNTY COMMISSIONERS OF MUSKOGEE COUNTY'S MOTION FOR SUMMARY JUDGMENT

Respectfully submitted,
s/ Jordan L. Miller
Andy A. Artus, OBA No. 16169
Jordan L. Miller, OBA No. 30892
Taylor M. Tyler, OBA No. 33291
COLLINS, ZORN & WAGNER, P.C.
429 N.E. 50th, Second Floor
Oklahoma City, OK  73105
Telephone: (405) 524-2070
Facsimile: (405) 524-2078
Email: aaa@czwlaw.com
       jlm@czwlaw.com
       tmt@czwlaw.com

*Attorneys for Defendant*
*Board of County Commissioners of*
*Muskogee County*

September 4, 2019

## TABLE OF CONTENTS

TABLE OF CONTENTS....................................................................................................ii

TABLE OF AUTHORITIES ........................................................................................iii-iv

LIST OF ATTACHMENTS ...............................................................................................v-vi

LCvR 56.1(b) STATEMENT .............................................................................................1

ARGUMENT AND AUTHORITY .....................................................................................15

STANDARD OF REVIEW ................................................................................................15

I.      Plaintiff Does Not Have a Private Right of Action Under the Oklahoma
        Constitution and the Defendant is Immune from Suit for Such Claim.......................16-20

CERTIFICATE OF SERVICE .........................................................................................21

# TABLE OF AUTHORITIES

**Cases**

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664 .................................................................. 15

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 ................................................................ 15

*Barrios v. Haskell County Public Facilities Authority; Foutch v. Turn Key Health*,
432 P.3d 233 ...................................................................................................................... 17

*Bosh v. Cherokee Cnty. Bldg. Auth.*, 305 P.3d 994 .......................................... 16, 17, 18

*Celotex Corp. v. Catrett*, 477 U.S. 317 ............................................................................ 15

*Conaway v. Smith*, 853 F.2d 789 ..................................................................................... 16

*Cone v. Longmont United Hosp. Ass'n.*, 14 F.3d 526 .................................................... 15

*Fuller v. Odom*, 741 P.2d 449 .......................................................................................... 18

*Gibson v. Copeland*, 13 P.3d 989 .................................................................................... 18

*Hall v. Bellmon*, 935 F.2d 1106 ....................................................................................... 15

*Horton v. State*, 915 P.2d 352 ......................................................................................... 18

*Medina v. State*, 871 P.2d 1379 ................................................................................. 18, 19

*Purvey v. State*, 905 P.2d 770 ......................................................................................... 19

*Redding v. State*, 882 P.2d 61 ......................................................................................... 19

*Roemer v. Pub. Serv. Co. of Colo.*, 911 F. Supp. 464 ..................................................... 15

*Salazar v. City of Oklahoma City*, 976 P.2d 1056 ........................................................... 18

*State v. Burris*, 894 P.2d 1122 ......................................................................................... 19

**Federal Rules**

Rule 56(a) ..................................................................................................................... 1, 15

**Constitutional Provisions**

Okla. Const. Art. 2, §§ 7 and 9 ............................................................................. 16, 17, 18

Okla. Const. Art. 2, § 30 .................................................................................................. 16

**Local Rules**

LCvR 56.1(b) ..................................................................................................................... 1

iii

**Oklahoma Statutes**

Okla. Stat. tit. 51, § 152(14) ................................................................. 16

Okla. Stat. tit. 51, § 152.1(A) ............................................................... 18

Okla. Stat. tit. 51, § 152.1(B) ............................................................... 18

Okla. Stat. tit. 51, § 153 ................................................................. 16, 17

Okla. Stat. tit. 51, § 153(B) ................................................................. 17

Okla. Stat. tit. 51, § 155 .................................................................... 18

Okla. Stat. tit. 51, § 155(18) ............................................................... 20

Okla. Stat. tit. 51, § 155(25) ....................................................... 17, 18, 19

