Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

```
JAMES D. BUCHANAN,         )
        Plaintiff,         )
                           )
vs.                        ) No. 18-CV-171-RAW
                           )
TURN KEY HEALTH CLINICS,   )
LLC, et al,                )
        Defendant.         )
```

VIDEO DEPOSITION OF
ROSEMARY KOTAS

DATE:   FEBRUARY 23, 2019

REPORTER:   MARISA SPALDING, CSR, RPR

Spalding Reporting Service, Inc.
1611 South Utica Avenue, Box 153
Tulsa, Oklahoma 74104
(918) 284-2017

Exhibit 11

Page 60

1   blank, then what happens next?
2      A   That's day shift.
3      Q   Okay.  What would day shift do?
4      A   I don't know.
5      Q   Okay.  Would day shift be responsible
6   for actually scheduling the visit with the
7   doctor or the nurse administrator?
8            MR. YOUNG:  Object to form.
9      Q   (By Mr. Smolen)  Or nurse practitioner?
10     A   I don't -- I don't know.
11           MR. MILLER:  Same objection.
12           THE WITNESS:  I don't know.  They --
13  it was day shift.  I just made the list.  After
14  that, it was day shift.  It was day shift.  I
15  don't -- I don't know what they did.
16     Q   (By Mr. Smolen)  Well, who was -- who
17  was supposed to do -- like if this was -- let's
18  say on 11 --  is this your handwriting,
19  11/11/16, James Buchanan?
20     A   It might be.
21     Q   Okay.  Does it -- does it seem to be
22  consistent with your handwriting?
23     A   It does.
24     Q   Okay.  And so you're working -- let's
25  look back at your time record, okay?  What time

Page 220

```
 1     A    Where are you at?
 2     Q    A ten is a term he's providing; is that
 3  correct?
 4     A    A ten is the term he was providing.
 5     Q    Can you go to Exhibit 9 -- Plaintiff's
 6  Exhibit 9.  Do you see there on the 11th there
 7  is the line that you -- you wrote in it.  Do you
 8  see that?
 9     A    Yes.
10     Q    Okay.  The one above it, I just wanted
11  to clarify.  Is that also you?  Did you write
12  that as well --
13     A    No, sir.
14     Q    -- the line above it?  Is that someone
15  else?
16     A    Yes, sir.
17     Q    You believe that's a different person's
18  handwriting?
19     A    Yes, sir.
20     Q    And thus unrelated to this completely;
21  is that fair, to Mr. Buchanan?
22     A    I don't know because I don't see the
23  patient's name.  It's been blocked out.
24     Q    Fair enough.  It was not written at the
25  same time because it's not your handwriting?
```

Electronically signed by Marisa Spalding (401-062-868-9834)                    72f95da8-2410-4061-ba6d-148f28674cb2

Page 221

1   A   No, it was not written at the same time.
2   Q   Do you recall on the 14th when
3   Mr. Buchanan went to the hospital, who was the
4   jailer who spoke to you about Mr. Buchanan?
5   A   I -- I can't recall.
6   Q   Okay. Do you know whether it was a
7   female or a male?
8   A   No, I can't recall.
9   Q   Okay.
10  A   I'm sorry.
11  Q   Mr. Buchanan in his deposition described
12  a large woman guard with short black hair. Does
13  that help you or jog your memory? Does that
14  tell you anything about who this particular
15  guard was?
16  A   No, sir.
17  Q   Okay. Do you recall any guard or
18  detention officer saying anything to you in
19  particular about Mr. Buchanan other than what
20  we've discussed here today?
21  A   No, sir.
22  Q   You agree that some member of the
23  detention staff spoke to you on the 14th to get
24  you to see him on the 14th, correct?
25  A   Yes, sir.

Page 222

1    Q   Do you recall any other guards at any
2  point saying anything to you about Mr. Buchanan
3  and about his condition?
4    A   No, sir.
5    Q   The county policies that were provided
6  to you earlier, the detention center's policies
7  --
8    A   Yes, sir.
9    Q   -- is this the first time you've seen
10 them as far as you know?
11   A   As far as I know, yes.
12   Q   So do you have any opinion one way or
13 the other about whether county policies were
14 violated or not violated?
15   A   No, sir.
16   Q   On the 11th, you saw Mr. Buchanan,
17 correct, and you wrote that note?
18   A   Yes, sir.
19   Q   I want to be clear on this because,
20 frankly, I think I heard a few answers.  Do you
21 know whether you wrote any other document
22 regarding your seeing him on the 11th or do you
23 not know?
24            MR. SMOLEN:  Objection to the form.
25 Asked and answered numerous times.

