Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA


JAMES D. BUCHANAN,
        Plaintiff,

vs.                                    No. 18-CV-171-RAW

TURN KEY HEALTH CLINICS,
LLC, et al,
        Defendant.




                    VIDEO DEPOSITION OF
                     KATIE MCCULLAR








DATE:  FEBRUARY 19, 2019

REPORTER:  MARISA SPALDING, CSR, RPR




                Spalding Reporting Service, Inc.
                 1611 South Utica Avenue, Box 153
                    Tulsa, Oklahoma 74104
                      (918) 284-2017

Exhibit 16

Electronically signed by Marisa Spalding (401-062-868-9834)                6e96128c-f587-4575-9fb8-511fb6533196

Page 195

1    professors at LPN school?

2         A    It--

3         Q    Who are you receiving your training

4    from?

5         A    Do you want their names or their

6    credentials?

7         Q    I meant credentials and what kind of

8    person is giving this training?

9         A    Generally -- generally at least a

10   master's -- my -- one of my instructors who's a

11   nurse practitioner.

12        Q    An RN is above you?

13        A    Correct.

14        Q    A higher level of training.  You're

15   going to have that soon.  The nurse practitioner

16   is a level even above that?

17        A    Correct.

18        Q    And that's what Lela Goatley is?

19        A    Yes.

20        Q    And also your dad?

21        A    Yes.

22        Q    How is your training in medical care

23   compared to the jailer's training, the detention

24   officers at the Muskogee County Jail?

25              MR. SMOLEN:  Objection, speculation.

Page 196

1              THE WITNESS:  Oh, I -- it's -- you
2      really can't even compare it.  I mean, they --
3      they don't have probably any medical care and --
4          Q   (By Mr. Miller)  Meaning they don't have
5      any training?
6          A   Training, yes.
7          Q   You do, correct?
8          A   Yes, correct.
9          Q   So you have significantly more?
10         A   Oh, yes.
11         Q   Without a doubt in your mind, do you
12     have more training than any of the employees of
13     the jail --
14              MR. SMOLEN:  Object to the form.
15         Q   (By Mr. Miller)  -- in medical care?
16         A   Correct.
17         Q   You would have less than RN or a LPN or
18     a nurse practitioner on the floor than anyone
19     who actually worked directly for the jail?
20         A   Correct.
21         Q   You were never a actual jail employee,
22     correct?
23              MR. SMOLEN:  Object to the form.
24              THE WITNESS:  Correct.
25         Q   (By Mr. Miller)  Always worked for Turn

Page 199

1       from Dr. Cooper, correct?

2           A    Either the 3rd or the 4th, yes.

3           Q    Okay.  Is it possible that he was on a

4       -- on a sick call page and then was seen for the

5       medical intake on that day, so thus he was seen

6       for that sick call?

7                   MR. SMOLEN:  Objection to the form.

8                   THE WITNESS:  It's possible.

9           Q   (By Mr. Miller)  Okay.  And your

10      testimony is still that you believe the medical

11      intake was likely done on the 4th?

12                  MR. SMOLEN:  Object to the form.

13                  THE WITNESS:  I believe, yes.

14          Q   (By Mr. Miller)  The same day he was on

15      the sick call for one -- for that day?

16          A    I believe, yes.

17          Q    Okay.  I want to be a little clearer

18      because I don't think it ever really quite came

19      out exactly.  If you can go to the document

20      showing the Medical Administration Record, all

21      of the -- all of the pages that you signed -- or

22      that were signed.  It's DDR 1, 007.  Okay.  I

23      want you to tell me precisely -- because I think

24      you started this and it never quite finished --

25      which of these are your initials?

Page 200

1      A    November 6th, 7th.

2      Q    Okay.  In the morning or a.m.?

3      A    Yes, the 11th and the 14th.

4      Q    Okay.

5      A    All a.m.

6      Q    So the 6th and the 7th would say "KS"?

7      A    Yes.

8      Q    And the 11th and the 14th, as far as I

9    could tell, say "KM"?

10     A    Yes.

11     Q    Those are -- those four are your

12   initials?

13            MR. YOUNG:  What about the 10th?

14   Can you make that out?

15            THE WITNESS:  The 10th?  I'm -- I'm

16   not sure about them.  It could be me but I'm not

17   sure.

