**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| (1) JAMES D. BUCHANAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 18-CV-171-RAW |
| | ) | |
| (1) TURN KEY HEALTH CLINICS, LLC, | ) | JURY TRIAL DEMANDED |
| (2) ROB FRAZIER, in his official capacity as | ) | |
| Muskogee County Sheriff, | ) | |
| (3) BOARD OF COUNTY COMISSIONERS | ) | |
| OF MUSKOGEE COUNTY, OKLAHOMA, | ) | |
| (4) DR. COOPER, and | ) | |
| (5) KATIE MCCULLAR, LPN | ) | |
| | ) | |
| Defendants. | ) | |

---

**DEFENDANT, ROB FRAZIER'S, IN HIS OFFICIAL CAPACITY,**
**MOTION FOR SUMMARY JUDGMENT**

---

Respectfully submitted,
s/ Jordan L. Miller
Andy A. Artus, OBA No. 16169
Jordan L. Miller, OBA No. 30892
Taylor M. Tyler, OBA No. 33291
COLLINS, ZORN & WAGNER, P.C.
429 N.E. 50th, Second Floor
Oklahoma City, OK  73105
Telephone: (405) 524-2070
Facsimile: (405) 524-2078
Email: aaa@czwlaw.com
jlm@czwlaw.com
tmt@czwlaw.com

*Attorneys for Defendant*
*Board of County Commissioners of*
*Muskogee County*

September 4, 2019

**TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................ ii

TABLE OF AUTHORITIES ...................................................................... iii-iv

LIST OF ATTACHMENTS ............................................................................ v-vi

LCvR 56.1(b) STATEMENT ........................................................................... 1

ARGUMENT AND AUTHORITY ................................................................... 13

STANDARD OF REVIEW ............................................................................. 13

I.     Defendant Frazier is Entitled to Summary Judgment with Regard to Plaintiff's
42 U.S.C. § 1983 Claim ................................................................... 14-25

CERTIFICATE OF SERVICE ....................................................................... 26

# TABLE OF AUTHORITIES

## Cases

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664 ................................................ 14

*Albright v. Oliver*, 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 ............................ 15

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 ............................................ 14

*Bd. Of County Comm'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397 ................................ 16

*Berry v. City of Muskogee, Oklahoma*, 900 F.2d 1489 ................................ 17

*Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397,
117 S. Ct. 1382, 137 L. Ed. 2d 626 ...................................................... 21, 22

*Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175 ........................... 22

*Burke v. Regalado*, 2019 WL 3938633 at *30-31 ........................................ 17, 18, 25

*Celotex Corp. v. Catrett*, 477 U.S. 317 .............................................. 13, 14

*Canton v. Harris*, 489 U.S. 378 and n. 7 ............................................ 17

*Carter v. Morris*, 164 F.3d 215 ...................................................... 22

*Cf Connick v. Thompson*, 131 S. Ct. 1350, 179 L.Ed.2d 417 .............................. 25

*Church v. City of Huntsville*, 30 F.3d 1332 .......................................... 22

*City of Los Angeles v. Heller*, 475 U.S. 796, 1986 .................................... 15

*City of Oklahoma City v. Tuttle*, 471 U.S. 808, 105 S. Ct. 2427, 85 L. Ed. 2d 791 ................... 21

*Conaway v. Smith*, 853 F.2d 789 ...................................................... 14

*Cone v. Longmont United Hosp. Ass'n.*, 14 F.3d 526 ..................................... 14

*Estelle v. Gamble*, 429 U.S. 97 ...................................................... 16

*Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 ..................... 16, 17

*Gallegos v. City and County of Denver*, 984 F. 2d 358 ................................ 15

*Hall v. Bellmon*, 935 F.2d 1106 ...................................................... 14

*Hinton v. City of Elwood*, 997 F.2d 774 ............................................ 15, 21, 22

*Hunt v. Uphoff*, 199 F.3d 1220 ...................................................... 17, 18

*Jett v. Dallas Independent School District*, 491 U.S. 701, 109 S. Ct. 2702,
105 L. Ed. 2d 598 ...................................................................... 15

*Lankford v. City of Hobart*, 73 F.3d 283 ............................................ 22

*Livsey v. Salt Lake County*, 275 F.3d 952 .......................................... 16

*Lytle v. Doyle*, 326 F.3d 463 ...................................................... 23

*Mata v. Saiz*, 427 F.3d 745 ........................................................ 16

*Medina v. State*, 871 P.2d 1379 .................................................... 18, 19

*McDonald v. Wise*, 769 F.3d 1202 ................................................... 14

*Miller v. Hawver*, 474 F. Supp. 441 ................................................ 15

*Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 98 S. Ct. 2018,
56 L. Ed. 2d 611 ...................................................................... 21

iii

*Pembaur v. Cincinnati*, 475 U.S. 469*Purvey v. State*, 905 P.2d 770, 106 S. Ct. 1291, 89 L. Ed. 2d 425 ....................................................................................................... 19

*Redding v. State*, 882 P.2d 61 .................................................................................. 19

*Roemer v. Pub. Serv. Co. of Colo.*, 911 F. Supp. 464............................................... 15

*Salazar v. City of Oklahoma City*, 976 P.2d 1056 ................................................... 18

*Spruill v. Gillis*, 372 F.3d 218.................................................................................. 18

*State v. Burris*, 894 P.2d 1122.................................................................................. 19

*Walker v. City of Orem*, 451 F.3d 1139 .................................................................. 15

*Whitley v. Albers*, 475 U.S. 312 ............................................................................... 16

**Federal Rules**

42 U.S.C. § 1983......................................................................... 14, 15, 16, 21, 22, 25

Rule 56(a)................................................................................................................ 1, 13

**Local Rules**

LCvR 56.1(b) ................................................................................................................ 1

