Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

JAMES D. BUCHANAN,            )
     Plaintiff,             )
                               )
vs.                           ) No. 18-CV-171-RAW
                               )
TURN KEY HEALTH CLINICS,      )
LLC, et al,                   )
     Defendant.             )


VIDEO DEPOSITION OF
WILLIAM COOPER, D.O.




DATE:  MARCH 27, 2019

REPORTER:  MARISA SPALDING, CSR, RPR




Spalding Reporting Service, Inc.
1611 South Utica Avenue, Box 153
Tulsa, Oklahoma 74104
(918) 284-2017

Exhibit 10

```
 1     A    On -- on Paycom.
 2     Q    Where would that be kept?
 3     A    Paycom.
 4     Q    Paycom?
 5     A    Uh-huh.
 6     Q    Okay.  But it was your general practice
 7   to go in exactly one-week increments; is that
 8   correct?
 9              MR. SMOLEN:  Object to the form.
10              THE WITNESS:  Generally.  Like I
11   said early on, there's sometimes exceptions.
12     Q    (By Mr. Miller)  And you have no memory
13   of seeing Mr. Buchanan on the 8th or any other
14   day that week, correct?
15     A    No.
16     Q    You have no memory of ever seeing
17   Mr. Buchanan, correct?
18     A    Correct.
19     Q    A cervical epidural abscess, is that a
20   common complaint?
21     A    No.
22              MR. SMOLEN:  Object to the form.
23     Q    (By Mr. Miller)  In your opinion, in
24   your experience, how many times do you think
25   you've seen a cervical epidural abscess in the
```

Page 135

```
 1   people you've treated?
 2              MR. SMOLEN:  Objection, relevance.
 3      Q   (By Mr. Miller)  Go ahead and answer.
 4      A   Once.
 5      Q   Is that this case?
 6      A   Once prior.
 7      Q   One other occasion.  And how many years
 8   have you been a doctor?
 9      A   25.
10      Q   Is that the first thing that springs to
11   mind with decreased range of motion?
12      A   No.
13      Q   Is that the second or third or fourth
14   thing that springs to mind with decreased range
15   of motion?
16      A   No.
17              MR. SMOLEN:  Object to the form.
18              THE WITNESS:  No.
19      Q   (By Mr. Miller)  You may have already
20   testified to this, but the fact that vitals are
21   not included in the records, does that mean
22   definitely they were not taken?
23      A   No.
24              MR. SMOLEN:  Object to the form.
25              THE WITNESS:  No, it does not.
```

 1     Q    (By Mr. Miller)  In fact, according to
 2   one of the records we've seen, he was already
 3   scheduled to be seen on the 15th by yourself,
 4   even on the 11th, correct?
 5     A    Correct.
 6     Q    So whether or not Mr. Buchanan was
 7   scheduled to be seen by you on the morning of
 8   the 14th, he had already been scheduled to be
 9   seen by you on the -- on the 11th, correct?
10              MR. SMOLEN:  Object to the form.
11              THE WITNESS:  Correct.
12     Q    (By Mr. Miller)  You would have been
13   seeing him on the 15th regardless of what was
14   written down on the 14th, correct?
15     A    Yes.
16              MR. SMOLEN:  Object to the form.
17     Q    (By Mr. Miller)  Do you know a nurse
18   named Rosemary Kotas?
19     A    Yes.
20     Q    Why was Rosemary Kotas terminated by
21   Turn Key?
22     A    I have no idea.
23     Q    Do you make any kind of personnel
24   decisions related to nursing staff?
25     A    No.

 1   Q   Okay. So whatever reason she was
 2   terminated, that was not your call; is that
 3   fair?
 4   A   Correct. Actually, I didn't know she
 5   was terminated.
 6   Q   (By Mr. Miller) Okay. How about Katie
 7   McCullar? Do you know Ms. McCullar?
 8   A   I don't recall her.
 9   Q   Okay. I think you testified that you do
10   not recall who contacted you on the morning of
11   the 14th. Do you have any reason to dispute
12   that it was Katie McCullar?
13   A   I do not.
14   Q   Did you ever speak with any jail
15   employee -- not a Turn Key employee -- but a
16   jail employee about Mr. Buchanan ever?
17   A   Not that I recall.
18   Q   Do you have any reason to think that
19   jail staff -- not Turn Key staff -- but jail
20   staff believed that Mr. Buchanan was receiving
21   improper or substandard medical care?
22   A   I did not.
23        MR. SMOLEN: Objection to the form.
24   Q   (By Mr. Miller) Do you have any reason
25   to believe that jail staff prevented Turn Key

