IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) JAMES D. BUCHANAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.: 18-CV-171-RAW |
| | ) | |
| (1) TURN KEY HEALTH CLINICS, LLC, | ) | |
| (2) ROB FRAZIER, in his official capacity as | ) | |
| Muskogee County Sheriff, | ) | |
| (3) BOARD OF COUNTY COMMISSIONERS | ) | |
| OF MUSKOGEE COUNTY, | ) | |
| (4) DR. COOPER, and | ) | |
| (5) KATIE MCCULLAR, LPN, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT, TURN KEY HEALTH CLINICS, INC.'S MOTION FOR SUMMARY
JUDGMENT ON ALL CLAIMS AND BRIEF IN SUPPORT**

COMES NOW Defendant, Correctional Healthcare Companies, Inc. (hereinafter referred
to as the "Defendant" or "Turn Key") and pursuant to Rule 56 of the Federal Rules of Civil
Procedure, moves for summary judgment on all claims asserted by the Plaintiff James "Doug"
Buchanan, In support of this Motion, Defendant offers the following brief.

## **TABLE OF CONTENTS**

STATEMENT OF THE CASE.................................................................................................1

STATEMENT OF UNCONTROVERTED FACTS .......................................................................3

ARGUMENTS AND AUTHORITY.................................................................................9

PROPOSITION I: PLAINTIFF CANNOT ESTABLISH THAT TURN KEY
VIOLATED PLAINTIFF'S CONSTITUTIONAL RIGHTS.........................................................12

    A.    NO EMPLOYEE OF TURN KEY VIOLATED THE CONSTITUTIONAL
        RIGHTS OF PLAINTIFF..........................................................................................12

    B.    TURN KEY'S POLICIES AND PROCEDURES DID NOT CAUSE
        A CONSTITUTIONAL DEPRIVATION…………………………………………13

    C.    PLAINTIFF CANNOT ESTABLISH THAT DEFENDANT OR ITS
        EMPLOYEES CAUSED ANY HARM TO PLAINTIFF OR THAT ANY
        ALLEGED DELAY IN TREATMENT EXACERBATED HIS INJURY
        IN ANY WAY……………………………………………………………………...14

    D.    PLAINTIFF CANNOT ESTABLISH A CLAIM UNDER THE MUNICIPAL
        LIABILITY THEORY……………………………………………………………...15

    E.    TURN KEY CANNOT BE HELD VICARIOUSLY LIABLE FOR
        ANY § 1983 CLAIMS AGAINST ITS EMPLOYEES OR AGENTS………….16

    F.    PLAINTIFF CANNOT ESTABLISH THE SUBJECTIVE COMPONENT
        NECESSARY TO MAINTAIN A DELIBERATE INDIFFERENCE CLAIM
        AGAINST ANY OF THE DEFENDANTS IN THIS CASE……………………17

PROPOSITION II:   PLAINTIFF CANNOT ESTABLISH A PRIMA
FACIE CASE OF NEGLIGENCE AGAINST TURN KEY..........................................................18

    A.    PLAINTIFF LACKS EXPERT TESTIMONY TO ESTABLISH
        A PRIMA FACIE CASE OF NEGLIGENCE AGAINST TURN KEY………...18

    B.    TURN KEY IS IMMUNE FROM LIABILITY FOR THE NEGLIGENCE
        CLAIMS ASSERTED BY THE PLAINTIFF UNDER THE OKLAHOMA
        GOVERNMENTAL TORT CLAIMS ACT…………………………………..20

CONCLUSION...............................................................................................................22

## STATEMENT OF THE CASE

This suit arises from the unforeseeable and exceedingly rare spinal infection that caused James Buchanan ("Plaintiff") to undergo two surgical procedures to his spine in November of 2016. The evidence in this case shows that this spinal infection began well prior to Plaintiff's incarceration at Muskogee County Detention Center ("MCDC"). The evidence further shows that multiple physicians misdiagnosed and/or failed to diagnose Plaintiff's spinal infection, which demonstrates how rare and difficult to diagnose this particular infection is for professional healthcare providers regardless of specialty and level of training. The evidence further shows that the symptoms and complaints made known to the defendants were substantially identical to those made to previous healthcare providers. Moreover, the evidence is undisputed that throughout Plaintiff's incarceration from November 3 to November 14, 2016 at MCDC, the records show that Plaintiff saw a healthcare provider at least twice daily (with one exception), and each of Plaintiff's medical complaints, signs, and symptoms that were made known to the defendants were being treated by Dr. Cooper, Nurse McCullar and Turn Key staff. The evidence is further undisputed that Dr. Cooper, Nurse McCullar, Turn Key staff, and the correctional staff never ignored any of Plaintiff's vocalized or observed signs or symptoms at any time while Plaintiff was at MCDC.

Prior to his incarceration, Plaintiff was struck by an automobile on September 16, 2016. Plaintiff then spent approximately two weeks in the St. John's Intensive Care Unit ("ICU") under the care of several physicians, including neurosurgeon Dr. Thomas Rapacki. Plaintiff's own treating neurosurgeon, Dr. Clinton Baird, stated that the spinal infection that led to his cervical epidural abscess was likely present when Plaintiff was at the St. John's ICU. He fever and elevated white blood cell count, and the imaging studies showed an infection on his spine, which was only diagnosed as a hematoma. Upon his discharge by his treating physicians from the ICU on September 30, 2016, Plaintiff was instructed to follow up with his treating providers Dallas Buck, APRN – CNP (Plaintiff would later refer to as "Dr. Buck") and Dr. Rapacki. However, Plaintiff failed to follow up as instructed. Specifically, Plaintiff failed to obtain additional imaging studies and return to his neurosurgeon, Dr. Rapacki, for a follow up appointment. On October 14, 2016, approximately two weeks after his discharge from the ICU, Plaintiff went to the St. John's Emergency Room and complained of constant, sharp, and severe neck pain. Plaintiff was not admitted to the hospital, but he was assessed in the ER, and after a brief stay, he

was discharged by his treating health care providers with instructions to follow up with his treating physicians. Again, Plaintiff failed to follow up as instructed. Instead, Plaintiff sought treatment from a chiropractor, Dr. Frank Greenhaw, and a pain management physician, Dr. Kenneth Trinidad to whom he complained of extreme shoulder pain, arm pain, neck pain, and decreased range of motion over the course of five visits between the two physicians. Neither physician diagnosed Plaintiff with a neurological condition or a spinal infection or recommended that Plaintiff go to the hospital. They did diagnose and treat him for trauma related to the bicycle versus motor vehicle accident on September 16, 2016.

