IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) JAMES D. BUCHANAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.: 18-CV-171-RAW |
| | ) | |
| (1) TURN KEY HEALTH CLINICS, LLC, | ) | |
| (2) ROB FRAZIER, in his official capacity as | ) | |
| Muskogee County Sheriff, | ) | |
| (3) BOARD OF COUNTY COMMISSIONERS | ) | |
| OF MUSKOGEE COUNTY, | ) | |
| (4) DR. COOPER, and | ) | |
| (5) KATIE MCCULLAR, LPN, | ) | |
| | ) | |
| Defendants. | ) | |

**EXHIBITS IN SUPPORT OF DEFENDANT, TURN KEY HEALTH CLINICS, LLC
MOTION FOR SUMMARY JUDGMENT ON ALL CLAIMS AND BRIEF IN SUPPORT**

**Exhibit 12 Wilcox Depo**

1              IN THE UNITED STATES DISTRICT COURT

2                 EASTERN DISTRICT OF OKLAHOMA

3                           * * *

4    JAMES D. BUCHANAN,          )
                                 )
5             Plaintiff,         )   Case No. 18-CV-171-RAW
                                 )
6        vs.                     )
                                 )
7    TURN KEY HEALTH CLINICS,    )
     LLC, et al.,                )
8                                )
              Defendants.        )
9

10

11

12           DEPOSITION OF TODD R. WILCOX, M.D.

13            Taken on Tuesday, July 2, 2019
                     At 9:30 a.m.
14
             Taken at Advanced Reporting Solutions
15              159 W. Broadway, Suite 100
                Salt Lake City, Utah  84101
16

17

18

19

20

21

22

23

24

25

Exhibit 12



**Page 2**

1        A P P E A R A N C E S
2  For the Plaintiff:
3        ROBERT M. BLAKEMORE ESQ.
         SMOLEN & ROYMAN, P.L.L.C.
4        701 S. Cincinnati Ave.
         Tulsa, OK  74119
5        (918) 585-2667
         bobblakemore@ssrok.com
6
   For the Defendant Turn Key, Dr. William Cooper
7  and Katie McCullar:
8        AUSTIN YOUNG, ESQ.
         JOHNSON, HANAN & VOSLER
9        9801 N. Broadway Extension
         Oklahoma City, OK  73114
10       (405) 232-6100
         ayoung@johnsonhanan.com
11
   For the Defendant Sheriff Rob Frazier,
12 Board of County Commissioners of
   Muskogee County:
13       ANDY A. ARTUS, ESQ.
         COLLINS ZORN WAGNER
14       429 N.E. 50th Street, 2nd Floor
         Oklahoma City, OK  73105
15       (405) 524-2070
         aaa@czlaw.com
16
17
18
19
20
21
22
23
24
25

**Page 3**

1        I N D E X
2  Witness
3  TODD R. WILCOX, M.D.
4  EXAMINATION  BY              PAGE
5  Mr. Young                    4
   Mr. Artus                    139
6  Mr. Blakemore                173
7
8        E X H I B I T S
9  EXHIBIT        DESCRIPTION            PAGE
10 No. 1  Todd Randall Wilcox, MD, MBA, FACP CV   5
11 No. 2  Wellcon Fee Schedule 2019     14
12 No. 3  Expert Report                 27
13 No. 4  St. John Medical Center record    29
14 No. 5  St. John Medical Center record    35
15 No. 6  Greenhaw Chiropractic         38
16 No. 7  Emergency Department Record   50
17 No. 8  Muskogee Sheriff Office Release Sheet   59
18 No. 9  Handwritten notes             69
19 No. 10 Excerpt from James Buchanan deposition   75
20 No. 11 Expert Medical Report         82
21 No. 12 Turn Key Health record        113
22 No. 13 Wellcon Invoice               139
23
24
25

**Page 4**

1        P R O C E E D I N G S
2        TODD R. WILCOX, M.D.
3  was called as a witness, having been first duly
4  sworn, was examined and testified on his oath as
5  follows:
6        --oOo--
7        EXAMINATION
8  BY MR. YOUNG:
9     Q.  Dr. Wilcox, if you would please state
10 your full name for the record.
11    A.  Todd Randall Wilcox.
12    Q.  Thank you.  And you understand that we're
13 here today because you've been listed by James
14 Buchanan as a retained expert in this matter; right?
15    A.  Correct.
16    Q.  All right.  And it's my understanding
17 that you have given previous deposition testimony in
18 other cases.  Is that right?
19    A.  I have.
20    Q.  So do we need to go over how depositions
21 work and deposition rules and all that, or do you
22 have a pretty good understanding?
23    A.  I think I know the basics.
24    Q.  All right.  And as you said a minute ago,
25 you are on call.  If you get a phone call, just let

**Page 5**

1  us know, and we'll take a quick break.
2        (Exhibit 1 was marked.)
3        All right.  Dr. Wilcox, I'm handing you a
4  copy of your CV.  I'll mark it as Exhibit 1.  This is
5  the CV that was produced in this case.  Does that
6  look like it's accurate and up to date?
7     A.  Yes, it does.
8     Q.  All right.  If you think of something
9  that's not on there, just let me know.  I see here
10 that in 1996 you became the chief executive officer
11 of Wellcon, Inc.  Is that right?
12    A.  That's correct.
13    Q.  Can you tell me what Wellcon, Inc. is,
14 please.
15    A.  It is a company that focuses mostly on
16 the delivery of healthcare in correctional healthcare
17 and institutional healthcare spaces.
18    Q.  Are you the only employee, or are there
19 several?
20    A.  Well, I'm the only technical employee.
21 We have lots of contracted physicians who work for us
22 as well.
23    Q.  Okay.  And do you guys operate in Utah --
24 in the Salt Lake City area, in Utah, or is it more
25 spread out than that?

Exhibit 12

Page 6

1    A.   We currently do direct delivery of
2 healthcare in the Salt Lake County Jail.
3    Q.   Okay.
4        Okay.  And I see also that you are the
5 medical director of the Salt Lake County Jail System,
6 1996 to current.  Is that right?
7    A.   That's correct.
8    Q.   All right.  Was there a reason those
9 three things happened at the same time?
10   A.   Well, they're interdependent.  I'm
11 medical director as a result of having a contract
12 with the jail, and Wellcon has that contract.
13   Q.   Okay.  Excuse me.  It looks like from
14 August 2001 to current you're an attending physician
15 at After Hours Medical.  Is that right?
16   A.   That's correct.
17   Q.   And what is After Hours Medical?
18   A.   After Hours Medical is a network of
19 healthcare clinics here in Salt Lake City, and
20 actually there's some clinics out of state now that I
21 don't ever work at, but they do have a couple extras.
22 And I'm an attending physician within their system
23 and will work some shifts, and I do some consulting
24 work with them on occasion with regard to treatment
25 plans and protocols.

Page 7

1    Q.   And forgive me if I missed it.  Is this
2 correctional healthcare also?
3    A.   No.  This is private sector healthcare.
4 It would be in the areas of urgent care and primary
5 care.
6    Q.   Okay.  That's what I was wondering.
7        All right.  January of '03 to December of
8 2009, senior consultant at Phase 2 Consulting.
9 What's Phase 2 Consulting?
10   A.   Phase 2 Consulting was a nationally known
11 healthcare consulting group that was based out of
12 here and Austin, Texas, and they did quite a bit of
13 work in the hospital zone, but they also did some
14 work in correctional facilities; so I was one of
15 their consultants for projects that were in
16 correctional facilities.
17   Q.   Okay.  They operated in both private and
18 correctional, but you focused on the correctional; is
19 that right?
20   A.   That's correct.
21   Q.   Okay.  Thanks.
22        All right.  Working back, Medical
23 Director, Maricopa County Jail System.  Excuse me.
24 Is Maricopa County in Utah or -- it's in Arizona,
25 isn't it?

Page 8

1    A.   Phoenix, Arizona.
2    Q.   Okay.  So did you have to live in Phoenix
3 for that job?
4    A.   No.  They wanted me to, but that was sort
5 of an emergency fill-in medical director engagement;
6 so I still lived here in Salt Lake and worked half
7 the week here in Salt Lake and then would fly down
8 and work half the week in Phoenix, and I did that for
9 a couple of years.
10   Q.   Okay.  Working backwards, an attending
11 physician at Wasatch Physician Services.  What is
12 that?
13   A.   Wasatch Physician Services was a group of
14 physicians that owned a network of clinics here in
15 town, and it's a similar setup to the after-hours
16 medical, and I worked for them for those four years.
17   Q.   And then I see you were the attending
18 physician at the State of Utah Department of
19 Corrections from August of '97 to January of '99.  Is
20 that right?
21   A.   That's correct.
22   Q.   What exactly was the scope of your duties
23 in that position?
24   A.   That was a part-time position, and I was
25 one of the staff physicians there.  I mostly took

Page 9

1 care of individuals who had orthopedic issues and
2 musculoskeletal complaints and did some procedural
3 based care for patients that needed biopsies done and
4 that sort of thing for them.
5    Q.   And from June of 1994 to May of '96 we've
6 got a staff position at the Salt Lake County Jail; is
7 that right?
8    A.   That's correct.
9    Q.   And what exactly was the scope of your
10 duties there?
11   A.   Well, I was a physician who saw patients
12 and took care of them during that period of time
13 within the Salt Lake County Jail.
14   Q.   Okay.
15       It looks like you got an MBA after you
16 completed your residency.  Is that right?
17   A.   Correct.
18   Q.   Is there any particular reason for that?
19   A.   Well, just general interest, I guess.
20 It's a program that's available here at the
21 University of Utah, and it was obviously something I
22 was interested in and had the opportunity to
23 participate in their program and decided to do it.
24   Q.   Okay.
25       I've got undergrad at Duke University



Todd Wilcox, MD, MBA, FACCP    7/2/2019    4 (10 - 13)

Page 10

1   with a major in biological psychology; is that right?
2       A.   That's correct.
3       Q.   The then med school at Vanderbilt from
4   August of '88 to May of 92; is that right?
5       A.   That's correct.
6       Q.   And I see you did an internship at the
7   University of Utah.  Is that when you first came to
8   the state of Utah?
9       A.   Yes.
10      Q.   And the internship was in general
11  surgery; is that right?
12      A.   Correct.
13      Q.   And then I see you stayed in Utah for
14  residency in orthopedic surgery.
15      A.   That's right.
16      Q.   Is that right?
17      A.   That's correct.
18      Q.   Did you -- it doesn't look like you stuck
19  with orthopedic surgery.  Is that right?
20      A.   That's correct.
21      Q.   Was there a reason for that?  Kind of
22  what happened there?
23      A.   Well, I was doing my orthopedic surgery
24  residency and ended up taking a year of sabbatical to
25  take care of my father, who became gravely ill, and

Page 11

1   assisted him with his recovery, and during that
2   period of time I began doing some other things in
3   healthcare and ultimately ended up enjoying more than
4   orthopedic surgery; so I made a decision to switch my
5   areas of specialty.
6       Q.   Okay.  Did you switch to urgent care?
7       A.   Urgent care and primary -- and primary
8   care.
9       Q.   Okay.  And I see you're board certified
10  in urgent care medicine.  Is that right?
11      A.   Yes, that's correct.
12      Q.   Are there any other board certifications
13  that are not listed there?
14      A.   Well, I guess the HIV would technically
15  be considered a board certification, and it's by exam
16  and similar thing; so I'm also certified for HIV
17  medicine.
18      Q.   Who issues that certification?
19      A.   The American Academy of HIV Medicine.
20          MR. YOUNG:  All right.
21          THE WITNESS:  Can we take just a brief
22  moment?  I just got a text from one of my nurses.
23          MR. YOUNG:  Sure, we can go off.
24          (Off the record.)
25          MR. YOUNG:  Back on.

Page 12

1       Q.   (BY MR. YOUNG)  All right.  Doctor, we're
2   back on after a quick break.  I'm going through your
3   CV, Defense Exhibit 1, and I notice that you've got
4   several publications.  All right.  Are any of these
5   publications related to surgery?
6       A.   Yes.
7       Q.   Which one, or which ones?
8       A.   So the last four on -- well, if you start
9   with subtitle of "Publications" and go to the next
10  page, which is not numbered, but there are four at
11  the bottom of that page that begin with Goble, Goble,
12  Wilcox and Goble.  Next page there's Goble and
13  Morris, Wilcox and Morris, Morris and Wilcox, Morris
14  and Wilcox, Cogbill, Morris, Moore and Feliciano, and
15  all of those are related to surgery.
16      Q.   All right.  And perhaps I should have
17  started with a more specific question.  How about any
18  of them related to orthopedic surgery?
19      A.   Well, many of them are.
20      Q.   Okay.
21      A.   Do you want me to outline them?
22      Q.   I guess let's just keep going with more
23  specific questions before you do that.  Are any of
24  them related to the underlying medical issues in this
25  case?

Page 13

1          MR. BLAKEMORE:  Object to form.
2       A.   No.
3       Q.   Okay.  And I can keep going on the
4   specificity.  Do any of them have to do with cervical
5   epidural abscess?
6       A.   No.
7       Q.   Okay.  Did you rely on any of these
8   articles in coming to your opinions in your report,
9   which we'll get to in a minute?
10      A.   No.
11      Q.   I notice under the presentations there's
12  one titled "Neurological Emergencies."  Do you see
13  that?
14      A.   Yes.
15      Q.   Do you recall that presentation?
16      A.   In vague recollection.  I don't -- I
17  can't recall all of the different topics that were
18  covered in that presentation.
19      Q.   Okay.  Do you know when you would have
20  been giving that presentation?
21      A.   Not off the top of my head.
22      Q.   Can you ballpark it?  Five, ten, fifteen
23  years ago?
24      A.   Probably five to ten years ago.
25      Q.   Okay.  Was it just you gave the



Exhibit 12

Page 14

1 presentation one time, or were you doing some sort of
2 circuit tour? I'm just trying to get an
3 understanding of what kind of preparation it was.
4     A.  Well, I'm not on the circuit, so no.
5 That was probably just a one-time presentation at
6 national conference.
7     Q.  Okay.  What kind of national conference?
8     A.  Probably the National Commission on
9 Correctional Healthcare.
10     Q.  Okay.  Do you have any materials that you
11 might have used, a slide show or anything like that?
12     A.  It's likely that I have the slides for
13 that.
14     Q.  Okay.  I might ask to see if
15 Mr. Blakemore can produce those.  As I sit here right
16 now, I don't know if I want to, but if you could when
17 you get back, maybe take a look and see if you can
18 dig that stuff up, if you don't mind, and he and I
19 will work that out.
20         (Exhibit 2 was marked.)
21         Doctor, I'm going to give you defense
22 Exhibit 2.  It's a copy of your fee schedule.  Does
23 this look accurate?
24     A.  Yes.
25     Q.  I notice that up at the top it's got the

Page 15

1 Wellcon header, and you are the CEO of that company;
2 is that right?
3     A.  Correct.
4     Q.  All right.  Who determines your rates,
5 then?
6     A.  Well, it would be me.
7     Q.  Okay.  What percentage of those fees do
8 you personally receive?
9     A.  Well, it's very dependent upon the
10 situation and the day.  Oftentimes when I have to do
11 some activity associated with this, I'm not able to
12 work as a clinical physician; so I have to hire
13 someone to cover my patients for me during that
14 period of time, and so oftentimes a significant
15 portion of this goes to that coverage.
16     Q.  Okay.
17         You have testified as an expert witness
18 many times in the past; is that right?
19     A.  Well, I have done it in the past.  I
20 don't know how to quantify the word "many."
21     Q.  Okay.  Fair enough.  About how many times
22 do you think you've done it?
23     A.  Estimate, I've probably given about
24 60 depositions.
25     Q.  Okay.  Can you estimate the percentage of

Page 16

1 the time that you've done for plaintiffs versus
2 defendants?
3     A.  I haven't exactly computed it.  I would
4 tell you just out of experience it has waxed and
5 waned over the years.  I think sum total it's
6 probably near 50/50.
7     Q.  Okay.  Do you remember the last -- when
8 the last time you testified on behalf of a defendant
9 was?
10     A.  I would have to look on my -- on my
11 deposition list.  Did you --
12     Q.  It's okay.  I was just curious if you --
13     A.  I can't remember.
14     Q.  Okay.
15         And I haven't seen any of your invoices
16 in this case.  Do you know how much you've billed the
17 plaintiff to date?
18     A.  Not exactly.
19     Q.  Do you have a ballpark?
20     A.  I'd hate to be specific.  I don't really
21 know the number --
22     Q.  Okay.
23     A.  -- but I have something.
24         MR. BLAKEMORE:  Let me see if I can find
25 it.  I should have sent it to you.

Page 17

1         MR. YOUNG:  It's okay.  We can circle back
2 on that.
3         THE WITNESS:  That information is
4 available.
5     Q.  (BY MR. YOUNG)  Right.  I understand.
6         When you bill, do you include review of
7 records, testimony, and discussions with counsel?
8     A.  I'm sorry.  I'm not sure I quite
9 understand what you're asking me.
10     Q.  That's fair.  I see here that you bill
11 for your review of records.  I was just curious if
12 your billing includes discussion with counsel.  I'm
13 just trying to get an idea for everything you bill
14 for, I guess.
15     A.  Sure.  I mean, what I bill for are the
16 standard time elements for serving as an expert, so
17 review of records, if there is a phone discussion
18 that occurs, sometimes there's additional research
19 that has to be done that I have to do, and all of
20 those take time; so fundamentally if I have to spend
21 time on a case then I will bill for that.
22     Q.  Okay.  And that includes preparing the
23 report, I assume.
24     A.  Yes, of course.
25     Q.  Would you agree with me that as an expert



Professional Reporters
800.376.1006
www.proreporters.com

Exhibit 12

Page 18

1  it's important to be fair and impartial to all
2  parties?
3      A.  Yes.
4      Q.  Would you agree that in your role as an
5  expert you are not an advocate for any particular
6  party?
7      A.  Correct.
8      Q.  Okay.  And you would agree with me that
9  your testimony should be fair and accurate and
10 objective and thorough?
11     A.  Yes, I think all those words pertain.
12     Q.  And would you agree with me that the
13 expert should limit his opinions to the area -- his
14 area of expertise?
15     A.  Yes.  I think there are lots of areas,
16 though, that are general medicine that sort of all
17 physicians have expertise in; so I think those are
18 fair areas as well.
19     Q.  What type of areas?
20     A.  Oh, things like interpretation of vital
21 signs, interpretation of labs, I mean just basic --
22 the basic elements of healthcare delivery that cut
23 across all specialties.
24     Q.  Okay.  Would you agree with me that as an
25 expert you have a duty to review all of the pertinent

Page 19

1  evidence and records?
2      A.  Yes.
3      Q.  And would you agree with me that an
4  expert witness should have appropriate education and
5  experience in the specific area in which he or she is
6  testifying?
7      A.  Yes.  I don't know how you can really be
8  an expert in something if you don't have the
9  appropriate preparation.
10     Q.  Well, it wouldn't be fair for someone who
11 didn't have such expertise to be testifying on topics
12 that they didn't have the proper education about.
13 Would you agree with that?
14         MR. BLAKEMORE:  Object to form.
15     A.  I would agree, and I think there are
16 legal mechanisms to inquire about that in case
17 someone crosses the line.
18     Q.  I believe I saw in your report that some
19 of the records that you have reviewed are the records
20 from when James Buchanan was at Hillcrest in
21 Oklahoma.  Is that right?
22     A.  Yes, I remember some records from
23 Hillcrest.
24     Q.  All right.  So then you're aware that
25 Mr. Buchanan had a cervical epidural abscess on his

Page 20

1  spine which required surgery; is that right?
2      A.  Yes, but I don't think surgery is
3  singular.  I think he required more than one.
4      Q.  That's correct.
5          Are you aware that Mr. Buchanan was at
6  St. Johns in Tulsa in the ICU prior to his
7  incarceration at Muskogee County Jail?
8      A.  Yes, I'm aware that he was at St. John's.
9  I don't know his exact room assignment and level --
10 and level of care they were delivering at that
11 particular room, but, yes, I'm aware that he was
12 there.
13     Q.  Let me ask you this:  Have you reviewed
14 the medical records from Mr. Buchanan's stay at
15 St. John's from September 17th, 2016, to September 31
16 of 2016?
17     A.  I have not.
18     Q.  Okay.  Then is it fair to say you also
19 haven't reviewed the imaging records that were done
20 during that period?
21     A.  Correct.
22     Q.  Okay.  Have you ever treated a patient
23 with a cervical epidural abscess?
24     A.  Yes.
25     Q.  How many times?

Page 21

1      A.  Well, in training we had several patients
2  who had that condition, and we took them to the
3  operating room to address that, but I was not the
4  attending physician.  I was just in training at that
5  time.
6      Q.  When you -- sorry.  I didn't mean to
7  interrupt you.  When you say "training," are you
8  talking about before -- are you talking about
9  internship?  Residency?  What are we talking about?
10     A.  Both.  You know, in the internship you
11 rotate through neurosurgical surgery and orthopedic
12 surgery, both whom manage spine conditions.  And then
13 in orthopedic surgery you spend quite a bit of time
14 on the spine service, and there would be cases of
15 epidural abscess that would come in; so I do have
16 some familiarity with the surgical techniques and
17 have at least seen those cases.
18     Q.  Okay.
19     A.  And then as an attending physician within
20 the correctional facility, I can remember three or
21 four cases over the years of patients with this
22 condition who we diagnosed and referred out.
23     Q.  Dr. Wilcox, do you intend to come to
24 trial and offer opinions to the Oklahoma jury as to
25 the cause of Mr. Buchanan's cervical epidural


Exhibit 12

Page 22

1  abscess?
2      A.  Well, the cause of it is really sort of
3  spontaneous.  It's a spontaneous event that occurred.
4  There wasn't anything that specifically caused it.
5      Q.  So is that a yes, that you do intend to
6  offer causation opinions, or, no, that you're only
7  going to focus on the correctional healthcare?
8          MR. BLAKEMORE:  Object to form.
9      A.  Well, I think the causation opinions are
10  sort of general in the sense of how this condition
11  arises, but my area of expertise is in the delivery
12  of correctional healthcare.
13      Q.  Would you agree with me that -- strike
14  that.
15          Do you intend to come to trial and offer
16  any causation opinions as it relates to
17  Mr. Buchanan's neurological function as it -- as he
18  is today?
19      A.  Well, I don't have the ability to do that
20  unless I examined him.
21      Q.  All right.  And you haven't done a
22  personal examination; is that right?
23      A.  That's correct.
24      Q.  Would you agree with me that you are not
25  qualified to render opinions in the field of

Page 23

1  orthopedic surgery?
2      A.  Well, I think that's a little overly
3  broad.  I certainly still practice a lot of non --
4  nonsurgical orthopedic surgery or orthopedic
5  medicine, and that's a pretty broad field that I
6  would be qualified to offer opinions in, but I
7  wouldn't offer opinions with respect to, for example,
8  neurosurgical techniques.
9      Q.  I mean, I know you did the residency in
10  orthopedic surgery, but you're not -- you didn't
11  complete the residency; is that right?
12      A.  Correct.
13      Q.  And you're not board certified in
14  orthopedic surgery; is that right?
15      A.  That's correct.
16      Q.  And nor are you board certified in
17  neurosurgery; is that right?
18      A.  That's correct.
19      Q.  It sounded like from your answer you do
20  feel like you can offer opinions regarding orthopedic
21  surgery, but you draw the line at neurosurgical
22  techniques.  Did I get that right?
23      A.  You did not.
24      Q.  Okay.  Can you explain it more for me,
25  please?

