IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) JAMES D. BUCHANAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No.: 18-CV-171-RAW |
| | ) |
| (1) TURN KEY HEALTH CLINICS, LLC, | ) |
| (2) ROB FRAZIER, in his official capacity as | ) |
| Muskogee County Sheriff, | ) |
| (3) BOARD OF COUNTY COMMISSIONERS | ) |
| OF MUSKOGEE COUNTY, | ) |
| (4) DR. COOPER, and | ) |
| (5) KATIE MCCULLAR, LPN, | ) |
| | ) |
| Defendants. | ) |

**EXHIBITS IN SUPPORT OF DEFENDANT, KATIE MCCULLAR, LPN'S MOTION FOR SUMMARY JUDGMENT ON ALL CLAIMS AND BRIEF IN SUPPORT**

**Exhibit 10 Baird Depo**

Clinton Baird, MD                                         June 28, 2019

Page 21

1   Q.  Okay.  And, similarly, he went to the ER at
2   EASTAR on September 16, 2016, following his bicycle
3   accident.
4           Have you ever or do you remember reviewing
5   the medical records from that visit?
6           MR. SMOLEN:  Object to the form.  It's
7   outside the scope of his report and outside the scope of
8   his note.
9           MR. MILLER:  You can answer the question.
10  He may object to the form from time to time.
11          THE WITNESS:  I understand.
12  A.  I don't recall reviewing that record.
13  Q.  (BY MR. YOUNG)  Okay.  And then would it be
14  fair to assume that you never reviewed or you don't
15  recall reviewing the medical records that document James
16  Buchanan's trip in the Muskogee County EMS when he was
17  transferred from EASTAR to St. John's Medical Center?
18          MR. SMOLEN:  Object to the form.
19  A.  I have no recollection of that direct review of
20  that record.
21  Q.  (BY MR. YOUNG)  I mean, is it part of your
22  practice, typically, to request and review records from
23  weeks and months prior to the care that you're giving?
24  A.  In rare circumstance, would I -- I request
25  those records if it's pertinent to the clinical care.

Exhibit 10

Clinton Baird, MD                                        June 28, 2019

Page 38

 1   medical or surgical management of that patient"; is that
 2   right?
 3        A.   Correct.
 4        Q.   Doctor, I don't want to you to go outside the
 5   scope of your expertise, and the way that you answer
 6   this next question could speed up the amount of time
 7   that we're going to be here.
 8             Given the fact that you -- first of all,
 9   let me back up.
10             Have you ever worked in a jail?
11        A.   No.
12        Q.   Have you ever worked in a prison?
13        A.   No.
14        Q.   You ever do any kind of rotations in residency?
15        A.   Yeah, actually, I've been in a jail in
16   residency.
17        Q.   How long ago was that?
18        A.   13, 15 years.
19        Q.   But you've never been employed or contracted as
20   a physician --
21        A.   No.  I was just -- we were just -- I can't
22   remember.  It was like -- almost like an educational
23   piece to -- to workplace safety in the jail.
24        Q.   All right.  So given the fact that you've never
25   been employed in a correctional setting as a

Exhibit 10

Clinton Baird, MD                                           June 28, 2019

Page 40

1    Q.  I'm sorry.  Can you explain that to me a little
2    bit more?
3    A.  So just to say it again, the standard of
4    care -- cervical epidural abscess is all about timing.
5    A patient can go from literally -- it's -- it's widely
6    variable, but a patient can go paralyzed over the course
7    of -- I wouldn't say minutes -- but hours to a day or
8    two from normal -- what appears to be normal on the
9    external surface to complete quadriplegia over the
10   course of -- of -- what happens, they get a cervical
11   epidural abscess, and it can function by two different
12   mechanisms.  The first mechanism is more surgically
13   addressable, and that's compression, inflammation from
14   the cervical spinal cord.  And the second mechanism is
15   venous infarction, so all that inflammation from the
16   infection clogs up the Batson's vertebral plexus, which
17   is like the venous drainage --
18              THE REPORTER:  Could I get you to slow down
19   for me?
20              THE WITNESS:  Sorry.  I'm getting all
21   too --
22              THE REPORTER:  That's okay.
23              MR. SMOLEN:  Hey, we all talk fast when we
24   get excited.
25              THE WITNESS:  Where should I back up to?

D&R REPORTING & VIDEO, INC.
(800)771-1500 / depo@drreporting.com

# Exhibit 10

Page 66

1    A    Nothing particular, just my regular visits
2    with him, talking to him about it.
3    Q    Do you know -- and that's what I'm asking
4    about is the regular visits with him, when you would
5    have spoken with him, what you remember from any of
6    those interactions?
7    A    Nothing like in particular, he was
8    concerned about whether he was going to walk again
9    or move again, what was wrong with him, if he was
10   going to get better, and, you know, that's a hard
11   conversation to have, there's not really a good
12   prediction on that, so -- but I don't recall
13   specific details of that --
14   Q    Okay.
15   A    -- conversation.
16   Q    Do you remember whether or not the
17   prognosis for his ability to regain function was
18   optimistic or could you put a percentage on it?
19   A    I can't remember how I relayed it to him,
20   I probably relayed it to him relatively
21   pessimistically based on what I would have thought I
22   would have done based on his surgical findings.
23   Q    Okay.
24   A    And his initial presentation.  So how he
25   presented clinically initially and his surgical

