Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

(1)   JAMES D. BUCHANAN,           )
                                   )
        Plaintiff,                 )
                                   )
v.                                 )  Case No. 18-CV-171-RAW
                                   )
                                   )
(1)   TURN KEY HEALTH CLINICS,     )
      LLC,                         )
(2)   ROB FRAZIER, in his          )
      official capacity as         )
      Muskogee County Sheriff,     )
(3)   BOARD OF COUNTY              )
      COMMISSIONERS OF MUSKOGEE    )
      COUNTY,                      )
(4)   DR. COOPER and               )
(5)   KATIE MCCULLAR, LPN,         )
                                   )
        Defendants                 )


DEPOSITION OF CLINTON BAIRD, M.D.

TAKEN ON BEHALF OF THE DEFENDANTS

IN TULSA, OKLAHOMA

ON JUNE 28, 2019


REPORTED BY:  WENDY SMITH, CSR



Clinton Baird, MD                           August 10, 2019

Page 75

1   had a deposition with a fact witness doctor where

2   we've sat here for hours and not looked at the

3   medical records that the doctor prepared.  I don't

4   know -- I think all the questions are outside the

5   scope of what he's been listed as for a witness,

6   Austin, that's all I'm saying.

7               MR. YOUNG:  I know, you've told us.

8               MR. SMOLEN:  We have another doctor, but

9   I'm looking at his report right now, who has opined

10  and offered expert opinion on these areas.  But go

11  ahead, it's your deposition.

12              MR. YOUNG:  It will go fast if you stop

13  interrupting.

14              MR. SMOLEN:  It's your deposition.

15      Q    (By Mr. Young) All right, Doctor, I'm

16  going to show you what was previously entered as

17  Defendant's Exhibit 3, this is your op note.

18              MR. ARTUS:  This is what was already in

19  from the last one?

20              MR. YOUNG:  Right.  This is Exhibit 3 from

21  the last time.

22              THE WITNESS:  Okay.

23      Q    (By Mr. Young)  Okay.  I hope this helps,

24  maybe this will forego some of the interruptions and

25  speed this thing along a little bit.  The reason I

Clinton Baird, MD                                    August 10, 2019

Page 76

1    was asking you about this is there's a line in your

2    notes where you say, "It is obvious that he likely

3    developed the beginnings of cervical epidural

4    abscess infection and result of his critical illness

5    and hospitalization, but then while in jail, he

6    deteriorated significantly and his clinical

7    deterioration went unrecognized and untreated until

8    he was nearly completely quadriplegic," does that

9    sound right?

10       A     Yes.

11       Q     Okay.  This note has been essentially the

12   centerpiece of plaintiff's case, they put it in

13   almost every pleading they possibly could and so --

14            MR. SMOLEN:  Object to the form.

15       Q     (By Mr. Young)  -- that's the reason why

16   I'm asking you these questions today is this is an

17   extremely important piece of evidence in this case,

18   do you understand that?

19       A     Uh-huh.

20       Q     And particularly, I want to ask you about

21   the words where you say he went untreated.

22       A     Yeah.

23       Q     I think that we established last time that

24   you hadn't looked at the medical records from the

25   incarceration or any of the records from the

Clinton Baird, MD                                August 10, 2019

Page 104

1      Q      Okay.  Do you have any thoughts on how the
2  infection did begin?
3      A      There's no way to know that, all those are
4  hypotheticals, there's a multitude of different
5  ways.
6      Q      Right.  I understand, I just wanted to
7  know if, as you sat here today, you had a -- an
8  opinion as to how that --
9      A      No.
10     Q      -- infection began?
11     A      Other than he's a very sick patient with a
12 multitude of risks for infection and then got
13 infection.
14     Q      Okay.  Do you have an opinion on whether
15 or not Mr. Buchanan's surgical procedure would have
16 been different in any way if he had come -- if he
17 had come to you sooner?
18            MR. SMOLEN:  Object to the form.
19            THE WITNESS:  Very hard to say.  At some
20 point along the spectrum, it wouldn't have been a
21 surgical procedure at all.
22     Q      (By Mr. Young)  I understand.
23     A      It would have been antibiotics and then
24 from there all the way through, it could have been
25 various different surgical procedures all the way up

Clinton Baird, MD                           August 10, 2019

Page 105

1    to -- the surgical procedure he had was pretty

2    maximally invasive.

