## VERIFICATION

I, Todd R. Wilcox, M.D., declare under penalty of perjury under the laws of the United States, that I drafted the attached expert report, dated April 10, 2019, and that the statements and opinions therein are true and correct, to the best of my knowledge and belief.

Executed on: September 30, 2019

_____
Todd R. Wilcox, M.D.



PLAINTIFF'S EXHIBIT 14



April 10, 2019

Bob Blakemore
Smolen, Smolen, and Roytman, PLLC
701 South Cincinnati Avenue
Tulsa, OK. 74119

**RE: Buchanan v Turn Key Health, et al**

Dear Mr. Blakemore,

In accordance with your request, I have examined materials provided by your office related to the healthcare of Mr. James Buchanan. Please accept this letter report as a summary of my opinions to date in the above referenced matters.

**Qualifications**

My opinion is based on my 25 years of experience in the design, administration, and delivery of correctional healthcare in various environments as well as the national standards that govern the field. I actively practice in correctional healthcare as the Medical Director of the Salt Lake County Jail System, and I am frequently called upon around the country as a consultant to assist facilities in improving their delivery of care. I have achieved both of the advanced levels of certification in correctional healthcare (CCHP-A and CCHP-P) from the National Commission on Correctional Health Care. Additionally, I have served as the President of the American College of Correctional Physicians and I am a Fellow of that organization.

**Materials Reviewed**

In providing this report, I have reviewed the following materials, provided by your office:

**4760 SOUTH HIGHLAND DRIVE #105   SALT LAKE CITY, UT 84117**
**385-743-1744            TRWILCOX@WELLCON.NET**

1. James Douglas Buchanan Depo Transcript
2. Katie McCullar Depo Transcript
3. Rosemary Kotas Depo Transcript
4. Amended Complaint
5. Hillcrest Records
6. Jail Records (DDR 1, 001-042)
7. Jail Policies (DDR 2, 001-130)
8. Eastar Records, etc. (DDR16, 001-23)
9. Jail Logs (DDR 30, 001-514)
10. Medical Complaint Log (DDR 30, 515)
11. Muskogee EMS Records
12. Oklahoma Spine-Dr. Baird Records
13. Reliant Records
14. Turn Key Policy Manual (RFP # 1 - PP&P)
15. Turn Key Contract (RFP #33 Contract)
16. Turn Key Proposal (RFP #34 – Proposal)
17. Turn Key Medical Records
18. Wagoner Community Hospital Records
19. Video of Brother's Jail Visit

**General Timeline**

On or about September 16, 2016, Mr. Buchanan, while riding a bicycle, was hit by an automobile and sustained multisystem trauma. ***See* Eastar Health System Records at PLAINTIFF_000455 – 000462.** Buchanan was initially treated by Eastar Health System. X-Ray and CT Records from Eastar show:

> "bruising/hematoma lateral left base of the neck and left supraclavicular region and additional large discrete hematoma in the prevertebral or retropharyngeal region extending along the length of the neck from C1 to T1 and likely extending into the mediastinum. ... Possibly related to injury of the anterior longitudinal ligament of the cervical spine.... Extracalvarial soft tissue swelling lateral to the left orbit and anteriorly and laterally on the Left [of his head]... There are acute appearing fractures involving the left fourth, fifth, sixth, seventh ribs at their lateral aspects... prevertebral or retropharyngeal hemorrhage seen in the neck extends into the posterior mediastinum with this portion of the hematoma within the posterior mediastinum"

**Eastar Health System Records at PLAINTIFF_000457.** Buchanan was transferred to Saint John in Tulsa, where he was hospitalized over the course of approximately six (6) weeks due to his injuries. He was discharged from Saint John Medical Center on or about October 30, 2016.

**Hillcrest Records at PLAINTIFF_000002 – 000005.**  Upon discharge from Saint John, Mr. Buchanan was ambulatory. **Hillcrest Records at PLAINTIFF_000002 – 000005.**