## LIST OF ATTACHMENTS

Exhibit 1 – Deposition of James Buchanan

Exhibit 2 – Official Oklahoma Traffic Report

Exhibit 3 – Deposition of Todd Wilcox

Exhibit 4 – Deposition of Stan Buchanan

Exhibit 5 – August 10, 2019 Deposition of Dr. Clinton Baird

Exhibit 6 – Booking and Release Sheet

Exhibit 7 – Medical Questionnaire

Exhibit 8 – Deposition of Ryan Hamil

Exhibit 9 – Provider Order

Exhibit 10 – Deposition of William Cooper

Exhibit 11 – Deposition of Rosemary Kotas

Exhibit 12 – Medication Administration Record

Exhibit 13 – Deposition of Marshal Dugan

Exhibit 14 – February 6, 2019 Deposition of Rob Frazier

Exhibit 15 – November 5, 2016 Sick Call List

Exhibit 16 – Deposition of Katie McCullar

Exhibit 17 – Deposition of Charles Quick

Exhibit 18 – November 6, 2016 Sick Call list

Exhibit 19 – November 10, 2016 Sick Call List

Exhibit 20 – November 11, 2016 Video of phone conference with Stan Buchanan

Exhibit 21 – November 11, 2016 Medical Visitor Log

Exhibit 22 – Deposition of Lloyd Bickel

Exhibit 23 – Deposition of Jeremy Garvin

Exhibit 24 – Katie McCullar's November 14, 2016 Medical Progress Note

Exhibit 25 – Rosemary Kotas' November 14, 2016 Medical Progress Note

Exhibit 26 – MCDC Policy 15-1

Exhibit 27 – MCDC Policy 15-3

Exhibit 28 – MCDC Policy 15-5

Exhibit 29 – MCDC Policy 15-6

Exhibit 30 – Audio recording of phone call to EMSA

Exhibit 31 – Contract for Medical Staffing, Section 1.3, 1.14, 1.23, 5.1

Exhibit 32 – Deposition of Flint Junod

Exhibit 33 – Intake form

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| (1) JAMES D. BUCHANAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 18-CV-171-RAW |
| | ) | |
| (1) TURN KEY HEALTH CLINICS, LLC, | ) | JURY TRIAL DEMANDED |
| (2) ROB FRAZIER, in his official capacity as | ) | |
| Muskogee County Sheriff, | ) | |
| (3) BOARD OF COUNTY COMISSIONERS | ) | |
| OF MUSKOGEE COUNTY, OKLAHOMA, | ) | |
| (4) DR. COOPER, and | ) | |
| (5) KATIE MCCULLAR, LPN | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT BOARD OF COUNTY COMMISSIONERS'
MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT**

Defendant Board of County Commissioners of Muskogee County ("Defendant Board") moves the Court to grant summary judgment in its favor pursuant to Federal Rule of Civil Procedure 56(a) with regard to Plaintiff's claims against it. In support thereof, Defendant Board submits the following Brief:

**LCvR 56.1(b) STATEMENT**

1. Plaintiff James Buchanan ("Buchanan" or "Plaintiff") has been in and out of the Muskogee County Jail for years, with 13 separate stays in the Jail. (See Exhibit 1, Deposition of James Buchanan, 78:13-78:21).

2. Buchanan was in a bicycle accident on September 16, 2016, where his bicycle was hit by an automobile from behind. (See Exhibit 1, Deposition of James Buchanan, 19:13-19:19, 89:5-89:23; Exhibit 2, Official Oklahoma Traffic Report).

3.   Buchanan claims to have both short-term and long-term memory problems, which date back to the time of this bicycle accident.  Buchanan's brother Stan, however, testified that Buchanan has had memory problems since he was at least 13 or 14 years old, or even younger. (See Exhibit 1, Deposition of James Buchanan, 18:3-18:13; Exhibit 3, Deposition of Todd Wilcox, 151:16-152:14, 152:18-152:22; Exhibit 4, Deposition of Stan Buchanan, 71:14-72:2)

4.   Buchanan was taken to Muskogee Regional Hospital for a few hours, before being transferred to St. John's in Tulsa, for 14 days, where he was discharged on September 30, 2016. (See Exhibit 1, Deposition of James Buchanan, 97:24-98:25).

5.   From the bicycle accident, Buchanan suffered two broken ribs on the left side, a collapsed left lung, and neck issues (which did not require surgery at St. Johns).  While at St. John's, his lung had re-inflated, and there was no treatment necessary for his broken ribs.  (See Exhibit 1, Deposition of James Buchanan, 100:14-103:7, 106:3-108:5).

6.   While at St. John's, the infection that eventually led to a cervical epidural abscess in his spine were not noticed by medical personnel, even though it was already existence. (See Exhibit 5, August 10, 2019 Deposition of Dr. Clinton Baird, 124:16-125:15).

7.   Buchanan did not return to work after being released from the hospital on September 30, 2016.  (See Exhibit 1, Deposition of James Buchanan, 109:11-109:16).

8.   Buchanan also did not bother to see his doctor, once his short-term pain medication ran out 20 days after his release from St. John's.  He instead chose on his own volition to begin seeing a chiropractor. (See Exhibit 1, Deposition of James Buchanan, 122:1-122:21, 151:1-151:16).

9.   After his release from St. John's, Buchanan absconded from court at an October 24, 2016 hearing on three criminal cases (including two felonies): CM-2015-232, CF-2014-62, and CF-

2

2016-367, causing his bond to be revoked by Judge Adair, and a bench warrant to be issued. (See Exhibit 1, Deposition of James Buchanan, 116:1-116:19, 122:24-123:1, 145:9-145:19).

10. Buchanan turned himself into the Muskogee County Jail on November 3, 2016.  (See Exhibit 1, Deposition of James Buchanan, 117:3-117:15; Exhibit 6, Booking and Release Sheet).

11. At the time he entered the Muskogee County Jail, his broken ribs had healed, and he no longer had a collapsed lung.   (See Exhibit 1, Deposition of James Buchanan, 137:22-138:15, 291:24-292:2).

12. Upon his entry into the Muskogee County Jail, Buchanan told jail personnel that he had broken ribs, a collapsed lung, burnt fingers, and "neck problems".  (See Exhibit 1, Deposition of James Buchanan, 147:19-148:14; Exhibit 7, Medical Questionnaire).

13. Buchanan also informed jail personnel that he was taking "anti-inflammatory muscle relaxers pain meds" via a Dr. Trinidad. (See Exhibit 1, Deposition of James Buchanan, 150:20-151:3).

14. As of November 3, 2016, Buchanan says he had no indication whatsoever that any sort of paralysis was developing.  (See Exhibit 1, Deposition of James Buchanan, 327:10-327:24).

15. A medical screening was thereafter performed by Turn Key Health Clinics, LLC ("Turn Key") nurse Rosemary Kotas on November 3, 2016, where it was again noted that Buchanan had broken ribs, a collapsed lung, burnt fingers, and "neck problems".  (See Exhibit 1, Deposition of James Buchanan, 153:3-156:21; Exhibit 3, Deposition of Todd Wilcox, 154:22-155:9; Exhibit 33, Intake form).