1   THE WITNESS: I don't recall.
2   Q   (By Mr. Miller) Okay. If you thought
3   it was an emergency on the 11th, would you have
4   done something?
5   A   Yes, sir.
6           MR. SMOLEN: Objection, speculation.
7           MR. MILLER: Object to the form.
8   The vast majority of the questions asked earlier
9   were speculation, so I -- I think I can ask this
10  question.
11          MR. SMOLEN: Well, that's not up to
12  you to decide. I'm going to make the objection.
13          MR. MILLER: Okay.
14  Q   (By Mr. Miller) You did believe that it
15  was an emergency on the 14th, right?
16  A   Yes, sir.
17  Q   Is that why you contacted Dr. Cooper?
18  A   Yes, sir.
19  Q   And he agreed with you that it was an
20  emergency?
21  A   Yes, sir.
22  Q   And the ER was contacted, correct?
23  A   Yes, sir.
24  Q   If you had believed it was an emergency
25  on the 11th, would you have done something

Electronically signed by Marisa Spalding (401-062-868-9834)                    72f95da8-2410-4061-ba6d-148f28674cb2

Page 224

1  similar?
2      A   Yes, sir.
3          MR. SMOLEN:  Objection.
4      Q   (By Mr. Miller)  Now you've discussed
5  your training a bit, how long you've been a
6  nurse.  Is part of your nursing training
7  learning what's an emergency and what's not?
8      A   Yes, sir.
9      Q   Do you have more medical training than
10 anyone else on the night shift at the Muskogee
11 County Jail, any of the other detention officers
12 --
13         MR. SMOLEN:  Objection, speculation.
14     Q   (By Mr. Miller)  -- as far as you know?
15     A   As far as I know, I was the only
16 licensed medical personnel on night shift.
17     Q   Are you aware of anyone else that had
18 remotely the same level of training or
19 experience as you?
20     A   I have no -- no clue if anybody had any.
21     Q   Sure.  They're relying on your judgment
22 for medical purposes, correct?
23     A   Yes, sir.
24     Q   That's why you're there, right?
25     A   Yes, sir.

```
                                                   Page 225
 1     Q   You're the best trained person on that
 2  night shift?
 3           MR. SMOLEN:  Objection to the form.
 4     Q   (By Mr. Miller)  Correct?
 5     A   Yes, sir.
 6           MR. SMOLEN:  Same objection.
 7     Q   (By Mr. Miller)  Ms. Goatley -- Lela
 8  Goatley, was she ever there on night shift?
 9     A   No.
10     Q   Did you ever --
11           MR. SMOLEN:  Objection, outside the
12  scope.
13     Q   (By Mr. Miller)  Did you ever personally
14  meet her?
15           MR. SMOLEN:  Outside the scope.
16           THE WITNESS:  I did not.
17           MR. YOUNG:  You entered the time
18  card as an exhibit.
19           MR. SMOLEN:  Uh-huh.
20           MR. YOUNG:  It's in there.
21     Q   (By Mr. Miller)  Okay.  Do you recall at
22  any point any other medical personnel being on a
23  night shift with you at any time?
24           THE WITNESS:  Just for training.
25     Q   (By Mr. Miller)  Okay.  Do you know who
```

Page 226

 1   those people were?
 2       A    Amity.  She was a nurse.
 3       Q    Okay.
 4       A    And there was a -- I can't remember her
 5   name, but she was a -- she was a medical
 6   assistant and she -- she trained me on the med
 7   cart.
 8       Q    Okay.  Can you turn to Plaintiff's
 9   Exhibit 1, Page 7?  It says DDR 1, 007.  It's a
10   Medication Administration Record.
11       A    Okay.
12       Q    These are some initials of when
13   Naproxen, as I understand it, was administered
14   to Mr. Buchanan.  You can see there at the
15   bottom it's a little cut off, but do you see the
16   name James Buchanan?
17       A    Yes.
18       Q    It's a little hard to read.  I think I
19   know.  I just want you to tell me on the record.
20   Which of these are your initials?
21       A    The one for the p.m. shift of the 4th of
22   November; the evening shift, 5th of November;
23   evening shift, 6th of November; evening shift --
24   uh -- evening shift, 10th and 11th.
25       Q    Is that it?