18     Q    (By Mr. Miller)  Okay.  So you're not

19   sure about the 10th.  You believe that the 12th

20   in the morning is not yours?

21     A    The 12th in the morning is not mine.

22     Q    Okay.  And also the 8th and the 9th?

23     A    Correct.

24     Q    And you're just not sure on the 10th?

25     A    Correct.

Page 201

1          Q    And none of them in p.m. are yours,

2     correct?

3          A    Correct.

4          Q    All right.  When you were an LPN on any

5     given day shift, were you usually the only LPN

6     there?

7          A    Usually.

8          Q    Did you have any contact with Lela

9     Goatley in particular?

10         A    Yes.

11         Q    What would she do when she came to the

12    jail?

13         A    She would see patients that were on --

14    were on the provider list.

15         Q    Okay.  So basically the list had to be

16    provided to her who would look at it and then

17    she would look at those particular patients?

18         A    Correct.  Generally, the nurses would

19    triage them and then -- you know, who needed to

20    be seen -- and then she would kind of look over

21    it to make sure there was not somebody that, you

22    know, needed to be on that we had missed.

23         Q    Was there a reason why Lela Goatley

24    versus Dr. Cooper would see a patient?

25         A    Lela Goatley was in person, and some

Page 203

1              MR. SMOLEN:  Object to the form.

2        Q   (By Mr. Miller)  -- in order to write

3    that down?

4        A   Yes.

5        Q   Okay.  Now you went to Mr. Buchanan's

6    cell to provide him the medication all of these

7    days?

8              MR. SMOLEN:  Object to the form.

9              THE WITNESS:  The -- the cell block,

10   a/k the pod.

11       Q   (By Mr. Miller)  Okay.  So you went to

12   his pod on the 6th, the 7th, maybe the 10th, the

13   11th, and then again on the 14th?

14       A   Correct.

15             MR. SMOLEN:  Object to the form.

16       Q   (By Mr. Miller)  So that's at least

17   four, maybe five times?

18       A   Correct.

19       Q   Until the final time -- and we've

20   discussed that at length -- do you have any

21   memory at all of what happened during those

22   encounters with Mr. Buchanan?

23       A   No, I do not.

24       Q   If someone had said, I'm paralyzed, I

25   can't walk, is that something you hear every

Page 204

1    day?

2              MR. SMOLEN:  Objection to the form.

3              THE WITNESS:  No.

4              MR. SMOLEN:  Relevance, speculation.

5              MR. MILLER:  Object to the form is

6    the appropriate objection.

7              MR. SMOLEN:  Object to the form,

8    relevance and speculation.

9              MR. MILLER:  Okay.

10    Q   (By Mr. Miller)  You have no memory of

11   him ever saying to you at any time before

12   November 14th in the morning that he could not

13   walk; is that correct?

14    A   Correct.

15              MR. SMOLEN:  Objection, speculation.

16   She's testified that she doesn't have any

17   memory.

18    Q   (By Mr. Miller)  Do you have any memory

19   at all of him being unable to walk, meaning

20   seeing that he was physically unable to move --

21              MR. SMOLEN:  Objection.

22    Q   (By Mr. Miller)  -- at any time prior

23   to the 14th in the morning?

24              THE WITNESS:  I have no memory.

25              MR. SMOLEN:  Objection, asked and

Page 205

1    answered.

2         Q   (By Mr. Miller)  You worked there for a

3    few months, correct?

4         A   Correct.

5         Q   Do you ever remember anyone else who

6    couldn't walk or who lost the ability to work

7    during the time period that you were there?

8         A   No.

9         Q   Is that an unusual circumstance?

10        A   Yes.

11        Q   Do you think that's something that would

12   trigger your memory?

13        A   Yes.

14        Q   And, in fact, it did trigger your memory

15   on the morning of the 14th when you specifically

16   remember him saying that to you?