**LIST OF ATTACHMENTS**

Exhibit 1 – Deposition of James Buchanan

Exhibit 2 – Official Oklahoma Traffic Report

Exhibit 3 – Deposition of Todd Wilcox

Exhibit 4 – Deposition of Stan Buchanan

Exhibit 5 – August 10, 2019 Deposition of Dr. Clinton Baird

Exhibit 6 – Booking and Release Sheet

Exhibit 7 – Medical Questionnaire

Exhibit 8 – Deposition of Ryan Hamil

Exhibit 9 – Provider Order

Exhibit 10 – Deposition of William Cooper

Exhibit 11 – Deposition of Rosemary Kotas

Exhibit 12 – Medication Administration Record

Exhibit 13 – Deposition of Marshal Dugan

Exhibit 14 – February 6, 2019 Deposition of Rob Frazier

Exhibit 15 – November 5, 2016 Sick Call List

Exhibit 16 – Deposition of Katie McCullar

Exhibit 17 – Deposition of Charles Quick

Exhibit 18 – November 6, 2016 Sick Call list

Exhibit 19 – November 10, 2016 Sick Call List

Exhibit 20 – November 11, 2016 Video of phone conference with Stan Buchanan

Exhibit 21 – November 11, 2016 Medical Visitor Log

Exhibit 22 – Deposition of Lloyd Bickel

Exhibit 23 – Deposition of Jeremy Garvin

Exhibit 24 – Katie McCullar's November 14, 2016 Medical Progress Note

Exhibit 25 – Rosemary Kotas' November 14, 2016 Medical Progress Note

Exhibit 26 – MCDC Policy 15-1

Exhibit 27 – MCDC Policy 15-3

Exhibit 28 – MCDC Policy 15-5

Exhibit 29 – MCDC Policy 15-6

Exhibit 30 – Audio recording of phone call to EMSA

Exhibit 31 – Contract for Medical Staffing, Section 1.3, 1.14, 1.23, 5.1

Exhibit 32 – Deposition of Flint Junod

Exhibit 33 – Burke v. Regalado case law

Exhibit 34 - Intake form

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) JAMES D. BUCHANAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 18-CV-171-RAW |
| | ) | |
| (1) TURN KEY HEALTH CLINICS, LLC, | ) | JURY TRIAL DEMANDED |
| (2) ROB FRAZIER, in his official capacity as | ) | |
| Muskogee County Sheriff, | ) | |
| (3) BOARD OF COUNTY COMISSIONERS | ) | |
| OF MUSKOGEE COUNTY, OKLAHOMA, | ) | |
| (4) DR. COOPER, and | ) | |
| (5) KATIE MCCULLAR, LPN | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT ROB FRAZIER, IN HIS OFFICIAL CAPACITY'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

Defendant Rob Frazier, in his official capacity as Muskogee County Sheriff, ("Defendant Frazier") moves the Court to grant summary judgment in his favor pursuant to Federal Rule of Civil Procedure 56(a) with regard to Plaintiff's claims against him.  In support thereof, Defendant submits the following Brief:

## LCvR 56.1(b) STATEMENT

1.  Plaintiff James Buchanan ("Buchanan" or "Plaintiff") has been in and out of the Muskogee County Jail for years, with 13 separate stays in the Jail. (See Ex. 1, Depo. of James Buchanan, 78:13-78:21).

2.  Buchanan was in a bicycle accident on September 16, 2016, where his bicycle was hit by an automobile from behind. (See Ex. 1, Depo. of James Buchanan, 19:13-19:19, 89:5-89:23; Ex. 2, Official Oklahoma Traffic Report).

3.  Buchanan claims to have both short-term and long-term memory problems, which date back to the time of this bicycle accident. Buchanan's brother Stan, however, testified that

Buchanan has had memory problems since he was at least 13 or 14 years old, or even younger. (See Ex. 1, Depo. of James Buchanan, 18:3-18:13; Ex. 3, Depo. of Todd Wilcox, 151:16-152:14, 152:18-152:22; Ex. 4, Depo. of Stan Buchanan, 71:14-72:2)

4.   Buchanan was taken to Muskogee Regional Hospital for a few hours, before being transferred to St. John's in Tulsa, for 14 days, where he was discharged on September 30, 2016. (See Ex. 1, Depo. of James Buchanan, 97:24-98:25).

5.   From the bicycle accident, Buchanan suffered two broken ribs on the left side, a collapsed left lung, and neck issues (which did not require surgery at St. Johns).  While at St. John's, his lung had re-inflated, and there was no treatment necessary for his broken ribs.  (See Ex. 1, Depo. of James Buchanan, 100:14-103:7, 106:3-108:5).

6.   While at St. John's, the infection that eventually led to a cervical epidural abscess in his spine were not noticed by medical personnel, even though it was already existent. (See Ex.5, August 10, 2019 Depo. of Dr. Clinton Baird, 124:16-125:15).

7.   Buchanan did not return to work after being released from the hospital on September 30, 2016.  (See Ex. 1, Depo. of James Buchanan, 109:11-109:16).

8.   Buchanan also did not bother to see his doctor, once his short-term pain medication ran out 20 days after his release from St. John's. He instead chose on his own volition to begin seeing a chiropractor. (See Ex. 1, Depo. of James Buchanan, 122:1-122:21, 151:1-151:16).

9.   After his release from St. John's, Buchanan absconded from court at an October 24, 2016 hearing on three criminal cases (including two felonies): CM-2015-232, CF-2014-62, and CF-2016-367, causing his bond to be revoked by Judge Adair, and a bench warrant to be issued. (See Ex. 1, Depo. of James Buchanan, 116:1-116:19, 122:24-123:1, 145:9-145:19).

10. Buchanan turned himself into the Muskogee County Jail on November 3, 2016.  (See Ex. 1, Depo. of James Buchanan, 117:3-117:15; Ex.  6, Booking and Release Sheet).

11. At the time he entered the Muskogee County Jail, his broken ribs had healed, and he no longer had a collapsed lung.   (See Ex. 1, Depo. of James Buchanan, 137:22-138:15, 291:24-292:2).

12. Upon his entry into the Muskogee County Jail, Buchanan told jail personnel that he had broken ribs, a collapsed lung, burnt fingers, and "neck problems." (See Ex. 1, Depo. of James Buchanan, 147:19-148:14; Ex. 7, Medical Questionnaire).

13. Buchanan also informed jail personnel that he was taking "anti-inflammatory muscle relaxers pain meds" via a Dr. Trinidad. (See Ex. 1, Depo. of James Buchanan, 150:20-151:3).

14. As of November 3, 2016, Buchanan says he had no indication whatsoever that any sort of paralysis was developing.  (See Ex. 1, Depo. of James Buchanan, 327:10-327:24).

15. A medical screening was thereafter performed by Turn Key Health Clinics, LLC ("Turn Key") nurse Rosemary Kotas on November 3, 2016, where it was again noted that Buchanan had broken ribs, a collapsed lung, burnt fingers, and "neck problems." (See Ex. 1, Depo. of James Buchanan, 153:3-156:21; Ex. 3, Depo. of Todd Wilcox, 154:22-155:9; Ex. 34, Intake Form).

16. As of that date (November 3, 2016), Buchanan says he was able to move both his arms and both his legs.  (See Ex. 1, Depo. of James Buchanan156:19-156:23).

17. On November 4, 2016, Buchanan was brought by Jailer Ryan Hamil ("Hamil") to Turn Key medical staff, where he was seen by a nurse named Deana Ayers ("Ayers").  Ayers spoke with Turn Key Dr. William Cooper ("Cooper"), who prescribed Buchanan with an anti-inflammatory pain reliever, Naproxen 500 mg, twice a day.  (See Ex. 1, Depo. of James Buchanan, 175:14-176:24; Ex. 8, Depo. of Ryan Hamil, 16:7-16:25; Ex. 9. Provider Order; Ex. 10, Depo. of William Cooper, 147:1-147:13).

18. On November 4, 2016, Buchanan says he was still able to move both his arms and both his legs.  (See Ex. 1, Depo. of James Buchanan, 178:8-178:20).