Page 139

1  staff from providing Mr. Buchanan with medical
2  care?
3       A   I do not.
4       Q   The nurses who Turn Key sends to work at
5  medical facilities, what are their minimum
6  certification requirements?
7       A   They have to have a current unrestricted
8  license.  They have to have a basic CPR card,
9  first aid.
10      Q   Do they have to be at least an LPN?
11      A   Yes.
12      Q   Licensed practical nurse?
13      A   Well, we have med aides.  We do have med
14 aides.
15      Q   Okay.
16      A   And a -- and a few places, we have EMT's
17 as well.
18      Q   Okay.
19      A   It depends on --
20      Q   You would agree that an LPN has more
21 training and more experience -- well, strike
22 that.  You would agree an LPN has more training
23 on medical care than your average detention
24 officer, correct?
25      A   Correct.

Page 140

1   Q   You would agree that detention officers
2   are generally told to rely for medical purposes
3   on the decision making of the LPN's that are on
4   staff?
5           MR. SMOLEN:  Objection to the form.
6           THE WITNESS:  Correct.
7   Q   (By Mr. Miller)  In fact, that's why
8   they're there, right?
9   A   Correct.
10          MR. SMOLEN:  Objection to the form.
11  Q   (By Mr. Miller)  There was some question
12  about 168 hours.  I just want to be real clear
13  on this.  Was Muskogee County Jail a jail during
14  the year 2016 in which Turn Key employees were
15  supposed to be on staff 24 hours a day
16  physically in the facility?
17  A   Yes.
18  Q   Do you have any reason to think that
19  wasn't true?
20  A   No.
21  Q   Have you ever heard that that wasn't
22  true?
23  A   No.
24  Q   Plus a medical provider, meaning
25  yourself, was also on call 24 hours a day,

```
 1   correct?
 2       A    Correct.
 3       Q    Do you have any reason to believe that
 4   that wasn't, that you weren't on call 24 hours?
 5       A    I do not.
 6       Q    You were on call 24 hours?
 7       A    Yes, I was.
 8       Q    There was a record -- I don't think we
 9   looked at it today -- that suggested something
10   about a lady named Lela Goatley.  Who is Lela
11   Goatley?
12       A    She's a nurse practitioner.
13       Q    Was Lela Goatley ever a nurse
14   practitioner at the Muskogee County Jail with
15   Turn Key?
16       A    Yes, at some point.
17       Q    Okay.  So your earlier testimony was you
18   thought maybe there weren't -- wasn't a nurse
19   practitioner except for maybe a male one at the
20   very beginning?
21       A    There was.  And Lela worked there -- I
22   don't remember what period of time it was, but
23   she did work there some.
24       Q    Okay.  So in addition to the male at the
25   very beginning, Lela Goatley was an additional
```