On November 3, 2016, just days after receiving treatment from Dr. Greenhaw and Dr. Trinidad, Plaintiff was booked into Muskogee County Jail. Immediately, Plaintiff was seen by a nurse who performed an intake screening and noted that Plaintiff had been in an automobile versus bicycle accident approximately seven weeks prior, which resulted in broken ribs, an collapsed lung, burnt fingers, and neck problems, and Plaintiff was noted to have increased discomfort with movement. Appropriately, Plaintiff was placed on the nursing sick call list. On November 4, 2016, as a result of Plaintiff's placement on the nursing sick call list, Nurse Delena Ayers contacted Dr. Cooper, and Dr. Cooper ordered that Plaintiff be given Naproxen twice daily to treat his pain. Throughout his incarceration Plaintiff received his Naproxen from a licensed healthcare provider twice per day, with one exception. On November 6, 2016, the records show that Plaintif complained of "shoulder pain." On November 11, 2016, Plaintiff was seen by Nurse Kotas and placed on the provider sick call list for complaints of pain, decreased range of motion in his extremities, and limited range of motion in his neck. On the morning of November 14, 2016, Plaintiff was seen by Nurse McCullar who contacted Dr. Cooper regarding Plaintiff's complaints of ongoing pain and weakness and tingling in his legs. Dr. Cooper and Nurse McCullar discussed Plaintiff's complaints and symptoms, and they made a plan to place Plaintiff on the list to be seen by Dr. Cooper the following day. On the evening of November 14, 2016, Plaintiff was seen by Nurse Kotas who again noted that Plaintiff complained of pain and decreased range of motion in his neck and extremities. Notably, at this time, Nurse Kotas charted that Plaintiff had urinated on himself. With this significant and new neurological symptom, Nurse Kotas and Dr. Cooper utilized their clinical judgment that Plaintiff's change in condition necessitated outside care. As such, he was then sent initially to Wagoner Community Hospital at 9:07 pm, on November 14, 2016, where he was assessed by an ER physician and a radiologist,

and his spinal infection was still unable to be definitively identified and treated. He was then transported to Hillcrest Medical Center in Muskogee, Oklahoma, at 1:00 am on November 15, 2016 where treating neurosurgeon Dr. Clinton Baird was finally able to identify Plaintiff's spinal epidural abscess and surgically treat it.

First, Plaintiff seeks to assert a claim of cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments of the United States Constitution under 42 U.S.C. § 1983 and Article II §§ 9 and 7 of the Oklahoma Constitution against Defendant Turn Key, alleging it was deliberately indifferent to his serious medical needs. Second, Plaintiff seeks to assert a negligence claim against Turn Key, alleging that it failed to provide him with competent and timely medical treatment.

## STATEMENT OF UNCONTROVERTED FACTS

1.      Prior to Plaintiff's incarceration at issue, he was struck by an automobile while he was riding his bicycle. *See* Doc. 25, *Amended Complaint, ¶ 12.* After this occurred, he was taken to Eastar Health System ("Eastar") where he was diagnosed with rib fractures and a collapsed lung. Exh. 1, *EASTAR Health System Records,* at EASTAR0001.

*2.*      While hospitalized at Eastar a CT was taken of Plaintiff which revealed what was believed to be a hematoma along Plaintiff's spine measuring approximately *Id.* at EASTAR0003.

3.      Plaintiff was transferred from Eastar to St. John's Medical Center for a higher level of trauma care and was admitted to the Intensive Care Unit.  See Exh. 2, *St. John's Medical Center Records,* at 0036.  His diagnosis at that time was that Plaintiff had a prevertebral hematoma on his spine measuring approximately 9.4 x 2.4 x 14 cm.  *Id.*

4.      Plaintiff was eventually discharged from St. John's, but his discharging diagnosis did not include a spinal infection, neurological disorder, or a cervical epidural abscess. *Id.* at 0010.  The discharge orders included instructions to follow up with Dallas Buck, APRN – CNP, on October 7, 2016, and Dr. Rapacki on October 12, 2016, after obtaining a cervical spine x-ray prior to the clinic appointment (*id.* at 0011), however there are no records that indicate that Plaintiff followed up as ordered.

5.      On October 14, 2016, Plaintiff returned to St. John's Medical Center and was seen in the Emergency Department at due to complaints of persistent neck pain. Described as as constant, sharp, severe, and increasing with palpation to the area. *Id.* at 1023.

6.      Plaintiff was subsequently discharged from the Emergency Department with a

diagnosis of "NECK SPASMS, no trauma", he was prescribed a muscle relaxant and anti-inflammatory medication (Naproxen), and he was instructed to follow up with APRN – CNP Buck.   *Id.* at 1013.

7.     On October 21, 2016, Plaintiff saw a chiropractor, Dr. Frank Greenhaw, and stated that stated he had symptoms of pain in his neck, shoulders, left arm, and right arm, which he described as "intense" and "constant". *See* Exh. 3, *Greenhaw Chiropractic Records*, at 011-012.

8.     Dr. Greenhaw noted that Plaintiff's range of motion was restricted on all planes, and Plaintiff's gait was noted to be "Antalgic" (a gait that develops to avoid pain while walking). *Id.* at 016.   Dr. Greenhaw ordered cold pack therapy and unattended electrical stimulation.   *Id.*

9.     On October 24, 2016, Plaintiff returned to Dr. Greenhaw to undergo further treatment for ongoing neck and shoulders pain which he rated as a 10 on a scale of 10 in both the neck and shoulders, and he complained that the pain was worse than the previous visit.   *Id.* at 008.   At this time, Dr. Greenhaw again noted that Plaintiff's range of motion was restricted on all planes, Plaintiff's gait was again noted to be "Antalgic."   *Id.* at 008 and 015.   Dr. Greenhaw also ordered cold pack therapy and unattended electrical stimulation.   *Id.*

10.     On October 26, 2016, Plaintiff returned to Dr. Greenhaw and complained that his neck and shoulders as still problematic and rated his pain as a 10/10.   *Id.* at 007.   Dr. Greehaw's charted findings remained the same and he ordered cold pack therapy and unattended electrical stimulation. *Id.* at 007 and 014.

11.     On October 27, 2016, Plaintiff was seen by Dr. Kenneth Trinidad at the Riverwest Medical Clinic, who documented that Plaintiff was taking Norco (pain reliever), Naproxen (anti-inflammatory), and Robaxin (skeletal muscle relaxant) to manage his pain sustained in his bicycle accident.   *Id.* at 009 and 010

12.     Dr. Trinidad diagnosed Plaintiff as having an acute cervical and thoracic spine injury and a left shoulder injury, for which he recommended Plaintiff to continue taking his medications to address the pain and spasms, to continue seeing Dr. Frank Greenhaw, and to return to the clinic in two weeks to be re-evaluated.   *Id.*

13.     On October 31, 2016, Plaintiff returned to Dr. Greenhaw who ordered cold pack therapy and unattended electrical stimulation. *Id.* at 006 and 013.   However, Plaintiff chose not to continue the recommended additional treatment.   *Id.* at 013.

14.     On November 3, 2016, Plaintiff was booked into custody at the Muskogee County Jail where a medical questionnaire was conducted by Sheriff's Department staff. Plaintiff denied all medical and/or mental health conditions with the exception of "broken ribs, collapsed lung, burnt fingers, and neck problems" and stated he was taking medications prescribed by Dr. Trinidad that he described as "anti-inflammatory, muscle relaxers, and pain meds." *See* Exh. 4, *Buchanan MCDC Records*, TK-RFP#50014-50015.