Page 24

1      A.  Well, you were inquiring about whether I
2  could offer opinions in the very broad field of
3  orthopedics, and I -- and I indicated that I could
4  and that I still practice orthopedics but in a
5  nonoperative fashion, but I said I would not offer an
6  opinion with respect to neurosurgical techniques
7  which are utilized in both neurosurgery and
8  orthopedic surgery.
9      Q.  Okay.  And perhaps I didn't ask the
10  question well, because I think you answered it there,
11  but would you say that you're going to offer
12  causation opinions in the field of orthopedic
13  surgery?
14      A.  No.
15          MR. BLAKEMORE:  Object to form.
16      Q.  (BY MR. YOUNG)  Okay.  You're right.  I
17  asked it broadly first with orthopedics.  What I
18  think I meant was orthopedic surgery.  Thank you.
19          All right.  Are you planning on offering
20  any opinions regarding physical or occupational
21  rehabilitation in this case?
22      A.  No.
23      Q.  Okay.
24          Would you agree with me that the practice
25  of medicine is largely about making judgment calls in

Page 25

1  the moment?
2          MR. BLAKEMORE:  Object to the form.
3      A.  No.
4      Q.  Would you agree with me that making
5  judgment calls is a part of practicing medicine?
6      A.  Yes, but, you know, those judgment calls
7  are based on the science of medicine.
8      Q.  Of course.
9      A.  So, yes, but --
10      Q.  Would you agree with me that it's not a
11  perfect science?
12          MR. BLAKEMORE:  Object to form.
13      A.  Well, I don't know quite what that --
14  what you mean by that.
15      Q.  I guess I'm asking you there is no one
16  way or perfect way to practice medicine.  Would you
17  agree with that statement?
18      A.  I guess I really still don't quite know
19  how to answer that.  There are oftentimes more than
20  one way to treat a condition that would be
21  successful.
22      Q.  Okay.  You have to use your clinical
23  judgment based on education, training, experience;
24  right?
25      A.  Yes.

Exhibit 12

Page 26

1    Q.  Would you agree with me that the
2  providers who are best suited to make those types of
3  judgment calls are those actually present, seeing the
4  patient with their hands on the patient?
5    A.  Well, certainly.  One of the mantras of
6  medicine is that there's no substitute for actually
7  seeing the patient.
8    Q.  And can you appreciate and understand
9  that in the practice of medicine there are sometimes
10 things that are done which are not charted?
11     MR. BLAKEMORE:  Object to form.
12    A.  Yes.
13    Q.  Okay.  And would you agree with me that
14 the person best able to fill in those gaps would be
15 the provider who was providing the hands-on care?
16    A.  Well, in the sense that it's not charted,
17 they would be sort of your only option for inquiring
18 about whether they did or did not do something.
19    Q.  And you reviewed deposition transcripts;
20 so you know that many of the treaters in this case
21 have been deposed to fill in any gaps of what they
22 did, what they saw, and what they remember; is that
23 right?
24     MR. BLAKEMORE:  Object to form.
25    A.  The treaters in this case, particularly

Page 27

1  the depositions I have read, would be the nurses.
2    Q.  Okay.  Well, you read Dr. Cooper's
3  deposition too; is that right?
4     MR. BLAKEMORE:  I don't think we had the
5  transcript at the time of his report.
6     MR. YOUNG:  Okay.
7     THE WITNESS:  No, I have not read his
8  deposition.
9    Q.  (BY MR. YOUNG)  Okay.  That's fine.  I
10 was wondering if you have a different definition of
11 treater, but that's fine.  We'll move on.
12    A.  Well, I was going to argue with you about
13 whether we can call nurses treaters.  So...
14    Q.  I am still working on all the lingo --
15 healthcare provider, treater.  The person providing
16 the healthcare is really all I meant.
17     All right.  With that we'll go on to the
18 expert report.
19     (Exhibit 3 was marked.)
20     Doctor, I've marked your report as
21 defendants' Exhibit 3.  You recognize that; right?
22    A.  Yes, I do.
23    Q.  Okay.  On the second page there is a list
24 of materials reviewed.  Is that accurate?
25    A.  Yes.

Page 28

1    Q.  Okay.  And then is it fair to assume that
2  this list compiles all of the records you have
3  reviewed in this case?
4    A.  Yes.
5    Q.  There's not anything left off.  Okay.
6  And you haven't reviewed anything else since this
7  list was created?
8    A.  Correct.
9    Q.  Have you asked for any additional
10 materials that you would like to review?
11    A.  I have not asked, although I have become
12 aware that there have been some additional materials
13 that have been produced.  I think there's an expert
14 report from perhaps on your side of the case that is
15 available, and I just found out about Dr. Cooper's
16 deposition, which I did not know about.  So...
17    Q.  Okay.  That's fair.  All that happened, I
18 believe, since you have been produced any of these
19 materials; so I'm just curious what you've seen.
20     Okay.  As for the report itself, did
21 you -- first of all, are there any other reports
22 you've prepared in this case, or is this the only
23 one?
24    A.  This is the only one.
25    Q.  Did you actually type it in its entirety?

Page 29

1    A.  I had some assistance with some of the
2  citations, which I did not retype, but overall the
3  rest of the report I typed myself.
4    Q.  Who helped you with the citations?
5    A.  Mr. Blakemore.
6    Q.  So then all of the substantive material
7  you drafted yourself; is that right?
8    A.  That's correct.
9    Q.  Okay.  And does it contain your complete
10 and final opinions?
11    A.  I would say that it contains my opinions
12 at this point based on the information that I have
13 reviewed, but I reserve the right to change those or
14 add to those if there is additional information that
15 I review that is relevant.
16    Q.  Okay.  Any changes you'd like to make
17 now?
18    A.  No.
19    Q.  So but for that caveat you just made, you
20 stand by all of the statement of opinions in this
21 report; is that right?  Is that fair?
22    A.  That's correct.
23    Q.  All right.  Keep that handy.  We're going
24 to circle back.
25     (Exhibit 4 was marked.)



Exhibit 12

Page 30

1   Doctor, I'm going to give to you what I
2   have marked as defense Exhibit 4, and I'll represent
3   to you that this is the discharge instructions from
4   Mr. Buchanan's stay at St. John's. I'll further
5   represent to you that there is a front page of it
6   that for reasons I couldn't figure out this morning
7   with the printer would not print out. However, what
8   I want to ask you about is summarized here on the
9   second page --
10   A. Okay.
11   Q. -- so we're going to make due. Take a
12   moment and look at it, if you don't mind.
13   Actually, Mr. Artus was kind enough to
14   give me a full -- he actually had it; so I'm going to
15   try again.
16   MR. BLAKEMORE: Do you want to mark that?
17   MR. YOUNG: Yeah. Let's just go ahead and
18   call it five.
19   MR. ARTUS: Five instead of four.
20   MR. YOUNG: Can we pull that sticker off,
21   do you think, or is it too late? I'll try. I knew
22   that printer was going to be a problem.
23   (Exhibit 4 was re-marked.)
24   MR. YOUNG: Okay. There you go. That's
25   the whole thing.

Page 31

1   Bob, did you get one?
2   MR. BLAKEMORE: Yes, I did.
3   (Dr. Wilcox reviews document.)
4   THE WITNESS: Okay.
5   Q. (BY MR. YOUNG) Okay. You'll notice
6   under "Discharge Diagnoses" up top you've got
7   "Auto v. Pedestrian; Closed pneumothorax; Multiple
8   closed fracture of ribs of left side."
9   Obviously, there's no diagnosis for
10   epidural abscess; right?
11   A. Correct.
12   Q. Now, you'll notice under "Consultants"
13   there's Dr. Rapacki, MD. I'll represent to you that
14   he is a neurosurgeon who treated Mr. Buchanan during
15   his stay at St. John's, and he didn't diagnose the
16   cervical epidural abscess; is that right?
17   A. Correct.
18   Q. I believe he -- first, it looks like
19   there was an MRI and there was a CT scan. So there
20   was imaging done, and they didn't see a cervical
21   epidural abscess; right?
22   MR. BLAKEMORE: Object to form.
23   A. Well, we just have the hospital summary
24   course here, but it indicates there was an MRI done
25   of his cervical spine. The CT scan was done of his

Page 32

1   chest.
2   Q. Okay. Thank you for that. And neither
3   of them revealed any indication of a -- neither of
4   them alerted the physician that Mr. Buchanan might
5   have a cervical epidural abscess. Is that fair?
6   MR. BLAKEMORE: Object to form.
7   A. Well, I think your question is perhaps a
8   bit leading. I think the way that you would state
9   that is that the MRI was done and there was no
10   evidence of abscess on the MRI.
11   Q. Okay.
12   It looks like the second sentence under
13   "Hospital Course Summary" says: "Initial scans were
14   done at OSH showing a possible hematoma."
15   Is that right?
16   A. Yes. It probably would be best to read
17   the whole sentence. "Initial scans were done at OSH
18   showing possible hematoma in the left lateral base of
19   the neck, multiple rib fractures and left -- and a
20   left pneumothorax," period.
21   Q. Okay.
22   On the next page under "Follow Up
23   Instructions and Plan," we've got "Follow up with
24   Dallas Buck on 10/7 at 1400; Follow up with
25   Dr. Rapacki on 10/12"; Obtain AP/lateral cervical

Page 33

1   spine x-ray prior to following up with Dr. Rapacki.
2   Is that right?
3   A. That's what it says.
4   Q. And have you seen any records that
5   indicate that Mr. Buchanan followed up as instructed?
6   A. No.
7   Q. And, additionally, this discharge summary
8   at the top is signed and dated on September 30th,
9   2016; is that right?
10   A. I don't see that on the second page.
11   Q. I'm sorry. First page up at the top
12   right.
13   A. There's more than one time stamp
14   indicated up here on the upper right. I don't know
15   how to interpret those. Dr. Yeary had a time stamp
16   on 10/10 of 2016, and Dallas Buck has a time stamp on
17   9/30/2016.
18   Q. Okay. How about this. The top left,
19   date of discharge is 9/30/16. Can we agree on that?
20   A. Yes, we can.
21   Q. All right. And I bring that up because
22   in your complaint -- I'm sorry -- in your report,
23   just as in the amended complaint, on the second page
24   it states that "Buchanan was transferred to St. John
25   in Tulsa, where he was hospitalized over the course

Exhibit 12

Page 34

of approximately six weeks due to his injuries. He was discharged from St. John Medical Center on or about October 30th, 2016."
And then it cites to the Hillcrest records at Plaintiff 002 to 005. Did you get that information from the Hillcrest records?
A. I'd have to go back and look at the citation.
Q. Okay. But we can agree that he did not -- Mr. Buchanan did not spend six weeks at St. John's. He spent two weeks. Right?
A. Yes, approximately two weeks.
Q. Approximately two weeks. That's fine. Is it fair to say, though, that when you wrote your report you were under the impression it was six weeks?
A. Yes.
MR. BLAKEMORE: Before you move on to that, can we -- we've been going about 50 minutes. Can we take a restroom break?
MR. YOUNG: Sure.
(Recess.)
MR. YOUNG: Dr. Wilcox, after a short break we're back on the record. You've been in enough depositions, I assume, to know that if at anytime you

Page 35

want to change or amend anything you've said after a break or anytime really, feel free to do that.
THE WITNESS: Thank you.
MR. YOUNG: All right.
(Exhibit 5 was marked.)
Q. (BY MR. YOUNG) Doctor, I'm going to hand you what I've marked as defense Exhibit 5. It's quite a few pages. You don't have to flip through all of them. I'll represent to you that these are records from an ER visit when Mr. Buchanan -- after his discharge from the ICU at St. John's. He returned approximately two weeks later to the ER, and that's what these records encompass.
Is it fair to say you've never seen these records before?
A. That's correct.
Q. All right.
Doctor, would you please flip -- hang on. Would you please flip to Bates page No st. John Medical Center 1019. Okay. About halfway down the left side you'll see "Diagnoses Active." It says: "Neck pain." Do you see that?
A. Yes.
Q. And then under "General" for "Chief Complaint Description" it says -- it says:

Page 36

Complained of -- it says "CO." That means complained of; right?
A. It does.
Q. "Complained of neck and bilateral neck pain after bicycle accident. Patient states he ran out of his pain medications 3 days ago. Had a bicycle accident on 9/16/16 and was discharged on 9/30/16. Has not been able to find a PCP in Muskogee."
Is that right?
A. You read that correctly.
Q. Just look at the following page, St. John Medical Center 1020. I'd like to direct your attention down to the very bottom left under "Pain Assessment Adult." Can you see what he rates his numeric pain score as?
A. It is listed as a nine.
Q. And the primary pain location is neck; right?
A. Correct.
Q. And the primary pain quality is sharp; right?
A. Correct.
Q. Doctor, would you please flip to Bates 1023. If you'll look in the middle under

Page 37

"History of Present Illness" a couple of sentences in, it says: "Pain has been constant since the accident, without change. Pain is sharp, constant, severe, increases with palpation, without radiation."
Did I read that right?
A. You did.
Q. And, Doctor, will you please flip to 1025. At the very top we've got a differential diagnosis that says: "Neck injury, cervical strain, and neck pain." Is that right?
A. I'm sorry. Say that again, please.
Q. The very top, read that, please.
A. Yes. "Neck injury, cervical strain, neck pain."
Q. All right. Now flip back, please, to 1017. He was given two prescriptions, one for methocarbamol, which is known as Robaxin, and another for naproxen, aka Naprosin; is that right?
A. Yes.
Q. All right. So he came to the ER. He complained of constant neck pain rating at a ten, and they discharged him with prescriptions of Naprosin and Robaxin. Did I get that right?
MR. BLAKEMORE: Object to form.
A. You did not.

Page 38

1    Q.  What did I miss?
2    A.  His pain was rated as a nine, I believe.
3  And you murdered the pronunciation of those, but
4  we'll let that pass.
5    Q.  I appreciate it.
6        And if you'll look on page 1013, left
7  side about halfway down, the follow-up instructions
8  say to follow up with Dallas Buck.  Do you see that?
9    A.  Yes.
10   Q.  Okay.  And one of those medications I
11 mentioned, the Robaxin, what does that treat?
12   A.  It is a muscle relaxer.
13       (Exhibit 6 was marked.)
14   Q.  All right.  I'm going to hand you some
15 records that are defense Exhibit 6.  I'll represent
16 to you these are chiropractor records from
17 Dr. Greenhaw in Muskogee, Oklahoma.  This is
18 Dr. Greenhaw -- strike all that.
19       These are chiropractic records.  Is it
20 fair to say you have not seen these records?
21   A.  That's correct.
22   Q.  All right.  Would you please flip to
23 Bates No. Frank Greenhaw 002.  All right.  We're
24 going to have to deal with some reading of
25 handwriting, but I'm assuming you're well versed in

Page 39

1  that.  So on the left side a few rows down it says:
2  "Please describe the principal health problems for
3  which you came to this office," and it says "Neck and
4  shoulders"; right?
5    A.  Yes.
6    Q.  All right.  And then about halfway down
7  on the right side it says:  "Does this interfere with
8  your normal living and work?"  The box for "Yes" is
9  checked.  And then it says:  "In what way?"  I
10 believe it says:  "I can't do much."
11       Does that look right to you?
12   A.  I agree with that.
13   Q.  The next page, 003, it says again the
14 conditions he's most interested in treating are his
15 neck and shoulders, and then below that it says:
16 "What functions are you unable to perform or induce
17 pain upon performance?  List in order of severity."
18 And in parentheses it gives examples of sitting,
19 walking, bending, lying down, etc.  Mr. Buchanan
20 writes in "Almost anything"; is that right?
21   A.  That's what I see there.
22   Q.  So when it asks, "What functions are you
23 unable to perform or induce pain?"  He says, "Almost
24 anything."
25       MR. BLAKEMORE:  Object to form.

Page 40

1    A.  Yes.
2    Q.  Okay.  And just so we can have an
3  accurate record, on the top of 002 the date is marked
4  October 21st, 2016; right?
5    A.  Correct.
6    Q.  And that would be approximately two weeks
7  before he came to Muskogee County Jail.  Does that
8  sound right?
9    A.  Approximately, yes.
10   Q.  All right.  On page 004, again dated
11 October 21st of 2016, we've got chart notes.  Next to
12 the abbreviation Q -- do you know what the
13 abbreviation Q stands for in this context?  Because I
14 wasn't sure.
15   A.  I can only speculate that it stands for
16 "quality."
17   Q.  Okay.  So in that case, if it stands for
18 quality, would it be reasonable to assume that that
19 means pain quality?
20       MR. BLAKEMORE:  Object to form.
21   A.  Yes.
22   Q.  Because it says next to Q "Intense pain,
23 constant," and whether we speculate as to the meaning
24 of the letter Q, we can be sure that he's describing
25 his pain as intense and constant.  Is that fair?

Page 41

1    A.  That's what it says.
2    Q.  We can see next to "R" it says:  "Left
3  arm to the hand.  Left is worse.  Right arm to the
4  elbow."
5        And then to "T" again it says "Constant."
6  And then we have got a notation that he went to the
7  ER at St. John's for his history.  Does that all look
8  right to you?
9    A.  Yes.
10   Q.  Would you please flip to Frank
11 Greenhaw 006.  I'll apologize.  The dates are a
12 little out of order, but we'll make it work.  Near
13 the top this one is dated October 31st of 2016, which
14 would be about four days before he came to Muskogee
15 County Jail; is that right?
16   A.  I believe that's correct.
17   Q.  All right.  Just below halfway on the
18 page he lists -- where it says, "Name your conditions
19 in the spaces below," it says:  "1. Arm; 2. Neck;
20 3. Shoulders."  Is that right?
21   A.  Yes.
22   Q.  Now, next to "Arm" we've got a pain level
23 where he circles 10, next to "Neck" the pain level
24 is 9, and next to "Shoulders" we've got a pain level
25 of 9.  Does that all look right?



Exhibit 12

Page 42

1    A.  Yes, it does.

2    Q.  Please flip to the next page.  We've got

3  another treatment at the chiropractor dated 10/26/16,

4  so approximately a week before his incarceration, and

5  under the "Conditions" he lists "Neck and shoulders";

6  is that right?

7    A.  Yes.

8    Q.  And this time he rates that as a ten.  Is

9  that fair?

10    A.  Yes.

11    Q.  All right.  Next page, again another

12  treatment at the chiropractor.  This one is 10/24 of

13  '16, approximately ten days before his incarceration.

14  Is that fair?

15    A.  Yes.

16    Q.  Okay.  And again we've got neck and

17  shoulders listed, and again he rates the pain at ten

18  for both the neck and shoulders.  Is that fair?

19    A.  Yes.

20    Q.  All right.

21        All right.  So included in these

22  chiropractic records are records from a pain

23  management specialist named Dr. Trinidad.

24  Mr. Buchanan went to see Dr. Trinidad on October 27th

25  of 2016, about a week before his incarceration, and

Page 43

1  under "Present Symptoms:  Mr. Buchanan complains of

2  constant pain and spasms in his neck to upper midback

3  with pain and paresthesias into the left arm."

4        Do you see that?

5    A.  Yes.

6    Q.  What is paresthesias?

7    A.  Usually described as a nerve tingling

8  sensation.

9    Q.  Okay.  And then he goes on to say that

10  Mr. Buchanan has pain and stiffness in his left

11  shoulder with crepitance and restricted movement and

12  weakness in the shoulder.

13        Do you see that?

14    A.  Yes.

15    Q.  What is crepitance?

16    A.  Crepitance is a sensation on physical

17  exam of -- how would you describe it?  It's roughness

18  as you move the body part.

19    Q.  Okay.  And it goes on to describe

20  "restricted movement and weakness in the shoulder."

21  Okay.

22        Will you please flip to Frank Greenhaw

23  page 010.  The top paragraph is a continuation of the

24  physical examination, and Dr. Trinidad describes

25  Mr. Buchanan's range of motion in his left shoulder.

Page 44

1  He describes the range of motion as "Range of motion

2  testing of left shoulder revealed flexion

3  150 degrees, extension 20 degrees, abduction

4  120 degrees, adduction 50 degrees, internal rotation

5  30 degrees and external rotation 50 degrees."

6        Did I get that right?

7    A.  You read those correctly.

8    Q.  All right.  Does that mean anything to

9  you?

10        MR. BLAKEMORE:  Object to form.

11    A.  Well, he's documenting his range of

12  motion, which is fairly good actually.

13    Q.  You would not describe that as a decrease

14  in range of motion, then?

15    A.  I didn't say that.  So compared to

16  stone-cold normal, many of these different motions

17  are slightly less than normal, but it's still fairly

18  mobile in all of these different planes of motion.

19    Q.  Okay.  Well, I asked it one way.  I'll

20  ask it this way now:  Would you describe that as a

21  decrease in range of motion in the shoulder?

22    A.  Well, as I said, compared to textbook

23  normal, the answer is it's a slight decrease, but

24  it's important to know what his baseline is.

25    Q.  Okay.

Page 45

1    A.  Many people have old injuries, and their

2  range of motion is limited to begin with.  But he has

3  a functional range of motion in his shoulder, as

4  evidenced by this physical exam finding.

5    Q.  Okay.

6        Well, then the cervical spine revealed --

7  "Musculoskeletal examination revealed tenderness and

8  spasm from C1 through C7 bilaterally.  Range of

9  motion testing in the cervical spine revealed flexion

10  to be 30 degrees, extension 20 degrees, right lateral

11  bending 20 degrees, left lateral bending 20 degrees,

12  right rotation 30 degrees and left rotation

13  30 degrees."

14        Did I get that right?

15    A.  You did.

16    Q.  All right.  Does that describe a decrease

17  in range of motion?

18    A.  Compared to normal range of motion, this

19  is a decrease in his range of motion, which would be

20  common with the kind of injury that he had.

21    Q.  When you say "the kind of injury," you

22  mean motor vehicle accident?