1  expert witness here, but to give some expert type
2  off-the-side testimony is a cervical epidural
3  abscess diagnosis is a very difficult to make
4  diagnosis, elusive and can -- this is the problem
5  you land yourself in, because the diagnosis is
6  difficult, people present initially with potentially
7  no to minor symptoms that escalate potentially
8  rapidly to profound symptoms.
9        Q    Thank you for that.  It's my understanding
10 as well, that that can be the case with this type of
11 injury.
12       A    So I'm on Page 23, 1023 of the St. John's
13 record.
14       Q    Yeah.  Let's pull off from that, let's go
15 to Page 1020, please.
16            MR. SMOLEN:  Where you at now?
17            MR. YOUNG:  St. John Medical Center 1020.
18            THE WITNESS:  So this looks like intake
19 from the nursing.
20       Q    (By Mr. Young)  And specifically, I want
21 to call your attention to the bottom left-hand
22 corner, the pain assessment.
23       A    Uh-huh.
24       Q    Looks like he's got a numeric pain score
25 of nine?

1   epidural abscess?
2       A    Yes, among -- yes.
3       Q    You haven't reviewed any of the records
4   for St. John's to see if they were fighting an
5   infection or anything of that nature when he was in
6   the hospital, have you?
7       A    I reviewed enough of it to know that by my
8   recollection, that he -- there was no infection
9   identified prior to an MRI.  The first imaging I'm
10  aware of is an MRI at Hillcrest Medical Center.
11      Q    From the bicycle accident?
12      A    The first imaging of his cervical spine
13  with regard to the whole clinical care that I'm
14  aware of was at Hillcrest Medical Center at the time
15  of admission.
16      Q    Have you reviewed any medical records from
17  St. John's showing that they were fighting
18  infection, that he had a series of temperatures and
19  high white cell count?
20      A    But they're -- I don't recall, no, I don't
21  recall that specifically, I don't recall reviewing
22  anything that led anyone to believe that he had a
23  neck infection.
24      Q    At St. John's; right?
25      A    At St. John's.

1    Q   (By Mr. Artus)  Is MRI?

2    A   Is MRI.  He could also do some other

3 studies, but that's the main one.

4    Q   You said earlier in your deposition

5 testimony, this is a hard thing to diagnose, a

6 cervical epidural abscess; is that correct?

7    A   No.

8        MR. SMOLEN:  Objection to the form.

9        THE WITNESS:  It's not a hard thing to

10 diagnose when you have the proper study, when you

11 see it in MRI, it is a delayed diagnosis most often

12 because someone comes in, you don't know what's

13 going on, they're complaining of neck pain, that's

14 new, so you do what you do with most people who have

15 neck pain, give them some steroids, some muscle

16 relaxers, some painkillers and you tell them it's

17 going to get better in a few weeks.  Then it doesn't

18 and then they come back with more.  It's -- the hard

19 diagnosis is -- if I said that, it was a

20 misstatement, it's a often delayed diagnosis.

21    Q   (By Mr. Artus)  And it's not very common,

22 is it?

23        MR. SMOLEN:  Object to the form.

24        THE WITNESS:  I'd actually have to look at

25 the literature to give you numbers on commonalty,

1   but in general, in the neurosurgery practice, it is
2   not overly uncommon.
3       Q    (By Mr. Artus)  Not common?
4       A    Yeah.
5       Q    I think we were talking in your
6   practice --
7       A    It's more common than, for example, an ER
8   physician practice.
9       Q    Right.
10      A    Or a family practice.  But it's still
11  uncommon.
12      Q    Now, with regard to your understanding
13  of -- you don't have any direct knowledge as to when
14  Mr. Buchanan lost function in his left arm and then
15  his right arm or his legs; is that correct?
16           MR. SMOLEN:  Object to the form.  You mean
17  beyond what you told him -- and when you say direct
18  knowledge, I guess I just -- would you clarify what
19  you mean by that?  I'll stipulate that he wasn't in
20  the jail.
21           MR. ARTUS:  Why do you make me make these
22  things?  Yeah, I don't know what I was saying.
23           THE WITNESS:  I don't have any direct
24  knowledge.
25      Q    (By Mr. Artus)  It's kind of obvious.

Exhibit 10

Clinton Baird, MD                                           August 10, 2019

Page 155

1  fine --
2       Q   Right.
3       A   -- is probably the first response, and
4  that's a cavalier response.  Because you wouldn't
5  say that to a patient sitting here in the office,
6  you would say, oh, what's been bothering you, how
7  long has it been bothering you, show me how you're
8  moving, you would do those things.  But in the jail,
9  it's a different environment and the first response
10 probably is somewhat cavalier, and it's not a
11 medical -- it's not -- when a prisoner complains of
12 pain, the nurse doesn't run and get the doctor and
13 say come and see him and evaluate him and take an
14 MRI and all those things.  Again, that's
15 overstepping my bounds, well outside the scope of my
16 expertise and I can't make any comments on what
17 really happens in a jail because I've never been in
18 a jail.
19      Q   So you really can't make any comment as to
20 whether or not anybody in the jail fell below any
21 standard of treatment?
22          MR. SMOLEN:  Objection to the form.
23          THE WITNESS:  I can make comments to the
24 patient -- no, that's not true.
25      Q   (By Mr. Artus)  Okay.

D&R REPORTING & VIDEO, INC.
(800)771-1500 / depo@drreporting.com

Exhibit 10