3          Q     I understand.

4          A     And it's kind of the most you could do.

5          Q     I understand.  And I guess that I'm trying

6    to see if you have an opinion as far as the extent

7    of that invasiveness, if you'll allow me to word it

8    like that, and specifically, let's say, for example,

9    if he had come to you two weeks sooner, would the

10   extent of the surgical procedure have been more,

11   less, the same or can you say?

12         MR. SMOLEN:  Objection to the form;

13   assumes he would even need a surgical procedure if

14   he had come in two weeks before.

15         THE WITNESS:  It's unknown, I mean, I

16   don't know the answer to that, it's not possible to

17   answer, other than to say it's possible that there

18   may have been some lesser degree of intervention

19   required at any time prior to the date of actually

20   being seen.

21         Q     (By Mr. Young)  And so I'll couch it like

22   this at this time, as you sit here today, can you

23   say the point at which antibiotic treatment was no

24   longer viable and he would have had to have had

25   surgery?  Do you understand the question?

Page 116

1   record, because if it was in the evening, I may not

2   have dictated the initial consultation request.

3        Q    Do you know when he was admitted into St.

4   John's?  Or not St. John's --

5        A    Hillcrest Medical Center, it says on here

6   admit date 11-15.

7        Q    Okay.

8        A    Discharge date 11-20.  I'm sorry, 1-20 of

9   '17, which is about correct, he was there for a long

10  time.

11       Q    Okay.  So would you have seen him on the

12  15th, November 15, 2016?

13       A    Likely.

14       Q    Okay.

15       A    I would want to confirm that by the

16  record.

17       Q    Then when did you do the first surgery?

18       A    11-16.

19       Q    And what was that first surgery?

20       A    That was the anterior cervical corpectomy,

21  discectomies and reconstruction.

22       Q    And as I understand it, there was the --

23  the corpectomy was the C5-C6 level; is that correct?

24       A    Correct.

25       Q    And a corpectomy is not -- obviously, I'm

1    not a doctor and I may something that's stupid, and

2    I apologize and correct me, but is a corpectomy

3    where you take out the disc?

4          A    That's a discectomy.  Corpectomy is where

5    you take out the vertebral bodies.

6          Q    Vertebral bodies?

7          A    Yeah.

8          Q    That's the actual spine; right?  Part of

9    the spine?

10         A    A large segment of the spine, yes.

11         Q    And so you take out the C5 and C6

12   spinal --

13         A    Vertebral bodies.

14         Q    Right.  A spine is made up of a series of

15   vertebral bodies and they're numbered by if it's C

16   that means in the cervical section?

17         A    Correct.

18         Q    The neck?

19         A    Yes.

20         Q    That's what cervical section means; is

21   that right?

22         A    Correct.

23         Q    And so when you do a corpectomy of the

24   C5-C6, does that mean you're taking out the

25   vertebral body of C5 and C6?

Clinton Baird, MD                                    August 10, 2019

Page 118

1          A      Correct.

2          Q      So two vertebral bodies come out?

3          A      Correct.

4          Q      I'm just trying to understand, I'm sorry.

5     Okay.  So corpectomy means you remove two vertebral

6     bodies; correct?

7          A      Correct.

8          Q      And then discectomy at the C4-5; right?

9     C6-C7 and 6, at C6 and C7; correct?  Is that the

10    other thing you did?

11         A      Correct.

12         Q      And what is a discectomy?

13         A      Removing just the space between the

14    vertebral bodies that occupies the disc.

15         Q      So you took out two vertebral bodies and

16    you took out three spaces; is that correct?  Disc

17    spaces, am I saying that right?