On November 3, 2016, Mr. Buchanan was booked into the Muskogee County Jail. Upon booking, Mr. Buchanan reported to the booking personnel employed by the Muskogee County Sheriff's Office and Turn Key Health Clinics, LLC that he had been in a motor vehicle accident on September 16, 2016. *See* **DDR #1, 004, 009, 010.** Mr. Buchanan further advised MCSO and Turn Key personnel that he was taking pain medication and that he was suffering from broken ribs, a collapsed lung, "burnt fingers" and neck problems. *See* **DDR #1, 004, 005, 009, 010.** The Turn Key booking nurse additionally observed that Mr. Buchanan was having "increased discomfort with movement" and that Buchanan requested to sit on a mat. *See* **Kotas Dep at 138-40;** *See* **DDR #1, 009.** However, next to the portion of the form for "recommended housing based on medical/mental health evaluation", the form is left blank. **DDR #1, 010.** Also, while the form asks, "instructed on how to access medical/mental health care?", nothing is checked next to the question. **DDR #1, 010.** Turn Key's "Access to Care" policy requires that "Upon arrival at the facility, each inmate will be given an oral and/or written orientation to the healthcare unit which will include obtaining emergency services, and accessing sick call." **TK_RFP#1007.** However, it appears that Buchanan, despite his serious reported medical history, injuries, and observed "increased discomfort with movement", was not given orientation in accessing health care services at the jail. Buchanan remained unaware that he could make a written request for medical care. **Buchanan Dep at 187.** The booking nurse, Nurse Kotas, wrote the above-discussed information down on the form about Buchanan's medical history, problems and injuries, but did not know what would be done with the information. *See* **Kotas Dep at 141-42.**

After the booking process with Nurse Kotas, Mr. Buchanan was placed in a general population pod, with no appointment set for him to see a physician.

On November 4, 2016, Buchanan was placed on the "sick call" list. **DDR #30, 063.** A nurse's note indicates that Dr. Cooper, the Jail's physician, gave a telephone order for Naproxen. **DDR #1, 011.** Dr. Cooper did not see Mr. Buchanan, despite the information in his booking form about his serious medical history and injuries. In fact, Buchanan never saw Dr. Cooper during his stay at the jail. **Buchanan Dep at 176.** During this sick call, Buchanan told the nurse that he needed to go to the hospital due to severe pain. **Buchanan Dep at 177-78.** The nurse told Buchanan that he would be given Naproxen and that he should go back and lay down. **Buchanan Dep at 178.**

Also, on November 4, 2016, Nurse Kotas got Buchanan's signature on a medical records release. **DDR #16, 017.** Kotas placed the signed medical records release in a "box" with the apparent belief that someone at the Jail, during the morning shift, would "fax" the release to obtain Mr. Buchanan's medical records from the hospital. *See* **Kotas Dep at 149-52.** The release indicates that Nurse Kotas filled it out for the purposes of "coordination of care". **DDR #16, 017.** However, Kotas did not send the records release to the hospital, and, as discussed below, the medical records release was not faxed to Eastar until November 14, 2016, ten days after it was filled out by Nurse Kotas. **DDR #16, 016, 017; Kotas Dep at 149-52.**

After the November 4 sick call, Mr. Buchanan was returned to the general population pod. It is my understanding that there was surveillance video of Buchanan -- from the pod -- that his lawyers requested be preserved by the jail, but that that video was lost or destroyed. It is also my understanding that two of Buchanan's pod mates have stated that they observed Buchanan in

extreme pain and having difficulty with movement, and that his condition rapidly and obviously deteriorated.

According to Mr. Buchanan, after he returned to the pod, nurses would come by only once a day to give him Naproxen, although the records indicate that the nurses provided him with Naproxen twice a day. **Buchanan Dep at 179-80.**

Early on in his incarceration, Buchanan began to lose feeling in his left arm. **Buchanan Dep at 183-84.** Each time that the nurse would come by the pod, including for pill pass, Buchanan would tell the nurse that he was losing feeling in his left arm, was in pain and needed to see the doctor. **Buchanan Dep at 183-84.** Buchanan also complained many times to the jailers that he was losing feeling in his left arm, was in pain and needed to see the doctor. **Buchanan Dep at 183-84.** The "whole time" that Buchanan was in the pod, he was laying on a 6-inch mat and crying out in pain. **Buchanan Dep at 184.** As his condition grew worse, other inmates in the pod would use the intercom system to try and get medical attention for Buchanan. **Buchanan Dep at 184-85.** The other inmates began to "pray" for Buchanan. **Buchanan Dep at 187.**

By his sixth day in the jail, approximately November 8, Buchanan had lost feeling in both of his arms. **Buchanan Dep at 188, 193.** Buchanan testified that he was laying on the mat in the pod, crying in pain, without use of his arms, but he could not get anyone at the jail to help him. **Buchanan Dep at 197-98.** Buchanan testified that be the sixth day in the jail, he could no longer feed or hydrate himself. **Buchanan Dep at 198.** Buchanan continued to complain every time he saw a nurse or jailer that he was in pain, needed help and needed to see a doctor. **Buchanan Dep at 199-200.** However, according to Buchanan, no one would help him. **Buchanan Dep at 200-201.**