16. As of that date (November 3, 2016), Buchanan says he was able to move both his arms and both his legs.  (See Exhibit 1, Deposition of James Buchanan156:19-156:23).

3

17. On November 4, 2016, Buchanan was brought by Jailer Ryan Hamil ("Hamil") to Turn Key medical staff, where he was seen by a nurse named Deana Ayers ("Ayers").  Ayers spoke with Turn Key Dr. William Cooper ("Cooper"), who prescribed Buchanan with an anti-inflammatory pain reliever, Naproxen 500 mg, twice a day.  (See Exhibit 1, Deposition of James Buchanan, 175:14-176:24; Exhibit 8, Deposition of Ryan Hamil, 16:7-16:25;   Exhibit 9. Provider Order; Exhibit 10, Deposition of William Cooper, 147:1-147:13).

18. On November 4, 2016, Buchanan says he was still able to move both his arms and both his legs.  (See Exhibit 1, Deposition of James Buchanan, 178:8-178:20).

19. In Buchanan's remaining time at the Muskogee County Jail, Hamil (who worked the north tower which covered cellblock 1, and received intercom messages) has no memory of any other interaction with Buchanan, of receiving any complaints from Buchanan or from any other inmates about Buchanan, or of hearing of any inmate who was paralyzed or unable to use his appendages.  (See Exhibit 8, Deposition of Ryan Hamil, 18:19-19:16, 21:17-21:24, 22:1-22:17, 48:15-49:4).

20. Buchanan was administered Naproxen by nurses twice a day every day, in the morning and at night, with only one exception (19 total times). On each of these occasions, the nurses came up to the bean hole at the door, and gave the medication directly to Buchanan, making sure that his mouth was open, and that the medication was swallowed. Buchanan had the opportunity to speak to the nurses on all of these occasions.  Moreover, on each of these occasions, Buchanan had to stand and walk up to the bean hole to obtain the medication. (See Exhibit 1, Deposition of James Buchanan, 181:12-181:22, 182:4-183:9;   Exhibit 11, Deposition of Rosemary Kotas, 226:8-227:21, Exhibit 12, Medication Administration Record; Exhibit 8, Deposition of Ryan Hamil, 49:15-49:22; Exhibit 3, Deposition of Todd Wilcox, 159:6-159:19; Exhibit 13,

Deposition of Marshal Dugan, 58:12-59:11, 63:7-63:13; Exhibit 10, Deposition of William Cooper, 156:2-157:6).

21. The Sick Call List from November 5, 2016 does not include Buchanan, which indicates he did not request to see any nurses on that date.  (See Exhibit 14, February 6, 2019 Deposition of Rob Frazier, 120:3-120:11; Exhibit 15, November 5, 2016 Sick Call List)

22. On at least five times, (November 4, 5, 6, 10, and 11) LPN Rosemary Kotas ("Kotas") administered medication directly to Buchanan, and never thought there was an emergency situation.  If she had thought there was, she would have contacted Dr. Cooper.  (See Exhibit 11, Deposition of Rosemary Kotas, 227:23-229:8; Exhibit 12, Medication Administration Record).

23. Also on at least four occasions (on November 6, 7, 11, and 14), LPN Katie McCullar (aka Katie Smith) ("McCullar") administered medication directly to Buchanan.  (See Exhibit 16, Deposition of Katie McCullar, 199:11-201:3, 203:5-203:18, 222:14-222:18; Exhibit 12, Medication Administration Record).

24. On November 6, 7, and 11, McCullar does not recall Buchanan saying anything to her about paralysis, or being unable to move, and McCullar does not believe there was any sort of emergency situation. (See Exhibit 16, Deposition of Katie McCullar, 203:16-204:24, 222:14-222:18).

25. Additionally, McCullar has no memory of any jailer or other nurse saying anything to her about Buchanan before the morning of November 14th.  (See Exhibit 16, Deposition of Katie McCullar, 205:20-205:25, 223:20-224:3).

26. Neither Buchanan, nor Marshal Dugan, can name any jailers at all that they dealt with in the Muskogee County Jail.  (See Exhibit 1, Deposition of James Buchanan, 184:2-184:3, 188:5-188:8; Exhibit 13, Deposition of Marshal Dugan, 77:10-77:14).

27. Buchanan never filled out a medical request in writing, or had another inmate fill one out on his behalf, during his entire time at the Muskogee County Jail.  (See Exhibit 1, Deposition of James Buchanan, 187:13-187:18; Exhibit 13, Deposition of Marshal Dugan 74:18-74:24; Exhibit 17, Deposition of Charles Quick, 40:17-40:24).

28. Buchanan does not know when he started to lose feeling in his arms, despite his Amended Complaint saying he lost feeling in his left arm on November 4, 2016.  (See Exhibit 1, Deposition of James Buchanan, 197:19-197:22; Dkt. 25, Paragraph 16).

29. Buchanan was put on the Sick Call List on November 6, 2016 for shoulder pain, and Buchanan agrees he may have only complained about shoulder pain at the time due to the fact that he was sleeping on a mat on the floor (which is permissible under the Oklahoma Department of Human Services Jail Standards).  The Sick Call List documentation says nothing about Buchanan losing feeling in his limbs, or becoming paralyzed. (See Exhibit 1, Deposition of James Buchanan, 204:22-207:21, Exhibit 18, November 6, 2016 Sick Call List).