Page 227

1   A   And I may have -- on the 10th morning,
2   that looks likes my initial.  I may have started
3   the morning med pass because the nurse called in
4   and she was going to be a few minutes late.
5   Q   Okay.
6   A   She was behind traffic or something.
7   Q   So --
8   A   That would -- we would -- I would
9   initially just initiate the first med pass so it
10  wouldn't be late because they had a lot of
11  things to do on day shift.
12  Q   So you would agree that on at least five
13  occasions, maybe six, you administered
14  medication, meaning Naproxen?
15  A   Yes, sir.
16  Q   And on each of those occasions, did you
17  use the procedure and protocol that you
18  described earlier in terms of their opening
19  their mouths and making sure the medication went
20  down?
21  A   Yes.
22  Q   And on none of those occasions, did you
23  believe it was an emergency; is that correct?
24          MR. SMOLEN:  Objection to the form.
25  She doesn't have any memory of any of this.

```
                                                   Page 228
 1       Q   (By Mr. Miller)  Well, you administered
 2   --
 3           MR. SMOLEN:  She already testified
 4   to that.
 5       Q   (By Mr. Miller)  You administered the
 6   medication five times.  If you believed it was
 7   an emergency --
 8       A   That's what it says, uh-huh.
 9           MR. SMOLEN:  Yeah, but she doesn't
10   have any memory of it.  Objection.
11           MR. MILLER:  Object to the form,
12   please.
13       Q   (By Mr. Miller)  If you --
14           MR. SMOLEN:  Form objection.
15       Q   (By Mr. Miller)  If you believed it was
16   an emergency, would you have done what did you
17   on the 14th in contacting Dr. Cooper?
18           MR. SMOLEN:  Objection, form,
19   speculation.
20           THE WITNESS:  Yes.
21       Q   (By Mr. Miller)  Okay.  And you didn't
22   do that on any of the five prior times you saw
23   him?
24           MR. SMOLEN:  Objection, assumes
25   facts not in evidence.
```

```
                                            Page 229
 1              THE WITNESS:  Called Dr. Cooper?
 2      Q   (By Mr. Miller)  Correct.
 3      A   No.
 4      Q   Okay.
 5      A   Not to the best of my recollection.
 6      Q   Sure.  If you had called Dr. Cooper,
 7   would you have made a note of it?
 8      A   Yes.
 9      Q   Okay.  The urination.  You recall seeing
10   urine on the floor on the evening of the 14th?
11              MR. SMOLEN:  Objection, asked and
12   answered.
13              THE WITNESS:  I wrote it down.  If I
14   wrote it down, then I had seen it that day.
15   But, now, if you asked me what he was in, I
16   couldn't tell you.
17      Q   (By Mr. Miller)  Do you have any
18   specific memory of him urinating on the ground
19   at any time prior to the 14th?
20      A   No, sir.
21      Q   Do you know whether he urinated because
22   he had lost control of his ability to regulate
23   his urine or whether he did it voluntarily?
24      A   There's no way to tell that --
25      Q   Okay.
```

```
 1      A    -- because it was after the fact.
 2      Q    Okay.  You'd agree it's possible for
 3   people to urinate on the floor voluntarily,
 4   correct?
 5      A    Well, yeah, if they don't want to use
 6   the bathroom, they can pee anywhere.
 7      Q    Sure.  There was a term -- something
 8   along the lines of increased discomfort in
 9   movement that is written down on one of the
10   notes that we've described here.  Does that
11   sound like a term you would use rather than an
12   term an -- an inmate would use, in your opinion?
13           MR. SMOLEN:  Objection to the form,
14   speculation.
15      Q    (By Mr. Miller)  Does that sound like a
16   term that a nurse would use or does that sound
17   like the phrasing that an inmate would use?
18           MR. SMOLEN:  Objection, speculation.
19           THE WITNESS:  That's medical
20   terminology.
21      Q    (By Mr. Miller)  Did you know as of the
22   evening of the 14th of November that
23   Mr. Buchanan had an epidural cervical abscess?
24      A    No, sir.
25      Q    Okay.  Is that something that's common
```

Page 231

```
 1   to see --
 2              MR. SMOLEN:  Objection to the form.
 3       Q   (By Mr. Miller)  -- in your experience
 4   at a jail?
 5              MR. SMOLEN:  Objection to the form,
 6   speculation.  She can't diagnose.
 7              THE WITNESS:  I -- I wouldn't know
 8   any of that.
 9       Q   (By Mr. Miller)  Okay.  Is that beyond
10   your --
11       A   Scope of practice.
12       Q   -- scope of practice?
13       A   Yes.
14       Q   Okay.  Do you recall that being
15   something that came up a lot?
16              MR. SMOLEN:  Objection to the form.
17       Q   (By Mr. Miller)  Do you recall that
18   being a common term you heard bandied about
19   while you were at Muskogee County Jail?
20       A   No, sir.
21              MR. SMOLEN:  Objection, relevance.
22       Q   (By Mr. Miller)  Do you do all the
23   intakes at the Muskogee County Jail?
24       A   No.
25       Q   How do you decide whether you do an
```