17        A   Yes.

18             MR. SMOLEN:  Objection to the form.

19   There's documentation of it.

20        Q   (By Mr. Miller)  Do you recall anyone

21   else coming -- any other nurses or jailers

22   before the morning of the 14th and saying

23   anything about Mr. Buchanan can't walk,

24   Mr. Buchanan is paralyzed?

25        A    Not before the morning of the 14th, no.

Page 206

1      Q   Okay.  How did -- I think we kind of

2      glossed over this.  What did happen on the

3      morning of the 14th that got you to go to that

4      cell?

5      A   Somebody -- one of the jailers called me

6      and -- with a walkie talkie to pod saying that

7      there was an inmate complaining, and that's --

8      that's how I was called to the pod.

9      Q   Okay.  Do you know who that person was?

10     A   I have no clue.

11     Q   Someone on a walkie talkie?

12     A   Yes, I imagine it was the tower guard,

13     but that's just speculation.

14     Q   Okay.  Do you know whether it was a male

15     or a female?

16     A   I do not know.  I do not remember.

17     Q   Mr. Buchanan, in his deposition,

18     testified that he was seen by a -- this is not

19     verbatim -- but a large woman guard with short

20     black hair, saw him on the morning of the 14th,

21     and that she left, and that about 20 minutes

22     later returned, and then that lady got the

23     nurse. Do you have any idea who this woman is?

24     A   I have no clue.

25     Q   Does that description that I just

Page 207

1      provided, a large woman guard with short black

2      hair, does that help you in any way think about

3      who this might be?

4          A    No.

5          Q    You just remember hearing a voice on a

6      walkie talkie saying he was complaining and that

7      you then went to the -- went to the cell block?

8          A    Yes.

9          Q    Okay.  When you say cell block, I'm

10     trying to picture this.  Is he in a cell by

11     himself or where is he when you go and see him

12     on the 14th?

13         A    Inside the pod, there's a bunch of

14     surrounding cells.  There's a common room like

15     the -- just the common area inside the pod.  He

16     was not in a cell.  He was just inside the pod,

17     like another common area.

18         Q    Okay.  Are there other people around?

19         A    I don't remember.

20         Q    Okay.  Does he sleep in the common area

21     or does he sleep in a cell?

22         A    I don't know.

23         Q    Okay.  Was he in a bed?

24         A    No.

25         Q    Was he standing up?

Page 208

1        A    No.

2        Q    Was he sitting down?

3        A    I believe he was sitting down, but I

4    don't want to mix up my memory with what I've

5    read in the records.

6        Q    Okay.  This -- inmates have beds,

7    correct, somewhere they sleep?

8        A    Correct, yes.

9        Q    And he had got in somehow from that bed

10    to wherever he was, right?

11              MR. SMOLEN:  Object to the form.

12              THE WITNESS:  I would imagine, yes.

13        Q    (By Mr. Miller)  Okay.  Could -- so

14    somehow he got there, right, to where he --

15        A    Somehow.

16        Q    To where you managed to encounter him?

17        A    I would imagine, yes.

18        Q    Now and, again, I think we glossed over

19    this a little bit.  If I recall your testimony,

20    you said that he was not flaccid.  What do you

21    mean by that?

22        A    Exhibiting --

23        Q    That is the term she used, so there's no

24    need for that from opposing counsel.

25        A    Muscle tone, not able to -- able to sit

Page 209

1       without falling or, you know.

2           Q   Okay.  Meaning he was able to keep

3       himself upright?

4           A   Yes.

5           Q   In your appearance?

6           A   Yes.

7           Q   And you also said that he had muscle

8       tone?

9               MR. SMOLEN:  Object to the form.

10              THE WITNESS:  Yes.

11          Q   (By Mr. Miller)  What does that mean?

12          A   He appeared to, as in, you know, if

13      you're sitting and you have your legs like this,

14      they're not splayed out.  They're able to

15      maintain a position like a 90-degree angle.

16          Q   Okay.  So it appeared to you based on

17      that that he did have control of his legs?

18          A   It appeared to me --

19              MR. SMOLEN:  Object to the form.

20              THE WITNESS:  -- at that time, yes.

21          Q   (By Mr. Miller)  Okay.  At least enough

22      control to be able to maintain muscle tone and

23      not be flaccid?