3

19. In Buchanan's remaining time at the Muskogee County Jail, Hamil (who worked the north tower which covered cellblock 1, and received intercom messages) has no memory of any other interaction with Buchanan, of receiving any complaints from Buchanan or from any other inmates about Buchanan, or of hearing of any inmate who was paralyzed or unable to use his appendages. (See Ex. 8, Depo. of Ryan Hamil, 18:19-19:16, 21:17-21:24, 22:1-22:17, 48:15-49:4).

20. Buchanan was administered Naproxen by nurses twice a day every day, in the morning and at night, with only one exception (19 total times). On each of these occasions, the nurses came up to the bean hole at the door, and gave the medication directly to Buchanan, making sure that his mouth was open, and that the medication was swallowed. Buchanan had the opportunity to speak to the nurses on all of these occasions.  Moreover, on each of these occasions, Buchanan had to stand and walk up to the bean hole to obtain the medication. (See Ex. 1, Depo. of James Buchanan, 181:12-181:22, 182:4-183:9; Ex. 11, Depo. of Rosemary Kotas, 226:8-227:21, Ex. 12, Medication Administration Record; Ex. 8, Depo. of Ryan Hamil, 49:15-49:22; Ex. 3, Depo. of Todd Wilcox, 159:6-159:19; Ex. 13, Depo. of Marshal Dugan, 58:12-59:11, 63:7-63:13; Ex. 10, Depo. of William Cooper, 156:2-157:6).

21. The Sick Call List from November 5, 2016 does not include Buchanan, which indicates he did not request to see any nurses on that date.  (See Ex. 14, February 6, 2019 Depo. of Rob Frazier, 120:3-120:11; Ex. 15, November 5, 2016 Sick Call List)

22. On at least five times, (November 4, 5, 6, 10, and 11) LPN Rosemary Kotas ("Kotas") administered medication directly to Buchanan, and never thought there was an emergency situation.  If she had thought there was, she would have contacted Dr. Cooper. (See Ex. 11, Depo. of Rosemary Kotas, 227:23-229:8; Ex. 12, Medication Administration Record).

4

23. Also on at least four occasions (on November 6, 7, 11, and 14), LPN Katie McCullar (aka Katie Smith) ("McCullar") administered medication directly to Buchanan.  (See Ex. 16, Depo. of Katie McCullar, 199:11-201:3, 203:5-203:18, 222:14-222:18; Ex. 12, Medication Administration Record).

24. On November 6, 7, and 11, McCullar does not recall Buchanan saying anything to her about paralysis, or being unable to move, and McCullar does not believe there was any sort of emergency situation.  (See Ex. 16, Depo. of Katie McCullar, 203:16-204:24, 222:14-222:18).

25. Additionally, McCullar has no memory of any jailer or other nurse saying anything to her about Buchanan before the morning of November 14.  (See Ex. 16, Depo. of Katie McCullar, 205:20-205:25, 223:20-224:3).

26. Neither Buchanan, nor Marshal Dugan, can name any jailers at all that they dealt with in the Muskogee County Jail.  (See Ex. 1, Depo. of James Buchanan, 184:2-184:3, 188:5-188:8; Ex. 13, Depo. of Marshal Dugan, 77:10-77:14).

27. Buchanan never filled out a medical request in writing, or had another inmate fill one out on his behalf, during his entire time at the Muskogee County Jail. (See Ex. 1, Depo. of James Buchanan, 187:13-187:18; Ex. 13, Depo. of Marshal Dugan 74:18-74:24; Ex. 17, Depo. of Charles Quick, 40:17-40:24).

28. Buchanan does not know when he started to lose feeling in his arms, despite his Amended Complaint saying he lost feeling in his left arm on November 4, 2016.  (See Ex. 1, Depo. of James Buchanan, 197:19-197:22; Dkt. 25, Paragraph 16).

29. Buchanan was put on the Sick call list on November 6, 2016 for shoulder pain, and Buchanan agrees he may have only complained about shoulder pain at the time due to the fact that he was sleeping on a mat on the floor (which is permissible under the Oklahoma Department of Human Services Jail Standards). The Sick Call list documentation says nothing about

5

Buchanan losing feeling in his limbs, or becoming paralyzed.   (See Ex. 1, Depo. of James

Buchanan, 204:22-207:21, Ex. 18, November 6, 2016 Sick Call list).

30. Buchanan was moved into Cellblock 1 on November 7, 2016.   (See Ex. 13, Depo. of

Marshal Dugan, 47:23-48:8; Ex. 17, Depo. of Charles Quick, 48:10-48:17).

31. The Sick Call List from November 10, 2016 does not include Buchanan, which indicates

he did not request to see any nurses on that date either. (See Ex. 14, February 6, 2019 Depo. of

Rob Frazier, 121:8-121:17; Ex.  19, November 10, 2016 Sick Call List).

32. Buchanan visited and spoke with his brother Stan Buchanan at the jail on November 11,

2016.  Buchanan claims that he could not use his arms at the time of this call, but video of the

encounter clearly shows otherwise: that he is not paralyzed and *can* use his arms.  Additionally,

he can use his legs in the video, and does not even complain of any issues related to his legs in

the video. (See Ex. 1, Depo. of James Buchanan, 271:24-273:13; Ex. 3, Depo. of Todd Wilcox,

153:12-154:4; Ex. 20, November 11, 2016 Video of visit with Stan Buchanan; Ex. 17, Depo. of

Charles Quick, 60:6-60:9; Ex. 4, Depo. of Stan Buchanan, 73:7-73:15, 75:6-75:11).

33. Also in the conversation with his brother, Buchanan spends much of the conversation

talking about taking care of his plants at home, and talking about his bicycle. (See Ex. 13, Depo.

of Marshal Dugan, 68:15-68:20; Ex. 20, Video of phone conference with Stan Buchanan).

34. In the video, Stan Buchanan suggested that he might come visit his brother again, but he

did  not  actually  bother  visiting  his  brother  in  the  Muskogee  County  Jail  again  after  the

November 11th conversation. Stan Buchanan additionally did not take anything his brother said

in  the  conversation  seriously  enough  to  actually  do  anything,  or  say  anything  to  any  jail

personnel about his brother's condition. (See Ex. 20, Video of phone conference with Stan

Buchanan, Ex. 4, Depo. of Stan Buchanan, 80:18-80:22, 95:12-95:18).

35. On November 11, 2016, Buchanan was seen by Turn Key LPN Rosemary Kotas (who had been a nurse for 33 years), who noted that he had decreased range of motion in his upper and lower extremities, limited range of motion in his neck, as well as pain.  (See Ex. 1, Depo. of James Buchanan, 207:23-210:25; Ex. 21, November 11, 2016 Medical Note; Ex. 11, Depo. of Rosemary Kotas, 220:5-220:19, 240:20-240:22).

36. Kotas did not believe that there was an emergency situation when she saw Buchanan on the 11th.  If she had thought there was an emergency situation, she would have made sure he received additional medical care. (See Ex.11, Depo. of Rosemary Kotas, 60:16-60:23, 222:16-222:18, 223:24-224:2).