Page 147

1  Q  Do you know for certain what day that
2  intake form was written?
3  A  I do not.
4  Q  Could it have been on the 4th, the day
5  after he got there?
6  A  That's the most likely date I would
7  choose.
8  Q  Why do you say that?
9  A  Because that's when they called me about
10 him.
11 Q  That's the day that -- the day that you
12 ordered -- Naproxen was ordered, correct?
13 A  Uh-huh.
14 Q  It's also the day that there was a sick
15 call request, correct?
16 A  Yeah.
17 Q  I think you described that there have
18 been times in which you've gotten calls from
19 jail staff --
20 A  Yes.
21 Q  -- at the Muskogee County Jail?
22 A  Correct.
23 Q  How often are the occurrences?
24 A  Very.
25 Q  Very?

```
 1     A   You're correct.
 2              MR. SMOLEN:  Objection to the form.
 3     Q   (By Mr. Miller)  In a jail that does not
 4  have 24-hour medical care -- is the only
 5  pipeline of knowledge basically from jail staff
 6  directly to you?
 7     A   Yes.
 8     Q   Meaning if they have any questions, they
 9  have to call you directly --
10     A   To whichever provider --
11     Q   -- during the night?
12     A   -- whichever facility.
13     Q   And that's a totally different situation
14  in here where there is 24 hour?
15     A   Correct.
16     Q   Is there a -- how many jails have 24
17  hours versus don't in your estimation,
18  approximately?
19     A   Maybe six have 24 hour.
20     Q   Out of the 40 you currently have?
21     A   Yeah.
22     Q   Okay.  So it's actually a minority that
23  have 24 hour?
24     A   Correct.
25     Q   So there is more on-site care at the
```

```
 1   Muskogee County Jail than most jails; is that
 2   fair?
 3        A    Oh, that's very true.
 4        Q    Okay.  You would agree that if there --
 5   if a nurse -- a licensed practical nurse
 6   believed there to be an emergency situation,
 7   they would contact emergency for them to be
 8   transported, correct?
 9             MR. SMOLEN:  Object to the form.
10             THE WITNESS:  Absolutely.
11        Q    (By Mr. Miller)  Do you as -- Dr.
12   Cooper, are you required to give the okay to
13   that before they can call emergency?
14        A    No.
15        Q    Do they have the authority -- a nurse --
16   to do that on their own --
17        A    Yes.
18        Q    -- for whatever reason if they believe
19   it's an emergency?
20        A    Yes, that's stated in the policy.
21        Q    Okay.  When you spoke with the lady the
22   morning of the 14th who the record suggests was
23   Katie McCullar, did she tell you she thought it
24   was an emergency situation?
25        A    I don't believe so.
```

```
                                                  Page 151
 1              MR. SMOLEN:  Object to the form.
 2              THE WITNESS:  I don't believe so.
 3     Q   (By Mr. Miller)  If she had said she
 4   thought it was an emergency situation, would you
 5   have probably discussed the option of calling
 6   emergency --
 7              MR. SMOLEN:  Object to the form.
 8     Q   (By Mr. Miller)  -- to take him to the
 9   hospital?
10              MR. SMOLEN:  Object to the form.
11              THE WITNESS:  Yes, I would have.
12     Q   (By Mr. Miller)  You would agree that if
13   it's an emergency situation or if a nurse
14   believes it's an emergency situation, they
15   should go to the emergency room, correct?
16     A   Correct.
17     Q   The on-site minor surgery and things you
18   were discussing earlier --
19     A   Uh-huh.
20     Q   -- what kind of minor surgeries are you
21   discussing there?
22     A   Cyst excisions, laceration repair,
23   toenail removals, abscess incision and drainage.
24     Q   Are any of those emergencies?
25     A   No.
```

1      Q    You don't do emergency surgery at the
2    facility?
3      A    No, we do not.
4      Q    If it's an emergency --
5      A    We do not have an operating room.
6      Q    -- go to the emergency room, right?
7      A    Right.
8      Q    All right.  If the nurses believed that
9    none of the particular protocols quite applied
10   to the situation, what are they supposed to do?
11     A    Schedule them to see the provider --
12     Q    Okay.
13     A    -- if it's not an emergency.
14     Q    If the nurses testified exactly that,
15   that they didn't quite believe any of these
16   particular protocols matched Mr. Buchanan's
17   situation, but yet also didn't think it was an
18   emergency, what -- what should they have done?
19     A    Schedule him to see the provider.
20     Q    And he was scheduled to see one of them?
21          MR. SMOLEN:  Objection to the form.
22          THE WITNESS:  Correct.
23     Q    (By Mr. Miller)  You would agree nursing
24   protocols don't cover all situations?
25     A    Correct.

Page 156

1  it.
2      Q    I don't think we looked at it, but
3  there's Medication Administration Record, M-A-R,
4  and it's on Exhibit 1 DDR#1, 007.
5      A    Yes.
6      Q    Do you see that?
7      A    I do.
8      Q    Tell me what this means to you.
9      A    Well, it was ordered twice a day.  It
10 looks like he received it twice a day from the
11 time it was ordered, except one dose was missed.
12     Q    Okay.  The morning of the 13th?
13     A    Yes.
14     Q    And it looks like there's initials in
15 the morning and the evening for every time twice
16 a day with the exception of the 13th, correct?
17          MR. SMOLEN:  Object to the form.
18          THE WITNESS:  Correct.
19     Q    (By Mr. Miller)  Does this indicate to
20 you that medical staff or Turn Key were the ones
21 providing him his medication?
22     A    Yes.
23     Q    Meaning that jail staff for Turn Key saw
24 -- or at least saw him enough to provide him
25 medication on one, two, three, four, five, six,

Page 157

1  seven, eight, nine, ten, eleven, twelve,
2  thirteen, fourteen, fifteen, sixteen, seventeen,
3  eighteen, nineteen -- nineteen occasions?
4           MR. SMOLEN:  Object to the form.
5           THE WITNESS:  If you counted
6  correctly, yes.
7      Q   (By Mr. Miller)  Okay, all right.  Do
8  Turn Key nurses -- are they always the medical
9  individuals who provide med pass?  Is that
10 something that Turn Key nurses do at every
11 facility?
12     A   No, we had med aides at some places.
13     Q   Okay.  So everyone that Turn Key
14 contracts with, it's either a med aide or a
15 licensed professional (sic) nurse; is that fair?
16     A   Yes.
17     Q   Are you aware of there being any med
18 aides at Muskogee County Jail?
19     A   Not that I recall.
20     Q   Okay.  So the individuals providing the
21 med pass, assuming they're licensed practical
22 nurses, are a higher level of training and
23 experience than at some other jails; is that
24 fair?
25          MR. SMOLEN:  Object to the form.