15.     Turn Key Health staff conducted an additional medical screening utilizing the Medical Intake Form in which it was documented that Plaintiff was alert and appropriate, although disheveled. *Id.*

16.     Plaintiff reported having been involved in a motor vehicle versus bicycle accident approximately seven weeks prior on September 16, 2016, and he was taking anti-inflammatory medications, pain medications, and muscle relaxant medications. *Id.* at TK-RFP#50012-50013.

17.     Plaintiff reported being under the care of Dr. Trinidad and "Dr. Buck", and he stated that he had broken ribs, a collapsed lung, burnt fingers and neck problems from the motor vehicle versus bicycle accident. *Id.*

18.     On November 4, 2016, at 3:30pm, the records show that Nurse Delena Ayers documented that she made a telephone call to Dr. Cooper regarding Plaintiff's pain. *Id.* at TK-RFP#50004. The records establish that, at most, Dr. Cooper knew, from what was relayed to him by Nurse Ayers that Plaintiff was approximately seven (7) weeks removed from a motor vehicle versus bicycle accident that resulted in broken ribs, a collapsed lung, burnt fingers and neck problems; Plaintiff reported that he had prescriptions for anti-inflammatory medications, pain medications, and muscle relaxant medications; he reported being under the care of a pain management physician Dr. Trinidad and his treating nurse practitioner from St. John's "Dr. Buck"; and Plaintiff was noted to have increased discomfort with movement. *Id.* at TK-RFP#50004, 50012-50013.

19.     In response to Plaintiff's reported symptoms and prescriptions, Dr. Cooper ordered an anti-inflammatory medication (Naproxen), which was consistent with the orders of Plaintiff's prior healthcare providers. Dr. Cooper was not made aware of any known diagnoses that required any additional treatment. *Id.* at TK-RFP#50011.

20.     The MAR shows that Plaintiff was seen by licensed nursing staff twice daily for the remainder of his incarceration (with the exception of September 13, 2016) for the

5

administration of Naproxen to manage his pain.   *Id.*

21.     On November 6, 2016, the records show that Plaintiff complained of shoulder pain.   *See* Exhibit 5, *Sick Call Lists*, at DDR 30, 151.

22.     On November 11, 2016, the Turn Key records show that Plaintiff complained of decreased range of motion in the upper and lower extremities, limited neck range of motion, and pain.   In response, Plaintiff was placed on the schedule to be seen by Dr. Cooper at the next scheduled provider visit on November 15, 2016.   *Id.* at DDR 30, 515.

23.     The records show that at 11:27am on November 14, 2016, Nurse McCullar was called to the housing area because Plaintiff told custody staff that he could not walk. *See* Exh. 4, *Buchanan MCDC Records*, TK-RFP#50010. Upon arrival to the cell, Nurse McCullar found Plaintiff complained of worsening pain, an inability to move his lower extremities, and tingling in his legs.   *Id.*

24.     Nurse McCullar testified that Plaintiff was not flaccid, had no obvious manifestations of paralysis, and was sitting on the bench with obvious muscle tone presence. *See* Exh. 6, McCullar Deposition, 89:15-20.

25.     In response to Plaintiff's complaints and symptoms, Nurse McCullar called Dr. Cooper.   *See* Exh. 4, *Buchanan MCDC Records*, TK-RFP#50010.   Dr. Cooper and Nurse McCullar discussed Plaintiff's complaints and symptoms, and they made a plan to schedule Plaintiff for an appointment to be seen at the next upcoming provider visit, which was the following day.   *Id.*

26.     Additionally, in response to Plaintiff's complaints, Dr. Cooper ordered Nurse McCullar to request Plaintiff's medical records from his previous hospitalization. *Id.* at TK-RFP#50008-50010.

27.     The records show that on November 14, 2016, at 8:10pm, Nurse Kotas was called to Plaintiff's housing unit by custody staff, and she documented that he had decreased range of motion to all extremities as well as his neck, his pain level was 10 out of 10, his heart rate was 116, blood pressure 139/93, and oxygen saturation fluctuating between 84-90%.   *Id.* at TK-RFP#50006.

28.     Nurse Kotas noted that Plaintiff lost control of his ability to urinate and was incontinent on himself and the floor.   *Id.* at TK-RFP#50006.

29.     Nurse Kotas telephoned Dr. Cooper with a report of her findings, and Dr. Cooper

told Nurse Kotas to send Plaintiff to the Emergency Department for further evaluation.   *Id.*

30.    Muskogee County EMS transported Plaintiff to Wagoner Emergency Department. *See* Exhibit 7, *Muskogee County EMS*, at 019 – 22.   However, Plaintiff was transferred and admitted to Hillcrest Medical Center in Muskogee, Oklahoma on November 15, 2016 at 1:00 am. *See* Exhibit 8, *Hillcrest Records*, 001-003

31.    Despite arriving at Hillcrest around 1:00 am, and he did not go into surgery until approximately 8:00 am the next day, almost 31 hours later. *Id.*   Plaintiff underwent a corpectomy of C5-6 vertebrae (removal of parts of the bony structure) and reconstruction of C4-7 vertebrae. *Id.* at 003.

32.    Plaintiff underwent another surgery on November 28, 2016 for a thoracic spine fixation and laminectomy with ongoing osteomyelitis and discitis.

33.    The evidence is undisputed that no Turn Key provider ignored any of Plaintiff's signs or symptoms throughout his incarceration.   *See generally* Exh. 4.

34.    Dr. Cooper, Nurse McCullar, and Turn Key staff treated each of Plaintiff's known symptoms and medical conditions appropriately and reasonably while he was incarcerated at MCDC.   *Id.*

35.    In his experience and judgment, the symptoms and complaints made known by Plaintiff during his incarceration are commonly associated with arthritis. *See* Exh. 9 Cooper Depo., 72:7-18.

36.    The uncontroverted evidence establishes that there was no sign or symptom that went unassessed or untreated by Dr. Cooper. *See generally* Exh. 4.

37.    The uncontroverted evidence establishes that Dr. Cooper was not deliberately indifferent to Plaintiff's medical needs. *See generally* Exh. 4.

38.    Defense expert, Dr. L'Heureux, reviewed all of Plaintiff's pertinent medical records, including the imaging records, and he opined in his sworn report that Plaintiff's spinal infection was misdiagnosed at Eastar and at St. John's.   *See* Exh. 10, *L'Heureux Report*, at 4-7, 66

39.    Dr. L'Heureux opined that based on the size of the fluid collection and Plaintiff's elevated white blood cell count, Plaintiff's spinal infection actually pre-dated motor vehicle versus bicycle accident.   *Id.* at 63.

40.    Dr. L'Heureux opined, and Plaintiff's treating neurosurgeon agreed, that the

diagnosis of a spinal epidural abscess is often delayed. *Id.* at 60, 63 and Exh. 11, *Baird Dep., 143:1-20*.

41.     With regard to Plaintiff's alleged damages, Dr. L'Heureux opined that the timing of Plaintiff's surgery was immaterial to his recovery, and that even if Plaintiff had been sent to the hospital on November 3, 2016 the extent of his surgery and his recovery would have been identical. *See* Exh. 10 at 66.

42.     Dr. L'Heureux further opined, and Plaintiff's treating neurosurgeon agreed, that Plaintiff had an excellent outcome.   *Id.* at p. 67 and Exh. 11 at 66:3-22.