23    A.  Yes, and the musculoskeletal nature of

24  his injury that was described in the medical records.

25    Q.  Do you mean the Hillcrest records?  I'm



Exhibit 12

Page 46

1  trying -- which musculoskeletal injury are we talking
2  about?
3      A.  Well, the paravertebral injury that's
4  described in both the records really.
5      Q.  Okay.  We might come back to that.
6          All right.  Let me ask it this way:  Are
7  you saying -- is this type of decrease in range of
8  motion typical of a cervical epidural abscess, or is
9  this typical of someone who is post motor vehicle
10 accident?
11     A.  Well, it would be typical of a patient
12 that has a musculoskeletal neck injury.  He basically
13 has a severe strain of neck muscles, and so you would
14 typically see range of motion like this.  He does
15 have some ability to move his neck, but it's limited.
16     Q.  Okay.
17     A.  Well, I guess to complete your thought
18 process there, so this would be more of a range of
19 motion than you would typically see in a patient with
20 a significant cervical spine epidural abscess.
21     Q.  And under "Impressions" Dr. Trinidad does
22 not list an epidural cervical abscess; right?
23     A.  Correct.  I think that's accurate.
24     Q.  And again we see a plan for naproxen
25 twice a day; is that right?

Page 47

1      A.  Well, that's No. 1 on the plan.
2      Q.  Right.
3      A.  There's more elements to it.
4      Q.  And then there's Robaxin and Norco; is
5  that right?
6      A.  Correct.
7      Q.  And it looks like he says he'll
8  reevaluate him in two weeks, the last part of the
9  plan?
10     A.  That is element five of the plan.
11     Q.  Now will you please flip to Frank
12 Greenhaw 13.  What we were just talking about was the
13 pain specialist, Dr. Trinidad, and now we're back to
14 the chiropractor, Dr. Greenhaw.  Again, all those
15 records kind of got mixed in with one another; so I
16 apologize for any confusion on that.
17         Anyhow, we're back to the chiropractor
18 records, and if you look at the very top on Frank
19 Greenhaw page 13, it's dated October 31st.  Do you
20 see that?
21     A.  I do.
22     Q.  Do you see just below that where it says
23 "ROM" and then it says "restricted" and then "All
24 planes" appears to be circled?
25     A.  Yes.

Page 48

1      Q.  Okay.  So am I correct in assuming that
2  means range of motion was restricted on all planes?
3  Would you agree with me that's what that means?
4          MR. BLAKEMORE:  Object to form.
5      A.  I would not agree with you on that.
6      Q.  Okay.  What does this mean to you?
7      A.  Well, if I'm reading this correctly and
8  using what we know about the patient already, he's
9  indicating that in the cervical and thoracic spine
10 the range of motion is restricted in all planes.
11     Q.  Okay.  So you believe that that No. 8
12 range of motion is limited to the cervical and
13 thoracic spine.  Okay.  I see that.
14         And we can kind of -- on page 14 look at
15 the top right.  We can see substantially identical
16 notation for October 26 of 2016.  Is that fair?
17     A.  Yes.
18     Q.  And then on the next page there's another
19 substantially identical notation dated October 24th
20 of 2016.  Is that fair?
21     A.  Hold on just a second.
22     Q.  It's easier for me.  I've got it
23 highlighted.  I'm on page 15, if that helps.
24     A.  I know.  I was just looking at something.
25 Sorry.  Could you ask your question again, please?

Page 49

1      Q.  Sure thing.  We've looked at two
2  notations that say range of motion to the cervical
3  and thoracic spine is restricted on all planes for
4  two other dates.  I'm just trying to establish that
5  we see it for October 24th as well.
6      A.  Right.  It would appear to me that all
7  these different dates that we've looked at, at least
8  in this upper right-hand corner, were just
9  photocopied, and they all look the same.
10     Q.  Well, no, they don't.  If you look at the
11 next page, down at the bottom right you can see where
12 someone has circled 67 and 68 and written "icepack"
13 and "subzero," and that's not on page 15.
14     A.  Right.  I just said in the upper right
15 box, is what I referring to.
16     Q.  Well, they can't just photocopy the upper
17 right corner of a page, can they?
18     A.  Sure, I mean, and fill in the rest of it.
19 Anyway, I'm not saying it is.  They all just look the
20 same to me.
21     Q.  We're almost done.  Just if we can agree
22 that there's another substantially identical notation
23 for October 24th, and then on the final page another
24 one on the 21st.  Is that fair?  Whether they're
25 photocopies or not, they're the same notation.

Exhibit 12

Page 50

1    A.  Yes.
2    Q.  Okay.
3        And will you flip over to page 13,
4  please.  In the center, kind of the top center,
5  there's a box labeled "Prognosis."  Do you see that?
6    A.  Yes.
7    Q.  And this page is dated October 31st,
8  2016, about four days before Mr. Buchanan's
9  incarceration; right?
10   A.  Correct.
11   Q.  And we see here that Dr. Greenhaw -- do
12  we refer to chiropractors as doctors?
13   A.  Yes.
14   Q.  Dr. Greenhaw lists Mr. Buchanan's
15  prognosis as fair, and then he circled below and
16  says:  "Patient decided not to follow through with
17  recommended treatment; therefore, long-term prognosis
18  is unknown."
19       Is that fair?
20   A.  That's what it says.
21   Q.  Can we take a brief pause just while I
22  answer this?
23       (Exhibit 7 was marked.)
24       THE WITNESS:  Okay.  Thank you.
25   Q.  (BY MR. YOUNG)  All right, Doctor.  Now,

Page 51

1  I've shown you several sets records that until today
2  you have never seen before; right?
3    A.  That's correct.
4    Q.  All right.  And that's understandable.
5  They weren't given to you.  I don't expect you to go
6  out and dig them up.  I just wanted to get everything
7  on the record.
8        I'm going to move on to defense
9  Exhibit 7, and I don't recall right this second
10  whether this was in your list or not.  These are the
11  records from Wagner Community Hospital where
12  Mr. Buchanan was transferred after his discharge,
13  after he left Muskogee County Jail.  Have you seen
14  these?  I think they're No. 18 on your list.
15   A.  Yes, I think so.  Yes.
16   Q.  Take a minute.
17       (Dr. Wilcox reviews document.)
18   A.  Okay.
19   Q.  Does reviewing these records refresh your
20  memory, looking at these?
21   A.  Yes.
22   Q.  All right.  When you reviewed these
23  records just now or in preparing your report, did you
24  see anywhere where Mr. Buchanan complained to any of
25  the Wagner healthcare providers of an inability to

Page 52

1  move his arm or arms?
2    A.  I don't see on here where he made that
3  statement, but on the physical exam they did find
4  weakness in his left arm.
5    Q.  Right.  We've got weakness is listed
6  several times, and body pain is listed several times,
7  but I've read this cover to cover, and I didn't see
8  anywhere where there was any mention of an inability
9  to use his left arm or his right arm.  I didn't see
10  anywhere where he was listed as unable to use his
11  legs.
12       And my question is he seems to -- he
13  alleges that he was unable to use his arms and his
14  legs progressively throughout his stay at Tulsa
15  County Jail.  Is that a fair understanding of your --
16       MR. ARTUS:  Muskogee County Jail.
17   Q.  (BY MR. YOUNG)  Sorry.  Muskogee County
18  Jail.  Is that a fair understanding of the
19  allegations in this case as you know?
20       MR. BLAKEMORE:  Object to form.
21   A.  Yes.
22   Q.  Okay.  Yet the first hospital he goes to
23  as soon as he gets out of Muskogee County Jail,
24  there's no mention of an inability to use arms or
25  legs.  Is that fair?

Page 53

1    A.  Yes, although they didn't really explore
2  what this chief complaint of weakness really means.
3  That certainly could be subsumed underneath that.
4    Q.  Okay.  So we've got weakness, and
5  certainly I appreciate that, but nothing about
6  paralysis.  Is that fair?
7        MR. BLAKEMORE:  Object to form.
8    A.  I don't see anything on here that says
9  "paralysis."
10   Q.  Nothing about quadriplegia.  Is that
11  fair?
12   A.  I have yet to meet the patient that comes
13  in and makes that diagnosis, but there's nothing on
14  here that says that.
15   Q.  Okay.  Well, there's nothing from the
16  healthcare providers making those diagnoses either,
17  is there?
18   A.  No.
19   Q.  There's weakness but not paraplegia and
20  not quadriplegia.  Is that fair?
21   A.  Correct.
22   Q.  Okay.
23       Doctor, these aren't Bates stamped, but
24  if you flip to the back -- I think it's the third
25  page from the back -- there's a final radiology

Exhibit 12

Page 54

1 report.
2      A.  I see that.
3      Q.  This is John -- this was requested by
4 Dr. Casey Hannah, possibly Hannah Casey, and this is
5 the report of a CT cervical spine without IV contrast
6 done at Wagner Community Hospital on September 14th
7 of 2016.  Is that fair?
8      A.  Yes.
9      Q.  All right.  At the bottom we've got it
10 electronically signed by Anoop Duggal, MD?
11         MR. ARTUS:  You want to spell that for the
12 court reporter?
13         MR. YOUNG:  That's fair, yeah.  It's
14 A-n-o-o-p, and then the last name is D-u-g-g-a-l.
15      Q.  (BY MR. YOUNG)  I don't see it on here
16 listed, but is it fair to assume that that's the
17 radiologist?
18      A.  I would assume that it is.
19      Q.  No reason to disagree with that; right?
20         And I'd like to call your attention to
21 the last -- the first paragraph under "Findings," the
22 last sentence.  "There is a probable abscess in these
23 prevertebral soft tissues."
24         Is that fair?
25      A.  Yes.  Let me read the whole thing.

Page 55

1      Q.  Sure.
2         So this finding -- sorry.  Have you had
3 time to look at it?
4      A.  Yes.
5      Q.  So this finding from a radiologist
6 looking at a CT of the cervical spine, he was still
7 unable to definitively diagnose a cervical epidural
8 abscess in Mr. Buchanan.  Is that fair?
9      A.  No, I don't think that's accurate.
10      Q.  It says there's a probable abscess.  Am I
11 wrong about that?
12      A.  Right, but you have to read the entire
13 findings because they're -- this is sort of a
14 situation where you have a couple of different
15 elements going on.  So you have destructive changes
16 involving the C5-6 vertebrae, which typically occur
17 with a discitis situation, which is sort of an
18 infection of the disc, and then oftentimes what
19 happens is when that becomes significant and there's
20 enough destruction there the infection breaks out
21 into the soft tissue.
22         And so the way I read this is that he had
23 a significant destructive change of C5-6, which would
24 be interpreted as like a discitis situation that has
25 progressed, and there is also an abscess in the

Page 56

1 prevertebral soft tissues.
2      Q.  Okay.  Can we agree that Dr. Duggal does
3 not put in his findings or impression a diagnosis of
4 a cervical epidural abscess?
5      A.  Well, those words are not on this page,
6 but the description of that process, and it's really
7 a very fluid relationship to discitis, and so that
8 description is here on the findings.
9      Q.  Well, okay.  So the word "probable."  It
10 looks like Dr. Duggal was not entirely sure of that
11 diagnosis.  Is that fair?
12         MR. BLAKEMORE:  Object to form.
13      A.  Well, it --
14      Q.  Otherwise why would he use the word
15 "probable"?
16      A.  Well, so that's pretty typical radiology
17 language in the sense that he's seeing changes on the
18 film, but, you know, you have to remember this is a
19 quickie CT cervical spine with no contrast, and so
20 the quality of this CT scan is not as good as what
21 you could achieve.  So he's seeing changes on the CT
22 scan that are suggestive of abscess, but that's going
23 to have to be further refined.
24      Q.  Okay.
25      A.  And, actually, if you look down below

Page 57

1 under his impression, he lists discitis and adjacent
2 osteomyelitis as the likely etiology, which is
3 exactly what I just talked about.
4      Q.  Okay.  And you can appreciate to a
5 layperson, though, that those don't sound the same as
6 cervical epidural abscess; right?
7      A.  Right.  That's why you have me.
8      Q.  And is it your testimony that those --
9 those terms, and as Dr. Duggal has his findings and
10 his impression, that he's essentially saying -- he's
11 essentially diagnosing a cervical epidural abscess
12 without using those words?
13      A.  Yes, other than the sense that, you know,
14 an abscess is a very specific anatomic term, and so
15 what he is seeing here is an infection of the disc
16 and adjacent osteomyelitis; so it likely started as
17 an abscess and then broke out and caused destructive
18 changes and decompressed, and so they're not seeing,
19 you know, basically a bubble on the film.
20      Q.  I mean, he uses another qualifier that
21 "These findings are highly suspicious."  Is this just
22 typical radiology?  Do they never let themselves be
23 boxed in and never make definitive diagnoses?  Is
24 that your opinion?
25      A.  Correct.  It's the art of radiology.



Exhibit 12

Page 58

1   But, you know, to be fair to them, you know, the
2   images are not perfect, and they certainly see
3   suggestions, but you have to have tissue or a sample
4   to make that diagnosis definitively.
5       Q.  So then would it be fair, based on what
6   you just said, that they were unable to make a
7   definitive diagnosis at Wagner Community Hospital?
8   That's why they had to transfer him to -- I forget
9   where he got transferred right now.
10      MR. BLAKEMORE:  Hillcrest.
11      MR. YOUNG:  Thank you.
12      THE WITNESS:  Well, I don't think that's
13  exactly accurate.
14      Q.  (BY MR. YOUNG)  Because they just said
15  that they couldn't definitively diagnose it without a
16  sample; so is it fair to say they had to transfer him
17  somewhere else to get a definitive diagnosis?
18      A.  Again, I don't agree with you.  So they
19  were able to see that there is destructive change of
20  the vertebra and that there is discitis and a likely
21  abscess, and the reason for transfer is not
22  necessarily just to make the diagnosis but to treat
23  the condition that they saw very clearly on the CT
24  scan.
25      Q.  Okay.  So is it for both, for definitive

Page 59

1   diagnosis and for treatment?
2       A.  Of course.
3       MR. YOUNG:  Okay.
4       This is a probably a good time for a
5   break, actually.
6       THE WITNESS:  Okay.
7       (Recess.)
8       (Exhibits 8 and 9 were marked.)
9       Q.  (BY MR. YOUNG)  Doctor, while we were on
10  the break, I put in front of you what I've marked as
11  defendant Exhibits 8 and 9.  These are Bates stamped
12  records from Mr. Buchanan's stay at Muskogee County
13  Jail.  It's DDR No. 1, page 001 through 042.  And
14  then separately I've attached what I've marked as
15  defense Exhibit 9, and this is three independent
16  pages Bates stamped DDR No. 30, 063, DDR No. 30, 151,
17  and DDR 30, 515.  Now that that's on the record,
18  you've seen these records before; right?
19      A.  I have.
20      MR. BLAKEMORE:  And just for the record,
21  this No. 30, DDR No. 30, these are pages taken out of
22  like a 500-page PDF; right?
23      MR. YOUNG:  Correct.
24      MR. BLAKEMORE:  Okay.
25      MR. YOUNG:  These are excerpts of a larger

Page 60

1   PDF.
2       MR. BLAKEMORE:  Yes.
3       MR. YOUNG:  In the interest of paper and
4   travel.
5       MR. BLAKEMORE:  I appreciate that.  I just
6   wanted to clarify.
7       Q.  (BY MR. YOUNG)  All right.  On defense
8   Exhibit 8, will you please turn to page 009.  All
9   right.  I understand this to be the medical intake
10  form preformed by Turn Key employee Nurse Rosemary
11  Kotas on or about either November 3rd or
12  November 4th, 2016.  Does that sound right?
13      A.  Well, it's not signed or dated; so we're
14  having to rely on additional information to come to
15  that conclusion.
16      Q.  Well, I'll represent to you that we -- I
17  didn't bring them today, but time sheets have been
18  produced that represent that Ms. Kotas worked either
19  on the night of the 3rd or the 4th.  It was either
20  one of those two days.  I don't recall right now.
21  But is it fair for purposes of today to assume that
22  this was completed on November 3rd or 4th?
23      A.  I don't know how you would say that.
24      Q.  Well, she testified this is her
25  handwriting.

Page 61

1       A.  I do remember that, but nonetheless it is
2   an unsigned assessment, and undated.
3       Q.  I understand that.
4       All right.  We can see that she noted
5   Mr. Buchanan's allergies or lack thereof.  Is that
6   fair?
7       A.  Yes.
8       Q.  Checked for head lice.  Asked whether
9   there was any injuries due to -- attributable to his
10  arrest and booking.  Is that fair?
11      A.  Hold on.
12      Q.  I'm just kind of working my way down.
13      A.  Yes, that's correct.
14      Q.  All right.  Look and see that vital signs
15  were recorded; is that right?
16      A.  There were some vital signs recorded.
17      Q.  We've got temperature.  We've got blood
18  pressure, pulse, 02, and weight.  Is that fair?
19      A.  Those are the ones that were recorded.
20  Weight is not really a vital sign, though.
21      Q.  We've got medications listed.  I've got
22  anti-inflammatory, pain med, and muscle relaxer, and
23  then there's a note to indicate that those are all
24  post MVA 9/16/16.  Is that a fair reading of that?
25      A.  Yes.



Exhibit 12

Page 62

1    Q.  All right.  We've got to the right of
2  that it says "Dr. Trinidad" and below that
3  "Dr. Dallas Buck" and "Tulsa."  Is that a fair
4  reading?
5    A.  Yes.
6    Q.  Down towards the bottom we've got where
7  it was asked whether or not he recently had a chronic
8  cough, coughing up blood, lethargy, body weakness,
9  more than 10 pounds of weight loss in the last month,
10  loss of appetite, fever, and night sweats, and there
11  is a circle with a line through it.  I come to
12  understand that that means that the answer to all of
13  those questions is no.  Is that fair?
14    A.  Well, I think that's poor documentation,
15  but I suppose that's one way you could interpret
16  that.
17    Q.  And you can appreciate that sometimes
18  nurses are busy and they use shorthand to speed up
19  the process of this type of notation.  Is that fair?
20    A.  Sure.
21    Q.  Do doctors do that too?
22    A.  Sometimes.
23    Q.  We've got appearance noted as disheveled,
24  behavior noted as appropriate, state of consciousness
25  noted as alert, breathing noted as unremarkable, and

Page 63

1  then for ease of movement she wrote in in the space
2  below "Sat on mat R/T".  I've come to understand that
3  means "related to."  Is that fair?
4    A.  I suppose.
5    Q.  Would you have any reason to disagree
6  with that?
7    A.  No.
8    Q.  Okay.  So "Sat on mat related to."  And
9  then the up arrow, is that fair to say that means
10  increase?
11    A.  Probably.
12    Q.  Okay.  "Sat on mat related to an increase
13  discomfort in movement."
14        Is that a fair reading of that note?
15    A.  I think you did a good job.
16    Q.  Thanks.
17        On page 10 down below "Other Comments or
18  Physical Findings" there's a note that says:  "Inmate
19  states he has broken ribs, collapsed lung, burnt
20  fingers and neck problems.  MVA 9/16/16."
21        Is that fair?
22    A.  Yes.
23    Q.  Do you have any opinion or position one
24  way or the other on whether or not Mr. Buchanan's
25  ribs were still broken as of the date of this intake?

Page 64

1    A.  Well, they probably are, yes.
2    Q.  Okay.  We're six to seven weeks,
3  approximately, post MVA.  Do you think his ribs are
4  still broken at this time?
5    A.  Yes.  They're healing, but they haven't
6  completely healed.
7    Q.  Okay.  What about the collapsed lungs?
8  Does he still have the pneumothorax?
9    A.  Hard to know since no assessment was
10  done, but likely not.
11    Q.  Do you think they would have discharged
12  him from St. John's if he still had the same -- if he
13  still had a collapsed lung?
14    A.  Well, sometimes they do, and sometimes
15  it -- especially with rib fractures and traumatic
16  collapsed lungs it will reoccur.  So...
17    Q.  Well, we just went through records from
18  October 14th; thereby, when Mr. Buchanan returned to
19  the St. John's ER, several visits with a
20  chiropractor, and a visit with a pain management
21  specialist, and none of them noted anything about
22  broken ribs or a collapsed lung.  Is that fair?
23    A.  Yes.
24    Q.  If you like, you're welcome to go back
25  through all those records, but I think it's a pretty

Page 65

1  accurate statement of the diagnoses in those records.
2  Okay.
3        And I'll call your attention to the other
4  exhibit, Exhibit 9.  Up at the top of this page it
5  says, "Sick Call 11/4/16," and then about halfway
6  down we see where it says, "Buchanan, James," and
7  next to it there's a number 6.  Is that fair?
8    A.  Yes.
9    Q.  Do you have any understanding as to who
10  wrote this -- who wrote this?
11    A.  I'm not sure that I -- I remember it was
12  discussed in the depositions.  I can't remember which
13  one discussed writing this, though.
14    Q.  Okay.  Would you agree with me that it
15  was a member of the Turn Key staff?
16    A.  Yes.
17    Q.  Okay.
18        Okay.  Back to Exhibit 8.  If you would
19  please flip over to page 11.  Okay.  We've got a page
20  labeled as "Provider Orders" for James Buchanan.  In
21  the top left-hand corner it says "11/4/16," and then
22  under "Provider Orders" it says, "Torb: Dr. Cooper,
23  Naproxen 500 mg 1 PO BID x 30 days."
24        Do you think that's a fair reading of
25  that note?