18         A      Yeah, three disc space -- well, yes, three

19    disc spaces, but 4-5, 5-6 and 6-7.

20         Q      So three disc spaces and two vertebral

21    bodies; correct?

22         A      Correct.

23         Q      And then you put a placement of an

24    expandable cage, reconstruction of corpectomy at C-4

25    through C-7; is that correct?

Clinton Baird, MD                                          August 10, 2019

1        A     Correct.

2        Q     And I'm a lay person, so I'm just trying

3    to understand, I'm trying to envision this, in other

4    words, you took out some of these vertebral bodies,

5    you got to put something in there to replace it, and

6    this is the cage; is that correct?

7        A     Correct.

8        Q     To stabilize the spine; correct?

9        A     Correct.  In other words, the spine will

10   fall down on itself.

11       Q     Then you put a plating on C-4 through C-7

12   on the arterial -- an anterior cervical plating; is

13   that correct?

14       A     Correct.

15       Q     And so you had to put what I would call a

16   bunch of hardware in there to replace the bones you

17   took out; is that correct?

18       A     Yes.

19       Q     Do you have any idea what necessitated the

20   need to replace those vertebral bodies and put that

21   hardware in?

22       A     Well, the vertebral bodies were removed,

23   so you have to replace that structure.

24       Q     Okay.  Well, what I mean, what caused

25   those vertebral bodies to have to be removed?

Clinton Baird, MD                                    August 10, 2019

Page 120

1        A     There was abscess behind the vertebral

2    bodies, the phlegmon epidural abscess, so the

3    vertebral body was removed to gain access to that

4    abscess.  Because if it's just behind the disc

5    space, then you can just go through the disc, but it

6    was also behind the vertebral body, then you have to

7    gain access to the --

8        Q     Had it also eaten away at those bones, at

9    those vertebral bodies, eroded those, so that they

10   need to be replaced or removed?

11       A     They were weak and soft, but they weren't

12   gone, they were just very fragile.

13       Q     So fragile that they were causing the cord

14   to kink?  Spinal cord?

15       A     No.

16             MR. SMOLEN:  Objection.

17             THE WITNESS:  Spinal cord compression was

18   based on the epidural abscess itself, not on a

19   pathological fracture.

20       Q     (By Mr. Artus)  Okay.  So the epidural

21   abscess is an infection; is that correct?

22       A     Correct.

23       Q     And the infection is pressing on the

24   spinal cord?

25       A     Correct.

1      Q      And it's your testimony you had to remove

2   the weakened vertebral bodies to get at the abscess;

3   is that correct?

4      A      Yes, the fact of the vertebral bodies were

5   weakened has nothing to do with the need to remove

6   them directly.  They were needed -- the primary

7   reason to remove the vertebral bodies was to gain

8   access to the anterior aspect of the spinal canal to

9   remove the epidural phlegmon or abscess pushing back

10  on the spine cord.

11     Q      And do you -- you had -- I think you

12  testified, you -- can you testify to a jury with a

13  reasonable degree of medical certainty when the

14  abscess began?

15     A      I can give a range of when I believe the

16  abscess began, but I cannot testify as to the exact

17  time.

18     Q      Look at Defendant's Exhibit 12 on Page

19  626.  Are you with me?

20     A      12, 626?

21     Q      Yeah, Hillcrest Medical Center, 626 of

22  Defendant's Exhibit 12.

23     A      Yeah.

24     Q      In the operative indications, you wrote

25  "Retrospectively, it is obvious that he likely

Clinton Baird, MD                                    August 10, 2019

Page 138

1       Q     (By Mr. Artus)   The vertebra?

2             MR. SMOLEN:   Speculation.

3             THE WITNESS:   Please restate your

4    question.

5       Q     (By Mr. Artus)   If he had that abscess

6    since the accident, date of his bicycle accident of

7    September 16, 2016, or before, if he had that

8    abscess since then, it would have had 40 some-odd

9    days to eat away at the bone; is that correct, the

10   vertebra?