There is a "Medical Complaint Log" in the records, dated November 11, 2016. **DDR #30, 515.** The log indicates that Buchanan was complaining to a nurse of decreased range of motion in his upper and lower extremities, pain throughout his body and limited range of motion in his neck. **DDR #30, 515; McCullar Dep at 158-59.** Despite the documented complaints of decreased range of motion in his upper and lower extremities, pain throughout his body and limited range of motion in his neck, Mr. Buchanan's vital signs were not taken and an assessment was not completed. **McCullar Dep at 159.** Turn Key's protocol regarding MUSCULAR SKELETAL / SPRAINS should have been applied, but was not. **TK_RFP#1043; McCullar Dep at 263.** The MUSCULAR SKELETAL / SPRAINS protocol required the nurse to document Buchanan's Pulse, respirations, temperature, O2, distal injuries, appearance of injury, range of motion and assessment. **TK_RFP#1043.** This was not done. There is no indication in the records that any medical assessment was done on November 11. Instead, Buchanan was scheduled for an appointment to see the doctor on November 15, 2016. **DDR #30, 515.**

Also on November 11, Buchanan had a short visit with his brother that was captured on video. In order to speak with his brother, Buchanan had to be lifted up off of the ground by another inmate. During the visit, Buchanan complained about nerve damage and pain, that he had been asking for medical help and that no one at the jail would help him. Buchanan was so weak during the call that he had to put down the receiver and have another inmate hold the phone to his ear. Buchanan cried out in pain during the call, and collapsed in the pod at the conclusion of the visit. **See Brother Video Call.**

Around the ninth to the tenth day in jail, approximately November 12 or 13, Buchanan lost use of his legs. **Buchanan Dep at 168-69.** Throughout his stay at the Jail, he was laying on the mat in the pod, crying in pain, and asking to for help and to see a doctor. **Buchanan Dep at 197-**

98.   He never saw a doctor, his vitals were not taken (until 8:10 p.m. on November 14) and he was not sent to an outside facility at any time until the night of November 14, when he was sent to the hospital.

At 11:27 a.m. on November 14, 2016, Buchanan was seen by a nurse at the jail, Katie McCullar, an LPN. **DDR #1, 012.** Nurse McCullar noted that she was "called to inmate's pod because pt. could not walk" and that Buchanan "complained of worsening pain and inability to move lower extremities", as well as "tingling in legs." **DDR #1, 012.** Again, the Turn Key MUSCULAR SKELETAL / SPRAINS protocol required the nurse to document Buchanan's pulse, respirations, temperature, O2, distal injuries, appearance of injury, range of motion and assessment. **TK_RFP#1043.** Nurse McCullar admits that she did not document any of the objective data. **McCullar Dep at 247-50.** McCullar did not take Buchanan's vital signs or send him to the hospital. Instead, she called Dr. Cooper and notified him of Mr. Buchanan's condition. **DDR #1, 012.** Dr. Cooper placed Mr. Buchanan on the "provider list for the upcoming week". **DDR #1, 012.** Nurse McCullar additionally notes that she "requested records f/ recent hospitalization." **DDR #1, 012.** It appears that the medical records authorization, originally filled out by Nurse Kotas on November 4, was finally faxed to Eastar, by Nurse McCullar, the afternoon of November 14. **DDR #16, 016-17.** It also appears that Eastar faxed the records to the jail that same afternoon, apparently within an hour of receiving the request and authorization from the Jail. **DDR #16, 001-8.** Still, Nurse McCullar has no recollection of reviewing the Eastar records. **McCullar Dep at 91.** And Nurse McCullar did not note that she reviewed the Eastar records. **McCullar Dep at 275-76.**

Apparently, after Nurse McCullar wrote her note at around 11:27 a.m. on November 14, she simply left him in the pod without providing any assistance. Hours later, Buchanan had to rely

on other inmates to physically carry him to the dinner table. **Buchanan Dep at 200-01.** While having dinner, Buchanan urinated all over himself, and one of the other inmates asked a jailer on duty to call a medical emergency. **Buchanan Dep at 200-01.** Twenty minutes or so later, the jailer ordered Buchanan to "get up and take a shower." **Buchanan Dep at 200-01.** Buchanan told the jailer that he could not get up and could not walk. **Buchanan Dep at 200-01.** After arguing with Mr. Buchanan for about 20 minutes, the jailer left, apparently to go watch video of the pod Buchanan was in. **Buchanan Dep at 202.** According to Buchanan, the jailer told him that after seeing video of inmates dragging Buchanan around the pod for the last 24 hours, she was going to call for an ambulance. **Buchanan Dep at 202.**