30. Buchanan was moved into Cellblock 1 on November 7, 2016.  (See Exhibit 13, Deposition of Marshal Dugan, 47:23-48:8; Exhibit 17, Deposition of Charles Quick, 48:10-48:17).

31. The Sick Call List from November 10, 2016 does not include Buchanan, which indicates he did not request to see any nurses on that date either.  (See Exhibit 14, February 6, 2019 Deposition of Rob Frazier, 121:8-121:17; Exhibit 19, November 10, 2016 Sick Call List).

32. Buchanan visited and spoke with his brother Stan Buchanan at the jail on November 11, 2016.  Buchanan claims that he could not use his arms at the time of this call, but video of the encounter clearly shows otherwise: that he is not paralyzed and *can* use his arms.  Additionally, he can use his legs in the video, and does not even complain of any issues related to his legs in

the video. (See Exhibit 1, Deposition of James Buchanan, 271:24-273:13; Exhibit 3, Deposition of Todd Wilcox, 153:12-154:4; Exhibit 20, November 11, 2016 Video of visit with Stan Buchanan; Exhibit 17, Deposition of Charles Quick, 60:6-60:9; Exhibit 4, Deposition of Stan Buchanan, 73:7-73:15, 75:6-75:11).

33. Also in the conversation with his brother, Buchanan spends much of the conversation talking about taking care of his plants at home, and talking about his bicycle.  (See Exhibit 13, Deposition of Marshal Dugan, 68:15-68:20; Exhibit 20, Video of phone conference with Stan Buchanan).

34. In the video, Stan Buchanan suggested that he might come visit his brother again, but he did not actually bother visiting his brother in the Muskogee County Jail again after the November 11th conversation. Stan Buchanan additionally did not take anything his brother said in the conversation seriously enough to actually do anything, or say anything to any jail personnel about his brother's condition.   (See Exhibit 20, Video of phone conference with Stan Buchanan, Exhibit 4, Deposition of Stan Buchanan, 80:18-80:22, 95:12-95:18).

35. On November 11, 2016, Buchanan was seen by Turn Key LPN Rosemary Kotas (who had been a nurse for 33 years), who noted that he had decreased range of motion in his upper and lower extremities, limited range of motion in his neck, as well as pain.  (See Exhibit 1, Deposition of James Buchanan, 207:23-210:25; Exhibit 21, November 11, 2016 Medical Note; Exhibit 11, Deposition of Rosemary Kotas, 220:5-220:19, 240:20-240:22).

36. Kotas did not believe that there was an emergency situation when she saw Buchanan on the 11th.  If she had thought there was an emergency situation, she would have made sure he received additional medical care.  (See Exhibit 11, Deposition of Rosemary Kotas, 60:16-60:23, 222:16-222:18, 223:24-224:2).

7

37. If Turn Key nursing staff did not believe there was an emergency situation, but also could not handle a situation with standard protocols, Turn Key procedure was that they were supposed to schedule an appointment with Dr. Cooper, who came in once per week. (See Exhibit 10, Deposition of William Cooper, 152:8-152:25, 159:22-160:37).

38. The Turn Key LPN's had more medical training than any of the jailers on staff at the Muskogee County Jail (including training on what is and what is not an emergency), and the jailers were entitled to rely on the nurses' medical opinions.  (See Exhibit 11, Deposition of Rosemary Kotas, 224:4-225:5; Exhibit 10, Deposition of William Cooper, 139:20-140:9; Exhibit 16, Deposition of Katie McCullar, 195:22-196:20, 214:25-215:10; Exhibit 22, Deposition of Lloyd Bickel, 110:7-110:14; Exhibit 23, Deposition of Jeremy Garvin, 117:2-117:9; Exhibit 14, February 6, 2019 Deposition of Rob Frazier, 124:4-124:18; Exhibit 5, August 10, 2019 Deposition of Dr. Clinton Baird, 161:13-161:24).

39. Jail staff members had no reason to believe that Turn Key nursing staff members were providing Buchanan with improper or substandard care. (See Exhibit 10, Deposition of William Cooper, 138:18-138:22).

40. Jail staff did not prevent Turn Key from providing Buchanan with medical care.  (See Exhibit 10, Deposition of William Cooper, 138:24-139:3).

41. Jail staff members were entitled to send inmates to the emergency room via EMS if they thought it was obvious nursing staff members were not providing appropriate medical care in an emergency situation.  (See Exhibit 22, Deposition of Lloyd Bickel, 110:15-110:21)

42. As she did not think it was an emergency situation as of her November 11th visit, Kotas put Buchanan on the sick call list, and Buchanan was scheduled to see Dr. Cooper on his next weekly round, on November 15, 2016.  (See Exhibit 1, Deposition of James Buchanan, 212:20-

212:25; Exhibit 3, Deposition of Todd Wilcox, 161:10-161:13; Exhibit 10, Deposition of William Cooper, 137:6-137:15, 159:7-159:10).

43. On the morning of November 14, 2016, Turn Key LPN Katie McCullar was contacted by a jailer via walkie-talkie, who told her that Buchanan was complaining.  McCullar went to the pod to see Buchanan, and she saw that he was sitting at a table, had muscle tone, was not flaccid, and he was able to hold himself upright.  (See Exhibit 16, Deposition of Katie McCullar, 206:1-209:24).