Page 235

```
 1   Muskogee County Jail?
 2        A    No, sir.
 3        Q    Have you ever spoken with Dr. Baird
 4   regarding Mr. Buchanan?
 5        A    Not to my recollection, no, sir.
 6        Q    Okay.  There was some talk about the
 7   term gone downhill.  Would you agree that as of
 8   the time that he left on the evening of the
 9   14th, he had, in fact, gone downhill?
10        A    There was a decline, yes.
11        Q    He was worse than he was before?
12        A    Yes, sir.
13        Q    And that's why he was in an emergency
14   situation, right?
15        A    Yes, sir.
16        Q    Crystal clear on this.  When you use the
17   term pain and then drew lines to the left and to
18   the right, did that mean to you pain throughout
19   his body?
20        A    No, those lines are to prevent anybody
21   else from adding anything to my charting.
22        Q    Okay.
23        A    That's a CYA.
24        Q    Did any -- to the best of your memory,
25   did any jail staff to you -- ever say to you
```

Page 236

```
 1   this man needs to go to the hospital
 2   immediately?
 3        A    No, sir.
 4        Q    Until the evening of the 14th, did you
 5   ever say that to any jail staff member?
 6        A    No, sir.
 7        Q    Did any jail staff member, to the best
 8   of your memory, ever say, it's -- it's obvious
 9   to me this man needs -- needs to go to -- to the
10   hospital?
11        A    To the best of my recollection, no, sir.
12        Q    Okay.  Did any jail staff member ever
13   express to you any additional concern regarding
14   Mr. Buchanan other than what we've discussed
15   here today?
16        A    Not to my recollection, no, sir.
17             MR. MILLER:  I'll pass the witness.
18             MR. YOUNG:  Okay.  Rose, we're
19   almost out of here.
20             THE WITNESS:  Okay.
21             MR. YOUNG:  I suppose those are
22   famous last words but...
23                CROSS-EXAMINATION
24   BY MR. YOUNG:
25        Q    Just to be crystal clear, part of your
```

Page 240

```
 1                MR. SMOLEN:  Objection, speculation.
 2                THE WITNESS:  It would be different.
 3    It would be unusual.
 4       Q    (By Mr. Young)  Let's take a look at
 5    Plaintiff's Exhibit 9.  There's been a lot of
 6    discussion about documentation and progress
 7    notes.  From that document right there, it looks
 8    to me --
 9       A    Excuse me.
10       Q    -- like at a minimum, you saw and spoke
11    to Mr. Buchanan; would you agree with that?
12       A    Yes.
13       Q    And the absence of documentation of a
14    progress note does not mean that there was no
15    assessment done; would you agree with that?
16                MR. SMOLEN:  Objection to the form.
17                THE WITNESS:  Yes.
18                MR. SMOLEN:  Misstates the
19    testimony.
20       Q    (By Mr. Young)  I think you said you've
21    been a nurse since 1983?
22       A    Yes, sir.
23       Q    There's been a lot of talk today about
24    protocols, standing orders, procedures.  Would I
25    be correct in say -- if I said that those words
```

Page 245

1   Q   And you would have if that's what you
2   thought the situation called for, right?
3           MR. SMOLEN:  Objection, speculation.
4           THE WITNESS:  Yes, I would.
5   Q   (By Mr. Young)  To your memory, did you
6   ever ignore Mr. Buchanan's complaints?
7           MR. SMOLEN:  Objection to the form.
8           THE WITNESS:  No, sir.
9   Q   (By Mr. Young)  To your memory, did you
10  ever intentionally delay him getting medical
11  care?
12          MR. SMOLEN:  Objection to the form.
13          THE WITNESS:  No, sir.
14  Q   (By Mr. Young)  So was there ever any
15  serious medical condition that you just ignored
16  that you weren't going to deal with that day?
17  A   No, sir.
18          MR. SMOLEN:  Objection to the form.
19          MR. YOUNG:  That's all I've got.
20          MR. SMOLEN:  Okay.  I've got a
21  couple of quick questions.
22                 REDIRECT EXAMINATION
23  BY MR. SMOLEN:
24  Q   Ma'am, of those factors that you
25  identified on November the 14th that led you to

Page 246

1  believe that it was an urgent situation, tell
2  the jury what those were.
3           MR. YOUNG:  Do you want me to get
4  the note back out?
5           THE WITNESS:  Uh-huh.  I reported
6  elevated vital signs.
7     Q   (By Mr. Smolen)  Is that one of the
8  factors?
9     A   Yes.  Decreased oxygen intake on room
10 air.
11    Q   Was that a significant factor that led
12 you to believe that it was an urgent situation?
13    A   Yes.
14    Q   Okay.  What other vital signs led you to
15 believe it was an urgent situation?
16    A   Elevated heart rate and the degree of
17 pain the patient was in.
18    Q   Okay.  Had you taken Mr. Buchanan's
19 vitals on the 11th and he had the same elevated
20 heart rate that he presented with on the 14th,
21 would you have called Dr. Cooper?
22           MR. YOUNG:  Object to the form.
23           MR. MILLER:  Same objection.
24           THE WITNESS:  Elevated heart rates,
25 no.