24          A   Yes.

25              MR. SMOLEN:  Object to the form.

Page 210

1        Q   (By Mr. Miller)  Did he flat out tell
2    you -- and again this is in the records -- I --
3    I can't move, I cannot move my legs?
4        A   I remember him complaining of lower
5    extremity pain and -- but I do not remember him
6    saying I cannot walk.  I remember there being an
7    issue with lower extremity and I remember, you
8    know, what I documented it -- documented, but I
9    don't want to get the two confused.
10       Q   Sure.
11       A   So specifically I remember him day, him
12   complaining of the pain.
13       Q   Okay.  Well, according to your records
14   --
15       A   Yes.
16       Q   -- you say that he was complaining of
17   worsening pain and inability to move his lower
18   extremities.  You also say that he was sitting
19   at the table with his head down.  So according
20   to this, he's not in a bed, right?  He's somehow
21   gotten to a table?
22       A   Correct.
23       Q   Meaning he's not --
24           MR. SMOLEN:   Object to the form.
25       Q   (By Mr. Miller) -- paralyzed, correct?

Page 211

1            MR. SMOLEN:  Object to the form.

2            THE WITNESS:  Correct.

3       Q   (By Mr. Miller)  Unless somebody picked

4    him up and placed him there?

5       A   Right.

6            MR. MILLER:  Are you testifying or

7    is the witness testifying?

8            MR. SMOLEN:  I think she is.

9            MR. MILLER:  Well, you're trying to

10   so --

11           MR. SMOLEN:  Why would I try to

12   coach your witness?

13           MR. MILLER:  Okay.  She's not --

14   she's not my witness.

15           MR. SMOLEN:  Okay.  What's your

16   point?

17           MR. MILLER:  We don't get along very

18   well.  I'm usually pretty easy going, but

19   Mr. Smolen and I have some difficulties.  Okay.

20      Q   (By Mr. Miller)  Did you see any signs

21   that somebody had picked him up and placed him

22   there?

23      A   I did not see any signs of that.

24      Q   Okay.  Do you know what a cervical

25   epidural abscess is?

Page 212

1          A    Generally speaking.

2          Q    What is a cervical epidural abscess?

3          A    It is an abscess on your cervical spine,

4     and that's about as much as I know about it.

5          Q    Okay.  Is that something that in the

6     daily complaints that you see from jail -- from

7     inmates at the jail, is that something that

8     comes up very often?

9          A    No.

10         Q    Do you recall at any point in your

11    career as a LPN, other than perhaps this

12    situation, having knowing anything about

13    cervical epidural abscess?

14         A    No.

15         Q    Did you know as of the morning of the

16    14th, that he had a cervical epidural abscess?

17         A    No.

18         Q    Did he say, Hey, I might have a cervical

19    epidural abscess?

20         A    No.

21         Q    Okay.  Is that something that is within

22    your training or experience to diagnose?

23         A    No.

24         Q    Is that why you called Dr. Cooper?

25         A    Yes.

Page 214

1         Q   -- that there was any kind of conscious
2    decision --
3         A   No.
4         Q   -- that, you know -- is it possible that
5    you were going back and forth --
6         A   No.
7         Q   -- between "KM" and "KS" for awhile?
8         A   Yes.
9         Q   You do not believe this was an emergency
10   situation as of the time that you contacted Dr.
11   Cooper on the morning of the 14th, correct?
12        A   Correct.
13        Q   And you have more medical training than
14   any of the jailers, right?
15        A   Correct.
16             MR. SMOLEN:  Object to the form.
17        Q   (By Mr. Miller)  Would you expect that
18   they would think it was an emergency situation
19   --
20             MR. SMOLEN:  Object to form.
21        Q   (By Mr. Miller)  -- if you didn't?
22             MR. SMOLEN:  Speculation.
23             THE WITNESS:  I would imagine that,
24   but I cannot speak for them.
25        Q   (By Mr. Miller)  Sure.  Jailers have to

Page 215

1      rely on the medical staff to some degree --

2              MR. SMOLEN:  Objection.

3         Q   (By Mr. Miller)  -- in terms of

4      determining what the medical situation is with

5      the inmates, correct?

6              MR. SMOLEN:  Object to the form.

7              THE WITNESS:  Correct.

8         Q   (By Mr. Miller)  That's why you're

9      there?