37. If Turn Key nursing staff did not believe there was an emergency situation, but also could not handle a situation with standard protocols, Turn Key procedure was that they were supposed to schedule an appointment with Dr. Cooper, who came in once per week. (See Ex.10, Depo. of William Cooper, 152:8-152:25, 159:22-160:37).

38. The Turn Key LPN's had more medical training than any of the jailers on staff at the Muskogee County Jail (including training on what is and what is not an emergency), and the jailers were entitled to rely on the nurses' medical opinions. (See Ex. 11, Depo. of Rosemary Kotas, 224:4-225:5; Ex. 10, Depo. of William Cooper, 139:20-140:9; Ex. 16, Depo. of Katie McCullar, 195:22-196:20, 214:25-215:10; Ex. 22, Depo. of Lloyd Bickel, 110:7-110:14; Ex.  23, Depo. of Jeremy Garvin, 117:2-117:9; Ex. 14, February 6, 2019 Depo. of Rob Frazier, 124:4-124:18; Ex. 5, August 10, 2019 Depo. of Dr. Clinton Baird, 161:13-161:24).

39. Jail staff had no reason to believe that Turn Key nursing staff were providing Buchanan with improper or substandard care. (See Ex. 10, Depo. of William Cooper, 138:18-138:22).

40. Jail staff did not prevent Turn Key from providing Buchanan with medical care.  (See Ex. 10, Depo. of William Cooper, 138:24-139:3).

41. Jail staff members were entitled to send inmates to the emergency room via EMS if they thought it was obvious nursing staff members were not providing appropriate medical care in an emergency situation.  (See Ex. 22, Depo. of Lloyd Bickel, 110:15-110:21).

42. As she did not think it was an emergency situation as of her November 11th visit, Kotas put Buchanan on the sick call list, and Buchanan was scheduled to see Dr. Cooper on his next weekly round, on November 15, 2016. (See Ex. 1, Depo. of James Buchanan, 212:20-212:25; Ex. 3, Depo. of Todd Wilcox, 161:10-161:13; Ex. 10, Depo. of William Cooper, 137:6-137:15, 159:7-159:10).

43. On the morning of November 14, 2016, Turn Key LPN Katie McCullar was contacted by a jailer via walkie-talkie, who told her that Buchanan was complaining.  McCullar went to the pod to see Buchanan, and she saw that he was sitting at a table, had muscle tone, was not flaccid, and he was able to hold himself upright. (See Ex. 16, Depo. of Katie McCullar, 206:1-209:24).

44. At 11:27 am, McCullar documented that Buchanan was complaining of worsening pain and inability to move his lower extremities, and tingling in his legs, but not paralysis. (See Ex. 16, Depo. of Katie McCullar, 210:1-211:2; Ex. 24, Katie McCullar's November 14, 2016 Medical Progress Note).

45. McCullar contacted Dr. Cooper, and Dr. Cooper instructed her to again place Buchanan on the list to be seen by Dr. Cooper on the 15th (even though he was already on the list). McCullar did not think there was an emergency situation at this time.  (See Ex. 10, Depo. of William Cooper, 138:9-138:13, 150:21-151:11; Ex. 16, Depo. of Katie McCullar, 212:24-212:25, 214:9-214:12, 216:1-216:18, 221:24-222:1; Ex. 24, Katie McCullar's Medical Progress Note).

46. Later on November 14, 2016, Buchanan intentionally urinated on himself for the first and only time in order to get the attention of a jailer, and Buchanan informed an unnamed jailer that

he had urinated. (See Ex. 1, Depo. of James Buchanan, 215:20-216:22, 220:25-221:2; Ex. 13, Depo. of Marshal Dugan, 50:18-50:25).

47. When Buchanan intentionally urinated on himself, he claims he had only just lost the use of his legs within the previous 24-36 hours. (See Ex. 1, Depo. of James Buchanan, 220:25-221:8; Ex. 13, Depo. of Marshal Dugan, 62:14-62:20).

48. Buchanan claims he was thereafter seen immediately by a Turn Key nurse, who the unnamed jailer called.  (See Ex. 1, Depo. of James Buchanan, 219:9-219:21).

49. Turn Key Nurse Rosemary Kotas agrees that a jailer informed her of Buchanan's situation on November 14th at 8:10 p.m., at which point Kotas saw urine on the floor, and performed vitals.  Based on the urination, elevated heart rate, decreased oxygen saturation (which is an unreliable number), and the appearance of pain, Kotas determined for the first time that it was an emergency situation, and contacted Dr. Cooper via telephone, who also agreed it was an emergency situation. (See Ex. 11, Depo. of Rosemary Kotas, 221:2-221:10, 221:22-221:25, 223:14-223:23, 229:9-229:16, 235:6-235:15, 245:24-246:17; Ex. 25, Rosemary Kotas' November 14, 2016 medical progress note; Ex. 16, Depo. of Katie McCullar, 221:11-221:17).

50. Dr. Cooper was not *required* to give approval to send an inmate to the emergency room; Rosemary Kotas, Katie McCullar, or any other nurse could have done so, even without his approval, if they believed there was an emergency situation.  (See Ex. 10, Depo. of William Cooper, 150:4-150:20, 151:12-151:16; Ex. 16, Depo. of Katie McCullar, 223:9-223:15).

51. Prior to this moment on the evening of November 14th, Kotas had never informed any jail staff member, or been informed by any jail staff member, that Buchanan was in an emergency situation, or needed to go to the hospital immediately. Nor had any such conversations occurred with Dr. Cooper and jail staff. (See Ex. 11, Depo. of Rosemary Kotas, 235:236:16; Ex. 10, Depo. of William Cooper, 161:24-162:21).

9

52. Kotas then contacted the EMSA ambulance service, who transported Buchanan to the hospital on the evening of November 14, 2016. (See Ex. 1, Depo. of James Buchanan, 220:20-221:25; Ex. 11, Depo. of Rosemary Kotas, 223:22-223:23; Ex. 30, Audio recording of phone call to EMSA).

53. Even on November 14, 2016, neither Kotas nor McCullar knew that Buchanan had a cervical epidural abscess, which is an uncommon condition that is not one of the first things that springs to mind upon seeing a decreased range of motion.  (See Ex. 11, Depo. of Rosemary Kotas, 230:21-231:20; Ex. 10, Depo. of William Cooper, 134:19-135:18; Ex. 16, Depo. of Katie McCullar, 211:24-212:23, 215:18-215:25; Ex. 5, August 10, 2019 Depo. of Dr. Clinton Baird, 143:24-144:11).

54. Buchanan was transferred again from the local hospital to a larger and more specialized hospital, Hillcrest Medical Center, on November 15, 2016, and he had surgery performed by Dr. Clinton Baird on November 16, 2016 on his spine.  Even by the time of the surgery (2 days after his release from the Muskogee County Jail), the surgery was done within the 24-72 hour window of time to prevent complete paralysis and allow Buchanan to recover.  (See Ex. 5, August 10, 2019 Depo. of Dr. Clinton Baird, 136:15-137:6).