Page 159

 1     A    Yeah, unless I've received a phone call
 2   and said, Hey, let's see that guy.
 3     Q    Okay.
 4     A    Something like that.  I may know some of
 5   them on the list, but I won't know the entire
 6   list of --
 7     Q    Sure, fair enough.  And you did already
 8   testify on the morning of the 14th it was
 9   discussed that he would be seen, correct?
10     A    Yes.
11     Q    I'm sure other people also would have
12   been seen?
13     A    Yes, there was several on the list.
14     Q    Okay.  Who makes that list, the list
15   that decides who you're going to be seeing?
16     A    The nurses and sometimes I tell them to
17   add people to my list, but the nurses generally
18   make most of those.
19     Q    Do you know how they make the
20   determination about who needs to be seen by you
21   on your weekly visit?
22     A    If they've seen them several times on a
23   nursing protocol and they haven't gotten better,
24   then they'll go ahead and refer them to a
25   provider.  Or if it's more severe and they think

```
 1   that a nursing protocol will not help, then
 2   they'll go ahead and schedule them for a
 3   provider.
 4        Q    How about if something doesn't quite fit
 5   into a nursing protocol?
 6              MR. SMOLEN:  Object to the form.
 7              THE WITNESS:  That too.
 8        Q    (By Mr. Miller)  But yet it is an
 9   emergency situation?
10              MR. SMOLEN:  Object to the form.
11              THE WITNESS:  No.
12        Q    (By Mr. Miller)  I think you described
13   that you were not in charge of the staffing of
14   the nurses at the Muskogee County Jail, deciding
15   who would be working on any different shift?
16        A    Yeah.
17        Q    Who was in charge of that?
18        A    The regional director.
19        Q    And who was that?
20        A    It was either Cindy Bilyeu or Nicole
21   Cobb.
22        Q    Was she also the one that made hiring
23   decisions, whatever that was?
24        A    Yeah, yes.
25        Q    Okay.
```

Page 161

1   A   And they've both been the regional over
2   that facility and I don't remember which one was
3   there at the time.
4   Q   Okay.  How about the contract?  I think
5   one of the exhibits we looked at here, 18,
6   Muskogee County, Oklahoma Contract For Medical
7   Staffing And Administration, I think you
8   testified you had never even seen that, correct?
9   A   Not until today.
10   Q   And at the back, it's signed by Flint
11   Junod, Chief Operating Officer.  I presume what
12   you're saying is rather -- is that Mr. Junod is
13   in charge of contracts, signing up jails, things
14   of that nature?
15           MR. SMOLEN:  Object to the form.
16           THE WITNESS:  That's correct.  He is
17   now the CEO.
18   Q   (By Mr. Miller)  Okay.
19   A   But he -- but at that time, he was the
20   COO.
21   Q   Okay.  You don't really handle the
22   business side is what I'm --
23   A   You're -- you're correct.
24   Q   Are you aware of any jail staff,
25   individuals at the Muskogee County Jail, who had

Page 162

```
 1   any problems or issues with the nursing care
 2   provided to Mr. Buchanan?
 3        A    No.
 4        Q    Or of the medical care provided by
 5   yourself to Mr. Buchanan?
 6        A    No.
 7        Q    Has any jail staff or jail employee ever
 8   told you that they didn't think you were
 9   providing proper care?
10        A    No.
11        Q    Has any jail staff or jail employee ever
12   told you that they thought Mr. Buchanan had an
13   emergency situation?
14        A    No.
15        Q    Has any jail staff or jail employee ever
16   told you that other inmates told them that
17   Mr. Buchanan was having an emergency?
18        A    No.
19        Q    I think you've never talked to any jail
20   staff at all, fair, about Mr. Buchanan?
21        A    Not about Mr. Buchanan.
22        Q    Sure.  Would you agree that a failure to
23   provide transport to an emergency center during
24   an emergency situation would violate your
25   policies?
```