43.     Plaintiff's correctional care expert, Dr. Wilcox, is not qualified to offer causation opinions in the areas of neurosurgery or orthopedic surgery as this is outside his area of expertise, education, and training, and he testified that he would not offer opinions in the areas of orthopedic surgery or neurosurgery. *See* Exh. 12, *Wilcox Dep.*, 23:9-18; 24:9-14.

44.     Plaintiff's correctional care expert, Dr. Wilcox, is not qualified to offer causation opinions in the areas of neurosurgery or orthopedic surgery and is therefore unqualified and cannot offer any causation opinions.

45.     Plaintiff's treating neurosurgeon expert is not qualified to offer standard of care opinions regarding care provided in a correctional setting as this is outside his area of expertise, education, and training. *See* Exh. 11, *Baird Dep.*, 38:10-23; 155:14-18.

46.     Plaintiff specifically stated in his Amended Complaint that he is not alleging negligence or claims under the Oklahoma Constitution against Dr. Cooper or Nurse McCullar. (Doc. No. 25, p. 15-16, fn. 5 and 6).

47.     Turn Key did not control the medical decisions of its physicians or medical staff.

48.     Plaintiff has not identified any policy or custom which encouraged or required physicians or nurses to deny medical care.

49.     Plaintiff has failed to offer any evidence that Turn Key policies and procedures do not comply with NCCHC guidelines.

50.     Plaintiff has not put forth any expert testimony that any of Turn Key's policies or procedures caused Plaintiff's alleged injuries or damages.

51.     Plaintiff has failed to put forth any evidence that Turn Key possesses final authority to establish municipal policy.

52.     The Muskogee County Sheriff is has final decision-making authority regarding

the provision of medical care in the Muskogee County Jail. OKLA. STAT. TIT. 57, § 52; *Estate of Crowell ex rel. Boen v. Board of County Comm'rs of Bryan County*, 237 P.3d 134 (Okla. 2010); (Exhibit 17, *Deposition of Sheriff Glanz (June 10, 2015)*, 18:24-19:14).

## ARGUMENTS AND AUTHORITY

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment may be granted where there is no genuine issue of material fact and one party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   Only disputes over facts which are material will preclude summary judgment. That is, a material fact is one which might affect the outcome of the suit under the governing law, and such facts are genuinely disputed "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 272, 248 (1986). Also, summary judgment is properly entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp.*, at 322.

Here, Plaintiff alleges that there is an affirmative causal link between Turn Key's customs, policies, and/or practices and Plaintiff's injuries and damages as alleged herein. (Dkt. 25, ¶ 64). Plaintiff further asserts that "Turn Key is charged with implementing and assisting in developing the policies of MCSO with respect to the medical and mental health care of inmates at the Muskogee County Jail and has shared responsibility to adequately train and supervise its employees." (*Id.*, ¶ 59). Plaintiff makes broad, conclusory allegations that the alleged deliberate indifference was in furtherance of and consistent with "policies, customs, and/or practices" of Turn Key. (*Id.*, ¶¶ 61-62)

A municipality can be found liable under 42 U.S.C. § 1983 only where the municipality itself was at fault and caused the constitutional violation at issue. *City of Canton, Ohio v. Harris,* 489 U.S. 378,387 (1989). A municipality cannot be held liable under a *respondeat superior* theory solely because its employees inflicted injury on the plaintiff. *Monell v. Dept. of Soc. Serv. Of New York,* 736 U.S. 658, 691(1978); *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993). It is only when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under 42 U.S.C. § 1983. *Monell v. Dept. of Soc. Serv. Of New York*, 736 U.S. 658, 694(1978).

A municipality may violate a person's civil rights "directly" through a designated decisionmaker who caused a deprivation of rights, such as when a city prosecutor directs an unlawful entry and search. *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986). In a case based upon the direct action of a decisionmaker, municipal liability attaches only where the decisionmaker possesses *final authority to establish municipal policy* with respect to the action ordered. *Id.* at 481. The official must be *responsible for establishing final government policy* respecting such activity before the municipality can be held liable. *Id.* at 483. A municipality may "directly" violate the constitution when its final policymakers implement a written policy that is facially unconstitutional. In *Monnell, supra*, the municipality enacted an unconstitutional policy requiring early pregnancy leave. Because the municipal fathers had approved this facially unconstitutional policy, the municipality was liable. *Monnell v. Dept. of Soc. Serv. Of New York*, 736 U.S. 658(1978). When a plaintiff claims that a particular municipal action *itself* violates federal law, or directs an employee to do so, resolving issues of fault and causation is straightforward. *Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 404 (1997). All that is required is to prove that the final decisionmaker intentionally deprived a plaintiff of a constitutional right, and that acts of the decisionmaker are the acts of the municipality. *Id.* at 405.

In this case, we are not dealing with an allegation that Turn Key ordered a constitutional violation; therefore, the burden of proof is much higher. Plaintiff in this case seeks to establish corporate liability by proving an employee of the corporation acted to violate the constitutional rights of the deceased, and the unwritten "policies or customs" of the municipality caused the employee to act unconstitutionally. In establishing this type of liability, one must first look to determine whether plaintiff has proved a constitutional violation by an employee of the municipality. A municipality will not be liable for a constitutional violation based upon a "policy" argument when there was no underlying constitutional violation by any of its employees. *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1317-18(10th Cir. 2002). Collective allegations against the state are not sufficient to create a civil rights claim; a plaintiff must identify who exactly injured him and then join that party as a defendant. *Robbins v. Okla. ex rel. Dep't of Human Servs.*, 519 F.3d 1242 (10th Cir. 2008); *Stone v. Albert,* 338 Fed. Appx. 757, 759 (10th cir. 2009); *Gray v. Weber,* 244 Fed Appx. 753 (8th cir. 2007). Therefore, if Plaintiff is unable to prove a constitutional violation by an employee of Turn Key, then he loses his civil

rights claim against the corporations.

In this case, the written policies, procedures, and protocols were constitutional, and no corporate decisionmaker ordered the violation of anyone's rights. Plaintiff seeks to establish liability by showing that Turn Key's policies, procedures, and protocols, or an unwritten policy or custom at the jail caused the employees to violate Plaintiff's rights. Under these facts, the courts look closely at the intent and acts of the municipality itself, rather than at the acts of the employees. Did the municipal policymakers establish an unwritten policy or custom that caused the constitutional violation? Rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employees. *Board of County Com'rs of Bryan County, Okl. v. Brown,* 520 U.S. 397, 405 (1997). Plaintiff must prove *deliberate action* by the municipality which was the moving force behind the plaintiff's deprivation of federal rights. Id. at 400. Plaintiff must demonstrate that municipal action was taken with "deliberate indifference" as to its known or obvious consequences. A showing of simple or even heightened *negligence by the municipality will not suffice*. *Id*. at 407.