Exhibit 12

Page 66

1    A. Yes.
2    Q. Okay. And to a layperson that means
3 Dr. Cooper ordered Mr. Buchanan to be on naproxen two
4 times a day for 30 days. Is that fair?
5    A. Yes.
6    Q. Okay. And that note to the right was
7 signed by D. Ayers, and I can represent to you that
8 that was most likely an employee named Delana Ayers,
9 LPN. Is that fair?
10    A. Yes.
11    Q. Okay.
12      Flip back to page 7, please. This is the
13 medical administration record for James Buchanan.
14 The name at the bottom left-hand corner is cut off,
15 but I think we could probably all agree that it says
16 "James Buchanan." And this is an accounting, from my
17 understanding, of the delivery of Mr. Buchanan's
18 Naproxen during his stay at Muskogee County Jail.
19 Any reason to disagree with that?
20    A. No.
21    Q. Okay. We can see that most days this
22 shows that he received it twice a day with the
23 exception of the fourth, which would have been
24 shortly after his intake, and then it looks like on
25 the 13th for whatever reason he didn't get it in the

Page 67

1 morning, the a.m. delivery. Is that fair?
2    A. That's what is suggested by this
3 document.
4    Q. Okay. Do you have any reason to believe
5 that this document is not accurate?
6    A. Well, there's a little lack of clarity.
7 Mr. Buchanan in his deposition indicated that he
8 received medication once a day and not twice a day,
9 and I don't really quite know how to interpret that
10 discrepancy.
11    Q. Okay.
12      Look back at defendants' Exhibit 9. I've
13 got another Sick Call List. It's handwritten. And
14 again about halfway down that page we've got James
15 Buchanan's name, and next to his name it says
16 "shoulder pain." Is that fair?
17      MR. BLAKEMORE: Where are you?
18      MR. YOUNG: Sorry. It's the next page,
19 defense Exhibit 9, the second page. It's No. 151.
20      THE WITNESS: Mm-hmm.
21    Q. (BY MR. YOUNG) Would you agree with me
22 that indicates James Buchanan reported shoulder
23 pain?
24    A. Well, it's a little hard to know what to
25 interpret from that. He's on, apparently, a sick

Page 68

1 call list for what somebody perceives to be shoulder
2 pain, but there's no progress note or assessment that
3 would document that in a way that would allow you to
4 come to that conclusion.
5    Q. Well, we know that he had previously gone
6 to a chiropractor complaining of, amongst other
7 things, shoulder pain; right?
8    A. Right.
9    Q. So is it not fair to assume that he
10 reported shoulder pain that generated this note?
11    A. It's not unreasonable.
12    Q. Okay.
13      Okay. Will you flip in that same exhibit
14 to the final page, DDR 30, 515. This page is -- it's
15 blacked out except for the name James Buchanan just
16 above the center of the page, and next to his name
17 there is a date 11/11/16; is that right?
18    A. Correct.
19    Q. All right. I'm going to tell you what I
20 think that the notation under "Complaint" means, and
21 you let me know if you disagree. Decreased range of
22 motion, upper and lower extremities. Neck limited
23 range of motion and pain. Is that fair?
24    A. I think that is one reasonable
25 interpretation of that.

Page 69

1    Q. Okay. And on the far right side, top
2 right, it says "Schedule," and next to Mr. Buchanan's
3 name it says "11/15/16"; is that right?
4    A. Yes.
5    Q. And then it says "OR'd admitted," I
6 believe is what that notation next to it means. Is
7 that right?
8    A. I guess so. What does "OR'd" mean?
9    Q. My understanding, and anybody is welcome
10 to correct me, is that means that he was released on
11 his own recognizance because he was in a hospital.
12    A. Okay. That doesn't mean they took him to
13 the operating room?
14    Q. It's not -- my understanding is that that
15 does not mean the operating room. I think it's "own
16 recognizance." Anybody is welcome to correct me if
17 they think I've got that wrong. All right.
18      On defense Exhibit 8 let's go over to
19 page 12. This is a progress note authored by
20 Nurse Katie McCullar at approximately 11:27 a.m. on
21 November 14th, 2016. Does that sound right?
22    A. Yes.
23    Q. All right. It says she was called to the
24 inmate's pod because "patient could not walk. When I
25 arrived to pod, inmate was sitting at his table with

Exhibit 12

Page 70

1  his head down. Inmate complained of worsening pain
2  and inability to move lower extremities. Also
3  complained of tingling in the legs."
4          Then Nurse McCullar writes that she
5  notified Dr. Cooper, who instructed her to place the
6  inmate on the provider list for the following week,
7  and she requested records from Mr. Buchanan's recent
8  hospitalization and she said she will continue to
9  monitor.
10         Did I get that right?
11     A.  Yes.
12     Q.  Okay.
13         And on the following page we've got a
14  progress note authored on the evening of
15  November 14th, 2016, by what I'll represent to you is
16  Rosemary Kotas. Her note says -- I'm going to
17  paraphrase here. She was called to the pod.
18  Mr. Buchanan was sitting at the table with his head
19  on the table. He presented with a decreased range of
20  motion in all extremities, decreased range of motion
21  to neck, complained of 10/10 pain.
22         Is that fair?
23     A.  That's what I would read that as.
24     Q.  All right. She took vitals, she got
25  heart rate, BP, and oxygen; is that right?

Page 71

1      A.  Yes.
2      Q.  She states that the patient had no
3  control over urinating and had urinated on himself
4  and the floor; is that right?
5      A.  Yes, I think so. That's correct.
6      Q.  She says he's currently on Naproxen twice
7  daily, and she again notified Dr. Cooper, and
8  Dr. Cooper said to send him to the ER. Is that a
9  fair summation of the rest of that -- or summation of
10  that note?
11     A.  Yes.
12     Q.  And then I believe that says: EMSA
13  arrived and transported Mr. Buchanan to Wagner ED as
14  Estar is on divert, which I guess means Estar wasn't
15  taking patients. I'll be honest. I can't make out
16  what the last sentence says right now. But up to
17  that, is that a fair summation of Nurse Kotas' note?
18     A.  Yes, up to the notification of the
19  diversion.
20     Q.  All right. Dr. Wilcox, we just kind of
21  poked through Mr. Buchanan's records from his stay at
22  Muskogee County Jail from November 3rd, 2016, to
23  November 14th, 2016. By my count, assuming that the
24  MAR, Medical Administration Record, is correct, that
25  was 26 interactions which he had with a Turn Key

Page 72

1  employee. Do you have any reason to disagree with
2  that?
3      A.  Well, I didn't count them; so I don't
4  really know, but --
5      Q.  That's fair. Does that sound about
6  right?
7      A.  Well, sure. I mean, you'd have to go
8  back and actually do the counting to say for sure,
9  but it doesn't seem out of range.
10     Q.  Can you give me the benefit of the doubt
11  and say I'm probably within two or three of my
12  counting?
13         Can you tell from those records, did he
14  ever go -- did Mr. Buchanan ever go more than
15  24 hours without an interaction with a Turn Key
16  employee?
17     A.  I'd have to mark it out over time. I
18  couldn't say just based on the jumping around in
19  records that we did.
20     Q.  Okay. Would you agree with me that his
21  complaint during his intake assessment, which was an
22  increased discomfort with movement -- is that
23  consistent with the complaints that we saw with
24  Dr. Greenhaw, the chiropractor, and Dr. Trinidad, the
25  pain management specialist?

Page 73

1      A.  Yes.
2      Q.  Would you agree with me that just as
3  Dr. Trinidad and the physicians at the St. John's ER
4  on October 14th -- just as they prescribed
5  Mr. Buchanan Naproxen, Dr. Cooper also prescribed
6  Mr. Buchanan Naproxen?
7          MR. BLAKEMORE: Object to form.
8      A.  I would agree with that with the notation
9  that the other clinical entities prescribed other
10  things in addition to Naproxen.
11     Q.  Well, and that's -- that's a good point.
12  In your experience, are there certain medications
13  that are not on formularies for -- in jails and in
14  prisons?
15     A.  Well, I don't know exactly what you mean
16  by that.
17     Q.  Okay.
18     A.  Formularies are common in jails and
19  prisons.
20     Q.  How often are opiates available to
21  inmates for pain?
22         MR. BLAKEMORE: Object to form.
23     A.  Well, if they're medically necessary for
24  the care of the prisoner, it should be available to
25  all prisoners.



Exhibit 12

Page 74

1    Q. And in what situations would that be --
2  what types of conditions would be medically necessary
3  for opiates in a correctional setting?
4    A. Patients who are experiencing pain at
5  levels where opiates would be necessary to control
6  that pain.
7    Q. Okay. It's been described to me before
8  that those types of situations typically involve bad
9  burns or, you know, very severe bone breaks and
10  things like that. Am I way off on that, or does that
11  sound about right?
12        MR. BLAKEMORE: Object to form.
13    A. Well, you know, the number of conditions
14  where patients can experience pain that would require
15  opiates to treat is huge.
16    Q. Okay.
17    A. The two limited conditions that you
18  talked about certainly could be on that list
19  depending upon severity, but you would really have to
20  do an appropriate assessment of the patient to
21  determine the level of intervention necessary.
22    Q. All right. So you agreed that -- I'm
23  sorry. I'm skipping ahead.
24        Would you agree with me that the shoulder
25  pain notation from the September 6, 2016 sick call --

Page 75

1  that complaint is consistent with the complaints that
2  Mr. Buchanan had made to Dr. Trinidad and
3  Dr. Greenhaw?
4    A. Yes, I would agree that that chief
5  complaint was also in those clinical encounters.
6    Q. Okay. And the note from November 11th,
7  2016, which is DDR 30, 515, and we agreed that it
8  says: Decreased range of motion upper and lower
9  extremities. Neck limited range of motion and pain.
10  I think you agreed that that was one acceptable
11  interpretation of that note. Would you agree that
12  that's consistent with the complaints Mr. Buchanan
13  made to Dr. Greenhaw and Dr. Trinidad?
14    A. Yes, I would agree that those chief
15  complaints are similar.
16    Q. Okay. And would you agree that in
17  receiving Naproxen he received at least substantially
18  similar treatment, even if it wasn't opioids or
19  muscle relaxers? I'm sorry. Yeah, that's right.
20    A. I would agree that Naproxen was used both
21  prior to jail and while he was in jail.
22    Q. All right.
23        (Exhibit 10 was marked.)
24        Doctor, I'm going to hand you defense
25  Exhibit 10, and I'll represent to you that these are

Page 76

1  excerpts of James Buchanan, the plaintiff's
2  deposition. Again in the interest of paper and
3  travel, I didn't bring the whole thing. You read
4  Mr. Buchanan's deposition transcript, though; right?
5    A. I have.
6    Q. Okay. You mentioned a moment ago that
7  there might be some discrepancy in the medical
8  administration record based on Mr. Buchanan's
9  recollection of his -- the amount of times per day he
10  received pills while he was incarcerated. Is that
11  fair?
12    A. Yes.
13    Q. The record reflects twice a day, but
14  Mr. Buchanan remembers once a day. Is that fair?
15    A. That's correct.
16    Q. If you would, take a look at defendant
17  Exhibit 10. I'm on page 61, line 23. It says: "So,
18  of all these 13 times in the jail, the one that you
19  can recall is just this last time."
20        Plaintiffs objected.
21        On the next page Mr. Artus asks: "Is
22  that correct?"
23        And Mr. Buchanan says: "Correct."
24        Now, I understand that to mean that
25  Mr. Buchanan has been incarcerated approximately

Page 77

1  13 times, and he testified that of all of those he
2  only remembers a single incarceration. Is that a
3  fair interpretation of that testimony?
4    A. I think so. I mean, this document
5  obviously is contextually referencing something on
6  pages that are prior to this --
7    Q. Right.
8    A. -- so in that sense it's kind of out of
9  context, but I think that is one probable
10  interpretation of that statement.
11    Q. And I appreciate you're not getting the
12  full context and that that's important, but the
13  transcript essentially says from Mr. Artus the record
14  shows you have been arrested 13 times, and
15  Mr. Buchanan says, "Well, I only remember the last
16  one." And I'm just asking do you think that's a fair
17  interpretation of that testimony?
18    A. I think so.
19    Q. Okay. Thank you.
20        If you would, please flip a few pages.
21  It's going to be page 118, and I'm going to read down
22  at the bottom. It's line 21. It says: "When
23  you" -- excuse me. "When you were released from the
24  St. John's Hospital, did you have any kind of orders
25  to go see somebody else after that, a specialist or



Exhibit 12

Page 78

1  anything for your neck?  Or did they just say" --
2       And Mr. Buchanan's response was "No."
3  Is that fair?
4       MR. BLAKEMORE:  Object to form.
5    A.  This intermittent page thing is getting
6  to me.  So, yes, based on what is on this one limited
7  page, you've read that correctly.
8    Q.  Okay.  We've already seen the discharge
9  records from St. John's, right, and we saw that he
10  was recommended to follow up with his neurosurgeon,
11  Dr. Rapacki, and to follow up with his -- well, to
12  follow up with Dr. Dallas Buck.  We saw that earlier.
13  Is that fair?
14    A.  We did.
15    Q.  All right.  And then we also saw that,
16  when he went back to the ER two weeks later, they
17  again recommended that he follow up with Dr. Buck.
18  Do you remember seeing that?
19    A.  I do not remember seeing that.
20    Q.  Okay.  Well, we can go back there if
21  you'd like.  We certainly remember that when he was
22  discharged from the St. John's ICU on September 30th
23  they recommended that he follow up with Dr. Rapacki
24  and Dr. Buck.  Fair?
25    A.  Not correct.

Page 79

1    Q.  I'm sorry.  Did you say, "Not correct"?
2    A.  That's correct.
3    Q.  Okay.  Thanks.
4    A.  I said, "Not correct."
5    Q.  Okay.  What's not correct?
6    A.  Well, Dallas Buck is a nurse
7  practitioner, not a doctor.
8    Q.  Fair enough.  They said to follow up with
9  Nurse Practitioner Buck and Dr. Rapacki.
10       My point is that, again, Mr. Buchanan
11  testified that that didn't happen, and it appears to
12  me that he doesn't remember that.  Is that -- is
13  that -- is that fair?
14    A.  That may be how to interpret that.  He
15  did go see other clinicians, though --
16    Q.  He did.
17    A.  -- so, I mean, it's not as if it would be
18  fair to suggest that he did not pursue any follow-up.
19    Q.  I'm not suggesting that.  This says:
20  "Did you have any kind of orders to go see somebody
21  else?"
22       And he said:  "No."
23       Is that fair?
24    A.  Correct.
25    Q.  Will you please flip to page 197.  Down

Page 80

1  at line 19 it says:  "To my knowledge, I don't
2  specifically remember when I started -- started to
3  lose the feelings in my arm."
4       Do you remember reading that in
5  Mr. Buchanan's deposition?
6    A.  Yes.
7    Q.  And I'll represent to you this was
8  shortly after he testified that he remembered it very
9  well because it was engrained in his memory; and then
10  when he was questioned about it, he admitted that he
11  does not specifically remember the timing of the loss
12  of feeling in his arms.  And, again, it looks to me
13  like Mr. Buchanan's memory of the time frame at issue
14  during his incarceration is at least flawed.  Is that
15  fair?
16       MR. BLAKEMORE:  Object to form.
17    A.  Well, it's certainly possible.  We see
18  memory issues in patients with traumatic brain
19  injuries fairly routinely, and we can't really fault
20  them for that.
21    Q.  Is it your position that Mr. Buchanan had
22  a traumatic brain injury?
23    A.  He likely did.  He had a pretty
24  significant motor vehicle accident, and they
25  frequently will have concussions or a traumatic brain

Page 81

1  injury as a part of that.
2    Q.  Is there a concussion diagnosis in any of
3  the records that you've seen?
4    A.  No.
5    Q.  Is there a traumatic brain injury in any
6  of the records that you have seen?
7    A.  No.
8    Q.  Okay.  And you haven't examined him
9  personally; right?
10    A.  Correct.
11    Q.  All right.
12       Many of the opinions in your report seem
13  to be based on Mr. Buchanan's recitation of the care
14  and treatment that he received during his
15  incarceration.  Is that a fair statement?
16    A.  Yes, it is.
17    Q.  Okay.  Well, given what we just went
18  through, is it also fair to say that maybe his
19  recitation is at least incomplete?
20    A.  That's possible.  I would be clear that
21  using his recitation of the events is not the most
22  preferable way to reconstruct what happened, but
23  given the rather shocking paucity of medical records
24  in the system, you couldn't really rely upon those to
25  do that.

Exhibit 12

Page 82

1      Q.   Well, is it fair to say that if your
2   report or portions of your report are based on
3   Mr. Buchanan's memory and recitation of his care,
4   then to the extent that his memory is flawed then
5   possibly your report would be, through no fault of
6   your own, similarly flawed?
7           MR. BLAKEMORE:  Object to form.
8      A.   I would disagree with that in the sense
9   that the elements that he reported were correlated
10   with some of the elements that are available in the
11   medical record, and it also correlates with what was
12   ultimately found to be his diagnosis; so to me those
13   are all internally consistent.
14           MR. YOUNG:  All right.  We might want to
15   take a break here.  Is everybody okay with that?
16           MR. BLAKEMORE:  That's fine.
17           (Recess.)
18           (Exhibit 11 marked.)
19           MR. YOUNG:  Back on record.
20      Q.   (BY MR. YOUNG)  All right.  Dr. Wilcox,
21   we took a short break, and I gave -- you took the
22   opportunity to review the defendants' expert report
23   authored by Dr. L'Heureux; is that right?  At least
24   certain paragraphs?
25      A.   Well, yes.  I reviewed the paragraphs

Page 83

1   that you had called out as well as a few others that
2   were close by.
3      Q.   Right.  I just didn't want to spring the
4   whole thing on you and not give you time to look at
5   it.  Now that you've had a moment, I want to discuss
6   some of the thoughts.  Before that, so Dr. L'Heureux
7   is a board certified orthopedic surgeon with a
8   fellowship specialty training in spine surgery.  He's
9   had a continuous orthopedic surgical practice with an
10   emphasis on orthopedic surgery of the spine for over
11   21 years.  He's an active fellow in the American
12   Academy of Orthopedic Surgeons and an active fellow
13   in the American College of Surgeons.
14           Dr. Buchanan -- I'm sorry.  Dr. L'Heureux
15   was given the records from St. John's, the two-week
16   ICU incarceration -- the two-week ICU -- two weeks in
17   ICU Mr. Buchanan spent.  He reviewed the imaging
18   records from that stay.  He reviewed the ER records
19   from when Mr. Buchanan returned two weeks later.  He
20   reviewed the chiropractic records that we discussed.
21   He had time to review Dr. Trinidad's records.
22           Given all that, Dr. L'Heureux's
23   specialty, his experience, his certifications, and
24   all of the records that he has to review -- he had to
25   review, do you intend to offer causation opinions

Page 84

1   that contrast with Dr. L'Heureux's opinions in this
2   case?
3           MR. BLAKEMORE:  Object to the form.
4      A.   Well, I don't know that I can really
5   answer.  Having not read the entire report, I don't
6   know that I know all of his opinions at this point in
7   time.
8      Q.   Okay.
9      A.   But, certainly, if he has an opinion that
10   I disagree with, I will let you know.
11      Q.   Okay.  And what I was trying to establish
12   was that he has a specialty in orthopedic surgery.
13   This case involves an epidural spinal cervical
14   abscess.  He's reviewed records you have not.  And my
15   question was do you feel like you are in a position
16   to offer causation opinions counter to his opinions?
17           MR. BLAKEMORE:  Wait for one second.
18           I want to object on one ground.  That's
19   beyond the scope of what -- we didn't ask him to do a
20   rebuttal report to Dr. L'Heureux; so to that extent
21   it's beyond the scope of what he's been asked to do.
22           But other than that, with that caveat,
23   answer.
24           THE WITNESS:  Well, again, I have not read
25   the entire report.  I can't really say at this moment

Page 85

1   in time.  But I know all of his opinions.  It is
2   possible and probably even likely that there may be
3   opinions that fall into the general category of
4   medicine that we talked about earlier that sort of all
5   doctors participate in where I may disagree with him,
6   and if that's the case then I will let you know.
7      Q.   (BY MR. YOUNG)  Okay.  Would you agree
8   with me that in the area of orthopedic spinal surgery
9   he's more qualified to opine -- to make opinions than
10   you are?
11      A.   Yes, and I would defer to the
12   neurosurgeon who is also an expert in this case to
13   weigh in on that as well.
14      Q.   Okay.  So with regards to the spinal
15   surgery, the surgeries, James Buchanan's epidural
16   abscess, would you say that's fair to leave that to
17   Dr. L'Heureux and Dr. Baird?
18           MR. BLAKEMORE:  Object to form.
19      A.   Likely.  Again, if there are opinions
20   that fall into the general realm of medicine that I
21   disagree with, I will probably let you know about
22   that.
23      Q.   Okay.  With that let's jump into the
24   report.  As you noted, I often go out of order.  Last
25   full paragraph page 66.  I'll sum it up and say that



Professional Reporters
800.376.1006
www.proreporters.com

Exhibit 12

Page 86

1  Dr. L'Heureux opined that, if Mr. Buchanan had gotten
2  to the hospital on November 3rd rather than November
3  14th, it would not have made a difference in his
4  outcome.  Is that a fair summation of this paragraph?
5      A.  It is a fair summary of his opinion.
6      Q.  And do you have any reason to disagree
7  with that opinion?
8      A.  No.  I think I would defer to the
9  neurosurgeon on that.
10     Q.  Okay.  Let's go over to page 60.  There's
11 a paragraph in the middle of the page that reads:
12 "Spinal infections such as the one Mr. Buchanan had,
13 along with spinal epidural abscesses are very rare
14 and represent approximately 1 to 2 patients out of
15 every 10,000 hospital admissions."
16     Do you have any reason to disagree with
17 that opinion?
18     A.  Well, is that an opinion?  It doesn't
19 really read as an opinion.
20     Q.  Are you aware of any literature to the --
21 that contradicts that?
22     A.  No, but I also -- my, I guess, overall
23 objection would be that he does not list a citation
24 for what is a factual statement.
25     Q.  And that's fair.  As we sit here right

Page 87

1  now, you don't have any reason to believe that that's
2  wrong.  Is that fair?
3      A.  No, but I also don't have any reason to
4  believe that that's right.
5      Q.  All right.
6      A.  So what's the citation?  It's easy enough
7  to check.
8      Q.  All right.  Two paragraphs down
9  Dr. Buck -- I'm sorry -- Dr. L'Heureux specializes in
10 orthopedic spinal surgery.  It says that, "A delay in
11 the diagnosis of spinal epidural abscess is the rule
12 not the exception.  Approximately 70 percent to
13 75 percent of patients diagnosed with spinal epidural
14 abscess are diagnosed after the onset of neurologic
15 symptoms."
16     Do you disagree with that?
17     A.  Well, I disagree with what he says there.
18 First of all, you know, again, there's no citation
19 for his statistic, but his indication that this is a
20 delay I don't think is really accurate.  Most
21 patients who present with epidural abscesses, the
22 presenting symptom is a neurological change, and
23 that's not a delay.
24     Q.  Okay.  Well, we saw that at the ER on
25 October 14th, 2016, and then again at Dr. Greenhaw

Page 88

1  over the course of four visits to the chiropractor,
2  and then with the pain management specialist,
3  Dr. Trinidad, there were reports of increased
4  discomfort in movement and neck pain.
5      And I guess my question to you is would
6  you agree that because of the difficulty and the
7  rareness of a cervical epidural abscess that those
8  physicians all failed to diagnose a cervical epidural
9  abscess?
10     A.  Oh, I would disagree with you on that.  I
11 don't think that he had a cervical epidural abscess
12 at the time that he presented to those clinicians.
13     Q.  Were those symptoms that I just listed,
14 the pain and the loss of range of motion -- could
15 those be considered neurological symptoms?
16     MR. BLAKEMORE:  Object to form.
17     A.  Well, pain is a neurologic symptom, yes,
18 but it is very nonspecific, and it is not nearly --
19 well, it is not what is really considered to be
20 neurologic symptoms like you would discuss with an
21 epidural abscess.  More specifically, the
22 neurological symptoms that typically present are
23 numbness, tingling, weakness, loss of function.
24     Q.  So am I correct in stating that when
25 Dr. L'Heureux says that a delay in the diagnosis of

Page 89

1  an epidural abscess is the rule not the exception
2  that you would not defer to him on that opinion?
3      MR. BLAKEMORE:  Object to form.
4      A.  Well, I wouldn't say it in those -- in
5  that way.  I think the -- many spinal epidural
6  abscesses are diagnosed in a timely fashion based on
7  the emergence of neurologic symptoms; so I don't
8  consider it to be a delay.
9      Q.  When you say you don't consider it to be
10 a delay, are you specifically talking about James
11 Buchanan or are you speaking generally?
12     A.  Well, really both.  You know, his
13 language in the use of the word "delay," you know,
14 really you have to be careful about that because, you
15 know, what's your starting point for when you
16 consider the spinal epidural abscess to, you know,
17 begin.  Is it the very first bacteria that sets up
18 that starts this process?  Because everything after
19 that would be considered a delay, and I don't think
20 that's what he means.  At least that's not the way I
21 would interpret that as the presentation.  So it
22 takes a little while for the infection to grow to the
23 point that it is clinically evident.
24     Q.  Okay.  It takes a while for the infection
25 to grow to the point it's clinically evident.  Could



Exhibit 12

Page 90

1 that not mean that because of the time that it takes
2 the diagnosis is often delayed until -- the diagnosis
3 is delayed and not immediately diagnosed.  I'm
4 trying -- is that fair?
5      A.  Right.  But you have to specify
6 "delayed."  With respect to what?
7      Q.  The onset of neurological symptoms.
8      A.  No, typically the diagnosis is not
9 delayed at the time the neurologic symptoms present.
10 Prior to the presentation of those neurologic
11 symptoms, the diagnosis is probably not made.
12      Q.  What type of neurologic symptoms are we
13 talking about?
14      A.  Well, typically focal symptoms in the
15 form of like I talked about earlier -- numbness,
16 tingling, weakness, loss of function, loss of
17 sensation, loss of nerve function like becoming
18 incontinent.
19      Q.  All right.  Slip over to page 64.  The
20 last paragraph Dr. L'Heureux states that the
21 infection began three to four weeks before
22 Mr. Buchanan's motor vehicle accident.  Do you have
23 any reason to disagree with Dr. L'Heureux's opinion?
24      A.  Yes.
25      Q.  Based on what?