11      A     That didn't happen.

12            MR. SMOLEN:   Object to the form;

13   speculation.

14      Q     (By Mr. Artus)   Pardon me?

15      A     That didn't happen.

16      Q     And how do you know that?

17      A     Because there's no way someone could --

18   the time course is not right, so the abscess I saw

19   wasn't in existence for very long.

20      Q     And how do you know that?

21      A     Because you would be completely paralyzed,

22   you wouldn't be moving.

23      Q     Okay.

24      A     The abscess -- an abscess has to start

25   with a bacteria, which starts with a single organism

Clinton Baird, MD                           August 10, 2019

Page 139

1    which is micro small, microns in measurement and

2    then it grows and grows and grows, then eventually

3    it's just a little bit of like redness on your skin,

4    for example, then it gets bigger and bigger and

5    bigger and bigger, and but the abscess I saw, he

6    didn't have for very long.  He had that over a

7    period of -- I don't know, but not over a period of

8    a month, a period of days to a week, maybe two

9    weeks, I can't imagine two weeks, but potentially.

10        Q    Well, now, you had said in your operative

11   notes that in retrospect, it appeared that it began

12   when he was in getting critical treatment.

13        A    I said likely, that is likely, and I'll

14   always stand by that, he very likely had the

15   infection start as a result of some line or

16   something else, but the guy's not healthy, he could

17   have got it by brushing his teeth or wiping his

18   bottom or any other -- using IV drugs, any other

19   multitude of avenues of entering bacteria into the

20   body.

21        Q    Right.  But on Defendant's Exhibit 12,

22   Hillcrest Medical Center 626, of all the words in

23   the English language you said, "Retrospectively, it

24   is obvious that he likely developed the beginnings

25   of cervical epidural abscess infection in result of

Clinton Baird, MD                              August 10, 2019

Page 140

1    his critical illness in the hospitalization;"

2    correct?

3         A     Correct.  That is the most obvious source

4    of him -- I mean, you're getting stuck with a bunch

5    of IVs and a bunch of IV lines and intervention and

6    you're sick and you're laying in bed, not moving,

7    that is the very most obvious likely source of

8    developing infection, right then and there.  And it

9    started there, and it also fits with the timing of

10   which from there, which would be about two weeks.

11        Q     It was November 16, 2016 when he was put

12   in the hospital.

13        A     No, you're stating it wrong.

14        Q     I'm sorry, September 16.

15        A     September, yeah, so September, October,

16   November, that would be -- well, you get an

17   infection that starts with a single organism, and

18   it's going to be two to three or four weeks, and

19   it's going to become clinically manifest, and that

20   would be about right for the time.

21        Q     And the St. John's records show that two

22   weeks -- he's in the St. John's for two weeks, they

23   start noticing he has high white counts and high

24   temperature, they start hitting him with

25   antibiotics.

        1        Q      (By Mr. Artus)   Is MRI?

        2        A      Is MRI.  He could also do some other

        3     studies, but that's the main one.

        4        Q      You said earlier in your deposition

        5     testimony, this is a hard thing to diagnose, a

        6     cervical epidural abscess; is that correct?

        7        A      No.

        8               MR. SMOLEN:  Objection to the form.

        9               THE WITNESS:  It's not a hard thing to

       10     diagnose when you have the proper study, when you

       11     see it in MRI, it is a delayed diagnosis most often

       12     because someone comes in, you don't know what's

       13     going on, they're complaining of neck pain, that's

       14     new, so you do what you do with most people who have

       15     neck pain, give them some steroids, some muscle

       16     relaxers, some painkillers and you tell them it's

       17     going to get better in a few weeks.  Then it doesn't

       18     and then they come back with more.  It's -- the hard

       19     diagnosis is -- if I said that, it was a

       20     misstatement, it's a often delayed diagnosis.

       21        Q      (By Mr. Artus)  And it's not very common,

       22     is it?