At approximately 8:10 p.m. on November 14, Nurse Kotas noted that she had been called to the pod and saw Buchanan sitting with his head on a table. **DDR #1, 013**. Kotas reported that Buchanan was reporting his pain level had increased to "10" on a scale from one to ten. **DDR #1, 013**. Kotas took some of his vitals, which she reported as an elevated heart rate of 116 and blood pressure of 139 over 93. **DDR #1, 013, Kotas Dep. at 176-82.** Kotas reported a decreased range of motion of all extremities and of the neck and that Buchanan was lying in his own urine. **DDR #1, 013.** Buchanan was sent to the hospital at approximately 8:45 p.m. **DDR #30, 473.**

After his admission to Hillcrest Medical Center, Mr. Buchanan was diagnosed with quadriplegia and a cervical epidural abscess. A cervical epidural abscess is essentially a collection of pus (infected material) and germs between the outer covering of the brain and spinal cord and the bones of the spine or neck. He required admission to the ICU and multiple invasive surgeries.

As noted by Clinton Baird, M.D., a spinal surgeon,

> [Mr. Buchanan] is a 54-year-old gentleman who had a very complicated history… [H]e was involved in being struck by a car while riding bicycle several weeks ago. … He ended up finding himself in jail and it was during this time in jail that he had very significant clinical deterioration in his neurologic status. [I]t is obvious that he

likely developed the beginnings of cervical epidural abscess infection in result of his critical illness [and] hospitalization, but then while in jail, he deteriorated significantly and his clinical deterioration went unrecognized and untreated until he was nearly completely quadriplegic. **Oklahoma Spine - Dr. Baird Records at PLAINTIFF_000027.**

**Statement of Opinions**

1. The healthcare (and lack thereof) provided to Mr. Buchanan from November 3, 2016 to November 14, 2016 by Turn Key Health Clinics, LLC was substantially beneath the standard of medical care.

2. Mr. Buchanan's condition of an epidural abscess should have been identified and could have easily been addressed well before he lost permanent neurological function. Mr. Buchanan articulated his progressive neurological decline to both medical and custody staff and no semblance of reasonable healthcare was provided to him during his entire stay in the jail. He was never assessed by a nurse, no vital signs were taken until the very end, and he was never seen by a medical provider despite his clear progression. Had any medical provider seen him during this time period, it is likely that they would have easily assessed his pending neurological emergency and had him sent out for definitive care.

3. In reviewing this case, it is clear that the circumstances that allowed this patient to go from ambulatory to quadriplegic over 11 days without any meaningful intervention are due to systemic failures in the Turn Key health program. A few of the key issues include:

    a. LPN's were working unsupervised in this system as they only on-site healthcare staff
    b. Outside medical records were not reviewed
    c. There was no reasonable access to a physician or mid-level provider in this system
    d. The on-call process was deficient
    e. The medical records in this system are grossly inadequate
    f. The system utilizes nursing protocols to avoid having patients see providers
    g. The nursing protocols are illegal and they create a situation where an LPN is practicing medicine
    h. Access to healthcare was compromised
    i. Officers did not interface adequately with the healthcare staff to advocate for Mr. Buchanan

4. The pain management provided to Mr. Buchanan during his incarceration did not meet the standard of care. The ongoing nature of his severe pain should have been a major clue to the clinical staff that the patient had a serious medical condition. Instead, he was provided Naprosyn and never assessed for the adequacy of treatment or why the Naprosyn was inadequate for his situation. Epidural abscesses are incredibly painful conditions. Merely addressing pain adequately and appropriately in this patient would

have led to a conclusion that he needed care outside of what could be provided in the jail. His untreated and unassessed severe pain represents indifference to his serious medical condition that was obvious to even his fellow prisoners.

5. Had Mr. Buchanan's situation been taken seriously and his symptoms been properly considered and his situation properly evaluated, he could have been easily treated for his underlying condition and retained his neurologic function.

The opinions in this report, based upon the materials reviewed, and the education, experience, and knowledge of the author, are presented with a reasonable degree of scientific and medical certainty. These opinions are based on the assessment of work accomplished to date, and I reserve the right to change any opinions expressed upon production of additional materials.

Respectfully submitted,

Todd R. Wilcox, MD, MBA, FACCP
Medical Director
Wellcon, Inc.