44. At 11:27 am, McCullar documented that Buchanan was complaining of worsening pain and inability to move his lower extremities, and tingling in his legs, but not paralysis.  (See Exhibit 16, Deposition of Katie McCullar, 210:1-211:2; Exhibit 24, Katie McCullar's November 14, 2016 Medical Progress Note).

45. McCullar contacted Dr. Cooper, and Dr. Cooper instructed her to again place Buchanan on the list to be seen by Dr. Cooper on the 15th (even though he was already on the list).  McCullar did not think there was an emergency situation at this time.  (See Exhibit 10, Deposition of William Cooper, 138:9-138:13, 150:21-151:11; Exhibit 16, Deposition of Katie McCullar,  212:24-212:25,  214:9-214:12,  216:1-216:18,  221:24-222:1;  Exhibit  24,  Katie McCullar's Medical Progress Note).

46. Later on November 14, 2016, Buchanan intentionally urinated on himself for the first and only time in order to get the attention of a jailer, and Buchanan informed an unnamed jailer that he had urinated.  (See Exhibit 1, Deposition of James Buchanan, 215:20-216:22, 220:25-221:2; Exhibit 13, Deposition of Marshal Dugan, 50:18-50:25).

47. When Buchanan intentionally urinated on himself, he claims he had only just lost the use of his legs within the previous 24-36 hours.  (See Exhibit 1, Deposition of James Buchanan, 220:25-221:8; Exhibit 13, Deposition of Marshal Dugan, 62:14-62:20).

48. Buchanan claims he was thereafter seen immediately by a Turn Key nurse, who the unnamed jailer called.  (See Exhibit 1, Deposition of James Buchanan, 219:9-219:21).

49. Turn Key Nurse Rosemary Kotas agrees that a jailer informed her of Buchanan's situation on November 14th at 8:10 p.m., at which point Kotas saw urine on the floor, and performed vitals.  Based on the urination, elevated heart rate, decreased oxygen saturation (which is an unreliable number), and the appearance of pain, Kotas determined for the first time that it was an emergency situation, and contacted Dr. Cooper via telephone, who also agreed it was an emergency situation.  (See Exhibit 11, Deposition of Rosemary Kotas, 221:2-221:10, 221:22-221:25,  223:14-223:23,  229:9-229:16,  235:6-235:15,  245:24-246:17;  Exhibit  25, Rosemary Kotas' November 14, 2016 medical progress note; Exhibit 16, Deposition of Katie McCullar, 221:11-221:17).

50. Dr. Cooper was not *required* to give approval to send an inmate to the emergency room; Rosemary Kotas, Katie McCullar, or any other nurse could have done so, even without his approval, if they believed there was an emergency situation.  (See Exhibit 10, Deposition of William  Cooper, 150:4-150:20, 151:12-151:16; Exhibit 16, Deposition of Katie McCullar, 223:9-223:15).

51. Prior to this moment on the evening of November 14th, Kotas had never informed any jail staff member, or been informed by any jail staff member, that Buchanan was in an emergency situation, or needed to go to the hospital immediately. Nor had any such conversations occurred

with Dr. Cooper and jail staff. (See Exhibit 11, Deposition of Rosemary Kotas, 235:236:16; Exhibit 10, Deposition of William Cooper, 161:24-162:21).

52. Kotas then contacted the EMSA ambulance service, who transported Buchanan to the hospital on the evening of November 14, 2016. (See Exhibit 1, Deposition of James Buchanan, 220:20-221:25; Exhibit 11, Deposition of Rosemary Kotas, 223:22-223:23; Exhibit 30, Audio recording of phone call to EMSA).

53. Even on November 14, 2016, neither Kotas nor McCullar knew that Buchanan had a cervical epidural abscess, which is an uncommon condition that is not one of the first things that springs to mind upon seeing a decreased range of motion.  (See Exhibit 11, Deposition of Rosemary Kotas, 230:21-231:20; Exhibit 10, Deposition of William Cooper, 134:19-135:18; Exhibit 16, Deposition of Katie McCullar, 211:24-212:23, 215:18-215:25; Exhibit 5, August 10, 2019 Deposition of Dr. Clinton Baird, 143:24-144:11).

54. Buchanan was transferred again from the local hospital to a larger and more specialized hospital, Hillcrest Medical Center, on November 15, 2016, and he had surgery performed by Dr. Clinton Baird on November 16, 2016 on his spine.  Even by the time of the surgery (2 days after his release from the Muskogee County Jail), the surgery was done within the 24-72 hour window of time to prevent complete paralysis and allow Buchanan to recover.  (See Exhibit 5, August 10, 2019 Deposition of Dr. Clinton Baird, 136:15-137:6).

55. Buchanan is now able to care for himself, including walking, going up steps, bathing himself, going to the bathroom on his own, cooking and cleaning for himself, and even riding a bicycle. (See Exhibit 1, Deposition of James Buchanan, 264:12-264:23, 305:19-306:2, 309:2-309:16, 327:25-328:1; Exhibit 4, Deposition of Stan Buchanan, 90:5-91:7).

56. The Muskogee County Detention Center ("MCDC") had a policy to provide adequate health care services, including complete emergency medical, dental, and mental health care, to all inmates regardless of their financial status. The policy provided that outside medical resources and specialized treatment was available, including access to adequately equipped and licensed hospital emergency rooms and other appropriate health facilities in the community. (Exhibit 26, MCDC Policy 15-1).