10        A   Correct.

11             MR. SMOLEN:  Inconsistent with the

12     policy.

13             MR. MILLER:  That's not an

14     objection.

15             MR. SMOLEN:  I'm just making a

16     notation in the record.

17             MR. MILLER:  Not an objection.

18        Q   (By Mr. Miller)  Your standing orders,

19     what kind of conditions do they cover?

20        A   Minor ailments, something that's easy

21     for a nurse to -- to -- to use a piece of paper

22     to treat somebody, a minor ailment.

23        Q   Is a cervical epidural abscess one of

24     those?

25        A   No.

Page 216

1        Q   You would agree that, according to the

2    records we've received, that we've looked over,

3    as of the 11th, he was already on the list,

4    Buchanan, to be seen by Dr. Cooper on the 15th,

5    correct?

6        A   Correct.

7        Q   So when you saw him on the 14th and put

8    him on the list to be seen by Dr. Cooper on the

9    15th, you were just kind of reiterating

10   something that was already scheduled, correct?

11              MR. SMOLEN:   Objection, leading.

12       Q   (By Mr. Miller)  Is that correct?

13       A   I -- I -- I don't remember that but,

14   yes.

15       Q   Okay.  Well, he was already going to be

16   seen?

17       A   Yes, yeah, that's where I was going with

18   that.

19       Q   Plaintiff's Exhibit 7, is that something

20   that you would have had access to?

21       A   Yes.

22       Q   This wasn't clear to me.  On Plaintiff's

23   Exhibit 7, there's a line that's not blacked out

24   and you see very clearly, James Buchanan,

25   decreased range of motion; do you see that line?

Page 221

1      Q    That's -- that in and of itself, is that
2      something that --
3      A    No, no, no.
4      Q    -- suggests an emergency to you?
5      A    No.
6      Q    How about the heart rate of 116 in and
7      of itself?
8      A    No.
9      Q    Does that suggest an emergency to you?
10     A    No.
11     Q    How about the oxygen at 84 to 90
12     percent?
13     A    Those are not extremely reliable
14     depending on the temperature of the person's
15     hands, the fit the pulse ox.  But, typically,
16     no, if they were not having any other dyspnea,
17     cyanosis, anything like that.
18     Q    Okay.  So even the vitals that were
19     taken that night or that evening after you had
20     left, do any of them in and of themselves
21     suggest an emergency to you?
22     A    No.
23          MR. SMOLEN:  Objection to the form.
24     Q    (By Mr. Miller)  You didn't believe it
25     was an emergency when you saw him, correct?

Page 222

```
 1        A    Correct.

 2        Q    Is it possible that an emergency can

 3   develop after you see him but before Ms. Kotas

 4   sees him?

 5             MR. SMOLEN:  Objection to the form,

 6   speculation.

 7                  THE WITNESS:  Yes.

 8        Q   (By Mr. Miller)  In temporal, you see

 9   him, she sees him later, right?

10        A    Yes.

11        Q    Something could develop in between?

12        A    Yes.

13             MR. SMOLEN:  Same objection.

14        Q   (By Mr. Miller)  Did you ever -- out of

15   all the times you had administered medication

16   for him, did you ever think there was an

17   emergency before?

18        A    No.

19        Q    If there was an emergency, what would

20   you have done?

21             MR. SMOLEN:  Objection to the form,

22   speculation.

23                  THE WITNESS:  If there was an

24   emergency, I would have -- if he was

25   experiencing, you know, something that --
```

Page 223

1                      MR. SMOLEN:  What kind of emergency
2          are we talking about?
3                      MR. MILLER:  Are you objecting to
4          the form?
5                      MR. SMOLEN:  Yeah, I'm going to
6          object to the form.  I don't know what type of
7          emergency we're talking about.
8                      MR. MILLER:  Okay.
9             Q    (By Mr. Miller)  If you thought there
10         was an emergent situation that required
11         emergency care --
12                     MR. SMOLEN:  Objection.
13            Q    (By Mr. Miller)  -- what would you have
14         done?
15            A    I would have contacted 911.
16            Q    Okay.  Did any jail staff at any point
17         ever tell you, I believe this man is
18         experiencing an emergency?
19            A    No.
20            Q    Did any jail staff at any point say this
21         man needs to go to the hospital immediately?
22            A    No.
23            Q    Did you ever tell any jail staff this
24         man needs to go to the hospital immediately?
25            A    No.