55. Buchanan is now able to care for himself, including walking, going up steps, bathing himself, going to the bathroom on his own, cooking and cleaning for himself, and even riding a bicycle. (See Ex. 1, Depo. of James Buchanan, 264:12-264:23, 305:19-306:2, 309:2-309:16, 327:25-328:1; Ex. 4, Depo. of Stan Buchanan, 90:5-91:7).

56. The Muskogee County Detention Center ("MCDC") had a policy to provide adequate health care services, including complete emergency medical, dental, and mental health care, to all inmates regardless of their financial status.  The policy provided that outside medical resources and specialized treatment was available, including access to adequately equipped and

licensed hospital emergency rooms and other appropriate health facilities in the community. (Ex. 26, MCDC Policy 15-1).

57. The MCDC had policies to provide inmates with access to routine and emergency medical care. The policies provided a "Sick Call" procedure by which inmates could request routine medical care, and provided for a medical clinic twice a week at the facility by licensed medical personnel to see inmates requesting care through the "Sick Call" procedure. The policies provided that medical staff would be on duty at the facility 24 hours a day, and inmates would have access to emergency medical care for acute illnesses and unexpected health care needs which could not be deferred until the next scheduled sick call. The policies also provided for in-cell care for illness or diagnosis requiring bed rest or limited observation or management, but not requiring hospital admission. The policies further provided for access to outside medical specialists where medically necessary. (Ex. 27, MCDC Policy 15-3; Ex. 28, MCDC Policy 15-5).

58. The MCDC had a policy requiring the administration of inmate prescription medication in compliance with the orders of a licensed physician or designated medical authority. (Ex. 29, MCDC Policy 15-6).

59. It was the policy and custom at the MCDC to provide inmates medical care, and to contact Turn Key medical if a jailer thought that an inmate needed medical care. It would be against policy and custom to ignore an inmate's medical needs, or to deny an inmate medical care. (See Ex. 8, Depo. of Ryan Hamil, 19:17-21:3; Ex. 3, Depo. of Todd Wilcox, 164:18-164:22, 166:19-166:22; Ex. 26-29, MCDC Policies; Ex. 22, Depo. of Lloyd Bickel, 110:23-111:1; Ex. 14, February 6, 2019 Depo. of Rob Frazier, 124:9-125:6).

60. It was also the policy of the MCDC to provide adequate healthcare services, including complete emergency, medical, dental and mental healthcare to all inmates in the jail regardless of their financial status. It was additionally the policy of the MCDC to provide inmates with

11

medical and healthcare services that met standards.  Further, it was the policy of the MCDC to send inmates to the emergency room in emergency situations. If healthcare was provided that did not meet standards (including any failure to send inmates to the emergency room in an emergency situation), this would be a violation of policy. (See Ex. 16, Depo. of Katie McCullar, 229:18-231:6; Ex. s 26-29, MDCD Policies; Ex. 22, Depo. of Lloyd Bickel, 111:2-111:4; Ex. 23, Depo. of Jeremy Garvin, 117:10-117:20; Ex. 14, February 6, 2019 Depo. of Rob Frazier, 124:9-125:6).

61.    There is no requirement in Oklahoma that County Jails have Licensed Practical Nurses (LPN's) on-site at all, and no requirement that County Jails have on-site medical staff 24/7. Nevertheless, the Muskogee County Jail, unlike the vast majority of County Jails, had, via Turnkey, LPN's on-site 24/7, as well as an Advanced Registered Nurse Practitioner or Doctor at the site twice per week, and a medical provider (Dr. Cooper) on call 24 hours per day. (See Ex. 3, Depo. of Todd Wilcox, 155:16-155:25; Ex.  10, Depo. of William Cooper, 139:4-139:25, 140:11-141:7, 149:16-150:3; Ex. 22, Depo. of Lloyd Bickel, 109:8-109:20; Ex. 23, Depo. of Jeremy Garvin, 118:5-118:21; Ex. 31, Contract for Medical Staffing, Section 1.14; Ex.  32, Depo. of Flint Junod,  44:13-45:9, 47:17-48:13, 88:1-88:24).

62. In contracting with Turnkey, the MCDC picked a higher and more expensive option with 24-hour coverage to provide optimal medical care for inmates.  (See Ex. 22, Depo. of Lloyd Bickel, 108:5-119:20; Ex. 23, Depo. of Jeremy Garvin, 118:5-118:21; Ex. 31, Contract for Medical Staffing, Section 1.14).

63. Some county jails in Oklahoma do not have on-site medical staff at all, which is approved by the Oklahoma Department of Health. (See Ex. 32, Depo. of Flint Junod, 89:7-89:25).

64. Additionally, there is no requirement in Oklahoma that County Jails have an LPN do an initial assessment. Nevertheless, at the Muskogee County Jail, LPN's performed the initial assessments. (See Ex. 3, Depo. of Todd Wilcox, 156:1-156:21).

65. The Muskogee County Jail had no control over Turn Key's staffing decisions, as Turn Key staff were employees/agents of Turn Key, not Muskogee County.  (See Ex. 23, Depo. of Jeremy Garvin, 115:15-115:20; Ex.  31, Contract for Medical Staffing, Section 1.14).

66. Under the terms of the Contract, Turn Key kept medical records of the inmates of its own, separate from the Jail's own files on the inmates.  (Ex. 31, Contract for Medical Staffing, Section 1.23).

67. Under the terms of the Contract with Turn Key, Turn Key was responsible for medical care of all inmates in the facility. (See Ex. 31, Contract for Medical Staffing).

68. Under the terms of the Contract with Turn Key, Turn Key was required to comply with the Oklahoma Department of Human Services Jail Standards. (Ex. 31, Contract for Medical Staffing, Section 1.3; Ex.  32, Depo. of Flint Junod, 91:11-92:2).

69. Under the terms of the Contract with Turn Key, Turn Key is an independent contractor, and not an agent of the County. (Ex. 31, Contract for Medical Staffing, Section 5.1; Ex. 32, Depo. of Flint Junod, 94:15-95:24).

## ARGUMENT AND AUTHORITY

### STANDARD OF REVIEW

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment is not a disfavored procedural shortcut, but an integral part of the federal rules as a whole. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986), the Supreme Court held that "there is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party."  The Court further held that "if the evidence is merely colorable, or not significantly probative, summary judgment may be granted." *Id.* In addition, the *Anderson* Court stated that "the mere existence of a scintilla of evidence in support of a plaintiff's position will be insufficient; there must be evidence on which a jury could reasonably find for the plaintiff." *Id.* A movant's summary judgment burden may properly be met by reference to the lack of evidence in support of plaintiff's position. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex*, 477 U.S. at 325).

Furthermore, as described by the court in *Cone v. Longmont United Hosp. Ass'n.*, 14 F.3d 526 (10th Cir. 1994), "Even though all doubts must be resolved in (the nonmovant's) favor, allegations alone will not defeat summary judgment." *Cone* at 530 (citing *Celotex*, 477 U.S. at 324). *See also Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991); *Roemer v. Pub. Serv. Co. of Colo.*, 911 F. Supp. 464, 469 (D. Colo. 1996).  Moreover, "(i)n response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

### PROPOSITION I:

### Defendant Frazier is Entitled to Summary Judgment With Regard to Plaintiff's 42 U.S.C. § 1983 Claim

Plaintiff asserts a sole claim against Defendant Frazier in his official capacity, which arises under 42 U.S.C. § 1983.[1]  This claim against Defendant Frazier in his official capacity represents another way of pleading an action against an entity of which Sheriff Frazier is

---

[1] Defendant Frazier was not even Sheriff of Muskogee County at the time of these events, when Charles Pearson was Sheriff.

currently the agent. *See McDonald v. Wise*, 769 F.3d 1202, 1215 (10th Cir. 2014). Specifically, Plaintiff alleges that his rights under the Eighth and/or Fourteenth Amendments were violated by the alleged denial of adequate medical care. (Dkt. 25, pp. 11-15). However, Defendant Frazier in his official capacity is entitled to summary judgment with regard to that claim.

Section 1983 creates no substantive civil rights, but rather only provides a procedural mechanism for enforcing rights established elsewhere. *See Albright v. Oliver*, 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994); *Gallegos v. City and County of Denver*, 984 F. 2d 358, 362 (10th Cir. 1993). *See also Miller v. Hawver*, 474 F. Supp. 441, 442 n.1 (D. Colo. 1979) (§ 1983 is not a general or common law tort claims statute). In order to establish municipal liability against the Defendant under 42 U.S.C. § 1983, Plaintiff must show that his constitutional right was violated by an individual subordinate agent of Sheriff Frazier in his official capacity, AND that such violation was caused by a policy, practice or custom of the MCDC or that an official with final policy-making authority for the MCDC (*i.e.* former Muskogee County Sheriff Charles Pearson) personally participated in the alleged constitutional violation(s). *See Jett v. Dallas Independent School District*, 491 U.S. 701, 109 S. Ct. 2702, 105 L. Ed. 2d 598 (1989) (municipality cannot be held liable under § 1983 unless the act complained of is that of a final policymaker or a custom or usage is shown).

**A.   Individual Violation**

The lack of a constitutional violation by the officers of a municipality negates a finding of liability against the municipality itself. *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993). This is so "regardless of whether the municipality's policies might have 'authorized' such harm." *Id.* (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)). *See also Walker v. City of Orem*, 451 F.3d 1139, 1152 (10th Cir. 2006) (holding that a plaintiff suing a county under § 1983 must demonstrate that a municipal employee committed a constitutional violation);

15

*Livsey v. Salt Lake County*, 275 F.3d 952, 958 (10th Circ. 2001) (county employees did not violate constitutional rights and thus could not have cause the county to be held liable based on their actions). Here, first and foremost, Plaintiff cannot show that any individual members of the jail staff acted with deliberate indifference toward Plaintiff's medical needs. As such, no constitutional violation occurred, and Defendant Frazier is entitled to summary judgment for this primary reason.

Deliberate indifference is a very high standard to meet, one which requires proof that an actor disregarded a "known or obvious consequence of his action" as it relates to providing medical care. *Bd. Of County Comm'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397, 410 (1997). "It is obduracy and wantonness, not inadvertence or error in good faith" that violates the Constitution with regard to meeting medical needs. *Whitley v. Albers*, 475 U.S. 312, 319 (1986). In *Estelle v. Gamble*, 429 U.S. 97 (1976), the U.S. Supreme Court held that deliberate indifference to a prisoner's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment, and such a constitutional violation is actionable under § 1983. *Estelle* at 104.

To state a claim that deliberate indifference to serious medical needs rises to the level of cruel and unusual punishment, a plaintiff must satisfy both the objective and subjective elements of the test for deliberate indifference. *Mata v. Saiz*, 427 F.3d 745, 752-753 (10th Cir. 2005) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834-37, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Defendant Frazier acknowledges that Plaintiff experienced medical issues that were sufficiently serious to satisfy the objective element of the test. However, the second element that Plaintiff must prove to satisfy the deliberate indifference test is the subjective element, which is not met here. To meet that burden, Plaintiff must show that an individual agent of Defendant Frazier in his official capacity acted with a "sufficiently culpable state of mind," in a manner so egregious

16

that it amounts to "deliberate indifference" to a substantial risk of serious harm to an inmate. *Farmer* at 834. Mere negligence, even gross negligence, is insufficient to meet this standard. *Berry v. City of Muskogee, Oklahoma*, 900 F.2d 1489, 1495 (10th Cir. 1990) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 and n. 7 (1989)). In other words, to meet the subjective element, Plaintiff must demonstrate that a specific employee of the Jail was aware of a known or obvious risk that Plaintiff was at substantial risk of serious harm, and did not act to mitigate that risk. *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999). Collective liability is insufficient; one or more specific employees of the Sheriff's Office must have acted with deliberate indifference. *See Burke v. Regalado*, 2019 WL 3938633 at *30-31 (10th Cir., August 20, 2019) (attached as Ex. 33).  Plaintiff cannot do this; there is simply no evidence that any particular individual MCDC employee was deliberately indifferent to Plaintiff's medical needs

First and foremost, it is important to note that Sheriff Frazier in his official capacity can only potentially be held responsible for deliberate indifference by subordinates of the  Muskogee County Sheriff's Office, not Turn Key staff.  The Tenth Circuit recently clarified the standard for when an employee is a subordinate, stating:

> Under the contract between TCSO and CHC, "TCSO is charged with the responsibility for administering, managing[,] and supervising the health care delivery system" at the jail. App. at 11824. CHC providers worked at the jail only with TCSO's permission, and TCSO sometimes revoked this permission for policy violations. Moreover, TCSO (1) could require CHC to terminate medical providers; (2) "own[ed] and retain[ed] custody and control of all medical records," *id.* at 11828; (3) allocated space for CHC medical providers to work; and (4) provided equipment to CHC staff.  *See Burke, supra,* at *19.

Here, unlike in *Burke, supra*, Turn Key Staff were obviously not subordinates of the Muskogee County Sheriff. The Muskogee County Jail had no control over Turn Key's staffing decisions, as Turn Key Staff were employees/agents of Turn Key, not Muskogee County. (See Undisputed Fact No. 65).  Moreover, Turn Key kept medical records of the

inmates of its own, separate from the Jail's own files on the inmates. (See Undisputed Fact No. 66).  Further, under the terms of the Contract with Turn Key, Turn Key was responsible for medical care of all inmates in the facility. (See Undisputed Fact No. 67). Most importantly, under the terms of the Contract with Turn Key, Turn Key is an independent contractor, and not an agent of the County.  (See Undisputed Fact No. 69). The situation here is directly inapposite to the situation in *Burke, supra*, and Turn Key staff were NOT subordinates of the Muskogee County Sheriff.

Thus, Plaintiff must establish that an individual who actually was a subordinate of the Muskogee County Sheriff was deliberately indifferent.  Plaintiff cannot do this.  Notably, Plaintiff fails to even indicate in his Amended Complaint (Dkt. 25) which particular individual allegedly violated Plaintiff's constitutional rights through deliberate indifference.  It is still not clear who Plaintiff is claiming the detention staff member is that allegedly violated his rights.  In fact, Plaintiff cannot even name any staff at the Jail at all.  (See Undisputed Fact No. 26).

Certainly, Plaintiff cannot establish that any particular employee of the Muskogee County Jail was aware of a known or obvious risk that Plaintiff was at substantial risk of serious harm, and did not act to mitigate that risk. *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999). In the absence of a reason to believe that medical personnel were mistreating or not treating the prisoner, non-medical prison personnel cannot be held liable for deliberate indifference to a prisoner's serious medical needs if the prisoner is under the care of prison medical personnel. *Spruill v. Gillis*, 372 F.3d 218, 236 (3rd Cir. 2004).

Here, Plaintiff was seen by medical personnel on at least 22 occasions.  He received a medical screening from a qualified nurse. (See Undisputed Fact No. 15). He received Naproxen 19 times, every morning and every night (with one exception), which was prescribed by a qualified physician, and passed to him directly by a qualified nurse, who

18

placed it in his mouth and had the opportunity to see him. (See Undisputed Fact Nos. 17, 20, 22, 23, 35). He was seen again by a qualified by nurse on November 11, 2016, and was placed on the sick call list to see Dr. Cooper. (See Undisputed Fact No. 35). No member of the nursing staff ever thought that Plaintiff was in an emergency situation, until the evening of November 14, 2016. (See Undisputed Fact Nos. 24, 36, 45, 51). Even when he was examined by Turn Key LPN Katie McCullar on the morning of November 14, 2016, she did not think it was an emergency situation. (See Undisputed Fact Nos. 43 - 45). Jail staff had no reason to believe that Turn Key nursing staff were providing Plaintiff with improper or substandard care. (See Undisputed Fact No. 39). Jail staff additionally did not prevent Turn Key from providing Plaintiff with medical care. (See Undisputed Fact No. 40). Jail staff were entitled to send inmates to the emergency room via EMS if they thought it was obvious nursing staff were not providing appropriate medical care in an emergency situation. (See Undisputed Fact No. 41). Here, no such thing was obvious. Rather, only after Plaintiff intentionally urinated on himself, and LPN Nurse Rosemary Kotas performed vitals, did it become apparent that Plaintiff was in an emergency situation. (See Undisputed Fact Nos. 47-50).

The Turn Key LPN's had more medical training than any of the jailers on staff at the Muskogee County Jail (including training on what is and what is not an emergency), and the jailers were entitled to rely on the nurses' medical opinions that it was not an emergency, and that he should be seen on November 15th by Dr. Cooper. (See Undisputed Fact Nos. 38, 51). Plaintiff's brother additionally did not seem to think that Plaintiff was in an emergency situation, as even after seeing and talking to him on the 11th (where Plaintiff spent much of the conversation talking about his bicycle and his plants), his brother did not do anything to help Plaintiff, or say anything to jail personnel. (See Undisputed Fact Nos. 33, 34).

Even on November 14, the Turn Key nurses had not been able to correctly diagnose Plaintiff's cervical epidural abscess, which is an uncommon condition that is not one of the first things that springs to mind upon seeing a decreased range of motion. (See Undisputed Fact No. 53). They were not alone: the medical personnel at St. John's had not diagnosed it either, even though the underlying infection had already started. (See Undisputed Fact No. 6). Nevertheless, the Turn Key nurses recognized an emergency situation when it in fact developed, as he was transferred to the hospital on November 14. (See Undisputed Fact No. 52). He was then transferred to Hillcrest Medical Center on November 15, who waited another day until November 16 to perform surgery within the 24-72 hour window to prevent complete paralysis and allow Plaintiff to recover. (See Undisputed Fact No. 54). Thankfully, Plaintiff recovered, and is now able to care for himself, including walking, going up steps, bathing himself, going to the bathroom on his own, cooking and cleaning for himself, and even riding a bicycle. (See Undisputed Fact No. 55).

Plaintiff here essentially argues that some unnamed and unknown jailer violated his rights by denying him medical care, even though Plaintiff was seen by well-trained medical personnel TWENTY-TWO times, and no medical personnel ever considered it to be an emergency until the evening of November 14, when he was promptly and appropriately taken to the hospital. There is no evidence in this case whatsoever that Muskogee County Jail personnel prevented Plaintiff from receiving medical care, and certainly no evidence that any particular subordinate of the Muskogee County Sheriff was deliberately indifferent. Even Plaintiff cannot name the individual who supposedly violated his rights. There is no underlying violation of Plaintiff's constitutional rights by a Muskogee County Sheriff's Office employee, and for this original and primary reason, Defendant Sheriff Frazier in his official capacity is entitled to summary judgment.

**B.   Official Capacity**

Here, there is no allegation or evidence that former Sheriff Pearson personally participated in the alleged violations of Plaintiff's constitutional rights.   As such, Plaintiff's § 1983 claim against Defendant Frazier in his official capacity must be premised on the existence of some policy, practice, or custom of the MCDC.

Defendant Frazier cannot be held liable under § 1983 based upon the doctrine of *respondeat superior* or vicarious liability. *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694-95, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).   In *Monell*, the Supreme Court held that a governmental entity is only liable under § 1983 when the constitutional injury can fairly be said to have been caused by that entity's own policies and customs. *Id*. at 694.   The actions of the governmental entity must be the moving force behind the constitutional violation. *Id*. The Supreme Court has held that governmental liability for a constitutional violation "attaches where - and only where - the entity makes a deliberate choice to follow a course of action from among various alternatives." *Pembaur v. Cincinnati*, 475 U.S. 469, 483, 106 S. Ct. 1291, 89 L. Ed. 2d 425 (1986).

Defendant Frazier may not be held liable simply because it "employs a tortfeasor." *Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 403, 117 S. Ct. 1382, 1388, 137 L. Ed. 2d 626 (1997).   Additionally, "[t]hat a plaintiff has suffered a deprivation of federal rights at the hands of a municipal employee will not alone permit an inference of municipal culpability and causation." *Id*. at 406-07.   Rather, *Monell* requires Plaintiff to establish that a policy or custom of the MCDC exists and that it caused the alleged constitutional violations. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 821-22, 105 S. Ct. 2427, 85 L. Ed. 2d 791 (1985); *see also Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993) (plaintiff must show that there is a direct causal link between the policy or custom and the injury alleged).

Furthermore, it is not enough for a §1983 plaintiff merely to identify conduct properly attributable to the municipality. *Brown*, 520 U.S. at 408. The plaintiff must also demonstrate that, through its *deliberate conduct*, the municipality was the "*moving force*" behind the injury alleged. *Id*. (emphasis added). Furthermore, "[w]here a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Id*. at 405.

In sum, Plaintiff cannot show that a policy, practice, or custom of the MCDC existed which caused any alleged violation of his constitutional rights.

> Municipal liability may be based on a formal regulation or policy statement, or it may be based on an informal custom so long as this custom amounts to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law.

*Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189 (10th Cir. 2010) (citations and internal quotation marks omitted).

In order for a municipality to be held liable for an un-official practice under § 1983, the practice must be "so permanent and well settled as to constitute a custom or usage with the force of law...In order to establish a custom, the actions must be persistent and widespread ... practices of [city] officials." *Lankford v. City of Hobart*, 73 F.3d 283, 286 (10th Cir. 1996) (internal citations and quotation marks omitted). In determining what level of persistent and widespread conduct will be sufficient to establish municipal liability, it is clear that "normally random acts" and "isolated incidents" fall short. *Church v. City of Huntsville*, 30 F.3d 1332, 1345 (11th Cir. 1994). *See also Carter v. Morris*, 164 F.3d 215, 220 (4th Cir. 1999) (a "meager history of isolated incidents" is insufficient). Furthermore, the court in *Lytle v. Doyle*, 326 F.3d 463, 473

(4th Cir. 2003), required evidence of "'numerous particular instances' of unconstitutional conduct."

However, Plaintiff cannot demonstrate that the alleged violations of his constitutional rights were caused by any policy, practice or custom of the MCDC. To the contrary, the MCDC had implemented policies and practices aimed at preventing the denial or delay of medical care to MCDC inmates.

Again, the Muskogee County Detention Center ("MCDC") had a policy to provide adequate health care services, including complete emergency medical, dental, and mental health care, to all inmates regardless of their financial status. The policy provided that outside medical resources and specialized treatment was available, including access to adequately equipped and licensed hospital emergency rooms and other appropriate health facilities in the community. (See Undisputed Fact No. 56). The MCDC had policies to provide inmates with access to routine and emergency medical care. The policies provided a "Sick Call" procedure by which inmates could request routine medical care, and provided for a medical clinic twice a week at the facility by licensed medical personnel to see inmates requesting care through the "Sick Call" procedure. The policies provided that medical staff would be on duty at the facility 24 hours a day, and inmates would have access to emergency medical care for acute illnesses and unexpected health care needs which could not be deferred until the next scheduled sick call. The policies also provided for in-cell care for illness or diagnosis requiring bed rest or limited observation or management, but not requiring hospital admission. The policies further provided for access to outside medical specialists where medically necessary. (See Undisputed Fact No. 57). The MCDC had a policy requiring the administration of inmate prescription medication in compliance with the orders of a licensed physician or designated medical authority. (See Undisputed Fact No. 58). It was the policy and custom at the MCDC to provide inmates medical

23

care, and to contact Turn Key medical if a jailer thought that an inmate needed medical care.  It would be against policy and custom to ignore an inmate's medical needs, or to deny an inmate medical care. (See Undisputed Fact No. 59).  It was additionally the policy of the MCDC to provide adequate healthcare services, including complete emergency, medical, dental and mental healthcare to all inmates in the jail regardless of their financial status. It was additionally the policy of the MCDC to provide inmates with medical and healthcare that met standards. Further, it was the policy of the MCDC to send inmates to the emergency room in emergency situations. If healthcare was provided that did not meet standards (including any failure to send inmates to the emergency room in an emergency situation), this would be a violation of policy.  (See Undisputed Fact No. 60).

In fact, the Muskogee County Detention Center went above and beyond the requirements to ensure that adequate and appropriate medical care was provide to its inmates.  There is no requirement in Oklahoma that County Jails have Licensed Practical Nurses (LPN's) on-site at all, and no requirement that County Jails have on-site medical staff 24/7. Nevertheless, the Muskogee County Jail, unlike the vast majority of County Jails, had, via Turnkey, LPN's on-site 24/7, as well as an Advanced Registered Nurse Practitioner or Doctor at the site twice per week, and a medical provider (Dr. Cooper) on call 24 hours per day.  (See Undisputed Fact No. 61). In contracting with Turnkey, the MCDC picked a higher and more expensive option with 24-hour coverage to provide optimal medical care for inmates. (See Undisputed Fact No. 62). Some county jails in Oklahoma do not have on-site medical staff at all, which is approved by the Oklahoma Department of Health. (See Undisputed Fact No. 63).  Additionally, there is no requirement in Oklahoma that County Jails have an LPN do an initial assessment.  Nevertheless, at the Muskogee County Jail, LPN's performed the initial assessments. (See Undisputed Fact No. 64).

Clearly, the policies and practices of the MCDC did not cause the alleged violations of Plaintiff's constitutional rights.   To the contrary, any alleged deprivations of the Plaintiff's constitutional rights (such as failing to send Plaintiff to the hospital if there was a known emergency situation) would be in violation of the MCDC's policies.

Moreover, Plaintiff has no evidence of any persistent and widespread pattern of denial of medical care to MCDC inmates that would support a claim of an informal unconstitutional custom or practice. *Cf Connick v. Thompson*, 131 S. Ct. 1350, 1360, 179 L.Ed.2d 417 (2011) (holding that a pattern of similar constitutional violations is typically necessary to prove deliberate indifference). The 10th Circuit recently clarified what is necessary to show such a widespread pattern, which would require a documented history of a failure to follow recommendations into increased staffing, a documented lack of well-qualified or trained nurses, and a repeated failure to timely address medical issues. *See Burke, supra*, at *21. None of these issues exist here.

Accordingly, the Defendant is entitled to summary judgment to the extent that Plaintiff's § 1983 claims against him are premised upon allegations of the existence of unconstitutional policies, practices, or customs.

WHEREFORE, premises considered, Defendant Rob Frazier, Sheriff of Muskogee County, in his Official Capacity, respectfully requests the Court to grant summary judgment in his favor and to dismiss all of Plaintiff's claims against him with prejudice to the re-filing thereof.

Respectfully submitted,

s/ Jordan L. Miller
Jordan L. Miller, OBA No. 30892
Andy A. Artus, OBA No. 16169
COLLINS, ZORN & WAGNER, P.C.
429 N.E. 50th, Second Floor
Oklahoma City, OK  73105
Telephone: (405) 524-2070
Facsimile: (405) 524-2078
Email: jlm@czwlaw.com
          aaa@czwlaw.com

*Attorney for Defendant Board of
Commissioners of Muskogee County,
Oklahoma and Sheriff Rob Frazier*

## CERTIFICATE OF SERVICE

I hereby certify that on September 4, 2019, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Daniel E. Smolen, via electronic mail at: danielsmolen@ssrok.com
Robert M. Blakemore, via electronic mail at: bobblakemore@ssrok.com
Bryon D. Helm, via electronic mail at: bryonhelm@ssrok.com
701 South Cincinnati Avenue
Tulsa, OK 74119

*Attorneys for Plaintiff*

Austin J. Young, via electronic mail at: ayoung@johnsonhanan.com
Sean P. Snider, via electronic mail at: ssnider@johnsonhanan.com
JOHNSON HANAN VOSLER
  HAWTHORNE AND SNIDER
9801 N. Broadway Extension
Oklahoma City, OK 73114

*Attorneys for Turn Key Health
Clinics, Inc., Dr. Cooper and
Katie McCullar, LPN*

s/ Jordan L. Miller
Jordan L. Miller