In a policy or custom case, both fault and causation as to the acts or omission of the corporation itself must be proved. *City of Canton, Ohio v. Harris,* 489 U.S. 378,394 (1989). Municipal liability only attaches where the municipal decisionmaker possesses final authority to establish municipal policy with respect to the action ordered. *Id*. at 481. The official must be responsible for establishing final government policy respecting such activity before the municipality can be held liable. *Id*. at 483; *Lankford v. Hobart,* 73 F.3d 283,286(10th Cir. 1996). Whether the governmental official had final decision-making power is a question of state law. *Id*. Oklahoma state law establishes that the Sheriff has final decision-making authority regarding the provision of medical care in a jail. Okla. Stat., tit. 57, § 52.

Where plaintiff bases his claim on the municipality establishing a policy which caused the constitutional violation, the policy must be one which the municipality officially sanctioned or ordered. *Pembaur v. City of Cincinnati*, 475 U.S. 469,480(1986). The policy must be the "official policy" adopted by the municipality. *Id.* at 479. The policy must have been made by an official whose acts may fairly be said to represent official policy. *Id.* at 480. A municipality is held liable only for the decisions of its duly constituted legislative body or of those officials whose acts may fairy be said to be those of the municipality. *Brd of County Com'rs of Bryan County, Okl. v. Brown,* 520 U.S. 397, 403-4(1997). A custom must have been formally approved

11

by an appropriate decisionmaker. *Id.* at 404.

In *Board of County Com'rs of Bryan County, Okl. v. Brown,* 520 U.S. 397, 411 (1997), the court looked to the intent of the municipality itself. The plaintiff must demonstrate that a municipal decision reflects *deliberate indifference* to the risk that a violation of a particular constitutional or statutory right will follow the decision. *Id.* at 411. The jury must find the action of the municipality was *highly likely to inflict the particular injury* suffered by the plaintiff. *Id.* at 412. The constitutional violation must be a *plainly obvious consequence* of the municipal decision. *Id.* at 414. Municipalities are not liable unless *deliberate action attributable to the municipality directly caused* a deprivation of federal rights. *Id.* at 415. The municipality must consciously, knowingly disregard an obvious risk that a constitutional violation will occur. *Id.* at 415.

**PROPOSITION I:   PLAINTIFF CANNOT ESTABLISH THAT TURN KEY VIOLATED PLAINTIFF'S CONSTITUTIONAL RIGHTS.**

**A.   NO EMPLOYEE OF TURN KEY VIOLATED THE CONSTITUTIONAL RIGHTS OF PLAINTIFF.**

A municipality will not be liable for a constitutional violation based upon a "policy" argument when there was no underlying constitutional violation by any of its employees. *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1317-18 (10th Cir. 2002). Collective allegations against the state are not sufficient to create a civil rights claim; a plaintiff must identify who exactly injured him and then join that party as a defendant. *Robbins v. Oklahoma*, 519 F.3d 1242 (10th Cir. 2008); *Stone v. Albert*, 338 Fed. Appx. 757, 759 (10th Cir. 2009); *Gray v. Weber*, 244 Fed Appx. 753 (8th Cir. 2007). Plaintiff's correctional care expert, Dr. Wilcox, testified that Nurse Rosemary Kotas should have sent Plaintiff to the hospital on November 11, 2016.  However, Nurse Kotas is clearly not a joined as defendant. Dr. William Cooper and Nurse Katie McCullar are the only named defendants who are alleged employees of Turn Key. Doc. No. 25. Defendants' McCullar and Cooper's briefs for their respective Motions for Summary Judgment are adopted by reference to further establish that there is no evidence that an employee of Turn Key violated the Constitution. (*See* Motions for Summary Judgment of Dr. William Cooper and Nurse Katie McCullar on Plaintiff's Claims). Plaintiff did not sue any of Turn Key' other nurses, nurse practitioners or physicians. Doc. No. 25. Because Plaintiff has made no claim that such unnamed nurses, nurse practitioners or doctors violated the constitution, there can be no claim

that a Turn Key policy caused such a violation by these doctors or nurses. *Olsen v. Layton Hills Mall,* 312 F.3d 1304, 1317-18(10th Cir. 2002).

Plaintiff has put forth no evidence that any Turn Key policy or custom encouraged or required Dr. Cooper, Nurse McCullar, or any of its employees to deny care to patients. To the contrary, Turn Key policy encouraged access to medical care for all inmates. Exhibit 13, *Healthcare Policies and Procedures*. Plaintiff's allegations in this action are insufficient to establish a 42 U.S.C. § 1983 action against Turn Key. In order to prevail in a § 1983 action for deliberate indifference, Plaintiff must prove that the Plaintiff was at a substantial and imminent risk of harm; that Turn Key was aware of facts from which the inference could be drawn that Plaintiff was a substantial and imminent risk of harm; and, further, that Turn Key drew upon that inference that Plaintiff was a substantial and imminent risk of harm. Plaintiff has failed to meet this burden and, as a result, summary judgment in favor of Turn Key is proper at this time. Because no Turn Key employee violated Plaintiff's constitutional rights, Turn Key cannot be sued for a violation of the same. There can be no "policy or custom" which caused a deprivation of rights when no employee deprived him of his rights. Summary judgment is appropriate because there was no constitutional deprivation by a Turn Key employee.

**B.    TURN KEY'S POLICIES DID NOT CAUSE A CONSTITUTIONAL DEPRIVATION.**

Rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employees. *Board of County Com'rs of Bryan County, Okl. v. Brown,* 520 U.S. 397, 405 (1997). Plaintiff must prove *deliberate action* by the municipality which was the moving force behind the Plaintiff's deprivation of federal rights. *Id.* at 400. Plaintiff must demonstrate that municipal action was taken with "deliberate indifference" as to its known or obvious consequences. A showing of simple or even heightened *negligence by the municipality will not suffice. Id.* at 407. The proof must show action of the municipality was *highly likely to inflict the particular injury* suffered by the plaintiff. *Id.* at 412. The constitutional violation must be a *plainly obvious consequence* of the municipal decision. *Id.* at 414. Municipalities are not liable unless *deliberate action attributable to the municipality directly caused* a deprivation of federal rights. *Id.* at 415.

Turn Key policies encouraged good medical care for inmates at the MCDC.   *See* Exhibit

13

13.   Plaintiff has put forth no evidence that the infirmary policies failed to comply with NCCHC guidelines, or that the written policies direct jail employees to deny medical care or violate inmate constitutional rights. To the contrary, the evidence is uncontroverted that Turn Key policies complied with NCCHC guidelines. Plaintiff's correctional care expert, Dr. Wilcox, was unable to cite any NCCHC guideline which Turn Key policies, procedures, and protocols allegedly violated.   Furthermore, the evidence is uncontroverted that the bedrock principle upon which these policies rest is the provision of healthcare services. Exhibit 4 at TK_RFP#1007. Plaintiff has failed to put forth any actual evidence that the policies of Turn Key violated the constitutional rights of Plaintiff. There is no evidence in this case that Turn Key directed a constitutional violation through a policy in this case. To the contrary, the policies show that policymakers at Turn Key encouraged good care and did not violate the constitution. Therefore, summary judgment is appropriate.

## C.   PLAINTIFF CANNOT ESTABLISH THAT DEFENDANT OR ITS EMPLOYEES CAUSED ANY HARM TO PLAINTIFF OR THAT ANY ALLEGED DELAY IN TREATMENT EXACERBATED HIS INJURY IN ANY WAY.

Plaintiff cannot prove that any act or omission allegedly committed by Turn Key or its employees and staff caused or affected Plaintiff's alleged harm. Instead, the uncontroverted evidence shows that the timing of Plaintiff's surgery was immaterial to his recovery, and that even if Plaintiff had been sent to the hospital on November 3, 2016 the extent of his surgery and his recovery would have been identical. *See* Exh. 10 at 66. Plaintiff's treating neurosurgeon, Dr. Baird, was unable offer any evidence to contradict this fact.   Thus, Plaintiff cannot produce expert testimony as to whether Dr. Cooper's allegedly incorrect clinical judgment and treatment, or any of the care and treatment provided by Dr. Cooper, Nurse McCullar, or the Turn Key staff, had any impact on Plaintiff's ultimate outcome. Indeed, Defense expert, orthopedic spinal surgeon Dr. L'Heureux, opined that even if Plaintiff had been admitted to the hospital on November 3, 2016, the surgery that was required to treat his cervical spine infection would have been the same.   *Id.*

Dr. L'Heureux further opined that Plaintiff's recovery following the necessary spine surgeries and his need for long-term rehabilitation and home healthcare would also have been the same, and he would have continued to require rehabilitation and physical therapy for approximately six months in order to reach maximum medical improvement.   *Id.*   Dr.

L'Heureux also testified, and Plaintiff's treating neurosurgeon agreed, that Plaintiff had an excellent outcome.  *Id.* at p. 67 and Exh. 11 at 66:3-22.  Plaintiff has produced no evidence to establish a causal link between any of the foregoing alleged acts of Dr. Cooper and Plaintiff's alleged constitutional deprivation and, therefore, she has failed to establish a constitutional violation under 42 U.S.C. § 1983. *Duffield v. Jackson,* 545 F.3d 1234 (10th Cir. 2008). As a result, summary judgment must be granted at this time in favor of Dr. Cooper on all of Plaintiff's claims against him based on 42 U.S.C. § 1983.

## D.   PLAINTIFF CANNOT ESTABLISH A CLAIM UNDER THE MUNICIPAL LIABILITY THEORY.

Turn Key cannot be held liable under a municipal liability theory under 42 U.S.C. § 1983 because Plaintiff cannot prove the bad intent of Turn Key—that policymakers for Turn Key knowingly established a policy or custom that caused an employee to violate the constitution. Plaintiff must prove who the policymakers were for Turn Key and what they knew. The law is settled that Turn Key cannot be liable for a constitutional violation through the application of *respondeat superior*. *Monnell v. Dept. of Soc. Serv. Of New York,* 736 U.S. 658 (1978). There is no such evidence here. Plaintiff has not and cannot identify any unconstitutional policy or custom of the municipality that was the moving force behind Plaintiff's death, nor can she establish that any such policy actually directly caused Plaintiff's death in this case.

"To establish municipal liability, a plaintiff must show (1) the existence of a municipal custom or policy and (2) a direct causal link between the custom or policy and the violation alleged." *Jenkins v. Wood*, 81 F.3d 988, 993-994 (10th Cir. 1996)(citing *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993)). The U.S. Supreme Court has held that, where a plaintiff is making a claim under 42 U.S.C. § 1983 based on a municipal liability theory, "it is not enough for a plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 404 (1997). Furthermore, the Supreme Court also held that "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.* "A showing of simple or

15

even heightened negligence will not suffice." *Id.* at 407.

Plaintiff has not identified any specific policy or custom of any of Turn Key which was the "moving force" behind Plaintiff's death. Despite the vague claims in his Amended Complaint, Plaintiff lacks any actual evidence to show that Turn Key acted with any degree of culpability toward Plaintiff which would place him at substantial and imminent risk of harm. The Plaintiff cannot, and has not, point to any specific policy or custom in effect at the Muskogee County Jail in November 2016 which was the "moving force behind any constitutional violation", nor has, or can, the Plaintiff point to a policy or custom in effect at the jail in November 2016 which "directly caused" Plaintiff's harm. In fact, the evidence is undisputed in this case that Plaintiff's alleged harm was not affected in any way by his incarceration in MCDC or any care that he received or allegedly did not receive. Exhibit 10 at p. 67. Plaintiff has failed to put forth the requisite expert testimony to establish causation in order to withstand summary judgment on a negligence action against Defendants. Therefore, summary judgment in favor of Turn Key on any claim asserted by the plaintiff under the municipal liability theory is appropriate at this time and must be granted as a matter of law.

**E.    TURN KEY CANNOT BE HELD VICARIOUSLY LIABLE FOR ANY § 1983 CLAIMS AGAINST ITS EMPLOYEES OR AGENTS.**

It is not entirely clear from Plaintiff's Amended Complaint whether she is trying to hold Turn Key liable for any alleged constitutional violations by any of their employees or agents. As noted above, the Plaintiff has individually sued two employees of Turn Key, Dr. Cooper, and Nurse McCullar, and asserted that they have violated Plaintiff's constitutionally protected rights. While the merits of Plaintiff's claims have been more thoroughly addressed in each of those individual health care provider's motions for summary judgment, the fact remains that Turn Key cannot be held vicariously liable under 42 U.S.C. § 1983 as a matter of law. Specifically, the U.S. Supreme Court has repeatedly stated that "A municipality or other local government may be liable under [42 U.S.C. § 1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011) (citing *Monell* at 692). Moreover, the Supreme Court has reiterated that "under § 1983, local governments are responsible only for 'their own illegal acts" and "[t]hey are not vicariously liable under § 1983 for their employees' actions." *Id.* (quoting *Pembaur* at 479). Therefore, Turn Key must be granted summary judgment in their

favor on any 42 U.S.C. § 1983 claims the Plaintiff may be asserting based on vicarious liability of Turn Key' employees.

**F.    PLAINTIFF   CANNOT   ESTABLISH   THE   SUBJECTIVE   COMPONENT NECESSARY   TO   MAINTAIN   A   DELIBERATE   INDIFFERENCE   CLAIM AGAINST ANY OF THE DEFENDANTS IN THIS CASE.**

Here, pursuant to 42 U.S.C. § 1983, the Plaintiff lacks the requisite evidence to prove that Turn Key was deliberately indifferent to any substantial and imminent risk of death. In this case, the Plaintiff asserts the defendants violated Plaintiff's rights under the Eighth and Fourteenth Amendments to the Constitution of the United States.

The subjective component of the deliberate indifference test "requires a showing that the defendant acted with a culpable state of mind." *Gaston v. Ploeger*, 229 Fed.Appx. 702, 710 (10th Cir. 2007). A jail official "cannot be liable for a claim of deliberate indifference 'unless the official knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Heidtke v. Corr. Corp. of Am.*, 489 Fed. Appx. 275, 279 – 280 (10th Cir. 2012)(quoting *Self v. Crum*, 439 F.3d 1227, 1231). "The subjective Component is akin to recklessness in the criminal law, where, to act recklessly, a person must consciously disregard a substantial risk of serious harm." *Id.* at 280. The Tenth Circuit has explained that "our case law firmly establishes that 'the subjective component is not satisfied, absent an extraordinary degree of neglect'". *Heidtke* at 280 (quoting *Self* at 1232). **The Tenth Circuit Court has said that "in this Circuit, the 'negligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation."** *Id.* (quoting *Self* at 1233). "Only when the symptoms obviously point to a substantial risk of harm can we draw an inference of the medical professional's conscious disregard of an inmate's medical emergency." *Id.* at 282.

Under 42 U.S.C. § 1983, and the analysis above should only be applied to individuals personally involved in an inmate's incarceration. If the Plaintiff attempts to argue that Turn Key should be subjected to this standard, or if he attempts to argue Turn Key is vicariously liable for the acts of their employees or agents, the Plaintiff still will be unable to demonstrate Turn Key or its employees or agents knew Plaintiff was at substantial risk of serious harm while incarcerated at the Muskogee County Jail and that Turn Key or its employees or agents consciously

disregarded any such risk.[1]

**PROPOSITION II:   PLAINTIFF CANNOT ESTABLISH A PRIMA FACIE CASE OF NEGLIGENCE AGAINST TURN KEY.**

In this case, the Plaintiff cannot establish a prima facie case of negligence against Turn Key because she lacks the requisite expert testimony regarding the standards of care applicable to Turn Key and causation. Further, Turn Key is immune from liability for negligence under the Oklahoma Governmental Tort Claims Act.

**A.   PLAINTIFF LACKS EXPERT TESTIMONY TO ESTABLISH A PRIMA FACIE CASE OF NEGLIGENCE AGAINST TURN KEY.**

Under Oklahoma law, three elements are essential for a plaintiff to establish a prima facie case of negligence:   (1) a duty owed by the defendant to protect the plaintiff from injury; (2) a failure of the defendant to properly exercise or perform that duty; and (3) injury to the plaintiff directly caused by the defendant's failure. *Thompson v. Presbyterian Hospital*, 652 P.2d 260, 263 (Okla. 1982). The absence of proof of any of these three essential elements is fatal to a negligence claim. *Id.* at 263. Moreover, in all but extraordinary cases, medical negligence must be established through expert medical testimony. *Reed v. Shaughnessy*, 570 F.2d 309, 313 (10th Cir. 1978); *Boxberger v. Martin*, 552 P.2d 370 (Okla. 1976); *Johnson v. Hillcrest Health Center, Inc.*, 70 P.3d 811, 817 (Okla. 2003); *Turney v. Anspaugh*, 581 P.2d 1301 (Okla. 1978); *Robertson v. Lacroix,* 1975 OK CIV APP 14, 534 P.2d 17. In this case, the negligent acts or omission the Plaintiff has asserted against the defendants are for failing to provide "adequate medical treatment." Therefore, Plaintiff's claims in this case must be considered medical negligence claims which require expert medical testimony.

In this case, the Plaintiff has listed one correctional care expert witness, Dr. Todd Wilcox, MD, and Plaintiff listed as a treating expert his treating neurosurgeon Dr. Clinton Baird.  Dr. Baird is not qualified to offer opinions regarding the standards of care in correctional health care nursing, and in fact, Dr. Baird agreed readily admitted that he has no education or experience related to correctional health care.

Summary judgment is also proper on the negligence claims because the Plaintiff cannot offer expert testimony regarding proximate cause. In particular, the causation element of a *prima*

---

[1] In addition, Turn Key incorporates and adopts by reference the arguments contained within the

*facie* case of negligence requires a plaintiff to present evidence that the harm suffered was "more likely than not" caused by the defendants' negligence. *McKellips v. Saint Francis Hosp., Inc.,* 741 P.2d 467, 473 (Okla. 1987). The mere possibility that the defendant "may have" caused a harm is insufficient to establish the requirement of proximate cause. *Hardy v. Southwestern Bell Telephone Co.,* 910 P.2d 1024, 1027 (Okla. 1996). The question of proximate cause is one of law as to whether the required proof of a causal nexus between the alleged negligence and resulting injuries exists. *Elledge v. Staring*, 939 P.2d 1163, 1165 (Okla. Civ. App. 1996) (citing *Thompson* at 263). In *Cohenour v. Smart*, 1951 OK 339, 240 P.2d 91, the Court held that mere possibilities are insufficient to prove causation; instead, the Plaintiffs must show through competent expert testimony that the act or conduct complained of more likely than not caused the harm complained of:

> It was incumbent upon the plaintiff, under the facts in that case, to prove not only that the accident could have caused the injury, but that it probably did. It is our opinion that where the evidence of the plaintiff does not show by expert testimony and all the surrounding facts and circumstances that the injury could have been caused by and was the probable result of the accident, then the plaintiff has not established sufficient facts to make out a cause of action.

*Id*, at ¶ 7. Additionally, negligence and causation can never be presumed from a showing no more than the happening of the harmful event. *Harder v. F.C. Clinton, Inc.*, 948 P.2d 298, 304 (Okla. 2009).

In this case, there is absolutely no expert testimony that any care and treatment, or lack of care, provided by the jail healthcare providers caused Plaintiff any harm. The uncontroverted evidence in this case shows that Plaintiff cannot prove that any act or omission allegedly committed by Dr. Cooper, Nurse McCullar, or the Turn Key staff, caused or affected Plaintiff's alleged harm. The uncontroverted evidence further shows that the timing of Plaintiff's surgery was immaterial to his recovery, and that even if Plaintiff had been sent to the hospital on November 3, 2016 the extent of his surgery and his recovery would have been identical. Exh. 10 at 66. Plaintiff's treating neurosurgeon, Dr. Baird, was unable offer any evidence to contradict this fact. Thus, Plaintiff cannot produce expert testimony as to whether Dr. Cooper's allegedly incorrect clinical judgment and treatment, or any of the care and treatment provided by Dr. Cooper, Nurse McCullar, or the Turn Key staff, had any impact one way or the other on

---

Motions for Summary Judgment of Defendant William Cooper. and Defendant Katie McCullar.

Plaintiff's ultimate outcome.

Dr. L'Heureux further opined that Plaintiff's recovery following the two spine surgeries and his need for long-term rehabilitation and home healthcare would also have been the same, and he would have continued to require rehabilitation and physical therapy for approximately six months in order to reach maximum medical improvement. Dr. L'Heureux also provided, and Plaintiff's treating neurosurgeon agreed, that Plaintiff had an excellent outcome.   *Id.* at p. 67 and Exh. 11 at 66:3-22.  In this case, the Plaintiff has failed to provide any expert testimony or evidence concerning the cause of Plaintiff's death. As such, the Plaintiff cannot establish proximate cause, an essential element of all medical negligence claims in Oklahoma. In particular, Plaintiff's medical experts have made no affirmative statement that, more likely than not, Plaintiff's harm would not have occurred in the absence of the alleged negligent acts or omissions on the part of Turn Key. Considering the Plaintiff cannot prove through expert testimony that Turn Key was the proximate cause of Plaintiff's alleged harm, the Plaintiff cannot establish a prima facie case of negligence against Turn Key and summary judgment on all negligence claims against Turn Key is appropriate at this time.

**B.     TURN KEY IS IMMUNE FROM LIABILITY FOR THE NEGLIGENCE CLAIMS ASSERTED BY THE PLAINTIFF UNDER THE OKLAHOMA GOVERNMENTAL TORT CLAIMS ACT.**

In this case, Turn Key entered into a contract with the Board of County Commissioners of the Muskogee County, Oklahoma, on behalf of the Muskogee County Sheriff's Office, to provide medical services in MCDC. Exh. 14, *Turn Key Contract*. Accordingly, summary judgment must also be granted on Plaintiff's negligence claims against Turn Key because Turn Key is considered an "employee" of the state and immune from liability under the Oklahoma Governmental Tort Claims Act ("GTCA").   In particular, section 152.1 of title 51 of the Oklahoma Statutes states the following:

> The State of Oklahoma does hereby adopt the doctrine of sovereign immunity. The state, its political subdivisions, and all of their employees acting within the scope of their employment, whether performing governmental or proprietary functions, shall be immune from liability.

OKLA. STAT. tit. 51, § 152.1(A).

The GTCA goes on to define "employee" and specifically provides that "the following are employees of this state" … "(7) licensed medical professionals under contract with the city,

county, or state entities who provide medical care to inmates or detainees in the custody or control of law enforcement agencies". OKLA. STAT. tit. 51, § 152(7)(b).  The uncontroverted evidence establishes that Defendant falls squarely within the language of the definition of "employee" as it provides that medical professionals pursuant to a contract with the city, county or state. Thus, as an employee, Defendant Turn Key is immune from liability in tort pursuant to the GTCA.

This interpretation is consistent with the Oklahoma Supreme Court who in December of 2018 encountered the issue of whether a private correctional healthcare contractor such as Turn Key, and not just its employees, are subject to the GTCA immunity. *See Barrios v. Haskell Cnty. Pub. Facilities Auth.,* 2018 OK 90. In *Barrios*, the Court reasoned as follows:

> Generally speaking, the staff of a healthcare contractor at a jail are "employees" who are entitled to tort immunity under the GTCA by virtue of sections 152(7)(b), 153(A), and 155(25). *See* 51 O.S. Supp. 2015 § 152(7)(b) ("As used in The Governmental Tort Claims Act: . . . 7. 'Employee' means any person who is authorized to act on behalf of a political subdivision or the state whether that person is acting on a permanent or temporary basis, with or without being compensated or on a full-time basis . . . b. For the purpose of The Governmental Tort Claims Act, the following are employees of this state, regardless of the place in this state where duties as employees are performed: . . . (5) physicians who provide medical care to inmates pursuant to a contract with the Department of Corrections, [and] . . . (7) licensed medical professionals under contract with city, county, or state entities who provide medical care to inmates or detainees in the custody or control of law enforcement agencies . . ."); *id.* §§ 153(A), 155(25). We have not been asked whether Turn Key Health, LLC [a private healthcare contractor] or its staff are "employees" under section 152(7)(b) but have assumed that they are for purposes of answering the questions certified to us.

*Id.* at n. 5 (emphasis added).

Pursuant to the Court's reasoning in *Barrios*, private correctional healthcare contractors, such as Turn Key, are considered state actors for the purposes of the GTCA. *See id.* at n. 5.

According to the GTCA immunity provisions, state actors are exempt as a matter of law from liability for certain tort claims, such as those arising out of "[p]rovision, equipping, operation or maintenance of any prison, jail or correctional facility."  OKLA. STAT. tit. 51, § 155(25).  Based on this immunity from tort afforded by the GTCA, Defendant Turn Key cannot be held liable for any tort claims that arise out of providing healthcare services to inmates at MCDC, including Plaintiff. Therefore, consistent with the reasoning in *Barrios*, the GTCA's grant of immunity extends to private corporations contracting with the state or its political

subdivisions to provide healthcare services, such as Turn Key, and not just their employees. *Id.* at n. 5.

Federal courts in Oklahoma have found the *Barrios* reasoning persuasive. In fact, the Northern District recently dismissed plaintiff's state law claims of negligence against Turn Key and held that Turn Key is an "employee" under the GTCA and immune from tort liability. *See Prince v. Turn Key*, Case No. 18-CV-0282, *20 (N.D. Okla. Jan. 16, 2019). Likewise, in its decision in *Birdwell v. Glanz*, Case No. 15-CV-304-TCK-FHM (N.D. Okla. Mar. 12, 2019), the Northern District also held that Turn Key, is an "employee" under the GTCA and is thus "entitled to immunity from tort suits arising out of the 'operation or maintenance of any prison, jail, or correctional facility'." *See id.* at 18 (citing 51 O.S. §§ 152(14) and 155(25)). Additionally, in *Burke v. Regalado*, Case No. 18-CV-231-GKF-FHM, *2 (N.D. Okla., March 28, 2019), Judge Frizzle, cited to *Barrios*, *Birdwell*, and *Prince*, as he summarily dismissed the plaintiff's state constitutional claim and negligence claim against Turn Key at the motion to dismiss stage.

The United States District Court for the Western District of Oklahoma has also found *Barrios* persuasive, finding that employees of Turn Key are immune from tort liability under the GTCA as they meet the statutory definition of employee. *Hernandez v. Bd. of Cnty. Comm'rs*, *et al.,* Case No. 18-CV-00606-R, *18 (W.D. Okla. July 12, 2019). In *Hernandez*, Judge Russell cited to *Barrios*, *Prince*, and *Crocke*r as he dismissed Plaintiff's medical negligence claim against Turn Key at the motion to dismiss stage.

According to these rulings and the plain language of Sections 152(7)(b)(7), 153(A), and 155(25) of the GTCA, Defendant Turn Key is immune from liability for tort claims as a matter of law, and all such claims against Defendant Turn Key should be dismissed as a matter of law with prejudice to refiling.

## CONCLUSION

For all of the reasons set forth herein, Defendant, Turn Key Health Clinics, Inc., prays that its Motion for Summary Judgment be granted, and that judgment on all of the claims against it by Plaintiff James D. Buchanan, be entered in favor of the Defendant.

Respectfully submitted,

*/s/ Austin J. Young*

_____

SEAN P. SNIDER, OBA# 22307
AUSTIN J. YOUNG, OBA# 32684
JOHNSON HANAN VOSLER
HAWTHORNE AND SNIDER
9801 N. Broadway Extension
Oklahoma City, OK 73114
Telephone: (405) 232-6100
Facsimile: (405) 232-6105
E-Mail: ssnider@johnsonhanan.com
E-Mail: ayoung@johnsonhanan.com
*Attorney for Defendants Turn Key Health Clinics,*
*Inc., Dr. William Cooper, DO and Katie McCullar,*
*LPN*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 4th day of September, 2019, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing:

| | |
|---|---|
| Daniel E. Smolen | danielsmolen@ssrok.com |
| Bob Blakemore | bobblakemore@ssrok.com |
| Bryon Helm | bryonhelm@ssrok.com |
| Andy A. Artus | czw@czwlaw.com |
| Jordan. L. Miller | jlm@czwlaw.com |

*s/ Austin J. Young*_____
Austin J. Young