Page 91

1      A.  Well, primarily based on the bacteria
2 that grew as part of this infection.  It's a
3 methicillin-sensitive staphylococcus aureus, and that
4 particular bacteria tends to grow very quickly, and
5 particularly in the soft tissue it manifests itself
6 as an infection in a matter of hours to days, and it
7 does not usually take an indolent course, which would
8 be manifest over weeks.
9      Q.  But, again, you have not been afforded
10 the opportunity to review the records from
11 Mr. Buchanan's stay at St. John's from September 16th
12 to September 30th, 2016; right?
13      A.  Correct.
14      Q.  And you haven't seen the imaging records
15 that they did while they were -- while Mr. Buchanan
16 was there; right?
17      A.  That's correct.
18      Q.  That leads us into the next one, page 65,
19 the top paragraph, but I'd like to call your
20 attention to the last two sentences.  This is in
21 reference to Mr. Buchanan's stay at St. John's on
22 September 16th to September 30th, 2016.
23           Dr. L'Heureux states that the
24 administration of IV antibiotics slowed the
25 progressive -- progression of the infection but did

Page 92

1 not cure the infection.  Does that change your
2 opinion as to whether or not the cervical -- the
3 abscess began three to four weeks before the motor
4 vehicle accident?
5      A.  No.  Again, that's the same reasoning.  A
6 staphylococcus aureus moves very quickly.  Those
7 infections manifest themselves very quickly, and the
8 timeline for this presentation versus the known
9 bacteria doesn't work.
10      Q.  Okay.  So we circled back to your report.
11 Do you still have that in front of you?
12      A.  Exhibit 3?
13      Q.  I believe so.  That sounds right.
14           Sorry.  Before we move on, I want to go
15 back just a little bit.  Do you intend to offer any
16 opinions that any Turn Key employee caused
17 Mr. Buchanan to have a cervical epidural abscess?
18      A.  Well, you couldn't -- to be clear, I
19 would not offer any opinions that anyone caused it.
20 It just is something that occurred.
21      Q.  Okay.
22           All right.  To your report.  Let's go to
23 the Statement of Opinions, second to last page.  All
24 right.  The first one states that:  "The healthcare
25 (and lack thereof) provided to Mr. Buchanan from

Page 93

1 November 3rd, 2016 to November 14th, 2016 by Turn Key
2 Health Clinics, LLC was substantially beneath the
3 standard of care."
4           Do you still agree with that statement?
5      A.  Yes.
6      Q.  All right.  Can we agree that a breach in
7 the standard of care is not the same as deliberate
8 indifference?
9           MR. BLAKEMORE:  Objection.  Calls for a
10 legal conclusion.  He wouldn't be able to testify to
11 that anyway.
12      Q.  (BY MR. YOUNG) Do you understand the
13 difference?
14      A.  Well, yes, I do understand that there is
15 a difference, but they are not mutually exclusive.
16      Q.  Okay.  Can we agree that there's a
17 difference between providing care below the standard
18 of care and outright ignoring a patient?
19      A.  Well, those can be the same thing.  Once
20 again they're not mutually exclusive.
21      Q.  But there is a difference between
22 providing some care and providing absolutely no care.
23 Can we agree on that?
24           MR. BLAKEMORE:  Object to form.
25      A.  Well, and I guess you'd have to include,

Exhibit 12

Page 94

1  you know, sort of this concept that you may provide
2  token care that has no reasonable chance of taking
3  care of the patient, which really amounts to no care
4  at all.
5      Q.  Would you agree with me that making a bad
6  judgment call in medicine is different than knowing
7  about a medical problem and doing nothing at all?
8      MR. BLAKEMORE:  Object to form.
9      A.  Well, those can be two different things,
10  but again they're not mutually exclusive.  It's
11  possible to have those coexist.
12      Q.  I understand that doing nothing and
13  breaching the standard of care can be the same thing.
14  I'm asking you if there is also a difference.
15      A.  Well, it depends on the circumstances.  I
16  mean, you can't state that as a universal rule.
17      Q.  Right.  Almost all care and all patients
18  depend on the circumstances.  Is that fair?
19      A.  Yes.
20      Q.  Because each one is different.  All the
21  circumstances surrounding the care are always
22  different.  Is that fair?
23      A.  Yes.
24      Q.  All right.
25      Would you agree with me that providing

Page 95

1  medications and scheduling appointments is a
2  different thing from doing absolutely nothing?
3      MR. BLAKEMORE:  Object to form.
4      A.  Well, again it depends on the
5  circumstances.  It's possible that providing
6  medications is actually deleterious to the patient
7  where doing nothing would have been in their best
8  interest.
9      Q.  And that's fair.  And I suppose if
10  someone was potentially providing someone harmful
11  medication that would be different than doing it
12  based on nothing but a lack of a mistake in judgment.
13  Is that fair?
14      A.  Yes, but there's other scenarios that you
15  could draw upon.  There could be mistakes in the
16  healthcare system where somebody gets a medication
17  and there's a known allergy to that but the system
18  does not flag that, so just as an example.
19      Q.  Okay.
20      All right.  No. 2.  I want to kind of
21  break this down a little bit.  The first sentence
22  says: "Mr. Buchanan's condition of an epidural
23  abscess should have been identified and could have
24  easily been addressed well before he lost permanent
25  neurologic function."

Page 96

1      And then the last sentence says:  "Had
2  any medical provider seen him during this time
3  period, it is likely that they would have easily
4  assessed his pending neurological emergency and had
5  him sent out for definitive care."
6      Do you stand by that opinion -- those
7  opinions?
8      A.  I do.
9      Q.  All right.
10      We've already gone over that during his
11  stay in the ICU at St. John's Mr. Buchanan's cervical
12  epidural abscess was not diagnosed at that time; is
13  that right?
14      A.  Well, I would disagree with the formation
15  of your question.  That question presumes that he had
16  that condition and that it was not diagnosed, and I
17  don't think that was the case.
18      Q.  Well, I mean, defendants' expert, who is
19  an orthopedic surgeon and is board certified in
20  orthopedic surgery, opined that he did at that time,
21  and so that's the basis for my question.  Do you have
22  any reason to disagree with Dr. L'Heureux and that
23  they failed to diagnose it at St. John's before he
24  was discharged on September 30th, 2016?
25      MR. BLAKEMORE:  Object to form.

Page 97

1      A.  Yes.  We have talked about that already.
2      Q.  Now, we've gone over Mr. Buchanan went to
3  St. John's ER on October 14th, 2016; he went to
4  Dr. Greenhaw, a chiropractor, four times; and he went
5  to Dr. Trinidad, the pain management specialist.  His
6  complaints were decrease in range of motion and pain.
7  At none of those three providers -- the ER
8  physicians, Dr. Greenhaw, and Dr. Trinidad -- made
9  the diagnosis of a cervical epidural abscess; right?
10      A.  Correct.
11      Q.  And you already agreed with me earlier
12  that Mr. Buchanan's complaints while he was in
13  Muskogee County Jail, loss of range of motion and
14  pain, were substantially similar to those complaints.
15  Is that fair?
16      MR. BLAKEMORE:  Object to form.
17      A.  No, that's not entirely fair.  I would
18  agree that there was some overlap with the ones that
19  he listed, but he had very clearly significant
20  neurological symptomatology that was present and
21  progressed when he was in jail that did not exist
22  when he was out in the community.
23      Q.  What did he have?  What symptoms were
24  different?
25      A.  The numbness, tingling, loss of function,

Exhibit 12

Page 98

1 and ultimately the loss of his ability to control his
2 bladder.
3      Q. Okay. The numbness and the tingling.
4 And what else other than the bladder? Numbness and
5 tingling and what else?
6      A. Numbness, tingling, the loss of function,
7 and ultimately the inability to control his bladder.
8      Q. Okay. So the numbness and the tingling
9 and the loss of ability to control his bladder, are
10 those symptoms recorded anywhere prior to
11 November 14th, 2016?
12      A. Well, yes. I mean, he reported those.
13 He indicated in his deposition that he reported those
14 to the staff.
15      Q. And we already talked about how his
16 memory of what he remembers from his incarceration is
17 very possibly not entirely accurate. Is that fair?
18      A. Sure, but there's, you know, corollary --
19 or there's information that correlates that and
20 triangulates that report. There's the videotape of
21 his phone call with his brother, I believe, and
22 there's reports from the prisoners about how they had
23 to assist him and the progression of his neurologic
24 symptomatology is really sort of anatomically
25 appropriate with what you expect with this condition.

Page 99

1      Q. So the numbness, the tingling, the loss
2 of function, those three symptoms you are --
3 Mr. Buchanan's self-reporting of those symptoms.
4 It's not charted anywhere in the medical records
5 until November 14th, 2016; so those symptoms, as far
6 as I understand it, come from Mr. Buchanan himself.
7 Is that fair?
8      MR. BLAKEMORE: Object to form.
9      Q. (BY MR. YOUNG) Is that the basis of your
10 opinion?
11      A. Right, as I said, with triangulation from
12 other sources. You know, one of the challenges in
13 this case is the fact that the Turn Key Healthcare
14 staff don't chart appropriately. So really what you
15 would expect is that, when he has those complaints
16 and when he's on a sick call list to be seen, there
17 would be a proper medical note that does a proper
18 assessment that would give you objective findings as
19 to whether his complaints are legitimate or not. In
20 this case, since there is none of that, you really
21 have to rely on the evidence that does exist, and
22 overall I find that his recollection of his
23 neurological progression triangulated with the other
24 elements in this case is probable.
25      Q. Okay. So in the absence of evidence you

Page 100

1 believe Mr. Buchanan and his fellow inmates. Is that
2 right?
3      MR. BLAKEMORE: Objection.
4      A. That is not at all what I said.
5      Q. Then please explain because that's what I
6 heard, is "If there is no records then I believe
7 Mr. Buchanan and the other inmates." That's the way
8 I heard what you said.
9      A. Well, that's an incorrect summary of what
10 I said. What I -- what I made mention of is the fact
11 that there are no appropriate healthcare records that
12 provide us with objective information in the form of
13 a proper medical assessment. Those would have been
14 nice to have in the chart. I'm sure you guys wish
15 they were there, but they're not, and so you have to
16 go with the evidence that is in existence, part of
17 which is his description of the progression of his
18 neurological issues, but you also correlate that with
19 the known final diagnosis and how it normally
20 presents in the normal progression. You correlate
21 that with what you see in the video phone call and
22 his inability to, you know, hold the phone, and you
23 correlate that with the other observational things
24 and the fact that the nurses are, you know, paying
25 attention to his chief complaints. That's the best

Page 101

1 evidence that you have in this case.
2      Q. And it helps to look upon that evidence
3 retrospectively now knowing the outcome; right? In
4 real time the healthcare providers didn't have the
5 benefit of retrospect. Is that fair?
6      A. Sure. That's never the case. But they
7 certainly had ample evidence of his progressive
8 neurological decline to figure out that he needed a
9 higher level of assessment to be done.
10      Q. Based on his complaints of a decreased
11 range of motion and pain.
12      A. No, that's not correct. Based on his --
13 those are elements of his complaint but also the
14 complaints of the numbness, tingling, loss of
15 function that progressed anatomically from arm to arm
16 to leg.
17      Q. According to Mr. Buchanan.
18      A. Sure. I mean, at a very reductionistic
19 standpoint, you have to start with the complaint of
20 the patient. That's not unreasonable.
21      Q. In paragraph 2 you make mention of lost
22 permanent neurological function. As we sit here
23 today, what is your understanding of Mr. Buchanan's
24 neurological function?
25      A. As I am here today, I have not examined



Exhibit 12

Page 102

1  him; so I could not give you a finely tuned
2  assessment of his neurologic function, but I am aware
3  that he does have some return of function, and he --
4  but he is still limited with respect to his ability
5  to work and he's considered to be a hundred percent
6  disabled.
7      Q.  And are you aware that he can walk?
8      A.  Yes.
9      Q.  Are you aware that he can ride a bicycle?
10     A.  Yes.  I don't know -- I saw mention of
11  him cycling.  I don't know what that means, whether
12  that's a stationary bike or one that's out on the
13  street.  But he has had some return of neurologic
14  function but not back to baseline.
15     Q.  He reported -- have you reviewed his home
16  healthcare records?
17     A.  I have not.
18     Q.  Okay.  Well, if I represent to you that
19  he reported working out, lifting with weights, in,
20  I believe, the summer of 2018, would that surprise
21  you?
22     A.  No.  I hope he's able to do that.  I
23  don't know that that's necessarily evidence of robust
24  function.  Many patients like this are able to lift
25  modest weights, and we encourage them to do that.

Page 103

1      Q.  Okay.  So then is it fair to say when it
2  comes to any loss of permanent function you don't
3  know one way or the other to what extent Mr. Buchanan
4  may have lost permanent function?
5      A.  Not at this point in time, no.
6      Q.  Okay.
7      All right.  You say in the middle of the
8  paragraph:  "No semblance of reasonable healthcare
9  was provided to him during his entire stay in jail.
10  He was never assessed by a nurse, no vital signs were
11  taken until the very end, and he was never seen by a
12  medical provider despite clear progression."
13     We went through earlier Mr. Buchanan's
14  intake where Nurse Kotas went through the form, and
15  yet you say that he was never assessed his entire
16  stay in jail.  How do you -- what are you basing that
17  on?
18     A.  Well, I certainly wouldn't consider that
19  intake to be an assessment.  It's notably deficient
20  in information.  I would grant you that there was --
21  there were some vital signs taken at that time, but
22  the rest of the assessment was pretty minimalistic
23  and not really focused in any way.
24     Q.  And is that because -- strike that.
25     So he took vital signs.  Nurse Kotas took

Page 104

1  vital signs, and I believe you described her
2  assessment as minimalistic.  That's not the same
3  thing as never being assessed.  Is that fair?
4      A.  Well, the assessment, as I said, is
5  minimalistic, and that is part of the intake.  What I
6  am referencing in that paragraph, though, is really
7  after his intake when he began having symptoms.
8      Q.  Okay.  So then never assessed the whole
9  time.  That's not -- that's not what you mean.  Is
10  that fair?
11     A.  Well, I still think that's an accurate
12  statement.  I don't think the intake would qualify as
13  an assessment.
14     Q.  Well, you just described it as
15  minimalistic and including vital signs; so is it
16  absolutely no assessment or is it minimalistic
17  assessment?
18     A.  Well, it's minimalistic and inadequate.
19     Q.  Okay.  But it's not no assessment; is
20  that right?
21     MR. BLAKEMORE:  Object to form.
22     A.  Well, it's no assessment that would be
23  adequate for the delivery of healthcare for this
24  patient.
25     Q.  And the Naproxen that he received twice a

Page 105

1  day almost every day, is that also no reasonable
2  healthcare?
3      A.  Well, the Naproxen is a medication
4  treatment that was started for him based on no
5  assessment and no follow-up with respect to efficacy.
6      Q.  I thought you just described it as a
7  minimalistic assessment.  Now it's back to no
8  assessment?
9      MR. BLAKEMORE:  Object to form.
10     A.  Careful now.  The Naproxen was started
11  after the intake.
12     Q.  I know.
13     A.  So there was no assessment by the
14  ordering clinician to initiate that therapy.
15     Q.  And it's your opinion that Dr. Cooper
16  needed to do a personal examination before ordering
17  the Naproxen based on increased discomfort with
18  movement?
19     A.  It is my opinion that based on the
20  presenting facts of this individual case that he
21  should have been assessed by a prescriber, and a
22  treatment plan should have been developed based on
23  that assessment, and then he should have been seen
24  again when he had progression and new onset of
25  symptoms.


Exhibit 12

Page 106

1    Q.   When you say the facts that he presented
2  with, do you mean the symptoms that he described, the
3  increased discomfort with movement, or are you
4  referring to history of the motor vehicle accident or
5  both?
6    A.   Well, really both.  The history of his
7  motor vehicle accident and his past medical history
8  of the injuries sustained in that and the fairly
9  close proximity in time should have led to a proper
10 assessment in this patient.
11   Q.   Okay.  And what do you think would have
12 been different had that happened?
13   A.   Well, I think that a more sophisticated
14 treatment plan likely would have been put in place,
15 and you would have had a baseline of his function
16 against which to judge the presentation of his new
17 onset of symptoms later on in his incarceration.
18   Q.   All right.  So the fact that on
19 October 14th Mr. Buchanan presented to the St. John's
20 ER with substantially similar complaints to at least
21 those of his intake, increased discomfort with
22 movement and pain, and the fact that he had similar
23 complaints to the chiropractor, Dr. Greenhaw, four
24 times nine and ten pain, decreased range of motion,
25 and then he also saw Dr. Trinidad, same complaints,

Page 107

1  every single time they sent Mr. Buchanan on his way
2  after they talked to him.  But you think that on
3  November 3rd, 2016, at his intake assessment at
4  Muskogee County Jail they should have done more than
5  those other physicians; is that right?
6        MR. BLAKEMORE:  Object to form.
7    A.   Well, yes.  I think what I would really
8  say is they should have done what those other
9  physicians did.  In each of those encounters you
10 cite, he was seen and evaluated by a physician and a
11 treatment plan was put in place.  When he was at the
12 Muskogee County Jail, at his intake he was seen by an
13 LPN, who is not legally allowed to do an assessment,
14 and that was the extent of the healthcare encounter
15 that he had.
16   Q.   When you say she's not legally allowed to
17 do an assessment, are you saying by having an LPN do
18 intakes Turn Key is violating Oklahoma law?
19   A.   Yes.
20   Q.   Okay.  Do you know -- can you cite to me
21 the law?
22   A.   I'd have to look it up.  LPNs are --
23 across the country they are not allowed to do
24 assessments.
25   Q.   Okay.  Is an assessment different than a

Page 108

1  screening?
2    A.   Yes.
3    Q.   How?
4    A.   Well, an assessment involves more of an
5  exam and making judgment.  A screening is merely
6  recording data.
7    Q.   Okay.  Which one of those things did
8  Nurse Kotas do on November 3rd, 2016?
9    A.   Well, she did a minimalistic assessment.
10   Q.   Not a screening?
11   A.   Right.
12   Q.   Isn't a screening just a reduced version
13 of an assessment?
14   A.   No.
15   Q.   All right.  Do you mind going back to
16 defense Exhibit 8.  It's the Turn Key records.  Do
17 you mind turning to page 9, please.  All right.  I
18 know how you feel about the completeness of the form,
19 but my question to you is where does this form cross
20 the line from screening to assessment?
21   A.   Well, the screening would have been just
22 the recordation of demographic information and the
23 vital signs, and when she's getting down into more of
24 a judgment with respect to his appearance and
25 behavior and those elements, then she's crossing over

Page 109

1  into an assessment.
2    Q.   So determining whether someone is
3  sweating, having tremors, anxious or disheveled,
4  that's an assessment?
5    A.   Sure.
6    Q.   Same for behavior, determining whether
7  someone is nervous, disorderly, insensible, or
8  inappropriate?
9    A.   Sure, in the sense that she's going to
10 use that information to determine a plan for this
11 individual.  In this scenario with this intake screen
12 it's kind of the worst of all possible situations
13 because you have an LPN doing a minimalistic
14 assessment information and a proper assessment by a
15 licensed, qualified individual is not done.
16   Q.   So is it your opinion that only RNs
17 should be employed by correctional healthcare
18 providers?
19   A.   No.
20   Q.   They're the ones qualified to do the job?
21   A.   No.  My opinion is the healthcare
22 providers need to assign their staff to work within
23 their scope of practice.
24   Q.   And an LPN is not qualified to determine
25 whether or not someone's state of consciousness is



Exhibit 12

Page 110

1  alert, lethargic, or under the influence?
2      A.  Not in the sense that it's going to
3  translate into a nursing care plan.  The other
4  problem with the system that we know from the
5  depositions is there was no supervising RN for her to
6  discuss the case with, which is really the
7  requirement.
8      Q.  Based on what?  Where are you getting
9  that requirement?
10     A.  Well, that's standard Nursing Practice
11 Act.
12     Q.  There has to be an RN physically watching
13 over the LPN?
14     A.  They have to be available for them to
15 discuss the case with and directly supervising their
16 care.  LPNs --
17     Q.  Do you know one way or another whether or
18 not there was such an RN or a 24-hour on-call
19 physician available for Nurse Kotas to call?
20     A.  According to the deposition, there was no
21 RN that was available for that.
22     Q.  Well, I'll represent to you that
23 according to Dr. Cooper's deposition he was on-call
24 24 hours a day and could have been contacted.  Would
25 that satisfy your opinion for on-call availability?

Page 111

1      MR. BLAKEMORE:  Object to form.
2      A.  No.
3      Q.  Why not?
4      A.  Because he doesn't come into the
5  institution and is not supervising the nurses'
6  practice.
7      Q.  You just said it has to be available by
8  phone.  Did I mistake that?
9      MR. BLAKEMORE:  Object to form.
10     A.  No, that's correct, but they still have
11 to supervise the nurses' practice, and physicians
12 don't supervise LPNs.  That's not really the way it's
13 structured in healthcare.
14     Q.  But you don't know one way or another
15 whether or not that was the case here; right?
16     MR. BLAKEMORE:  Object to form.
17     A.  I don't understand your question.
18     Q.  You don't know one way or the other
19 whether or not Dr. Cooper would have been supervising
20 Nurse Kotas; right?  You're just talking about
21 general practice in correctional healthcare?
22     A.  No.  That's the general practice in
23 healthcare overall.  Physicians don't supervise
24 nurses clinically.
25     Q.  Okay.  You don't disagree with me that he

Page 112

1  spoke to and interacted with nurses during his
2  incarceration; right?
3      MR. BLAKEMORE:  Who is "he"?
4      MR. YOUNG:  Mr. Buchanan.
5      THE WITNESS:  No, I agree that he did
6  interact with the nursing staff.
7      Q.  (BY MR. YOUNG)  Okay.
8      And he got Naproxen either once or twice
9  a day depending on who you believe; right?
10     MR. BLAKEMORE:  Objection.
11     A.  Correct.
12     Q.  And the records show it was twice; right?
13     MR. BLAKEMORE:  Asked and answered
14 multiple times.
15     Q.  (BY MR. YOUNG)  All right.  The statement
16 of opinion No. 3:  "In reviewing this case, it is
17 clear that the circumstances that allowed this
18 patient to go from ambulatory to quadriplegic over
19 11 days without any meaningful intervention are due
20 to systemic failures in the Turn Key health program."
21     Do you still stand by that opinion?
22     A.  Yes.
23     Q.  Have you reviewed the Turn Key policies
24 and procedures?
25     A.  Some of them.

Page 113

1      Q.  Okay.  We'll get to that in a second.
2      My question is, is this opinion based on
3  any specific policy or procedure that you read?
4      A.  Not based on any specific one.  They
5  contributed to the formulation of this opinion,
6  though.
7      Q.  Okay.  So this is more a general
8  collective of them as opposed to a single policy that
9  you think would have been the -- would have been
10 responsible for any harm that came to Mr. Buchanan.
11 Is that fair?
12     MR. BLAKEMORE:  Object to form.
13     A.  Well, those certainly informed the
14 opinion, but the other elements that informed this
15 opinion were the medical records and lack of medical
16 records that are in evidence in this case.
17     Q.  Sure.  I get that.  I was curious if
18 there was one policy that stuck out to you and that's
19 what you were talking about in this No. 3.  So just
20 to be clear, is your answer, no, that there was not a
21 specific policy that you were referring to in this
22 third opinion?
23     A.  Correct.
24     Q.  Okay.  Thank you.
25     (Exhibit 12 was marked.)



Exhibit 12

Page 114

1    Doctor, I'll hand you defense Exhibit 12.
2  These are the Turn Key policies and procedures
3  produced in this case.  I believe you said a minute
4  ago you reviewed some but not all of these.  Is that
5  accurate?
6    A.   Yes, I've looked at a number of these.  I
7  didn't -- at the time that I reviewed them, I did not
8  know if it was a complete set or not as I was seeing
9  policies and procedures in front of me.
10   **Q.   Okay.  Well, I'll represent to you that**
11 **when we were doing written discovery Turn Key**
12 **produced the table of contents to plaintiffs, and we**
13 **came to an understanding as to at least that time**
14 **what we agreed are the relevant policies and**
15 **procedures and protocols, and this is a list of them.**
16   A.   You probably have a better understanding
17 of what completeness is compared to me.
18   **Q.   If you had a problem with that, you**
19 **probably would have stated it; so I think I probably**
20 **got pretty close there.**
21   **All right.  We've already discussed "A."**
22 **LPNs working unsupervised.  Is it fair to say that**
23 **you don't agree with me that having a physician**
24 **on-call 24-7 counts as supervision?**
25   A.   Correct.

Page 115

1    **Q.   Okay.**
2    **Part B, one of your criticisms is the**
3  **outside medical records were not reviewed.  We know**
4  **that on the 14th Katie McCullar sent a request to**
5  **Estar, and those records eventually came back.  Now,**
6  **I think we all agree that those records were not**
7  **reviewed before Mr. Buchanan left Muskogee County**
8  **Jail.**
9    **But my question to you is what is**
10 **contained in those Estar records, in your opinion,**
11 **that would have made a difference in his care and**
12 **treatment at Muskogee County Jail?**
13   MR. BLAKEMORE:  Object to form and
14 misstates the evidence.
15   A.   Well, I'd have to look at those records
16 specifically to answer your question with
17 specificity, but really the point of item B here is
18 that at the intake assessment he communicated to the
19 staff that he'd had a serious accident and had
20 serious injuries, which should have prompted a
21 medical records request to obtain a better
22 understanding of the extent of his injuries and the
23 treatment plan that he was on in the community.
24   **Q.   Okay.**
25   A.   So it's not so much the Estar records but

Page 116

1  really the rest of the records that should have been
2  requested and reviewed.
3    **Q.   Well, if he only disclosed the Estar**
4  **visit -- strike that.  Okay.**
5    **So am I correct that you feel like the**
6  **records should have been requested, but you can't say**
7  **one way or another whether or not it would have**
8  **changed the outcome?**
9    A.   Well, they should have been requested and
10 reviewed so that -- and I'm sure that the treatment
11 plan would have been different had they done that,
12 but that's a judgment call based on the reviewer and
13 what they were doing.
14   **Q.   Okay.  So you can't say one way or**
15 **another whether the outcome would have been**
16 **different; is that correct?**
17   A.   Correct.
18   **Q.   All right.  Part C under No. 3:  "There**
19 **was no reasonable access to a physician or midlevel**
20 **provider."**
21   **There was a midlevel provider at the**
22 **facility once a week.  I believe there's records to**
23 **support that.  Is that your understanding?**
24   A.   Yes.
25   **Q.   Okay.**

Page 117

1    A.   Which is inadequate for a facility of
2  this size.
3    **Q.   Okay.  What would -- what would be**
4  **adequate, in your opinion?**
5    A.   Well, it really depends a lot on sort of
6  the overall acuity of the patients, but from a
7  minimalistic standpoint you would probably expect to
8  see at least a half-time FTE prescriber for a
9  facility of this size.
10   **Q.   Can you help me out there, a half time**
11 **FDE?  I don't understand what that means.**
12   A.   Well, a full FTE is usually 40 hours of
13 clinical time per week; so a half time would be
14 probably 20 hours of clinical time.
15   **Q.   And what is your understanding of how**
16 **many inmates were at Muskogee County Jail in November**
17 **of 2016?**
18   A.   My understanding is it's approximately
19 four hundred.
20   **Q.   Okay.  Do you remember where you got that**
21 **number?**
22   A.   I believe it was in one of the
23 depositions.
24   **Q.   Okay.  And the 20 hours FTE that you said**
25 **would be appropriate -- am I saying that right?**



Exhibit 12

Page 118

1    A.  Yes.
2    Q.  -- are you getting that from --
3    A.  I'm sorry.  No it would be a half-time
4  FTE.
5    Q.  Okay.  I'm sorry.  I've misunderstood.
6    MR. ARTUS:  What is an FTE?  I'm sorry.
7    MR. YOUNG:  Yeah.
8    THE WITNESS:  Full-time equivalent.
9    Q.  (BY MR. YOUNG)  Half-time FTE, is that
10  20 hours?  Did I understand that right?
11    A.  Yes.
12    Q.  Okay.  And you were saying that half-time
13  FTE, which means 20 hours of clinic time by a
14  physician or midlevel provider; is that right?
15    A.  Correct.
16    Q.  Okay.  That's what you say would have
17  been appropriate for that number of inmates.  Did I
18  get that right?
19    A.  Well, what I'm saying is that's a rough
20  estimate.  You would have to determine -- you would
21  have to look at the patient demand, the backlogs,
22  that sort of a thing, to adjust that number up and
23  down --
24    Q.  Sure.
25    A.  -- but that would be a good starting

Page 119

1  point for a facility of this size.
2    Q.  I guess my question is where were you
3  getting that starting point?  Is that a law, is that
4  a standard, or is that your opinion?
5    A.  That's a fairly well worked out ratio
6  within correctional healthcare.
7    Q.  Is that published somewhere?  I'm
8  just curious where you got this ratio.
9    A.  Part of it is based on a lot of
10  experience consulting, and that's kind of where the
11  number usually comes out, but that's also a number
12  that NCCHC has referenced in the past.
13    Q.  So there is an NCCHC standard that
14  articulates this ratio that you've just spoken about;
15  is that right?
16    A.  No, that number would not be in their
17  standard.  They've moved to another one that I'd have
18  to look up to see if it's in their current standards
19  or not.
20    Q.  Okay.  So when it comes to midlevel
21  physician clinic hours, the ratio per inmate, you're
22  not, as we sit here, aware of the current NCCHC
23  standard.  Is that fair?
24    A.  Yes.
25    Q.  Okay.

Page 120

1    A.  But the number that I gave you is fairly
2  close to what the recommendations have been over the
3  years.
4    Q.  Okay.
5    A.  But it's really not about that number.
6  You know, this criticism here is really about the
7  fact that this particular patient had symptoms that
8  were progressive and was never seen by a clinician.
9    Q.  And just to make sure I've got an
10  understanding here, are you aware of any Oklahoma law
11  that sets this ratio that we've been discussing?
12    A.  No.
13    Q.  Okay.
14    On part D you say that the on-call
15  process was deficient.  Now, if there was a physician
16  on-call 24 hours a day, in what way is the on-call
17  process deficient?
18    A.  Well, in the sense that there really
19  wasn't any sort of assessment that would convey to
20  the on-call -- that was done or conveyed to the
21  on-call physician for determination of a treatment
22  plan, especially when the symptoms were progressive.
23    Q.  So it's not the on-call process itself.
24  It's the symptoms that were relayed to the physician.
25  Is that accurate?

Page 121

1    MR. BLAKEMORE:  Object to form.
2    A.  Well, it's all part of a process.
3    Q.  As far as you know, does the on-call
4  process, as you've understood it from the records --
5  is it in compliance with Oklahoma law?
6    A.  I don't know that there's any written
7  text that would define that.
8    Q.  Okay.  Is that both statute and NCCHC
9  standards?  You're not aware of any text?
10    A.  Well, NCCHC standards would address that
11  in a certain respect, but, you know, really what the
12  deficiency would be is that given the progression of
13  symptoms there wasn't a clinical appointment that was
14  seen by -- or was accomplished by a clinician.
15    Q.  Okay.
16    A.  They were on-call, but they never came in
17  to see the patient.
18    Q.  All right.  So as far as this specific
19  criticism, there's not an NCCHC standard or Oklahoma
20  statute that says it's deficient; is that right?
21    A.  Well, NCCHC would find that to be
22  deficient for when patients have progressive problems
23  they should be seen by a clinician.
24    Q.  Okay.
25    A.  You can't just take a telephone call and



Exhibit 12

Page 122

1   never see the patient.
2       Q.  I'll be more specific.
3       A.  For example, you can't -- well to be, you
4   know, succinct, you can't just phone in the care.
5       Q.  I understand.  As far as 24/7 access to a
6   physician, that in a vacuum of itself, is that a
7   deficient on-call system?
8           MR. BLAKEMORE:  Object to form.
9       A.  Possibly, if they don't ever come in to
10  see the patient.  Being on call sort of assumes that
11  you're available to come in and see a patient that's
12  in trouble.
13      Q.  And are you aware one way or the other
14  whether or not Dr. Cooper was available to come in to
15  see James Buchanan if necessary?
16      A.  Well, I don't know whether he was
17  technically available, but he did not.  And according
18  to the depositions, doing on-site clinic visits with
19  patients was not part of his history.
20      Q.  But you haven't read his deposition,
21  right, Dr. Cooper's deposition?
22      A.  That's correct.  Just the nurses who
23  worked at the facility.
24          MR. BLAKEMORE:  Can we take a five-minute
25  break?

Page 123

1           MR. YOUNG:  Yeah.
2           (Recess.)
3       Q.  (BY MR. YOUNG)  All right.  Dr. Wilcox,
4   we're back on the record after a quick break.  Do you
5   feel like -- you know that Nurse Katie McCullar is
6   one of the defendants in this case; right?
7       A.  Correct.
8       Q.  In your review of the records and your
9   opinion, do you feel like she did anything to
10  intentionally cause harm to James Buchanan?
11          MR. BLAKEMORE:  Did you say
12  "intentionally"?
13          MR. YOUNG:  Correct.
14      Q.  (BY MR. YOUNG)  Did she intend him harm?
15      A.  Well, I have criticism of her care, for
16  sure.
17      Q.  I understand that.  I meant have you seen
18  anything to show that she was motivated by an intent
19  to bring him harm?
20      A.  I don't think there's any evidence in the
21  record that would inform an opinion like that.
22      Q.  Okay.
23          MR. BLAKEMORE:  We haven't alleged it.
24          MR. YOUNG:  Okay.
25      Q.  (BY MR. YOUNG)  And same question for

Page 124

1   Dr. Cooper.  Anything that shows that he was
2   motivated by intent to cause harm to James Buchanan?
3       A.  I don't think there's anything in the
4   record to show that he did much of anything.
5       Q.  So the answer is no, though?
6       A.  Yeah.
7       Q.  All right.  Back to your statement of
8   opinions, part F, you say that "The system utilizes
9   nursing protocols to avoid having patients see
10  providers."
11          Do you stand by that?
12      A.  Yes.
13      Q.  All right.
14          If you'll flip in defense Exhibit 12,
15  please, to TK_RFP No. 1008.  Do you know whether or
16  not you reviewed this policy, which is titled
17  "Nursing Assessment Protocols"?
18      A.  I remember reading over this briefly, but
19  mostly what I reviewed were the actual protocols
20  themselves.
21      Q.  In your experience, are these types of
22  protocols or standing orders -- are those typical in
23  the correctional healthcare field?
24      A.  Well, you do find facilities that use
25  nursing assessment protocols, and most of the time

Page 125

1   they are not legal or appropriate, but there are a
2   few places that have managed to use them in a way
3   that is reasonable.
4       Q.  When you say "a few places," do you mean
5   because state laws are different or because of the
6   wording of the protocols?
7       A.  Well, it's really more the application
8   and the content of the protocol and what it seeks to
9   treat.
10      Q.  Okay.  Now, am I going to be correct if I
11  say that in the same way that you feel like the
12  intake form called for an LPN to practice medicine,
13  is that the same way you feel about the nursing
14  protocols -- close?
15      A.  Well, to be clear, the intake issue is --
16  I don't think I said it is a practice of medicine.
17  That's more exceeding the scope of practice of an LPN
18  and doing what would be an assessment that's in the
19  realm of an RN.
20      Q.  Okay.
21      A.  Now, with nursing assessment protocols,
22  the typical problem is really sort of a compounded
23  issue because the LPNs are very clearly doing nursing
24  assessments and actually making diagnoses, and
25  oftentimes, as is the case in these ones, they are

Exhibit 12

Page 126

1 practicing medicine by making a diagnosis and doing
2 prescriptive care.
3      Q.  Okay.  Can you please show me
4 specifically what you're talking about when you say
5 making diagnoses and prescriptions?
6      A.  So the nursing protocols that are part of
7 your policies and procedures here are listed starting
8 with 1031.
9      Q.  Okay.  Give me a sec.
10         Okay.  I'm there.  What specifically are
11 you talking about when you say that it requires a
12 nurse to practice medicine?
13      A.  So the mere choosing of which protocol to
14 use is the function of making a diagnosis.  You
15 can't -- you have to have a diagnosis in mind in
16 order to know which one to choose, and so that --
17 that is part of the problem.  But where they get in
18 trouble is in this whole workup, you know, for
19 example, this back pain one that I'm looking at here,
20 this whole workup is an assessment that is outside
21 the scope of practice of an LPN.
22         And then you get down to the plan that,
23 for example, No. 2, one of the options that they can
24 do is ibuprofen 400 milligrams PO BID for no more
25 than seven days without a provider order.  Ibuprofen

Page 127

1 400 milligrams is a prescriptive dose of ibuprofen
2 that an LPN is not legally allowed to give to this
3 patient for even one dose, let alone the 14 that are
4 authorized by this protocol.  We can go through
5 others if you want, but that's an example.
6      Q.  Actually, I'd like to go back to the top,
7 because you said that essentially everything that's
8 in this subjective and objective data is practicing
9 medicine, and it's my understanding --
10      A.  No, I didn't say that.
11      Q.  Okay.  I don't want to misstate you.  I
12 just want to get a little more definition and
13 clarity, please.  What specifically are you talking
14 about?
15      A.  So this whole section up here on --
16 that's the assessment, the subjective and the
17 objective, that is a nursing assessment, which is
18 outside the scope of practice for an LPN.
19      Q.  And that's true of the subjective and
20 objective data, those boxes.  Is that -- am I
21 understanding --
22      A.  Yeah.  There are elements of the
23 subjective part that would be data collection, for
24 example, allergies and initial complaint, things like
25 that.  But it really is the objective component in

Page 128

1 the development of the plan that is the realm of an
2 RN, not an LPN.
3      Q.  Okay.  So data collection.  Vomiting,
4 that's data collection.  That's not data collection.
5 Is that what you're telling me?
6      A.  Right.  And the assessment of a normal
7 gait, the assessment of abdominal pain, the
8 assessment of range of motion.  All of that is
9 assessment data that is outside the scope of practice
10 of an LPN.
11      Q.  Okay.  And are you citing to the Nursing
12 Practice Act, to Oklahoma law?  Where are you
13 referencing?
14      A.  Oh, I am citing to every Nurse Practice
15 Act.  I mean, that's a well-established delineation
16 in healthcare, that LPNs are not allowed to do
17 nursing assessments, particularly on new onset,
18 undiagnosed problems.
19         So I guess to say it in a different way,
20 the completion of this nursing assessment form would
21 have to be done by an RN and then the prescriptive
22 component would have to be completed by a physician.
23      Q.  I get it.  As a layperson it all kind of
24 looks the same to me; so I needed you to kind of
25 articulate that for me.

Page 129

1      I have a question.  In your report,
2 page 7 of 10 -- I don't remember what the exhibit is.
3 I think it's Exhibit 3.  Sorry.  Go to page 6, first
4 paragraph, please.  In the middle of that paragraph
5 there is a line that says:  "Turn Key's protocol
6 regarding MUSCULAR SKELETAL/SPRAINS should have been
7 applied but was not."
8         Is that your opinion?
9      A.  Well, that -- that's really not in the
10 opinions section.  To be honest, that certainly would
11 have been a relevant protocol for assessing the
12 patient, but to be privily honest with you, I would
13 have been delighted if the nurse would have applied
14 any protocol to assess the patient.
15      Q.  But you just said that was illegally
16 practicing medicine because Nurse McCullar at that
17 time was an LPN.
18      A.  Right.  So, you know, you needed to have
19 a nurse come in and do that or the clinician needed
20 to come in and do it.  You can't have this lib at the
21 LPN level.
22      Q.  Okay.  So I guess I'm just not clear on
23 the contradiction between -- you say that the
24 protocol should have been applied, but also it
25 shouldn't have been applied because she was an LPN.



Exhibit 12

Page 130

1  You're saying that the only option was for an RN or
2  higher to come in. Is that fair?
3      MR. BLAKEMORE: Object to form.
4      A. Well, yeah, that would be legal. But
5  even if she went through kind of the basics of the
6  data collection and then had that discussion with the
7  clinician, it would have been better than really the
8  situation that occurred, which is none of that
9  happened. And when a patient complains of a new
10  onset of symptoms or has a complaint about a problem,
11  you at least have to do something, some sort of
12  objective analysis.
13      Q. And you don't feel that calling the
14  provider and relaying the symptoms counts as doing
15  something; is that right?
16      A. Well, you know, what she relayed, I mean,
17  there was really sort of minimal objective
18  information, and we'd have to reference which note
19  you're talking about. But in the multiple sick call
20  assessments done -- or not really done but noted
21  about this individual, there's no documentation that
22  anybody did a reasonable assessment of this patient.
23      But I guess that really gets to, you
24  know, the criticism of the systemic issues because
25  when you're not staffed appropriately for the right

Page 131

1  level of licensure to do the right kind of assessment
2  for patients who have problems.
3      Q. Have you reviewed the contract between
4  Turn Key and Muskogee County?
5      A. Not in any detail, no.
6      Q. Okay.
7      All right. H. This one is pretty vague;
8  so I'm just going to kind of ask you to tell me what
9  you mean, and I'll go ahead and say this is a -- I'm
10  getting close to the end; so if there's anything that
11  you've left on the table that I haven't asked, feel
12  free to lay it on me here. What do you mean by
13  "Access to healthcare was compromised"?
14      A. Well, the concept of access to healthcare
15  in a correctional facility is really fundamental to
16  the delivery of care. This is a broad category.
17  There's lots of elements that are kind of included in
18  this with respect to whether a prisoner can get
19  appropriate healthcare by an appropriately licensed
20  individual, done in a timely fashion, and with kind
21  of an appropriate outcome for the healthcare that
22  was, you know, ordered, and so there's just lots of
23  different elements of that.
24      But where you end up with problems in
25  this particular case is, you know, as we've talked

Page 132

1  about in more detail, you have an LPN doing
2  assessments in intake and not really doing a very
3  good job of it, which resulted in an ineffective care
4  plan leaving the booking area. The patient had
5  complaints of issues and progressive physical exam
6  findings throughout his stay in the jail. An
7  appropriate assessment was never done. He was never
8  seen by a provider due to -- even though he had
9  ominous symptoms and ominous progression, and just
10  the overall access to appropriately licensed
11  individuals making decisions at their appropriate
12  level of expertise didn't happen.
13      Q. All right. Is there anything in No. --
14  sorry. Let's go back to I. "Officers did not
15  interface adequately with the healthcare staff to
16  advocate for Mr. Buchanan."
17      What data -- what are you basing that on?
18  Is there records that you're basing this on?
19      A. Well, I suspect that there are records
20  that better delineate this that would be available to
21  review that I have not reviewed. But, you know, the
22  officers are really the frontline staff who are
23  interfacing with the prisoners more than the health
24  care staff. You know, the nurses typically will come
25  by twice a day, deliver medication. But the officers

Page 133

1  are in those units 24/7; so they have a much better
2  sense for how someone is doing. Typically, in many
3  systems, the officers are real advocates for patient
4  care for patients who are not doing well. And I
5  didn't really see any evidence of that in the records
6  here, which is surprising.
7      Q. And if you say that that's -- it's your
8  opinion that that's typical, that healthcare -- that
9  correctional officers are advocates and that that
10  didn't occur here, did it ever occur to you that
11  perhaps Mr. Buchanan's recitation of his symptoms
12  throughout his stay was embellished or mistaken at
13  all?
14      MR. BLAKEMORE: Object to form.
15      A. That's possible, but --
16      Q. I mean, if they are typically -- if
17  correctional officers are typically advocates and
18  they weren't in this case, is it not a reasonable
19  conclusion that there was nothing to advocate for?
20      MR. BLAKEMORE: Object to form.
21      A. That's one possible conclusion. I don't
22  think that's the accurate conclusion in this case.
23  But...
24      Q. Well, you agreed with me earlier that as
25  an expert opinion you have to consider all positions.



Exhibit 12

|  |  |
|---|---|
| **Page 134** | **Page 136** |

**Page 134**

1  You don't necessarily have to support it, but you
2  consider them all.  Is that fair?
3      A.  Yes.
4      Q.  Okay.
5          All right.  Moving on to No. 4.  This one
6  seems substantially similar to a lot of things we've
7  already talked about, but it specifies on pain
8  management.  Again you use the word "untreated."  He
9  was receiving Naproxen twice a day, but yet you use
10  the word "untreated."  Why is that?
11      A.  Right.  So when you are treating somebody
12  in severe pain, it's imperative to actually do an
13  assessment to get kind of the starting point and then
14  to implement a treatment plan and then to reassess
15  the patient for whether that treatment plan has -- is
16  efficacious.
17      Q.  Okay.
18      A.  So that did not occur in this case, and
19  in that sense, although he was given Naproxen, it was
20  unsuccessful in treating his severe pain, which
21  really amounts to an ineffective and inadequate
22  treatment for his condition, which should have been a
23  very good clue that you had another process going on
24  that did not respond to merely Naproxen.
25      Q.  And that's because he was recording pain

**Page 135**

1  ten out of ten, nine out of ten; is that right?
2      A.  Right, pain with loss of function; so in
3  that scenario, you know, Naproxen is not really a
4  medication that you would think of using.  But really
5  the important part is that the pain and the failure
6  to respond to low-level intervention is a very good
7  clinical clue that you've got a bigger problem on
8  your hands and you need to look harder.
9      Q.  So then if he had reported to -- before
10  he came to jail, before he was incarcerated, if he
11  had reported that the pain medications he was taking
12  to another provider -- he reported this to another
13  provider -- sorry.  Let me start over.  Strike that.
14          We know that he went to the ER at
15  St. John's.  He went to Dr. Trinidad and he went to
16  Dr. Greenhaw before he came to Muskogee County Jail.
17  If he had reported to one of them that his pain
18  medications were not effective along with the
19  decreased range of motion that he reported, then
20  should they have been on lookout for something else?
21      MR. BLAKEMORE:  Object to form.
22      A.  Sure.  And that really comes down to a
23  judgment call based on your assessment of the patient
24  and the efficacy of those medications.  In reading
25  their notes, the overall treatment plan with the

**Page 136**

1  three different medications that he was on was
2  working for him even though he still had some
3  residual pain.
4      Q.  Okay.  But if the records reflect that he
5  said that the medications were not managing his pain,
6  then would you agree with me that that would have put
7  them on alert that there was some other -- some other
8  illness involved?
9      A.  Yes, it should have put them on alert
10  that they needed to look harder for what was going on
11  or they needed to change the treatment plan.
12      Q.  Okay.
13          And his reporting pain at a level of nine
14  or ten when he got to jail, that would not be
15  indicative of a change in his condition; right?  That
16  alone would not be indicative of a change in
17  condition because he had already previously reported
18  pain levels at that rate.  Is that fair?
19      MR. BLAKEMORE:  Object to form.
20      A.  That's correct.  The real change in his
21  presentation was the emergence and the progression of
22  his neurological findings.
23      Q.  Okay.
24          All right.  No. 5, your last, it says:
25  "Had Mr. Buchanan's situation been taken seriously

**Page 137**

1  and his symptoms been properly considered and his
2  situation properly evaluated, he could have been
3  easily treated for his underlying condition and
4  retained his neurologic function."
5          Now, I'm pretty sure we've covered just
6  about all of that already, except when you say "had
7  his situation been taken seriously."  Have you seen
8  anything in the records you reviewed that indicate
9  that his symptoms and his condition were not taken
10  seriously by any of the correctional or medical
11  staff?
12      A.  Yes.  I would answer that in two ways.
13  The first is -- is what's not in the records, because
14  he had complaints -- so there was complaints of
15  progression.  There was no prescriber who ever came
16  in to see him to do a proper evaluation of his
17  situation; so that is a problem.  Had they seen him,
18  had they done a proper assessment, they likely would
19  have seen his progression and his neurological issues
20  and sent him out for definitive care in a timely
21  fashion.
22          The other piece that is concerning is
23  this note from LPN McCullar on DDR 012, dated
24  11/14/16, where she calls Dr. Cooper to indicate to
25  him that the patient is having worsening pain and

Exhibit 12

Page 138

1  inability to move his lower extremities.  Those are
2  red-flag findings, and it's just not appropriate at
3  all for the response from the doctor to be to put him
4  on the list to be seen in the next few days.
5       Q.  Okay.  I guess part of my question was
6  have you seen anything that reflects anybody thought
7  he was faking his injuries?  Directly states that, I
8  should say.  Have you seen anything to that nature?
9       A.  I do not see anything there that uses
10 those words exactly.
11      Q.  Okay.
12          I know you didn't know this until today
13 when I showed you the records, but do you find it odd
14 that instead of following up with his neurosurgeon
15 after his discharge from St. John he sought to follow
16 up with a chiropractor and a pain management
17 physician?
18      MR. BLAKEMORE:  Object to form.
19      A.  No.  I find that to be pretty normal,
20 unfortunately.  I don't think it's appropriate, but
21 getting an appointment with a neurosurgeon in the
22 community is a very daunting task.
23      Q.  I think that according to the discharge
24 instructions he had an appointment that was set for
25 approximately ten days later, and he was instructed

Page 139

1  to get some imaging done before returning.
2       A.  Mm-hmm.
3       MR. YOUNG:  All right.  I'm going to pass
4  the witness.  Thank you, Doctor.
5       MR. ARTUS:  Do you need to take a break,
6  or do you want to just go?
7       THE WITNESS:  I think we just had a break;
8  so I'm probably okay for a little bit.
9       MR. ARTUS:  All right.  I just want to do
10 a little housekeeping.  Do you have that invoice?
11      MR. YOUNG:  Oh.
12      MR. ARTUS:  I don't know what our next
13 exhibit is, but I just want to put into the record --
14      MR. YOUNG:  Thirteen.
15      (Exhibit 13 was marked.)
16          EXAMINATION
17 BY MR. ARTUS:
18      Q.  Defendants' Exhibit 13, which is the
19 invoice dated -- it says May 19th, 2019, for $10,800.
20 It's defendants' Exhibit 13 that was emailed to me
21 today by your attorney -- or not by your attorney but
22 Bob Blakemore, who has retained you.  Is that the
23 total that you have incurred in reviewing and getting
24 your opinions up to May 19th, 2019, or is there more
25 than that?

Page 140

1       A.  No.  That's the total.
2       Q.  Okay.  I'm going to switch -- I'm going
3  to kind of jump around to try to understand things.
4  I'm just going to go through my notes as we've been
5  going.
6           Wellcon is the company that you created
7  that contracts with the Salt Lake County Jail System;
8  is that correct?
9       A.  That's correct.
10      Q.  And Wellcon provides the medical care for
11 the Salt Lake County Jail System; is that correct?
12      A.  Not exactly.  We provide part of the care
13 in that system.
14      Q.  Kind of like Turn Key contracts to
15 provide medical care in this case at the Muskogee
16 County Detention Center.  Is that kind of what --
17 you're like Turn Key, and you contract and you
18 provide services that will come into the jail and run
19 the medical for the jail?
20      A.  No, they're not exactly comparable.
21      Q.  Okay.  How is it different?
22      A.  In our system here in Salt Lake County,
23 the nurses and support staff and mental health staff
24 are all county employees, and Wellcon provides
25 prescribers.

Page 141

1       Q.  Prescribers meaning doctors or APRNs or
2  what?
3       A.  Doctors, APRNs, physician assistants, but
4  we don't -- we don't provide the nurses.  We don't
5  provide the pharmacy services.  We don't provide the
6  mental health staff as far as, like, the counselors
7  and that sort of thing.
8       Q.  So Wellcon, you are basically contracting
9  the clinicians, the people that come in and see the
10 inmates and prescribe.
11      A.  That's right.
12      Q.  And then the county, Salt Lake County,
13 they have nurses on as their employees; is that
14 correct?
15      A.  That's correct.
16      Q.  And how many inmates on average does Salt
17 Lake County Jail have?
18      A.  Approximately 2200.
19      Q.  So much bigger than Muskogee County.
20      A.  Yes.
21      Q.  Or the detention center.
22          And how many physicians take care of
23 these 2200 inmates?
24      A.  Well, we have a number of clinicians who
25 participate in care inside the jail.  I would

Exhibit 12

Page 142

1   estimate it's about eighteen.
2       Q.  How many of them are medical doctors?
3       A.  Let's see.  Sixteen of those eighteen are
4   medical doctors.
5       Q.  And then the other two are what?
6       A.  One is an APRN and one is a PA.
7       Q.  And do those 16 -- and when do you
8   have -- when you do clinicals -- is that the proper
9   term where inmates that need to be seen by a
10  prescriber will see them?  Is that what you would
11  call a clinical?
12      A.  Well, yeah.  Probably I would just call
13  it a clinic.
14      Q.  Okay.
15      A.  But there's different clinical functions
16  that exist inside the jail.  So within the general
17  population setting, which is sort of an ambulatory
18  care setting, we would do clinics, and on any given
19  weekday there would be between three and six separate
20  clinics that operate on each day.  On the weekends
21  there would be one or two clinics depending upon the
22  day and the schedule.  And then in addition to that
23  we have in-patient units where the clinicians come in
24  and round on the patients who are admitted into those
25  units on a daily basis.

Page 143

1       Q.  And in your system are there physicians
2   at the jail 24/7?
3       A.  No.
4       Q.  Are there nurses at the jail 24/7?
5       A.  Yes.
6       Q.  And the clinics that happen each day, are
7   they eight hours long, or are they two hours?  How
8   long are they?
9       A.  No.  The clinics that happen each day are
10  really more scheduled based on number of patients,
11  and they go as long as they need to go; so we don't
12  really do it quite by time.  And the clinics are
13  really sort of set up to fit between meal times so
14  that we're not disrupting the meal times of the
15  prisoners.
16          Just to be clear, so all of our RNs who
17  work for the county, they're all RNs.  We don't have
18  any LPNs.
19      Q.  Okay.  I thought you said 16 medical
20  doctors.  Do you have 16 RNs?
21      A.  No.  So 16 medical doctors, one APRN, and
22  one PA.
23      Q.  Right.  And then the nurses?
24      A.  And then what I was referencing are the
25  nurses.  We have about -- I don't know -- 55 or 60

Page 144

1   nurses, something like that, and they're all RNs.
2       Q.  What is the budget for Wellcon, Inc. and
3   Salt Lake County Jail System?  How much do they
4   pay a month for your services?
5       A.  It's paid on a man-day; so --
6       Q.  What does that mean, a "man-day"?
7       A.  A prisoner that is in house for one day.
8       Q.  Okay.
9       A.  I'd have to look up what the current rate
10  is.
11      Q.  How much per prisoner?
12      A.  Well, I'd have to look up exactly what it
13  is right now because it's split over a couple of
14  different contracts; so I don't know the exact
15  amount, but it's probably $1.90 or so.
16      Q.  $1.90 per inmate?
17      A.  Uh-huh.
18      Q.  So you'd multiply that if you had -- like
19  you said, if we had 2200, that's how much it would be
20  a day?
21      A.  Right.
22      Q.  And as you've been doing your deposition
23  today, you've been taking texts from medical staff;
24  is that correct?
25      A.  Correct.

Page 145

1       Q.  Who is covering your shift today?
2       A.  Well, today there are multiple physicians
3   on site doing clinics, and then I'm doing some
4   administrative work once we finish here.
5       Q.  As I understood your testimony, you're
6   not really -- well, first of all, do you have any
7   hospital privileges?
8       A.  No.  I don't need hospital privileges
9   with my current job.
10      Q.  When was the last time you did surgery?
11      A.  Well, it depends on what you mean by
12  surgery.  We do lots of minor surgery with local
13  anesthesia on a fairly routine basis, but in the
14  operating room under general anesthesia was back when
15  I was a resident.
16      Q.  And that was back in '96?
17      A.  Yeah.
18      Q.  Is that right?
19      A.  That's right.
20      Q.  Okay.
21          Now, have you been sued in your capacity
22  as a medical -- a medical provider in a jail?
23      A.  Yes.
24      Q.  And how many times?
25      A.  Oh, I think a couple of times, and then

Exhibit 12

Page 146

1  the county gets sued on a regular basis and
2  oftentimes we get named in those suits, and a lot of
3  times I don't even know about those.
4      Q.  What about the Ostler case, O-s-t-l-e-r
5  case?  Is that still going on?
6      A.  Yeah.  I think they're in some discovery
7  on that case.
8      Q.  Is that regarding an inmate found dead of
9  infection in her abdomen?
10     A.  Yes.
11     Q.  And have you been named in that case?
12     A.  I think so.  I can't remember if it was
13 just Wellcon that got named or whether I got named
14 individually.  I'd have to go back and look.
15     Q.  What's the allegation there?
16     A.  The allegation there really is more at
17 the county level with the nurses than it is anything;
18 so the allegation for me is a supervisory deficiency.
19     Q.  And what's the allegation against the
20 nurses?
21     A.  That they didn't respond in a timely
22 fashion to a patient who had a medical problem.
23     Q.  The infection in her abdomen?
24     A.  Yes, that nobody knew about.
25     Q.  And what about the Aus case, A-u-s?  Is

Page 147

1  that still ongoing?
2      A.  I think so.
3      Q.  Is that a case about a plaintiff who had
4  a congenital brain cyst and died of complications in
5  jail?
6      A.  Right.
7      Q.  And what are the allegations against you
8  in that case?
9      A.  Again that's a supervisory issue.  I
10 never saw the patient as a clinician.  But the
11 allegations are that somehow a congenital problem
12 that caused his death -- or that -- well, how do I
13 say it?  I'm not sure I even understand what the
14 allegations are.  The allegations are that he should
15 have been given a benzodiazepine that somehow would
16 have altered a congenital medical problem.
17     Q.  Okay.  So is it mostly against the nurses
18 or against the physicians for not properly assessing
19 him?
20     A.  Well, it's really mostly with the nurses
21 and primarily with the mental health clinical staff.
22     Q.  Okay.  Again for not recognizing that he
23 had a congenital brain cyst; right?
24     A.  Right.  I don't -- nobody knew that he
25 had this congenital brain cyst.  It was an unknown

Page 148

1  element.
2      Q.  Right.
3          Your primary job is the director for
4  Wellcon, which is really providing medical care to
5  the jail; is that correct?
6      A.  Right.
7      Q.  But you also on the side do consulting
8  work; right?
9      A.  Sometimes, yes.
10     Q.  And you give how many depos a year, doing
11 depositions as a consultant?
12     A.  Well, there's a list of my depositions.
13 I think in the last four years I probably have
14 done -- I don't know -- eight.
15     Q.  I read a prior deposition you gave where
16 you said you give about four or five depos a year as
17 an expert in consulting.  Does that sound right to
18 you or not?
19     A.  Yeah.  It just is so variable.  Sometimes
20 you'll have a couple in a row and then go for a long
21 period of time.  I think on the list that I have
22 right now spans four years, and I'm guessing that
23 there's eight to ten cases that were given
24 depositions over that period of time.
25     Q.  Can you testify for the jury with any

Page 149

1  medical degree of certainty when Mr. Buchanan in this
2  case had developed -- first started developing an
3  epidural abscess?
4          MR. BLAKEMORE:  Object to form.
5      A.  Well, as we talked about in the previous
6  version of this, you'd have to sort of define that
7  with respect to, you know, the initiation of the
8  infectious process versus when it became clinically
9  evident.
10     Q.  Well, I think what I heard you say, and
11 correct me if I'm wrong, was you don't think he had
12 the epidural abscess before he went in the jail.  You
13 think he got it while he was in the jail.  Is that
14 correct?
15     A.  That's correct.
16     Q.  What is the basis for that opinion?
17     A.  The basis for that opinion is my
18 experience with these types of patients as well as
19 knowledge of the typical clinical course for
20 staphylococcus aureus infections.
21     Q.  In other words, it grows fast, and so you
22 think it must have developed fast.
23     A.  Right.
24     Q.  And when you say "these type of
25 patients," what do you mean, "these type of



Exhibit 12

Page 150

1  patients"?
2      A.  Well, patients with epidural abscesses.
3      Q.  Okay.  And how many epidural abscesses do
4  you have in your jail per year?
5      A.  Oh, it would be less than one.  It's not
6  a particularly common condition.  But over my career
7  I've taken care of several patients with epidural
8  abscesses.
9      Q.  So your career goes back to the '90s,
10  early '90s; is that right?
11      A.  That's right.
12      Q.  What year did you become a medical
13  doctor?
14      A.  Let's see.  1990, I think.
15      Q.  So since 1990 how many epidural abscesses
16  do you think you've treated in your career?
17      A.  Five.  Let me be clear.  Five as acute
18  presentations.  We've had a number of patients who
19  have come to us after they've had an epidural abscess
20  and we've managed them kind of in the aftermath
21  phase.
22      Q.  So five acute presentations.  That means
23  they've got symptoms, and so you're treating them for
24  those symptoms?
25      A.  Right.  So I guess to be more clear, they

Page 151

1  developed symptoms, they had clinical findings, we
2  identified those clinical findings and sent them out
3  for definitive care, and the care was done at the
4  hospital.
5      Q.  Okay.  And when you have an epidural
6  abscess, that's what you do, you send them to the
7  hospital; right?
8      A.  Correct.
9      Q.  So as soon as you notice something like
10  that, that's what you do, you send them to the
11  hospital; right?
12      A.  Right.  You have to have a low index of
13  suspicion based on the presentation of
14  neurological -- changes in their neurological
15  presentation.
16      Q.  I think counsel for Turn Key had you
17  testify about plaintiff's memory problems.  Would you
18  agree that he is not a reliable historian?
19          MR. BLAKEMORE:  Object to form.
20      A.  Well, I think that there are elements of
21  his testimony that probably are reliable.  I don't
22  think it's all unreliable, but I suspect that he has
23  some difficulties with some detail recall.
24      Q.  Well, in this case what's going to be
25  absolutely critical is when his symptoms actually

Page 152

1  started; right?
2      A.  Sure.
3      Q.  And he's given several different
4  testimonies.  He's told the doctors one thing and in
5  his deposition he's told another thing, and in his
6  deposition he said he's been diagnosed with short
7  term and long term memory problems.  Did you see
8  that?
9      A.  Mm-hmm.
10      Q.  Was that a yes?
11      A.  Yes.  Sorry.
12      Q.  In fact, did you read his brother's
13  testimony?
14      A.  I did not.
15      Q.  You haven't read Stan Buchanan's
16  deposition testimony?
17      A.  I have not.
18      Q.  Well, he testified that his brother has
19  had memory problems since before he was 13 or 14.
20  Were you aware of that?
21          MR. BLAKEMORE:  Object to form.
22      A.  No.
23      Q.  Okay.  So if that is true, I mean,
24  you're -- an accurate history, if Mr. Buchanan's
25  testimony as to when he couldn't use his -- start

Page 153

1  using his left arm and when he stopped using his
2  right -- let me rephrase that because I was jumbling
3  my words.
4          In this case if Mr. Buchanan's testimony
5  is not reliable as to when he could not -- when he
6  started not being able to use his left arm and then
7  not being able to use his right arm, that's very
8  important; right?
9      A.  It can be, although it's a symptom that
10  would present over a range of time which is fairly
11  short.
12      Q.  Like, for example, he told Dr. Baird, "I
13  couldn't use my left arm at the very first.  I
14  couldn't even use it.  It was completely paralyzed
15  day one I was in the jail."  And then in his
16  deposition he said -- he started saying that, and
17  then he said, "Well, no.  It was on day six."  Did
18  you see that?
19          MR. BLAKEMORE:  Object to form.
20      A.  I did.
21      Q.  And then we have the video, which was on
22  the 11th, and he can still use his arms, can't he?
23      A.  In a limited fashion, yes.
24      Q.  Sure.  But it's not like he described in
25  his deposition; correct?

Exhibit 12

Page 154

1    A.  Well, it's not paralysis.

2    Q.  Right.  And he can certainly use his

3 legs.

4    A.  Yes.

5    Q.  Now, when Mr. Buchanan -- now, inmates,

6 when they come into the jail, it's not unusual for an

7 inmate in their fifties to come in with already

8 having a restricted range of movement or motion;

9 isn't that correct?  That happens all the time;

10 right?

11    A.  Well, that can happen.  I don't know -- I

12 don't have any sense of numbers or percentage.

13    Q.  Well, there are people who come in who

14 have already had injuries in their earlier life where

15 now they have -- they can't use their arm as well or

16 they can't use their neck as well; right?

17    A.  Correct.

18    Q.  And everybody who comes in with a

19 restricted range of motion doesn't have an epidural

20 abscess; right?

21    A.  That's correct.

22    Q.  Now, Mr. Buchanan came in -- was booked

23 into the jail on November 3rd, 2016, and he was seen

24 by Nurse Kotas as an initial assessment.  Is there

25 anything wrong with doing an initial assessment, with

Page 155

1 having an LPN meet with an inmate when he first comes

2 in to go over a form to just find out what his --

3 what -- what his situation is medically?

4         MR. BLAKEMORE:  Object to form.

5    Q.  (BY MR. YOUNG)  Is there anything wrong

6 with doing that?

7         MR. BLAKEMORE:  Object to form.

8    A.  There's nothing wrong with collecting

9 basic screening information by an LPN.

10    Q.  And do you have any criticism of any of

11 the defendants for having Nurse Kotas do an

12 assessment of Mr. Buchanan on November 3rd, 2016?

13    A.  Well, sure.  We've talked about that.

14 LPNs are not -- it is not appropriate and within the

15 scope of practice for an LPN to do an assessment.

16    Q.  Well, a lot of jails in Oklahoma don't

17 even have any LPNs working at all.  Are you aware of

18 that?

19    A.  I am.

20    Q.  And there's no requirement under Oklahoma

21 law to even have 24-hour, 7-day-a-week nurses.  You

22 understand that; right?

23    A.  Yes.

24    Q.  But here, Muskogee has them 24/7; right?

25    A.  Yes.

Page 156

1    Q.  And there's no requirements under the

2 Oklahoma jail standards that says a nurse has to do

3 an initial assessment.  Are you aware of that?

4    A.  I am not specifically aware of that, no.

5    Q.  And you talk about NCC -- I can't

6 remember what you called it.  NCCHA or something like

7 that.  What is that?

8    A.  NCCHC.

9    Q.  Yeah.  There's no legal requirement in

10 Oklahoma that that be followed, that the NCCHC be

11 followed, is there?  Are you aware of that?

12    A.  I'm not aware that there's any

13 requirement to follow NCCHC standards.

14    Q.  All right.

15         Now, when Nurse Kotas did her initial

16 assessment of Mr. Buchanan, she passed it on, puts it

17 in a box, and based on that he's brought up to

18 medical the next day, on the 4th.  Is there anything

19 wrong with that?

20    A.  No.

21    Q.  And then Nurse Mc -- is it McCullar? --

22 McCullar sees him, and then she calls Dr. Cooper on

23 the phone, relays what she has said, and he orders

24 Naproxen.  Is there anything illegal about that?

25    A.  No.  It's really not -- I mean, he should

Page 157

1 be seeing the patient.

2         MR. BLAKEMORE:  Did you say illegal?

3         MR. ARTUS:  Yeah.

4         THE WITNESS:  He should be seeing the

5 patient as part of that process, and I have criticism

6 of that, but -- or not necessarily he, but one of the

7 prescribers should have seen the patient.

8    Q.  (BY MR. ARTUS)  Well, if -- so would you

9 rather that he just say, "Well, we're not going to

10 give him any Naproxen until I come in on next" -- you

11 know, in two days or whenever he's coming in for his

12 clinical?  Would you rather him just say, "I'm not

13 going to give -- don't give him any kind of medicine

14 at all until I see him before we give it to him"?  Is

15 that better, or is it better for him to just say,

16 "Let's get him on Naproxen right now.  That's what I

17 think -- based on what you're telling me, that's what

18 I think he needs.  I want you to -- I'm going to

19 write the script for that"?

20    A.  So I think it's reasonable to write a

21 bridging prescription and then to assess the patient

22 thereafter.

23    Q.  Okay.  And then he was scheduled to be

24 seen on the 6th.  Well, at least that's when the note

25 is.  He was put on the sick call list on the 6th to


Exhibit 12

Page 158

1  be seen the next time. We don't know why he wasn't
2  seen.
3      A. Well, my understanding was that that was
4  a nursing sick call, not a provider sick call.
5      Q. And where did you get that?
6      A. I think that's from the depositions. I'd
7  have to go back and look at that. The process is
8  confusing, but as I understand it, that was a nursing
9  sick call, and there was not any sort of note
10  generated as a result of that.
11      Q. And again that was for shoulder pain, not
12  paralysis; right?
13      A. Right.
14      Q. Now, meanwhile, once the prescription
15  started on the 4th, November 4th, 2016, then we have
16  LPNs seeing him in the morning and the evening;
17  right? At least according to the MAR; right?
18      A. For medication pass. That's right.
19      Q. And Buchanan says it was only once a day;
20  right?
21      A. That's what he says.
22      Q. But the other inmates who have been
23  deposed all agree it was two times a day.
24      MR. BLAKEMORE: Object to form.
25      A. I don't know that. I have not seen those

Page 159

1  depositions.
2      Q. Okay.
3      And again this would be another symptom
4  of Mr. Buchanan having poor memory; right?
5      A. Possibly.
6      Q. And those LPNs, they go and they see him
7  and pass the medication, they make sure he takes it,
8  and at that time he can tell them, "Hey, I've lost
9  the use of my left arm," or "I've lost the use of my
10  right arm." Right?
11      MR. BLAKEMORE: Object to form.
12      A. That's correct.
13      Q. And if he says that to them -- if he
14  says, "Hey, I've lost the use of my left arm," then
15  they should see him; right?
16      A. That's correct.
17      Q. And we know on the 15th -- so that's
18  happening two times a day every day; right?
19      A. That's right.
20      Q. Now, do you believe that the nurses just
21  heard him say that and then just deliberately and
22  indifferently just said, "I'm not going to see you"?
23      MR. BLAKEMORE: Objection. Calls for a
24  legal conclusion.
25      A. So the conclusion for that I don't really

Page 160

1  know. I think they -- what they did is they put him
2  on for a sick call.
3      Q. Okay. Well, the next time we know that
4  he's put on sick call is on November 11th, 2016;
5  right?
6      A. Correct.
7      Q. And on that day we know earlier in the
8  day he has a video visitation with his brother;
9  right?
10      A. I'd have to look at the date of that, but
11  that's probably correct.
12      Q. And you've seen that video; correct?
13      A. I have.
14      Q. Now, do you believe that the description
15  by Nurse Kotas -- and then she sees him later on that
16  day; so somehow somebody got to her, for her to look
17  at him and put him on sick call. Right?
18      A. Well, I don't really know what happened.
19  There's no note.
20      Q. Well, we've taken her depo, and she --
21  she saw him and she wrote down what's written in that
22  note and puts him on sick call; right?
23      A. Yes, but, I mean, there's no -- I mean,
24  that's not really an assessment. So...
25      Q. What is inappropriate with her seeing

Page 161

1  him, writing down, "Hey, I think he's getting worse.
2  Let's put him on -- I want him to see the doctor"?
3      A. Well there's nothing wrong with that.
4  What's wrong is that he wasn't seen by any of the
5  clinicians.
6      Q. Would it have been better of her to just
7  say, "Let's send him to the hospital right now"?
8      A. Well, yes. He would have been seen by a
9  clinician.
10      Q. Right. But evidently she didn't think it
11  was that bad, and she put him on sick call to be seen
12  by a clinician; right?
13      A. I think that's what happened, yes.
14      Q. Okay. And so can you testify whether she
15  was deliberately indifferent from there? She could
16  say, "Oh, wow. He really needs to go to the
17  hospital. I'm not going to send him." Or do you
18  think she was more like, "I don't know. I'm going to
19  have him be seen by our doc and let him look him
20  over"?
21      MR. BLAKEMORE: Object to form and object
22  as it calls for a legal conclusion.
23      A. Well, I don't really know her thought
24  process on that. It would have been nice if there
25  had been some objective data and involvement with the



Exhibit 12

Page 162

1  on-call clinicians in making those decisions.
2      Q.  So you're saying she could have done more
3  and didn't; is that right?
4      A.  Correct.
5      Q.  Now, her note says: "Decreased range of
6  motion up and down extremities.  Neck limited range
7  of motion and pain."  But it doesn't say paralyzed;
8  right?
9          MR. BLAKEMORE:  Can you say what you're
10  reading from for the record, please.
11          MR. ARTUS:  This is from DDR 30, 515, what
12  is marked as defendants' Exhibit 9.
13          MR. BLAKEMORE:  Thank you.
14          THE WITNESS:  That's correct.
15      Q.  (BY MR. ARTUS)  And this is Nurse Kotas.
16  We know that; right?
17      A.  Yes.
18      Q.  She's the same one who did see him on the
19  14th and noticed that he'd even gotten worse and did
20  send him to the hospital at that time; right?
21      A.  Yes.  She sent him out on the 14th at
22  2010 after consulting Dr. Cooper.
23      Q.  Right.  So she knows, Hey, he's gotten --
24  he's gotten even worse.  I'm calling Dr. Cooper.
25  And she even testified, "Even if Dr. Cooper said

Page 163

1  don't send him to the hospital," she said, "I was
2  sending him anyway."  Do you remember reading that?
3      A.  Yes.
4      Q.  Okay.  So we know she's got the moxie to
5  send him to the hospital because she did; right?
6          MR. BLAKEMORE:  Object to form.
7      Q.  (BY MR. ARTUS)  Right?
8      A.  Sure.
9      Q.  And on the 15th the same woman who -- I
10  mean on the 11th, the same woman on the 14th said,
11  "We're going to send him to the hospital," on the
12  11th when she sees him, she is thinking, Hmm.  I
13  think he needs to be seen by the doctor so he can
14  decide, but she's not thinking, He's so bad where
15  I've got to send him to the hospital, like she was on
16  the 14th.  Do you agree with that?
17          MR. BLAKEMORE:  Object to form.
18      A.  Well, I think that's adding her thought
19  process into this without really having evidence of
20  that, but...
21      Q.  Well, you can't -- you can't say, can
22  you, Doctor, that -- that Mr. Buchanan was denied
23  medical care, can you, because he's was seen 24 times
24  by medical people; right?
25      A.  Yes, just not the appropriately trained

Page 164

1  and licensed individuals.
2      Q.  And on the 14th when they realized, Hey,
3  this guy has got some serious problems and needs to
4  go to the hospital, they send him to the hospital;
5  right?
6      A.  That's correct.
7      Q.  And up until that point they didn't make
8  the connections in their heads, for whatever reason,
9  to send him to hospital; right?
10      A.  Correct.
11      Q.  Now, is it -- there's nothing wrong with
12  contracting with a medical provider to provide
13  medical care in a jail; right?
14      A.  I agree with that.
15      Q.  In fact, that's what they're doing in
16  your jail; right?
17      A.  Well, partially, yes.
18      Q.  Okay.  And do you agree that the policies
19  at the jail require medical care to be given to
20  inmates?
21          MR. BLAKEMORE:  Object to form.
22      A.  In general, yes.
23      Q.  And that if a jailer knew an inmate was
24  in a serious medical need and then did not call
25  medical to have it looked at that that would be a

Page 165

1  violation of policy?  Would you agree with that?
2      A.  Well, I would have to review the custody
3  policies and procedures to answer that probably.
4      Q.  Okay.  That was my next question.  Have
5  you reviewed the policies and procedures of the
6  Muskogee County Detention Center?
7      A.  I have not.
8      Q.  Are you going to offer any opinions on
9  that?
10      A.  No.
11      Q.  Okay.
12          What is your knowledge as to the Board of
13  County Commissioner of Muskogee County's role in
14  running the jail?  Do you know anything about that?
15      A.  I don't know exactly their role.  Like
16  most governmental entities at this level, they
17  probably have a funding role primarily.
18      Q.  Okay.  And as far as the sheriff,
19  Rob Frazier, will you be able to testify one way or
20  the other about his policies or procedures or the
21  policies or procedures that were from the sheriff
22  with running the jail?
23      A.  I have not reviewed them and don't plan
24  to offer any opinions about that.
25      Q.  It sounds to me like your criticisms in



Exhibit 12

Page 166

1 this case are with Turn Key and their -- their
2 employees. Is that correct?
3       MR. BLAKEMORE: Object to form.
4       A. I would say that's the majority of my
5 criticism, yes.
6       Q. And the other criticism I saw was the
7 health -- the other one I heard was that the
8 health -- the officers did not interfere
9 adequately -- or interface adequately. Is that the
10 criticism of the jailers?
11      A. Yes, and of Turn Key.
12      Q. And of Turn Key.
13      A. It's a duel, two-way street there.
14      Q. Because we know Turn Key employees saw
15 him 24 times or whatever it was, 19 times,
16 administering medication plus all times we've gone
17 over; right?
18      A. Right.
19      Q. And, again, do you -- would you agree
20 it's against policy to deny or hinder an inmate
21 access to medical treatment?
22      A. Yes.
23      Q. So it's not -- so what I understand from
24 your opinion is you disagree with the type of medical
25 care that was provided. Is that correct?

Page 167

1       MR. BLAKEMORE: Object to form.
2       A. Well, I certainly agree -- or I disagree
3 with the model of care that's in place and the
4 staffing choices for who is delivering the care.
5       Q. Now, is it reasonable for a jail staff --
6 if an inmate is saying, "Hey, I've got these medical
7 problems," is it reasonable for a jail staff to
8 contact the medical department and say, "Hey, come
9 look at this person, and then rely on what they say,
10 you know, either to take them to the hospital or put
11 them on sick call," or anything like that? Is it
12 reasonable to do that?
13      MR. BLAKEMORE: Object to form.
14      A. Yes.
15      Q. Are you going to offer any opinions as to
16 the contract between Turn Key and Muskogee County
17 Detention Center?
18      A. No.
19      Q. Do you have an opinion as to when
20 Mr. Buchanan should have been sent to the ER? We
21 know he was sent on the 14th. Should he have been
22 sent that morning, or should he have been sent
23 earlier? Do you have any opinions as to that?
24      A. He should have been sent earlier.
25      Q. When?

Page 168

1       A. When he began complaining of progressive
2 neurologic symptoms.
3       Q. And what date are you going to testify to
4 a jury is that?
5       A. Well, that's going to require a little
6 bit of working out with regard to his testimony and
7 the issues, but it was before the 14th.
8       Q. Based on your review of the video on the
9 11th of November, just what you could see of him and
10 how he was functioning, is it your opinion he should
11 have been sent to the hospital on that day?
12      A. At least -- at least by then, yes.
13      Q. You think even before that?
14      A. Probably.
15      Q. And why is that?
16      A. Just because of the reports of
17 progressive neurological loss.
18      Q. And again this is all based on
19 plaintiff's memory of what happened and when it
20 happened; right?
21      MR. BLAKEMORE: The video?
22      MR. ARTUS: No.
23      Q. (BY MR. ARTUS) You're saying before the
24 video; right?
25      A. Partly, and I believe also review of the

Page 169

1 depositions of the other prisoners, which I have not
2 yet done.
3       Q. So Nurse Kotas made a mistake on the
4 11th? She should have just sent him to the hospital?
5       A. I think so, yes.
6       Q. Do you think she did that deliberately?
7       A. No.
8       Q. Do you think she made a mistake?
9       A. I think she's untrained, and she did
10 not -- or she's not adequately trained to make that
11 decision.
12      Q. Do you think she was negligent?
13      A. No. I think she was not adequately
14 trained to make that decision.
15      Q. And do you have an opinion as to who
16 trained her?
17      A. Well, it really is more of a licensure
18 issue. She's making a nursing assessment and
19 judgment call about a treatment plan, and that's
20 outside the scope of an LPN's licensure.
21      Q. Well, anybody in the jail can send
22 somebody to the emergency room; right?
23      A. Correct.
24      Q. You don't have to have a medical degree
25 to do that. You can just send them. Correct?

Exhibit 12

Page 170

1    A.  That's correct.
2    Q.  So her licensure or anything like that
3  didn't make a difference.  She could have made the
4  decision to send him.  Right?
5    A.  Yes, she could.
6    Q.  And you're saying that on the 11th when
7  she saw him and she made the decision to send him --
8  to have Dr. Cooper look at him, you're saying she
9  made a mistake and she should have sent him to the
10  hospital right then.
11    A.  I agree.
12    Q.  What did Dr. Cooper do that was wrong?
13    A.  I'm sorry.  Could you ask that again,
14  please.
15    Q.  What did Dr. Cooper do or not do that
16  you're critical of?
17    A.  Well, I'm critical of the fact that he --
18  that the patient was not seen by a provider during
19  his incarceration, of which Dr. Cooper is one who
20  could have done that, but there was also an APRN who
21  could have done that as well.
22    Q.  Okay.  And he should have gone to see him
23  sooner is what you're saying.
24    A.  Well, someone should have seen him is
25  what I'm saying.

Page 171

1    Q.  Okay.  Is that all of your criticism as
2  to Dr. Cooper?
3    A.  Yes.
4    Q.  And what is your criticism of Nurse
5  McCullar?  That's M-c-C-u-l-l-e-r.
6    MR. YOUNG:  I think it's a-r.
7    MR. ARTUS:  A-r.  Sorry.
8    THE WITNESS:  My criticism is that when
9  she evaluated him on the 14th at 11:27 she should have
10  sent him to the hospital.
11    Q.  (BY MR. ARTUS)  And of course he was sent
12  to the hospital on 11/14/16, a few hours later;
13  right?
14    A.  Yes.  Like nine hours later, I think.
15    Q.  Okay.  And she called Dr. Cooper, told
16  him what was going on, and Dr. Cooper said put him on
17  the list; right?
18    A.  Correct.
19    Q.  And so she relied on him; right?
20    A.  She did.
21    Q.  And was that wrong of her?  She should
22  have instead gone against the doctor and sent him to
23  the hospital; right?
24    A.  Based on his presentation, yes.
25    Q.  Okay.  And any other criticisms of what

Page 172

1  Nurse McCullar did that was wrong?
2    A.  No.
3    Q.  What about Turn Key?  What are you
4  critical of Turn Key?  It's been -- it's been sued.
5    MR. BLAKEMORE:  Didn't he just testify to
6  that?
7    MR. ARTUS:  I don't know.  I don't think
8  so.
9    THE WITNESS:  Well, I feel like we spent a
10  lot of time going over that.
11    MR. ARTUS:  Maybe we did.  Okay.  Is that
12  what we've been talking about --
13    MR. YOUNG:  Start from the top.
14    Q.  (BY MR. ARTUS)  Okay.  So that's what
15  we've been talking about.  Prior to me talking,
16  you've been talking about all the things that Turn
17  Key did wrong; right?
18    A.  Correct.
19    Q.  And we talked about Sheriff Frazier;
20  right?
21    A.  Yes.
22    Q.  And we've talked about with the board;
23  right?
24    A.  Yes.
25    Q.  And you don't really have opinions as to

Page 173

1  them; is that correct?
2    A.  I do not.
3    Q.  Sheriff Frazier and the board, you don't
4  have any opinions as to them; correct?
5    A.  That's what I said.
6    MR. ARTUS:  Okay.  I think I am going to
7  pass the witness.
8    MR. BLAKEMORE:  I actually do have a few
9  questions, believe it or not.
10    THE WITNESS:  Okay.
11    EXAMINATION
12  BY MR. BLAKEMORE:
13    Q.  All right.  So one of the things that
14  you've testified to is that you're critical of the
15  lack of documentation in the medical records;
16  correct?
17    A.  Correct.
18    Q.  And throughout your deposition today
19  defense counsel has asked you about potential issues
20  with Mr. Buchanan's memory; correct?
21    A.  Correct.
22    Q.  Are you aware that there was -- there was
23  actually surveillance video of Mr. Buchanan that was
24  taken of him while he was at the jail?
25    A.  I am aware that there -- that video did



Exhibit 12

| Page 174 | Page 176 |
|---|---|

**Page 174**

1 exist at one point, and I believe that it does not
2 exist now.
3    Q.  Okay.  Would that -- would that
4 surveillance video have been helpful to you in
5 arriving at your opinions in this case?
6    A.  Oh, it would have been immensely helpful.
7    Q.  Okay.  And how would it have been
8 helpful?
9    A.  Well, it would have provided an objective
10 assessment of his level of functioning.
11    Q.  Do you have any understanding as to
12 what -- what happened to the video?
13    A.  I don't know.  You informed me that it
14 didn't exist any longer.
15    MR. BLAKEMORE:  Okay.  Those are all the
16 questions that I have.
17    MR. ARTUS:  Do you want to advise him on
18 read and sign?
19    I don't know if you have to do it here.
20    Oh, did you have any other questions?
21 I'm sorry.
22    MR. YOUNG:  No.  I'm good.
23    MR. ARTUS:  You have to say if you want to
24 read and sign or waive.
25    MR. BLAKEMORE:  I'll leave that to you.

**Page 175**

1    THE WITNESS:  I'll read and sign.
2    MR. BLAKEMORE:  Yeah.
3    MR. ARTUS:  Thank you for your time.
4 Appreciate it.
5    THE WITNESS:  You're welcome.
6    MR. ARTUS:  I'm okay with just electronic.
7    MR. YOUNG:  All electronic, and I like the
8 minis.
9    MR. BLAKEMORE:  Because we are on Apple,
10 we just do searchable PDF.  Is that doable?
11    (Concluded at 2:30 p.m.)

**Page 176**

1 Case: James D. Buchanan vs. Turn Key Health Clinics
  Case No.: 18-CV-171-RAW
2 Reported by Jerry R. Martin, RPR
  Date Taken:  Tuesday, July 2, 2019
3
4    WITNESS CERTIFICATE
   I, Todd R. Wilcox, M.D. HEREBY DECLARE:
5
   That I am the witness in the foregoing
6 transcript; that I have read the transcript and know
  the contents thereof; that with these corrections I
7 have noted this transcript truly and accurately
  reflects my testimony.
8
9 Page-Line    Change-Correction    Reason
10 _____
11 _____
12 _____
13 _____
14 _____
15    _____  No corrections were made.
16
17    I, Todd R. Wilcox, M.D., deponent herein,
18 do hereby certify and declare under penalty of
19 perjury the within and foregoing transcription to be
20 true and correct.
21    _____
22    Todd R. Wilcox, deponent
   SUBSCRIBED AND SWORN to at_____
23 _____, this_____ day of _____, 2019.
24
25    Notary Public

**Page 177**

1    CERTIFICATE
2 STATE OF UTAH       )
3 COUNTY OF UTAH      )
4    THIS IS TO CERTIFY that the deposition of
  TODD R. WILCOX, M.D., was taken before me, Jerry R.
5 Martin, a Registered Professional Reporter in and for
  the state of Utah;
6    That the said witness was by me, before
7 examination, duly sworn to testify the truth, the
  whole truth, and nothing but the truth in said cause;
8    That the testimony of said witness was by
9 me reported in stenotype, and therefore caused to be
  transcribed into typewriting, and that a full, true,
10 and correct transcription of said testimony so taken
  and transcribed is set forth in the foregoing pages,
11 numbered 4 to 175, inclusive, and said witness
  deposed and said as in the foregoing annexed
12 deposition;
13    I further certify that I am not of kin or
  otherwise associated with any of the parties to said
14 cause of action, and that I am not interested in the
  event thereof.  WITNESS MY HAND AT SPANISH FORK,
15 UTAH, THIS 9TH DAY OF JULY, 2019.
16
17
18    JERRY MARTIN, RPR



Professional Reporters
800.376.1006
www.proreporters.com

Exhibit 12