       23               MR. SMOLEN:  Object to the form.

       24               THE WITNESS:  I'd actually have to look at

       25     the literature to give you numbers on commonalty,

1   but in general, in the neurosurgery practice, it is

2   not overly uncommon.

3        Q    (By Mr. Artus)  Not common?

4        A    Yeah.

5        Q    I think we were talking in your

6   practice --

7        A    It's more common than, for example, an ER

8   physician practice.

9        Q    Right.

10       A    Or a family practice.  But it's still

11   uncommon.

12       Q    Now, with regard to your understanding

13   of -- you don't have any direct knowledge as to when

14   Mr. Buchanan lost function in his left arm and then

15   his right arm or his legs; is that correct?

16            MR. SMOLEN:  Object to the form.  You mean

17   beyond what you told him -- and when you say direct

18   knowledge, I guess I just -- would you clarify what

19   you mean by that?  I'll stipulate that he wasn't in

20   the jail.

21            MR. ARTUS:  Why do you make me make these

22   things?  Yeah, I don't know what I was saying.

23            THE WITNESS:  I don't have any direct

24   knowledge.

25       Q    (By Mr. Artus)  It's kind of obvious.

Clinton Baird, MD                              August 10, 2019

Page 155

1    fine --

2         Q     Right.

3         A     -- is probably the first response, and

4    that's a cavalier response.  Because you wouldn't

5    say that to a patient sitting here in the office,

6    you would say, oh, what's been bothering you, how

7    long has it been bothering you, show me how you're

8    moving, you would do those things.  But in the jail,

9    it's a different environment and the first response

10   probably is somewhat cavalier, and it's not a

11   medical -- it's not -- when a prisoner complains of

12   pain, the nurse doesn't run and get the doctor and

13   say come and see him and evaluate him and take an

14   MRI and all those things.  Again, that's

15   overstepping my bounds, well outside the scope of my

16   expertise and I can't make any comments on what

17   really happens in a jail because I've never been in

18   a jail.

19        Q     So you really can't make any comment as to

20   whether or not anybody in the jail fell below any

21   standard of treatment?

22              MR. SMOLEN:  Objection to the form.

23              THE WITNESS:  I can make comments to the

24   patient -- no, that's not true.

25        Q     (By Mr. Artus)  Okay.

Clinton Baird, MD                              August 10, 2019

Page 156

1          MR. SMOLEN:   He can testify about what is
2     in his report, guys, that's what he can testify
3     about.
4          Q     (By Mr. Artus)   Well, what I want to know
5     is -- yeah, that's what I want to know, what are you
6     going to testify about, are you going to testify
7     about any kind of standard of care that --
8          A     If someone asks me, should this patient
9     have been treated on day three in the jail when he
10    was laying on the ground, then I'm going to say,
11    yes, he should have been evaluated when --
12         Q     What do you mean day three?   Where are you
13    getting that number?
14         A     Day four, day five, whatever day, whatever
15    day he's laying on the floor in jail and saying he
16    can't move, as a medical professional, I'm going to
17    say the patient should be evaluated, as a jail
18    trained person, professional, I'm going to say I
19    don't know.   I'm sure there's ten other guys laying
20    on the ground and I don't know the procedure for
21    when the guy's laying on the ground leads them to a
22    medical evaluation, but in this case, the guy laying
23    on the ground, in fact, did have a problem, and any
24    trained medical professional would tell you that
25    someone complaining of neck pain, not moving their

Clinton Baird, MD                              August 10, 2019

                                                    Page 157

1    arms requires further evaluation.

2         Q    Okay.

3         A    That's all I can say.  As so far as

4    regards whether ten guys laying on the ground in

5    jail, why this guy gets evaluation, that's not for

6    me to say.  I'm not a trained --

7         Q    Can you give any testimony that -- we know

8    that Turn Key sent him to the hospital on November

9    14th, 2016.

10        A    Yeah, deep in -- deep into his problem,

11   yes.

12        Q    And -- but can you testify as to when they

13   should have sent them?

14        A    That is --

15             MR. SMOLEN:  He just did, the moment his

16   arms stopped moving.

17             THE WITNESS:  They -- let me look back,

18   take me back to Dr. Trinidad's note.

19        Q    (By Mr. Artus)  It's Defendant's 10.

20        A    Which exhibit is it?

21        Q    Defendant's Exhibit 10.

22        A    Okay.  Is it 13 maybe?

23        Q    No, Defendant's Exhibit 10.

24        A    I don't see a Exhibit 10.  13, 14, 12, 3,

25   I seem to have parted from it.

Clinton Baird, MD                              August 10, 2019

Page 173

1    arterial blood can't get into the spinal cord and

2    there's a stroke.  And that's an irreversible

3    process, and addressing the mechanics at that point

4    typically isn't going to change the situation with

5    regard to the outcome.  Because of that

6    unpredictable nature of when that process could

7    occur, that's why it's critically urgent to identify

8    an epidural abscess as soon as possible and treat it

9    as soon as possible, because you don't know when

10   that may happen.

11        Q    Let me ask you this, defense counsel asked

12   you if it's possible you told Mr. Buchanan that he

13   needed to seek counsel or do something about his

14   lack of treatment, do you recall that question?

15        A    Something in that regard, yeah.

16        Q    You said, yeah, it's possible that you

17   could have told him that based on how messed up

18   everything was, do you recall that?

19             MR. ARTUS:  Object to the form.

20             THE WITNESS:  Something like that, yes, I

21   said.

22        Q    (By Mr. Smolen)  Why don't you just tell

23   me why everything was messed up from your opinion,

24   based on what you saw in the way Mr. Buchanan

25   presented on November 15th of 2016?

Clinton Baird, MD                              August 10, 2019

Page 174

1                MR. YOUNG:  Object to the form.

2                MR. ARTUS:  Object to the form.

3                THE WITNESS:  My opinion with this

4      whole -- the whole matter is with regard to the

5      diagnosis, the treatment is not the issue, the

6      health care delivered in the jail is never going to

7      provide adequate treatment for an epidural abscess,

8      there's -- the capacity and the means to provide

9      treatment for it is not available in the jail,

10     however, there is the capacity to make a diagnosis,

11     and/or to lead to the proper medical professionals

12     that can make the diagnosis.

13                And the clinical history goes back to the

14     patient had an injury to his neck, as demonstrated

15     by the initial imaging and physical exam findings

16     related to the bicycle-automobile collision.  And

17     then he ends up in the hospital with multiple

18     medical co-morbidities, he's already a poor

19     medically health condition patient, and then he --

20     so that's the setup for being keenly aware that this

21     guy may have troubles, and probably should have --

22        Q    (By Mr. Smolen)  He's at risk?

23        A    -- some regular medical evaluation.  This

24     note here states that he wasn't evaluated by a

25     physician during, it seems like, any of this --

Clinton Baird, MD                                    August 10, 2019

Page 175

1       Q      He wasn't.

2       A      -- event.  And someone with that high of

3   medical risk and those kind of complaints, in my

4   opinion, this guy should have been sent away from

5   the jail, he should have been evaluated.  I mean,

6   he -- his intake evaluation is concerning.  His

7   intake evaluation by the LPN, if this is factual, is

8   concerning.  Let alone, November 11th and November

9   10th, I guess November 11th when he couldn't hold up

10  the phone.

11          The -- so my piece of being critical of

12  this whole thing is a grossly negligent delay in

13  diagnosis.  A human being is laying on the floor in

14  his own urine, and a normal individual, an untrained

15  medical professional, I'm sorry, an untrained human

16  being with no medical background could say, hey,

17  that guy, something's wrong with him.

18      Q      He needs help?

19      A      Yeah, and he needs help.  And so to have

20  the healthcare team not aware to make a further

21  evaluation, in my untrained jail situation, is

22  grossly wrong.

23      Q      Is an epidural abscess painful, can it be

24  painful?

25      A      It can be painful, but I've seen some