57. The MCDC had policies to provide inmates with access to routine and emergency medical care. The policies provided a "Sick Call" procedure by which inmates could request routine medical care, and provided for a medical clinic twice a week at the facility by licensed medical personnel to see inmates requesting care through the "Sick Call" procedure. The policies provided that medical staff would be on duty at the facility 24 hours a day, and inmates would have access to emergency medical care for acute illnesses and unexpected health care needs which could not be deferred until the next scheduled sick call. The policies also provided for in-cell care for illness or diagnosis requiring bed rest or limited observation or management, but not requiring hospital admission. The policies further provided for access to outside medical specialists where medically necessary. (Exhibit 27, MCDC Policy 15-3; Exhibit. 28, MCDC Policy 15-5).

58. The MCDC had a policy requiring the administration of inmate prescription medication in compliance with the orders of a licensed physician or designated medical authority. (Exhibit 29, MCDC Policy 15-6).

59. It was the policy and custom at the MCDC to provide inmates medical care, and to contact Turn Key medical if a jailer thought that an inmate needed medical care. It would be against policy and custom to ignore an inmate's medical needs, or to deny an inmate medical

12

care. (See Exhibit 8, Deposition of Ryan Hamil, 19:17-21:3; Exhibit 3, Deposition of Todd Wilcox, 164:18-164:22, 166:19-166:22; Exhibits 26-29, MCDC Policies; Exhibit 22, Deposition of Lloyd Bickel, 110:23-111:1; Exhibit 14, February 6, 2019 Deposition of Rob Frazier, 124:9-125:6).

60. It was also the policy of the MCDC to provide adequate healthcare services, including complete emergency, medical, dental and mental healthcare to all inmates in the jail regardless of their financial status. It was additionally the policy of the MCDC to provide inmates with medical and healthcare services that met standards. Further, it was the policy of the MCDC to send inmates to the emergency room in emergency situations. If healthcare was provided that did not meet standards (including any failure to send inmates to the emergency room in an emergency situation) this would be a violation of policy. (See Exhibit 16, Deposition of Katie McCullar, 229:18-231:6; Exhibits 26-29, MDCD Policies; Exhibit 22, Deposition of Lloyd Bickel, 111:2-111:4; Exhibit 23, Deposition of Jeremy Garvin, 117:10-117:20; Exhibit 14, February 6, 2019 Deposition of Rob Frazier, 124:9-125:6).

61. There is no requirement in Oklahoma that County Jails have Licensed Practical Nurses (LPN's) on-site at all, and no requirement that County Jails have on-site medical staff 24/7. Nevertheless, the Muskogee County Jail, unlike the vast majority of County Jails, had, via Turnkey, LPN's on-site 24/7, as well as an Advanced Registered Nurse Practitioner or Doctor at the site twice per week, and a medical provider (Dr. Cooper) on call 24 hours per day. (See Exhibit 3, Deposition of Todd Wilcox, 155:16-155:25; Exhibit 10, Deposition of William Cooper, 139:4-139:25, 140:11-141:7, 149:16-150:3; Exhibit 22, Deposition of Lloyd Bickel, 109:8-109:20; Exhibit 23, Deposition of Jeremy Garvin, 118:5-118:21; Exhibit 31, Contract for

Medical Staffing, Section 1.14; Exhibit 32, Deposition of Flint Junod, 44:13-45:9, 47:17-48:13, 88:1-88:24).

62. In contracting with Turnkey, the MCDC picked a higher and more expensive option with 24-hour coverage to provide optimal medical care for inmates.  (See Exhibit 22, Deposition of Lloyd Bickel, 108:5-119:20; Exhibit 23, Deposition of Jeremy Garvin, 118:5-118:21; Exhibit 31, Contract for Medical Staffing, Section 1.14).

63. Some county jails in Oklahoma do not have on-site medical staff at all, which is approved by the Oklahoma Department of Health. (See Exhibit 32, Deposition of Flint Junod, 89:7-89:25).

64. Additionally, there is no requirement in Oklahoma that County Jails have an LPN do an initial assessment.  Nevertheless, at the Muskogee County Jail, LPN's performed the initial assessments. (See Exhibit 3, Deposition of Todd Wilcox, 156:1-156:21).

65. The Muskogee County Jail had no control over Turn Key's staffing decisions, as Turn Key staff were employees/agents of Turn Key, not Muskogee County.   (See Exhibit 23, Deposition of Jeremy Garvin, 115:15-115:20; Exhibit 31, Contract for Medical Staffing, Section 1.14).

66. Under the terms of the Contract, Turn Key kept medical records of the inmates of its own, separate from the Jail's own files on the inmates. (Exhibit 31, Contract for Medical Staffing, Section 1.23)

67. Under the terms of the Contract with Turn Key, Turn Key was responsible for medical care of all inmates in the facility. (See Exhibit 31, Contract for Medical Staffing).

68. Under the terms of the Contract with Turn Key, Turn Key was required to comply with the Oklahoma Department of Human Services Jail Standards.  (Exhibit 31, Contract for Medical Staffing, Section 1.3; Exhibit 32, Deposition of Flint Junod, 91:11-92:2).

69. Under the terms of the Contract with Turn Key, Turn Key is an independent contractor, and not an agent of the County.  (Exhibit 31, Contract for Medical Staffing, Section 5.1; Exhibit 32, Deposition of Flint Junod, 94:15-95:24).

<u>**ARGUMENT AND AUTHORITY**</u>

**STANDARD OF REVIEW**

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment is not a disfavored procedural shortcut, but an integral part of the federal rules as a whole. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986), the Supreme Court held that "there is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party."  The Court further held that "if the evidence is merely colorable, or not significantly probative, summary judgment may be granted." *Id.*   In addition, the *Anderson* Court stated that "the mere existence of a scintilla of evidence in support of a plaintiff's position will be insufficient; there must be evidence on which a jury could reasonably find for the plaintiff." *Id.* A movant's summary judgment burden may properly be met by reference to the lack of evidence in support of plaintiff's position. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex*, 477 U.S. at 325).

15

Furthermore, as described by the court in *Cone v. Longmont United Hosp. Ass'n.*, 14 F.3d 526 (10th Cir. 1994), "Even though all doubts must be resolved in (the nonmovant's) favor, allegations alone will not defeat summary judgment." *Cone* at 530 (citing *Celotex*, 477 U.S. at 324). *See also Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991); *Roemer v. Pub. Serv. Co. of Colo.*, 911 F. Supp. 464, 469 (D. Colo. 1996).   Moreover, "(i)n response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

## PROPOSITION I:

### Plaintiff Does Not Have a Private Right of Action Under the Oklahoma Constitution and the Defendant is Immune from Suit for Such Claim

Plaintiff asserts a sole claim against Defendant Board for the alleged denial of rights under Article II, §§ 7 and 9 of the Oklahoma Constitution premised upon the alleged denial of adequate medical care. (Dkt. 25, pp. 16-17).   However, Plaintiff simply does not have a private right of action for denial of inmate medical care under the Okla. Const. Art. II, §§ 7, 9, or any other provision of the Oklahoma Constitution.

In *Bosh v. Cherokee Cnty. Bldg. Auth.*, 305 P.3d 994 (Okla. 2013), the Oklahoma Supreme Court recognized a limited private right of action for excessive force under Okla. Const. Art. II § 30, independent of the Oklahoma Governmental Tort Claims Act ("OGTCA"). However, after the Oklahoma Supreme Court's decision in *Bosh*, the Oklahoma legislature amended the OGTCA to bring Oklahoma constitutional claims within its ambit. *See* Okla. Stat. tit. 51, § 152(14) and Okla. Stat. tit. 51, § 153 (as amended April 21, 2014).[1]   In that regard, the

---

[1] These amendments were enacted prior to the accrual of Plaintiff's claims in this matter. (Dkt. 25, ¶¶ 12-32).

16

Oklahoma legislature amended the definition of "tort" under the OGTCA to mean "a legal wrong, independent of contract, involving violation of a duty imposed by general law, statute, *the Constitution of the State of Oklahoma*, or otherwise…." Okla. Stat. tit. 51, § 152(14) (emphasis added).  Moreover, the legislature also amended Okla. Stat. tit. 51, § 153 of the OGTCA to read, in pertinent part:

> The liability of the state or political subdivision under The Governmental Tort Claims Act *shall be exclusive and shall constitute the extent of tort liability of the state, a political subdivision or employee arising from common law, statute, the Oklahoma Constitution, or otherwise*.

 Okla. Stat. tit. 51, § 153(B) (emphasis added).

In *Barrios v. Haskell County Public Facilities Authority; Foutch v. Turn Key Health*, 432 P.3d 233 (Okla. 2018), the Oklahoma Supreme Court was requested to respond to substantially identical certified questions from the United States District Court for the Eastern District of Oklahoma and the United States District Court for the Northern District of Oklahoma – *i.e.* whether inmates have a private right of action for the denial of medical care under Okla. Const. Art. II, §§ 7 and 9 despite the tort immunity provided by § 155(25). *Id*. at 234-35. The Oklahoma Supreme Court responded: "Because the Legislature responded to our decision in *Bosh* by amending the Governmental Tort Claims Act ("GTCA"), 51 O.S. §§ 151 *et seq*., to clarify that the State's immunity from suit extended even to so-called 'constitutional' torts, we answer the first question 'no'." *Id*. at 235 (footnote omitted).  In so holding, the court reasoned:

> The Legislature's amendment of the GTCA to specify that the GTCA applies even to tort suits alleging violations of constitutional rights was an exercise of the Legislature's long-recognized power to define the scope of the State's sovereign immunity, which forecloses our ability to expand the common law in a manner that would conflict with statutory law. Thus, because these "constitutional" torts are now clearly "torts" governed by the GTCA, the GTCA's specific prohibition against tort suits arising out of the "operation or maintenance of any prison, jail or correctional facility" bars the claims at issue here.

*Id*. at 238-39 (foot notes omitted).  The court further concluded:

> …[B]ecause the Legislature amended the GTCA after our decision in *Bosh* to specify that the GTCA applies even to tort suits alleging violations of constitutional rights, we conclude that the GTCA's specific prohibition against tort suits arising out of the "operation or maintenance of any prison, jail or correctional facility" is a legislative determination to which we must now defer.

*Id*. at 240 (footnote omitted).

As such, Plaintiff's state law constitutional claim is governed by the provisions of the OGTCA, Okla. Stat. tit. 51, § 151, *et seq*., which is the exclusive remedy by which an injured plaintiff may recover against an Oklahoma governmental entity in tort. *Fuller v. Odom*, 741 P.2d 449, 451 (Okla. 1987). In the OGTCA, Okla. Stat. tit. 51, § 152.1(A), the legislature adopted and reaffirmed sovereign immunity for the State, its political subdivisions, and all employees acting within the scope of their employment. This immunity is subject to a limited waiver to the extent and the manner specifically provided for by the provisions of the other sections of the OGTCA. Okla. Stat. tit. 51, § 152.1(B); *see also Salazar v. City of Oklahoma City*, 976 P.2d 1056, 1066 (Okla. 1999). The Defendant is a political subdivision under the OGTCA. *See* Okla. Stat. tit. 51, § 152(11)(c). Accordingly, the Defendant may be liable for its torts or the torts of its employees in situations where private persons or entities would also be liable under state law. *Salazar*, at 1066. However, the OGTCA also preserves certain limitations and exemptions from its general waiver of liability. *See Salazar, supra.; see also* Okla. Stat. tit. 51, § 155. In other words, the state and its political subdivisions do not always consent to suit, but rather retain their essential sovereign immunity in certain cases. Okla. Stat. tit. 51, § 155(25) of the OGTCA provides complete tort immunity for losses resulting from the "Provision, equipping, operation or maintenance of any prison, jail or correctional facility…" "The exemption from tort liability as

provided in Section [155(25)] is all inclusive for tort claims." *Gibson v. Copeland*, 13 P.3d

989, 992 (Okla. Ct. App. 2000) (citing *Medina v. State*, 871 P.2d 1379 (Okla. 1993); *see*

*also Horton v. State*, 915 P.2d 352, 354 (Okla. 1996) (noting that the state and its political

subdivisions are "immune from tort liability to inmates . . . for the infinite numbers of

activities that are involved in prison operations"). According to *Medina, supra.*, and its

progeny, the exemption applies to preserve sovereign immunity against virtually any loss or

injury, whether to an inmate or other person, resulting from virtually any act undertaken in the

operation of a jail. For example, in *Medina*, the Oklahoma Supreme Court found:

> Reading the three clauses of [§ 155(25)] together reveals an intent to
> withhold the waiver of sovereign immunity for any loss or injury, whether
> to an inmate or other person, resulting from the operational level acts
> required to furnish the services of a penal institution, including the
> construction and repair of the facility; the security of the facility; the
> employment of personnel; the utilities and furnishings of the facility; the
> food, clothing, items for hygiene and other basic personal items needed by
> inmates or other persons; the educational, rehabilitative, communicational,
> recreational and **medical and health services** or any other service provided
> for inmates or other persons; the assignment of an inmate to a facility or a
> cell; and the release of an inmate; with the single exception of loss to persons
> not in custody caused by an accident involving a motor vehicle operated by
> the Department of Corrections.

*Id.*, 871 P.2d at 1384, n.13 (emphasis added); *see also Purvey v. State*, 905 P.2d 770 (Okla.

1995); *State v. Burris*, 894 P.2d 1122 (Okla. 1995). Indeed, in *Redding v. State*, 882 P.2d 61

(Okla. 1994), the Oklahoma Supreme Court, in discussing the scope of its holding in *Medina*,

expressly held that the "legislative intent of [§ 155(25)] is to protect the state from liability for

loss resulting **from any and all actions** of officers and employees of a penal institution." *Id*. at

63 (emphasis added). Here, because Plaintiff's claims arise on the context of the operation of the

MCDC, the exemption clearly applies, and the Defendant is immune from suit for Plaintiff's

claims.

Moreover, because some of the alleged deprivations of Plaintiff's constitutional rights were committed by the employees of the Defendant's contractor, Turn Key (See Undisputed Fact No. 69), the Defendant Board is further immune from suit for Plaintiff's state constitutional claims pursuant to Okla. Stat. tit. 51, § 155(18) of the OGTCA which provides complete tort immunity for losses resulting from "An act or omission of an independent contractor or consultant or his or her employees, agents, subcontractors or suppliers or of a person other than an employee of the state or political subdivision at the time the act or omission occurred…"

Accordingly, Defendant is entitled to summary judgment with regard to Plaintiff's state law constitutional claims.

WHEREFORE, premises considered, Defendant Board of County Commissioners of Muskogee County respectfully requests the Court to grant summary judgment in its favor and to dismiss all of Plaintiff's claims against it with prejudice to the re-filing thereof.

Respectfully submitted,

s/ Jordan L. Miller
Jordan L. Miller, OBA No. 30892
Andy A. Artus, OBA No. 16169
COLLINS, ZORN & WAGNER, P.C.
429 N.E. 50th, Second Floor
Oklahoma City, OK  73105
Telephone: (405) 524-2070
Facsimile: (405) 524-2078
Email: jlm@czwlaw.com
          aaa@czwlaw.com

*Attorney for Defendant Board of Commissioners of Muskogee County, Oklahoma and Sheriff Rob Frazier*

## CERTIFICATE OF SERVICE

I hereby certify that on September 4, 2019, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Daniel E. Smolen, via electronic mail at: danielsmolen@ssrok.com
Robert M. Blakemore, via electronic mail at: bobblakemore@ssrok.com
Bryon D. Helm, via electronic mail at: bryonhelm@ssrok.com
701 South Cincinnati Avenue
Tulsa, OK 74119

*Attorneys for Plaintiff*

Austin J. Young, via electronic mail at: ayoung@johnsonhanan.com
Sean P. Snider, via electronic mail at: ssnider@johnsonhanan.com
JOHNSON HANAN VOSLER
  HAWTHORNE AND SNIDER
9801 N. Broadway Extension
Oklahoma City, OK 73114

*Attorneys for Turn Key Health*
*Clinics, Inc., Dr. Cooper and*
*Katie McCullar, LPN*

s/ Jordan L. Miller
Jordan L. Miller