Page 224

1        Q    Did any -- did you ever suggest any

2        doubt or issues with his medical care to any

3        jail staff at any point?

4        A    No.

5        Q    Are you aware of any reason why the jail

6        staff would have thought that you were not

7        providing proper medical care to Mr. Buchanan?

8             MR. SMOLEN:  Object to the form.

9             THE WITNESS:  No.

10       Q    (By Mr. Miller)  There is one time on

11       the morning of the 13th that it's not documented

12       he received his Naproxen, correct?

13       A    (Moving head up and down)

14       Q    Does that mean with certainty he didn't

15       get Naproxen on that day or does it mean it

16       wasn't done?

17            MR. SMOLEN:  Objection to the form.

18            THE WITNESS:  Not with certainty

19       that he did not get it.  I don't -- I don't know

20       whether he did or he didn't.

21       Q    (By Mr. Miller)  Fair enough.  Do you

22       have any knowledge one way or the other about

23       whether his lack of receiving Naproxen on the

24       morning of the 13th affected anything later in

25       terms of his care?

Page 229

1        A    No.

2        Q    Okay.  Was there ever a time when you

3    were working at the Muskogee County Jail that an

4    inmate expressed concerns about their medical

5    care or -- or their medical situation and you

6    just said, I don't care; I'm going to blow you

7    off; you're not getting care?

8              MR. SMOLEN:  Object to the form.

9              THE WITNESS:  No.

10        Q    (By Mr. Miller)  Is that something that

11    you would ever do?

12        A    No.

13              MR. SMOLEN:  Object to the form.

14        Q    (By Mr. Miller)  If they said they were

15    in serious pain, would you always take that

16    seriously and listen to them?

17        A    Yes.

18        Q    If you look at -- I don't recall which

19    exhibit it is exactly, but it's the Muskogee

20    County Detention Center exhibit on Page DDR #2,

21    054.  We're almost done.  This is the Healthcare

22    Administration Policy, and the main policy under

23    15-1.4 is the policy of the Muskogee County

24    Detention Center to provide adequate healthcare

25    services, including complete emergency medical,

Page 230

```
 1       dental, and mental healthcare to all inmates in

 2       the jail regardless of their financial status

 3       and relying when necessary on community

 4       healthcare resources.  If someone has an

 5       emergency situation and they are not provided

 6       emergency care, do you believe that would be a

 7       violation of the policy --

 8                 MR. YOUNG:  I'm going to object to

 9       the form on that.

10            Q   (By Mr. Miller)  To not receive -- to

11       not receive medical care during an emergency

12       situation, that would be a violation of Muskogee

13       County's policy, correct?

14            A   Yes, that would be a violation if they

15       did not receive care.

16            Q   If it was an emergency situation?

17            A   Correct.

18            Q   It's a policy to provide adequate

19       healthcare services.  If they didn't receive

20       healthcare services, that would be a violation

21       of the policy, correct?

22            A   Correct.

23            Q   Go to DDR #2, 62 -- 2, 062, 15-3.4, the

24       policy.  It says:  The policy of the Muskogee

25       County Detention Center to provide inmates with
```

Page 231

1      access to medical and healthcare that meet

2      standards.  If they didn't provide inmates with

3      access to medical and healthcare to meet

4      standards, that would be a violation of the

5      policy, right?

6          A   Correct.

7          Q   On the morning of the 14th, did you know

8      that Mr. Buchanan had a serious medical

9      condition?

10         A   No.

11         Q   If you believe that it was an emergency

12     situation that required emergency care, what

13     would you have done?

14         A   I would have called 911.

15         Q   And do you have any reason to think that

16     anyone who worked for the jail knew any more

17     than you did --

18             MR. SMOLEN:  Object to the form.

19         Q   (By Mr. Miller)  -- about his situation?

20         A   No.

21             MR. MILLER:  That's all.

22             MR. YOUNG:  Katie, I've got a few

23     questions.

24                     CROSS-EXAMINATION

25     BY MR. YOUNG: